

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS (213113)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
  – and –
DARREN J. ROBBINS (168593)
DAVID C. WALTON (167268)
CATHERINE J. KOWALEWSKI (216665)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com
davew@csgrr.com
katek@csgrr.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORI WEINRIB, Individually and on Behalf of All Others Similarly Situated, ) | No. CV08 1405 |
| ) | |
| Plaintiff, ) | CLASS ACTION |
| ) | |
| vs. ) | COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS |
| ) | |
| THE PMI GROUP, INC., L. STEPHEN SMITH, DAVID H. KATKOV and DONALD P. LOFE, JR., ) | |
| ) | |
| Defendants. ) | |
| ) | DEMAND FOR JURY TRIAL |

# INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of The PMI Group, Inc. ("PMI" or the "Company") between November 2, 2006 and March 3, 2008, inclusive (the "Class Period"), against PMI and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.     PMI, through its subsidiaries, provides credit enhancement products designed to promote homeownership and facilitate mortgage transactions in the capital markets in the United States, Australia, New Zealand and the European Union.

3.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, PMI stock traded at artificially inflated prices during the Class Period, reaching its Class Period high of $50.21 per share in February 2007.

4.     As the real estate and credit markets softened in late 2006 and into 2007, defendants repeatedly assured PMI investors that the Company had been very selective in its underwriting standards in the past and maintained adequate loss reserves to weather the deteriorating real estate and credit markets. Defendants further issued materially false and misleading statements regarding the Company's business and financial results related to its investment in FGIC Corporation ("FGIC") and FGIC's bond insurance arm Financial Guaranty Insurance Company ("Financial Guaranty").

5.     As late as the summer of 2007, as the housing and credit crisis deepened, defendants continued to play down and conceal PMI's growing exposure to these problems. As a result, PMI's stock continued to be artificially inflated due to defendants' false statements.

6.     Beginning in late July 2007 and continuing throughout the Fall of 2007, PMI began to acknowledge that issues surrounding its exposure to anticipated losses and defaults related to its book of business written in 2005 through most of 2007 were more serious than previously represented due to a failure to engage in proper underwriting practices. PMI further announced mounting losses due to a large increase in both the amount and severity of defaults and due to its investment in FGIC and the problems that FGIC was experiencing as a bond insurer.

7.    As the truth about PMI's financials and business outlook emerged, the artificial inflation in the Company's stock came out and the stock began to drop.

8.    On January 17, 2008, the U.S. Commerce Department reported a significant decline in new-home construction in the previous year.  The Commerce Department reported that work began on 1.35 million houses and apartments in 2007, down 24.8% from 2006.  This decline was the second-biggest annual decline on record, exceeded only by a 26% percent plunge in 1980. Additionally, on the same date, Moody's Investors Service announced that it had placed Ambac Financial Group Inc., one of the nation's leading bond insurers and a close competitor of FGIC, on review for possible downgrades due to much higher than expected losses on mortgage-related bonds. These announcements were strong indicators as to the depth and severity of the problems in the housing market.

9.    Upon this news, shares in the Company's stock closed down $1.29 per share to close at $6.48 per share on January 17, 2008, a one-day decline of 17%.

10.    Then, on March 3, 2008, after the market closed, PMI issued a press release entitled "The PMI Group, Inc. Reports Preliminary Fourth Quarter 2007 Financial Results for Certain Segments."  The release stated in part:

> PMI Group, Inc. (the "Company") today announced that due to delays in obtaining 2007 financial results from FGIC Corporation ("FGIC") the Company has filed a Form 12b-25 with the Securities and Exchange Commission ("SEC") for a late filing of its 2007 Form 10-K. In this SEC filing and as outlined below in financial highlights, the Company provides financial results for its U.S. Mortgage Insurance Operations and International Operations and discusses its expectations for its Financial Guaranty segment. The Company plans to issue its financial results for the fourth quarter of 2007 before the financial markets open (approximately 6:00 AM ET) on Wednesday, March 12, 2008, followed by a conference call at 11:30 AM ET.
>
> "Our preliminary fourth quarter results for our U.S. Mortgage Insurance and International Operations demonstrate that we are facing challenging market conditions, particularly in the U.S. housing market," said The PMI Group Inc.'s Chairman and CEO Steve Smith. "We have implemented a plan to address these challenges, which we will discuss in detail on our conference call next week. A cornerstone of the plan and our strategic focus going forward is our core business, mortgage insurance, which we believe offers PMI long term opportunities for growth and profitability. Within our Financial Guaranty segment, we will continue to work to stabilize our equity investments in FGIC and RAM Re, but we will not be contributing any additional capital to these companies."

**Financial Highlights of U.S. and International Mortgage Insurance Operations**

- *U.S. Mortgage Insurance Operations – reported a net loss of $236.0 million in the fourth quarter of 2007 compared to net income of $77.2 million in the fourth quarter of 2006. The loss in the fourth quarter of 2007 was driven in large part by an increase in losses and loss adjustment expenses resulting from an increase in our default inventory, higher claim rates and higher average claim sizes.* For the full year ended December 31, 2007, U.S. Mortgage Insurance Operations reported a net loss of $190.8 million compared to net income of $290.3 million for the full year of 2006. The Company estimates that U.S. Mortgage Insurance Operations' losses and loss adjustment expenses in 2007 were approximately $1.1 billion.

- International Operations – reported a net loss of $10.1 million in the fourth quarter of 2007 compared to net income of $20.0 million in the fourth quarter of 2006. Fourth quarter 2007 results were driven primarily by a loss of $29.6 million in PMI Europe as a result of increases in losses and loss adjustment expenses and mark-to-market losses associated with credit default swap derivative contracts, net income of $17.8 million in PMI Australia and net income of $2.9 million in PMI Asia. For the full year ended December 31, 2007, International Operations reported net income of $55.0 million compared to net income of $103.5 million for the full year of 2006.

- Corporate and Other – reported a net loss of $3.8 million in the fourth quarter of 2007 compared to a net loss of $25.1 million in the fourth quarter of 2006. For the full year ended December 31, 2007, Corporate and Other reported a net loss of $49.5 million compared to a net loss of $71.4 million for the full year of 2006.

**Financial Guaranty Segment**

Because the Company lacks the necessary financial information from FGIC to complete its consolidated financial statements, the Company is not yet able to calculate its consolidated results of operations for the full year ended 2007 and also is not able to calculate the financial results of its Financial Guaranty segment. *The Company expects that its Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during those periods. In connection with the preparation of the Company's consolidated financial statements, the Company is conducting an analysis to determine whether the value of its investment in FGIC was impaired as of December 31, 2007.* This analysis cannot be completed until the Company receives financial information from FGIC necessary for the Company to complete its consolidated financial statements.

(Footnotes omitted.)

11.    Additionally on March 3, 2008, in a Form 12b-25, the Company announced that it would be delayed in filing its Form 10-K for year-end 2007, stating in part:

> The PMI Group, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

> The Company is unable to complete its consolidated financial statements for the year ended December 31, 2007 because it is currently awaiting financial information from an equity investee, FGIC Corporation ("FGIC"), that is necessary for the Company to complete its financial statements. *FGIC has informed the Company that it is in the process of completing its financial statements, but that it has not been able to do so due to the time and effort involved in determining the amount of loss reserves related to residential mortgage-backed securities and collateralized debt obligations of asset-backed securities. The determination of such reserves has been affected by the unprecedented rapid and severe deterioration of the residential mortgage market.*

12.    On this news, PMI's stock collapsed to $6.43 per share on March 4, 2008, a one-day decline of 5%. This was the lowest PMI's stock had traded in its twelve years as a public company.

13.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company's investment in FGIC was materially impaired as FGIC's bond insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to the plunge in value of mortgage debt;

(b)    The Company was materially overstating its financial results by failing to properly value its investment in FGIC and by failing to write down that investment in a timely fashion in violation of Generally Accepted Accounting Principles ("GAAP");

(c)    The Company was not adequately accounting for its loss reserves in violation of GAAP, causing its financial results to be materially misstated;

(d)    The Company failed to engage in proper underwriting practices for its book of business related to insurance written in 2005 through most of 2007;

(e)    The Company had far greater exposure to anticipated losses and defaults related to its book of business related to insurance written in 2005 through most of 2007 than it had previously disclosed;

1          (f)      Given the deterioration and the increased volatility in the subprime market,

2   the Company would be forced to tighten its standards and stop writing insurance policies to certain

3   categories of borrowers which would have a direct material negative impact on its book of business

4   going forward; and

5          (g)      Given the increased volatility in the subprime market, the Company had no

6   reasonable basis to make projections about its incurred losses or about its new insurance written. As

7   a result, the Company's projections issued during the Class Period about its earnings for 2007 and

8   2008 were at a minimum reckless.

9          14.      As a result of defendants' false statements, PMI's stock price traded at inflated levels

10  during the Class Period.  However, after the revelations seeped into the market, the Company's

11  shares were hammered by massive sales, sending them down more than 87% from their Class Period

12  high of $50.21 per share in February 2007.

13                              **JURISDICTION AND VENUE**

14         15.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise

15  under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

16         16.      (a)      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the

17  false and misleading statements were made in or issued from this District.

18                  (b)      PMI's principal executive offices are located at 3003 Oak Road, Walnut

19  Creek, California.

20                                      **PARTIES**

21         17.      Plaintiff Lori Weinrib purchased PMI common stock as described in the attached

22  certification and was damaged thereby.

23         18.      Defendant PMI, through its subsidiaries, provides credit enhancement products that

24  promote homeownership and facilitate mortgage transactions in the capital markets in the United

25  States, Australia, New Zealand and the European Union.  PMI stock trades under the symbol PMI on

26  the New York Stock Exchange.

27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                    - 5 -

19.    Defendant L. Stephen Smith ("Smith") is, and at all relevant times was, Chairman and Chief Executive Officer ("CEO") of the Company. During the Class Period, Smith disposed of $6.9 million worth of his PMI stock while the stock was artificially inflated.

20.    Defendant David H. Katkov ("Katkov") is, and at all relevant times was, Executive Vice President of the Company. During the Class Period, Katkov disposed of $485,414 worth of his PMI stock while the stock was artificially inflated.

21.    Defendant Donald P. Lofe, Jr. ("Lofe") was, at relevant times, Executive Vice President and Chief Financial Officer ("CFO") of the Company.

22.    Defendants Smith, Katkov and Lofe (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of PMI's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶30-36, 38, 40 and 44.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about PMI. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of PMI common stock was a success, as it: (i) deceived the investing public regarding PMI's prospects and business; (ii) artificially inflated the price of PMI common stock; (iii) allowed certain of the defendants to reap over $7.3 million in insider selling proceeds; and (iv) caused plaintiff and other members of the Class to purchase PMI common stock at inflated prices.

1        24.    Defendants were also motivated by the compensation arrangements of PMI.

2   Defendants' compensation was in large part determined by the reported financial performance of the

3   Company:

4            PMI pays for, and rewards, performance. At the executive level, this means
         that nearly all aspects of our compensation program are designed in whole or in part
5        to reward individual excellence and achievement that has led to the achievement of
         corporate goals. Accordingly, the Committee's compensation decisions are driven by
6        both PMI's performance and the Committee's assessment of each executive officer's
         performance. Stellar individual performance that has not resulted in collective
7        achievement is not the primary goal and, therefore, our executive compensation
         program metrics are not based primarily on individual achievement. *Rather, a*
8        *significant portion of executive compensation is contingent upon the achievement*
         *of PMI's short- and long-term financial and other corporate objectives, including*
9        *earnings growth and the creation of shareholder value. In particular, annual*
         *incentive awards are based upon net income and other quantitative and qualitative*
10       *factors, including the achievement of pre-established corporate goals.* The
         Committee also takes into account the performance of each executive. Key factors
11       affecting the Committee's individual assessments include the nature and scope of the
         executive officer's responsibilities, and his or her level of experience, effectiveness
12       in leading corporate initiatives, and success in creating a culture of integrity and
         compliance.

13                          *        *        *

14

15           PERFORMANCE-BASED ANNUAL INCENTIVES. PMI's compensation
         program includes annual cash incentive award opportunities. The Committee
16       believes that annual incentives further the goal of tying a significant portion of
         compensation to PMI's achievement of its strategic annual goals and provides a
17       means by which to reward superior performance. The Committee believes that
         annual incentive opportunities are necessary to attract and retain talented and
18       experienced executives. Annual incentive awards are primarily designed to focus
         management on financial measures and corporate initiatives that promote stockholder
19       value. Accordingly, awards are predominantly tied to PMI's performance and, to a
         lesser extent, the Committee's overall assessment of the executive's performance.

20           Annual incentive awards to PMI's executives are governed by PMI's Bonus
         Incentive Plan. *The Plan provides for the payment of bonuses from a pool that is a*
21       *percentage (not to exceed 5%) of PMI's consolidated net income for the year. The*
         *size of the aggregate net income bonus pool is determined annually by the*
22       *Committee. The Plan does not provide the Committee with the discretion to pay*
         *aggregate bonuses under the Plan in excess of the net income pool.* The Plan also
23       limits the amount that can be paid to any one executive to 30% of the net income
         pool.

24                          *        *        *

25       *In 2006, the Committee established the following Company criteria for the*
26       *2006 performance period:*

27           1.    *2006 consolidated net income;*

28

2.   *2006 net income from operations overseen by PMI Capital Corporation, a wholly owned subsidiary of PMI; and*

3.   *2006 net income from PMI's U.S. mortgage insurance operations.*

These criteria excluded realized gains and losses, extraordinary items under GAAP, and any impact of changes in accounting principles, and adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors. The Committee weighted these three criteria 40%, 30% and 30%, respectively.

The Committee selected these criteria for 2006 because, among other things, it believes that: (i) net income is a fundamental criteria of company performance used by management, the Board of Directors and PMI's shareholders; and (ii) the focus on the net income of PMI's two operating segments, PMI Capital Corporation and PMI's U.S. mortgage insurance operations, encourages continued diversification and growth as well as commitment to PMI's core operations. The Committee established threshold, target and maximum numeric goals for the net income criteria. The numerical goals associated with "target" represented the financial goals contained in the Board-approved corporate operating plan for 2006. Based upon the facts that (i) the Committee has not paid bonus awards at the maximum level under the Plan and (ii) the criteria associated with potential maximum bonus payouts for 2006 were significantly higher than the financial goals contained in the operating plan, the Committee believes that the criteria were sufficiently challenging and difficult to focus executives on superior achievement of the Company's short-term objectives.

\*     \*     \*

*Corporate Performance Measures for 2007 Annual Incentives.* In early 2007, the Committee set the maximum bonus pool and maximum bonus amounts that can be earned in 2007 under the Bonus Incentive Plan as follows:

• The bonus pool was set at 5% of net income; and

• The 2007 maximum bonus opportunity, expressed as a percentage of base salary, for each of the Named Executive Officers is: Mr. Smith – 240%, Mr. Lofe – 170%, Mr. Shuster – 185%, Mr. Bacigalupi – 170% and Mr. Katkov – 175%.

The Committee also established the following criteria that it will review, in conjunction with other quantitative and qualitative factors, when it determines whether, and to what extent, to award bonuses from the aggregate bonus pool pursuant to the Plan:

• *The Company income criteria*:

    • 2007 consolidated net income,

    • 2007 net income from operations overseen by PMI Capital Corporation, and

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                    - 8 -

- 2007 underwriting income from PMI's U.S. mortgage insurance operations.

These criteria exclude realized gains/losses, extraordinary items under GAAP, any impact of changes in accounting principles, adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors and the effect of FGIC refundings. The Committee weighted these three criteria equally; and

- Attainment of various corporate objectives criteria, including financial measures such as return on equity; strategic planning and strategic objectives; capital management; business segment synergies; investor, rating agency and governmental relations activities; and key officer development.

The Committee weighted the income criteria and the corporate objectives criteria at 65% and 35%, respectively.

In addition to these criteria, the Committee considers other quantitative and qualitative factors, including individual performance, retention, reward and motivation. The Committee believes that the net income bonus pool, the criteria and other factors will motivate our executive officers to achieve our 2007 goals in a manner consistent with the creation of long-term shareholder value, and that they are sufficiently challenging and difficult to achieve to focus executives on superior achievement of the Company's short-term objectives.

25.    For 2006, defendants received the following amounts:

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| L. Stephen Smith Director, President, Chief Executive Officer and Chief Operating Officer | 2006 | 649,583 | 462,183 | 1,342,969 | 968,419 | 881,957 | 170,816 | 4,475,927 |
| Donald P. Lofe, Jr. Executive Vice President and Chief Financial Officer | 2006 | 390,000 | 231,984 | 379,501 | 380,250 | 90,715 | 80,259 | 1,552,709 |
| David H. Katkov Executive Vice President | 2006 | 385,333 | 231,092 | 361,055 | 374,969 | 213,470 | 54,583 | 1,620,502 |

(Footnotes omitted.)

## BACKGROUND

26.    PMI, through its subsidiaries, provides credit enhancement products that promote homeownership. It operates in four segments: U.S. Mortgage Insurance Operations, International Operations, Financial Guaranty, and Other.  The U.S. Mortgage Insurance Operations segment

1  provides residential mortgage insurance and structured finance products to mortgage lenders, savings
2  institutions, commercial banks, capital market participants, and investors in the United States. The
3  International Operations segment offers mortgage insurance and credit enhancement products,
4  including primary mortgage insurance, structured portfolio products, and reinsurance products to
5  lending institutions, as well as for residential mortgage-backed securitizations in Australia, New
6  Zealand, the European Union, and Hong Kong. The Financial Guaranty segment provides financial
7  guaranty insurance for public finance and structured finance obligations and offers credit
8  enhancement solutions that enable municipal and asset-backed issuers to facilitate access to capital
9  markets. It provides direct insurance to issuers and lenders, and reinsurance to financial guarantors.
10 The Other segment engages in contract underwriting operations.

11         27.    PMI owns a 42% equity ownership interest in FGIC. It purchased its ownership in
12 FGIC along with Blackstone Group LP ("Blackstone") and Cypress Group ("Cypress"). The
13 consortium purchased an 88% interest in FGIC from General Electric Co. in 2003 for $1.86 billion.
14 PMI gained the largest stake in FGIC with a 42% share while Blackstone and Cypress each obtained
15 a 23% stake in the company.

16         28.    FGIC was founded in 1983 and is one of the four leading monoline financial
17 guarantors. FGIC is the parent company of Financial Guaranty, its bond insurance arm. Financial
18 Guaranty is a monoline insurer ("monoline"). Monolines such as Financial Guaranty insure bonds
19 that have been issued by other entities. Financial Guaranty purports to leverage its AAA financial
20 strength rating by Moody's Investors Service ("Moody's"), Standard & Poor's Ratings Services
21 ("Standard & Poor's") and Fitch Ratings ("Fitch") to guarantee the timely repayment of bond
22 principal and interest of an issuer in the event the issuer defaults, thus allowing the debt issued to get
23 the highest possible rating. Financial Guaranty's financial guarantee is designed to protect investors
24 in the event of securities default.

25         29.    Traditionally Financial Guaranty focused mainly on conservative municipal bonds.
26 In recent years, lured by larger profits and higher growth rates, Financial Guaranty began writing
27 insurance on collateralized debt obligations ("CDOs"), including CDOs backed by subprime
28 mortgages to higher-risk borrowers. CDOs are a type of asset-backed security and structured credit

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                    - 10 -

1  product. CDOs repackage bonds, mortgages and other assets into new securities and then use the

2  income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds,

3  loans or other assets, where investors buy slices classified by varying levels of debt or credit risk.

4  ## DEFENDANTS' FALSE AND MISLEADING
   ## STATEMENTS ISSUED DURING THE CLASS PERIOD

5
6  30.    On November 2, 2006, the Company issued a press release entitled "The PMI Group,

   Inc. Reports Third Quarter 2006 Net Income of $104.2 Million, or $1.16 per Diluted Share." The
7
   release stated in part:
8
9      The PMI Group, Inc. (the "Company") today reported net income of $104.2 million
       for the third quarter of 2006 compared to net income of $95.7 million for the third
       quarter of 2005. Net income per diluted share grew by approximately 20 percent to
10     $1.16 for the third quarter of 2006 compared to $0.97 for the third quarter of 2005.
       The increase was due to improved performance in all business segments of the
11     Company's operations, a reduced number of common shares outstanding and a
       favorable comparison with the third quarter of 2005 when the Company's equity
12     earnings from FGIC were adversely impacted by Hurricane Katrina.

13     Highlights in the third quarter of 2006 include:

14     •      U.S. Mortgage Insurance Operations – solid growth in premiums
              written, premiums earned, average premium rate and net investment
15            income as well as increased persistency and continued expense
              reductions from field office restructurings;
16
17     •      International Operations – PMI Australia reported record net income
              along with solid growth in premiums earned and net investment
18            income while also strengthening loss reserves. PMI Europe grew net
              premiums written, new insurance written and insurance in force as
19            well as continued expansion of PMI's European presence;

20     •      Financial Guaranty – FGIC reported strong premium earnings,
              increased net investment income and favorable credit performance;
21
22     •      Common Share Repurchases – the Company entered into an
              accelerated stock buyback program pursuant to which it will purchase
23            common stock for an aggregate purchase price of $345 million. The
              maximum number of shares to be repurchased under the program has
24            been set at 8.2 million common shares and the minimum number has
              been set at 7.2 million representing a purchase price range per
25            common share from $41.88 to $47.99, respectively. The actual
              number of shares received and the average per share cost per share
26            will depend on the weighted average share price of common stock
              over the period of the program which will extend through April 2007
27            but may terminate earlier. In the third quarter of 2006, the Company
              received the minimum allotment of approximately 7.2 million
28

common shares. The Company will receive additional common shares at the program's expiration to the extent the Company's weighted average common share net price does not exceed $47.99 during the program. During the third quarter of 2006, the Company also entered into a Rule 10b5-1 Plan for the purchase of up to $40 million of additional common shares.

- New Revolving Credit Facility – the Company entered into a new five-year $400 million revolving credit facility with a consortium of lenders. The facility may be expanded up to $500 million with the approval of the lenders.

- Book value per share ended the third quarter at $39.14, an increase of approximately 10% from third quarter of 2005.

***Consolidated Operating Results***

Consolidated net premiums written for the third quarter and year to date totaled $212.4 million and $626.1 million, respectively, compared to $206.1 million and $599.6 million for the same periods one year ago. The increases, on a year over year comparison, were due primarily to an increase in average premium rates and average insured loan balances in U.S. Mortgage Insurance Operations and higher new insurance written in PMI Australia.

Consolidated premiums earned for the third quarter and year to date were $214.9 million and $634.8 million, respectively, compared to $205.1 million and $611.0 million for the same periods one year ago. The increases, on a year over year comparison, were due to higher average premium rates, higher new insurance written, insurance in force growth and a release of unearned premiums on terminated policies in PMI Australia, and higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations.

Consolidated other underwriting and operating expenses for the third quarter and year to date were $56.2 million and $169.6 million, respectively, compared to $54.5 million and $154.6 million for the same periods one year ago. The increases in the third quarter and first nine months of 2006, compared to the same periods in 2005, were due primarily to stock option and employee stock purchase plan related expenses, partially offset by savings from field office restructurings in U.S. Mortgage Insurance Operations.

Consolidated losses and loss adjustment expenses for the third quarter and year to date were $79.6 million and $212.4 million, respectively, compared to $61.3 million and $193.0 million in the same periods last year. The increase in the third quarter of 2006, compared to the same period in 2005, was primarily a result of loss reserve additions and an increase in claims paid in U.S. Mortgage Insurance Operations, PMI Australia and, to a lesser extent, PMI Europe. The increase in the first nine months of 2006 compared to the same period in 2005 was due primarily to reserve additions and an increase in paid claims in PMI Australia and PMI Europe.

Consolidated reserve for losses and loss adjustment expenses totaled $394.2 million as of September 30, 2006 compared to $384.6 million as of June 30, 2006 and $366.3 million as of September 30, 2005. Loss reserves in U.S. Mortgage Insurance Operations increased $3.0 million in the third quarter of 2006, compared to

second quarter of 2006, primarily due to higher expected claim rates and claim sizes. PMI Australia's reserve for losses increased $6.1 million in the third quarter, compared to the second quarter of 2006, primarily due to an increase in delinquent loans, and higher expected average claim sizes and claim rates.

(Footnotes omitted.)

31.     On February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Record 2006 Net Income of $419.7 Million, or $4.57 Per Diluted Share; Fourth Quarter 2006 Net Income of $100.5 Million, or $1.19 Per Diluted Share." The release stated in part:

The PMI Group, Inc. (the "Company") today reported record net income for the full year 2006 of $419.7 million compared to $409.2 million in 2005. Net income per diluted share for the full year of 2006 rose 11.5% to $4.57 compared to $4.10 per share one year ago. Net income for the fourth quarter of 2006 was $100.5 million, or $1.19 per diluted share, compared to net income in the fourth quarter of 2005 of $107.7 million, or $1.11 per diluted share.

The Company ended 2006 with a book value of $41.14 per share compared to $36.42 at the end of 2005, representing an increase of approximately 13%.

Highlights include:

- U.S. Mortgage Insurance Operations – primary insurance in force grew to $102.6 billion and the persistency rate increased to 69.6%. Incurred losses for the year were approximately $263 million, consistent with the Company's guidance;

- International Operations – PMI Australia had substantial growth in net premiums written driven by insurance in force growth. Fourth quarter results included an increase in incurred losses due to a normalization of credit performance in Australia.   PMI Europe reported record net income along with solid growth in new insurance written PMI's European presence continued to expand;

- Financial Guaranty – equity earnings from FGIC grew as a result of strong premium earnings and increased net investment income;

- Capital Events – the Company repurchased approximately 907,000 common shares in the fourth quarter for $40 million. For the full year, the Company has retired approximately 11.4 million common shares at a cost of approximately $535 million. Inclusive within the $535 million cost, the Company expects to receive additional common shares under its accelerated stock buyback program by no later than the second quarter of 2007. The Company had 84.5 million diluted weighted average common shares outstanding in the fourth quarter of 2006, a decrease of 14.7 million common shares from the fourth quarter 2005.

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS

- In the fourth quarter of 2006, the Company recognized a one-time pension settlement charge of $4.0 million after tax, a $1.2 million benefit from an after tax reversal related to the Raynham settlement and costs of $738,000 after tax to exchange and extinguish debt.

- Book value per share as of December 31, 2006 was $41.14, an increase of approximately 13% from the prior year.

Consolidated Operating Results

Consolidated net premiums written for the fourth quarter and full year totaled $235.5 million and $861.6 million, respectively, compared to $246.1 million and $845.7 million for the same periods one year ago. The year over year increase was due primarily to an increase in average premium rates and average insured loan balances in U.S. Mortgage Insurance Operations and higher new insurance written in the International segment from PMI Australia and PMI Europe.

Consolidated premiums earned for the fourth quarter and full year were $225.7 million and $860.5 million, respectively, compared to $206.6 million and $817.6 million for the same periods one year ago. The increases in 2006 were due to insurance in force growth, higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations and insurance in force growth in PMI Australia.

Consolidated losses and loss adjustment expenses for the fourth quarter and full year were $90.5 million and $302.9 million, respectively, compared to $64.8 million and $257.8 million in the same periods last year. The increases in 2006 were primarily a result of loss reserve additions in U.S. Mortgage Insurance Operations and an increase in total incurred losses in PMI Australia. The incurred losses increase for PMI Australia was driven principally by increases in claim rates and severity.

Consolidated other underwriting and operating expenses for the fourth quarter and full year were $68.7 million and $235.8 million, respectively, compared to $59.1 million and $213.6 million for the same periods one year ago. The increases in 2006 were due primarily to our adoption of SOFAS 123R and the resulting expenses for stock options and stock based compensation and a pension settlement charge related to a lump-sum distribution from the Supplemental Employee Retirement Plan.

Consolidated reserve for losses and loss adjustment expenses totaled $414.7 million as of December 31, 2006 com-pared to $394.2 million as of September 30, 2006 and $368.8 million as of December 31, 2005. Loss reserves in U.S. Mortgage Insurance Operations increased $7.4 million in the fourth quarter of 2006 primarily due to higher expected claim rates and claim sizes. PMI Australia's reserve for losses and LAE increased $12.4 million in the fourth quarter primarily due to higher expected claim rates and severity and, to a lesser extent, an increase in the number of delinquent loans.

(Footnotes omitted.)

32.    Also on February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Issues 2007 Financial Guidance," which stated in part:

The PMI Group, Inc. (the "Company") today issued the following financial guidance for 2007:

> • Total incurred losses for its U.S. Mortgage Insurance Operations to be between $280 million to $305 million;

> • Expense ratio for its U.S. Mortgage Insurance Operations to be between 21% and 24%;

> • Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

> • Full year expenses related to stock options and stock based compensation to be between $13 million to $15 million after tax;

> • Consolidated tax rate to be between 25% and 27%.

33.    On April 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports First Quarter 2007 Net Income of $102.0 Million, or $1.16 Per Diluted Share; Record Quarterly Revenues Driven by Growth in U.S. Mortgage Insurance Operations." The release stated in part:

> The PMI Group, Inc. (the "Company") today reported net income for the first quarter of 2007 of $102.0 million compared to net income in the first quarter of 2006 of $105.3 million. Diluted net income per share grew by approximately six percent to $1.16 for the first quarter of 2007 compared to $1.09 for the first quarter of 2006 and was positively influenced by the Company's redemption of its 2.5% Senior Convertible Debentures in October 2006.

> The Company ended the first quarter of 2007 with a book value of $42.21 per share compared to $37.24 at the end of the first quarter of 2006, representing an increase of approximately 13%.

> Highlights include:

> > • U.S. Mortgage Insurance Operations – achieved record total revenues driven by strong growth in net premiums written and earned, and grew primary insurance in force to $106.9 billion. Net premiums written and net premiums earned in the first quarter of 2007 increased approximately 20% and 16%, respectively, compared to the same period one year ago;

> > • International Operations – PMI Australia had solid growth in net premiums written driven by insurance in force growth of 27%, compared to the first quarter 2006, to end at $156.7 billion. PMI Europe reported strong growth in net premiums written of approximately 24% compared to the first quarter of 2006;

- Financial Guaranty – equity in earnings from FGIC grew by 34% to $29.3 million compared to the first quarter of 2006 as a result of strong premium earnings, increased net investment income and a favorable impact to tax expense from a reduction of contingent tax reserves;

- Capital Events – the Company repurchased approximately 325,000 common shares for approximately $14 million. The Company's accelerated stock buyback program is expected to be completed in the second quarter of 2007.

Consolidated Operating Results

Consolidated net premiums written for the first quarter of 2007 totaled $244.1 million compared to $201.9 million for the same period one year ago. The year over year increase was primarily due to an increase in new insurance written, improved persistency, higher average premium rates and higher average insured loan balances in U.S. Mortgage Insurance Operations and an increase in net premiums written in PMI Australia.

Consolidated premiums earned for the first quarter of 2007 were $236.4 million compared to $206.2 million for the same period one year ago. The increase in the first quarter of 2007 was due to insurance in force growth, higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations and insurance in force growth in PMI Australia.

Consolidated losses and loss adjustment expenses for the first quarter of 2007 were $109.3 million compared to $60.9 million in the same period last year. The increase in first quarter of 2007 was primarily a result of higher incurred losses in U.S. Mortgage Insurance Operations and PMI Australia. The incurred losses increase in U.S. Mortgage Insurance Operations was a result of an increase in claim size and claim rates while the increase in PMI Australia was due to higher claim sizes and an increase in the number of delinquent loans.

Consolidated other underwriting and operating expenses for the first quarter of 2007 were $62.7 million compared to $58.6 million for the same period one year ago. The increase in the first quarter of 2007 was due primarily to higher stock option expense charges.

Consolidated reserve for losses and loss adjustment expenses totaled $443.0 million as of March 31, 2007 com-pared to $414.7 million as of December 31, 2006 and $369.9 million as of March 31, 2006. Loss reserves in U.S. Mortgage Insurance Operations increased $19.9 million in the first quarter of 2007 primarily due to lower default cure rates and higher claim sizes. PMI Australia's reserve for losses and LAE increased $7.8 million in the first quarter of 2007 primarily due to an increase in the number of delinquent loans.

(Footnotes omittted.)

34.    Also on April 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Updates 2007 Financial Guidance," which stated in part:

The PMI Group, Inc. (the "Company") today updated its financial guidance for 2007:

- Total incurred losses for its U.S. Mortgage Insurance Operations to be between $300 million to $360 million;

- Expense ratio for its U.S. Mortgage Insurance Operations to be between 20% and 23%;

- Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

- Full year expenses related to stock options and share-based compensation to be between $13 million to $15 million after tax;

- Consolidated tax rate to be between 25% and 27%.

35.    On July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Second Quarter 2007 Net Income of $83.8 Million, or $0.95 Per Diluted Share." The release stated in part:

The PMI Group, Inc. (the "Company") today reported net income for the second quarter of 2007 of $83.8 million, or $0.95 per diluted share. Net income for the second quarter of 2006 was $109.6 million, or $1.14 per diluted share. The decline in net income for the second quarter of 2007 was primarily due to a $58.7 million increase in loss reserves and higher claims paid in U.S. Mortgage Insurance Operations, partially offset by increases in net income from International Operations and Financial Guaranty.

The Company ended the second quarter of 2007 with a book value of $43.46 per share compared to $38.11 at the end of the second quarter of 2006, representing an increase of approximately 14%.

Highlights include:

- U.S. Mortgage Insurance Operations – Net income was $41.5 million in the second quarter of 2007. Losses and loss adjustment expenses increased to $134.4 million as a result of increases in notices of default, claim rates and claim sizes. Total revenues in the second quarter of 2007 increased by approximately 13% driven by strong growth in net premiums written and earned. Net premiums written and net premiums earned in the second quarter of 2007 increased by approximately 19% and 16%, respectively, compared with the same period one year ago. Insurance in force at the end of the second quarter of 2007 was $111.7 billion, representing an 11% increase from one year ago.

- International Operations – PMI Australia had solid growth in net premiums written and grew their insurance in force to $172.9 billion. Total losses and loss adjustment expenses decreased in the second quarter of 2007 from the first quarter resulting in a loss ratio of 25.2% for the period and 34.4% for the first six months of 2007. PMI

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS

- 17 -

Europe reported strong growth in net premiums written of approximately 66% compared with the second quarter of 2006 driven particularly by flow business in Italy.

- Financial Guaranty – equity in earnings from FGIC were $27.4 million (pre-tax), an increase of 10% compared with the second quarter of 2006, as a result of strong premium earnings, a significant recovery related to a Hurricane Katrina impacted credit, a release of certain tax contingencies and increased net investment income, partially offset by mark to market adjustments in certain mortgage related CDO's due principally to widening credit spreads.

- Capital Events – The Company repurchased 468,500 common shares for approximately $23 million in the second quarter of 2007.  The Company also completed its accelerated stock buyback program in the second quarter of 2007 with the final delivery of 436,152 common shares.  In July 2007, the Company announced an additional $150 million authorization to its existing common share repurchase program which brings total current authorizations to $300 million.

Consolidated Operating Results

Consolidated net premiums written for the second quarter and first half of 2007 totaled $256.0 million and $500.0 million, respectively, compared with $211.8 million and $413.7 million for the same periods one year ago. The year over year increases were primarily due to an increase in new insurance written, improved persistency, higher average primary premium rates and higher average insured loan balances in U.S. Mortgage Insurance Operations and an increase in net premiums written combined with favorable foreign exchange rates in PMI Australia.

Consolidated premiums earned for the second quarter and first half of 2007 were $242.3 million and $478.7 million, respectively, compared with $213.6 million and $419.9 million for the same periods one year ago. The increases were due to insurance in force growth, higher average premium rates and larger loan sizes in U.S. Mortgage Insurance Operations.

Consolidated losses and loss adjustment expenses for the second quarter and first half of 2007 were $146.2 million and $255.5 million, respectively, compared with $71.9 million and $132.8 million for the same periods last year. The increases were primarily a result of higher incurred losses in U.S. Mortgage Insurance Operations as a result of an increase in notices of default, claim size and claim rates.

Consolidated other underwriting and operating expenses for the second quarter and first half of 2007 were $59.8 million and $122.5 million, respectively, compared with $52.9 million and $113.4 million for the same periods one year ago. The increases were primarily due to growth of the International Operations combined with changes in foreign exchange rates.

Consolidated reserve for losses and loss adjustment expenses totaled $507.0 million as of June 30, 2007 compared with $443.0 million as of March 31, 2007 and $384.6 million as of June 30, 2006. Reserves for losses and loss adjustment expenses (LAE) in U.S. Mortgage Insurance Operations increased $58.7 million in the second

quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes. PMI Australia's reserve for losses and LAE increased $2.8 million in the second quarter of 2007 due to a higher default inventory.

(Footnotes omitted.)

36.    Also on July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Updates 2007 Financial Guidance," which stated in part:

The PMI Group, Inc. (the "company") today updated its financial guidance for 2007:

- Paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. Mortgage Insurance Operations to be between $450 million to $550 million;

- Expense ratio for its U.S. Mortgage Insurance Operations to be between 20% and 23%;

- Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

- Full year expenses related to stock options and share-based compensation to be between $13 million to $15 million after tax;

- Consolidated tax rate to be between 19% and 22%.

37.    This was part of a series of partial disclosures and revelations concerning the truth about PMI's business operations, finances, business metrics, and future business and financial prospects.    Nonetheless, PMI's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by defendants.    Upon this news, PMI's stock dropped $3.20 per share on July 31, 2007, to close at $34.07 per share, a one-day decline of 8.6% on volume of over five times the average three-month volume.

38.    On August 29, 2007, the Company issued a press release entitled "The PMI Group, Inc. Comments on Fitch Revisions to U.S. Mortgage Insurance Capital Model and Ratings Actions," which stated in part:

The PMI Group, Inc. announced today that consistent with its revisions of its capital model for U.S. mortgage insurance companies, Fitch Ratings (Fitch) has changed the insurer financial strength ratings for PMI Mortgage Insurance Co. and PMI Guaranty Co. to AA from AA+. Fitch has noted that these changes are the result of revisions Fitch made to its capital model for U.S. mortgage insurance companies. Fitch affirmed ratings for PMI Australia and PMI Europe at AA and for The PMI Group,

Inc. at A+. Fitch's Outlook for The PMI Group, Inc. and related subsidiaries' ratings is Stable.

Steve Smith, CEO of The PMI Group, Inc., said, "It is important to recognize that the ratings changes made by Fitch were primarily driven by a change in their ratings methodology and capital model, not by a deterioration in the financial position or results of The PMI Group, Inc. or our subsidiaries. PMI Mortgage Insurance Co.'s AA ratings from Fitch and Standard and Poor's and Aa2 rating from Moody's Investor Services speak to our position as a strong mortgage insurance counterparty for our customers in the U.S. and international credit enhancement markets. *PMI Guaranty Co.'s AA rating from Fitch, along with AA ratings from Standard and Poor's and Aa3 ratings from Moody's Investors Services, provides strong ratings upon which PMI Guaranty can continue to successfully offer mezzanine and remote loss credit enhancement solutions for structured portfolio transactions and capital markets executions.*"

In announcing its ratings changes, Fitch noted a declining U.S. residential real estate market and PMI's related exposure and cited PMI's solid franchise, strong balance sheet at the AA rating stress level, experienced management team, and high quality insured portfolio as measured by FICO score distribution and other risk layering characteristics. Fitch also noted that The PMI Group, Inc. derives benefit from diverse earnings streams from international mortgage insurance as well as operations outside of the mortgage insurance space, primarily financial guaranty.

39.    On October 17, 2007, MGIC Investment, PMI's closest competitor, announced that it had suffered its first quarterly loss as a public company due to a large increase in both the amount and severity of defaults. MGIC Investment further indicated that it had more exposure to anticipated losses and defaults related to its book of business written in 2005 through most of 2007 than previously represented due to a failure to engage in proper underwriting practices.

40.    On October 18, 2007, the Company issued a press release entitled "The PMI Group, Inc. Announces Housing, Mortgage and Credit Market Conditions to Adversely Affect Third Quarter 2007 Financial Results," which stated in part:

As a result of the continued weak housing and mortgage markets and associated dislocation in the credit derivative markets, The PMI Group, Inc. announced today that it expects to report a net loss per basic and diluted share outstanding of approximately $1.05 in the third quarter of 2007. The primary components of the loss are incurred losses in its U.S. Mortgage Insurance Operations and a mark-to-market (or fair value) adjustment at its unconsolidated subsidiary FGIC.

The Company's review of the September mortgage default data on its U.S. mortgage insurance portfolio indicates that credit performance significantly worsened during the month and now expects paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. mortgage insurance operations of approximately $350 million in the third quarter of 2007. As a result, the Company is withdrawing its full year total incurred loss guidance and other financial guidance.

Credit conditions also had an adverse effect on the insured credit derivative portfolio of FGIC, in which PMI is the lead strategic investor, with a common equity ownership of 42.0 percent. FGIC conducted a fair value review of its outstanding credit derivative contracts at September 30, 2007 and estimates that mark-to-market adjustments will result in an unrealized loss of approximately $206 million, pre-tax, in the third quarter of 2007. FGIC anticipates that as a result of this adjustment it will report a net loss for the third quarter of 2007 of approximately $65 million. As a result of PMI's equity ownership in FGIC, PMI will realize an earnings per share loss of $0.32 in the third quarter of 2007 (which amount is included in the estimated third quarter 2007 net loss per share for The PMI Group, Inc. shown above).

41.    On October 19, 2007, Standard & Poor's announced that it had placed PMI on negative CreditWatch with negative implications.

42.    In mid-October 2007, as this news surfaced concerning the true state of PMI's financials and business outlook, PMI's stock price began to decline rapidly. Between October 16, 2007 and October 23, 2007, PMI's stock dropped $11.55 per share to close at $17.96 per share on October 23, 2007, a five-day decline of 39% on extremely high volume.

43.    Thereafter, in the next couple of months, as more of the truth about PMI's financials and business outlook emerged, including information concerning FGIC and Financial Guaranty, more of the artificial inflation in the Company's stock came out and the stock dropped even more.

44.    On October 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Third Quarter 2007 Financial Results," which stated in part:

The PMI Group, Inc. (the "Company") today reported a net loss for the third quarter of 2007 of $86.8 million, or $1.04 per basic and diluted share. Net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share. The net loss for the third quarter of 2007 was primarily due to $348.3 million in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") in the U.S. Mortgage Insurance Operations, and FGIC's negative mark-to-market adjustments on its insured credit derivative portfolio in the Company's Financial Guaranty segment.

Highlights include:

•    U.S. Mortgage Insurance Operations – The net loss was $65.2 million in the third quarter of 2007. During the third quarter, the Company added $253.6 million to the reserves for losses and loss adjustment expenses (LAE) and paid $92.6 million in claims. Total revenues in the third quarter increased by approximately 20% compared to the third quarter of 2006, driven by strong growth in net premiums written and earned. Insurance in force at the end of the third quarter of 2007 was $120.0 billion, representing a 20% increase from one year ago.

- International Operations – PMI Australia posted net income of $19.7 million on higher premiums earned and net investment income, partially offset by higher losses and LAE. PMI Australia reported solid growth year over year in net premiums written and grew its insurance in force to $182.8 billion. Total losses and LAE increased in the third quarter of 2007 to $21.8 million due primarily to higher claim rates. PMI Europe reported a net loss of $8.4 million, primarily as a result of an unrealized $8.4 million, after tax, negative mark-to-market adjustment on credit default swaps related to European prime mortgage risks due to widening credit spreads. PMI Europe's net premiums written increased approximately 50% compared with the third quarter of 2006 driven particularly by flow business in Italy. PMI Asia reported net income of $2.9 million fueled by strong growth in reinsurance premiums written and earned compared to the third quarter 2006.

- Financial Guaranty– equity in losses from FGIC for the third quarter of 2007 were $28.9 million (pre-tax), as a result of a negative unrealized mark-to-market adjustment in its insured credit derivative portfolio due to widening credit spreads partially offset by strong premium earnings and increased net investment income.

- Capital Events – The Company repurchased 5,454,381 common shares for approximately $178 million in the third quarter of 2007.

Consolidated Operating Results

Consolidated net premiums written for the third quarter and year to date totaled $276.7 million and $776.8 million, respectively, compared with $212.4 million and $626.1 million for the same periods one year ago. The year over year increases were primarily due to increases in insurance in force from new insurance written, and higher average insured loan balances in the U.S. Mortgage Insurance Operations and an increase in International Operations' net premiums written combined with favorable Australian foreign exchange rates.

Consolidated premiums earned for the third quarter and year to date were $256.8 million and $735.5 million, respectively, compared with $214.9 million and $634.8 million for the same periods one year ago. The increases were due primarily to insurance in force growth, new insurance written, improved persistency and larger loan sizes in the U.S. Mortgage Insurance Operations.

Consolidated losses and LAE for the third quarter and year to date were $372.8 million and $628.3 million, respectively, compared with $79.6 million and $212.4 million for the same periods last year. The increases were primarily a result of higher losses and LAE in the U.S. Mortgage Insurance Operations as a result of an increase in notices of default, increased claim rates and larger claim sizes.

Consolidated reserve for losses and LAE totaled $770.4 million as of September 30, 2007 compared with $507.0 million as of June 30, 2007 and $394.2 million as of September 30, 2006. Reserves for losses and LAE in the U.S. Mortgage Insurance Operations increased $253.6 million in the third quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes.

PMI Australia's reserve for losses and LAE increased $7.3 million in the third quarter of 2007 principally due to higher claim rates and claim sizes.

Consolidated other underwriting and operating expenses for the third quarter and year to date were $50.6 million and $173.1 million, respectively, compared with $55.9 million and $169.0 million for the same periods one year ago. The decrease in the third quarter of 2007 was primarily the result of lower employee compensation expenses compared to the corresponding period in 2006. The increase in the first nine months of 2007 compared to the corresponding period in 2006 was primarily due to growth in our International Operations and lower share-based compensation expenses in 2006.

(Footnotes omitted.)

45.     On November 5, 2007, Fitch announced its new methodology in assessing financial guarantors CDOs and further announced that it would be reviewing the capital of the monolines, including Financial Guaranty, to ensure that they had enough capital to warrant their AAA rating. As a result of the ongoing review, Financial Guaranty faced a "high probability" risk of falling beneath the capital requirements necessary to keep its AAA rating, which would result in either a potential ratings downgrade or force the Company to raise more capital. The review was expected to last six weeks.

46.     In December 2007, Moody's and Standard & Poor's made similar announcements that they were also reevaluating their ratings of Financial Guaranty and had placed Financial Guaranty on review for possible downgrades.

47.     On January 3, 2008, the Mortgage Bankers Association reported a decline in an index measuring the volume of mortgage applications which offered little hope for a recovery in the housing market.

48.     On January 8, 2008, Lehman Brothers published a research note concerning the need for PMI to substantially increase its reserves to cover the significant growth in claims. As reported by the *Associated Press* in an article entitled "Sector Wrap: Mortgage Insurers":

Fears of accelerating deterioration in the mortgage market sent shares of mortgage insurers lower Tuesday.

*Lehman Brothers analyst Bruce Harting wrote in research notes MGIC Investment Corp., PMI Group Inc. and Radian Group Inc. will all need to significantly boost reserves for the fourth quarter and beyond to cover expected jumps in insurance claims.*

1    Mortgage insurers cover principal and interest payments on mortgages when
     borrowers stop paying their loans. As mortgages have increasingly defaulted, the
2    insurers have been forced to pay out more claims on the failed loans. Until defaults
     dissipate, the insurers will continue to struggle and likely have to build reserves to
3    cover future losses.

4    *Harting said MGIC, PMI and Radian are all likely to speed up reserve*
     *building to cover claims because deterioration in the mortgage market is occurring*
5    *faster than anticipated.*

6                              *        *        *

7    *Harting estimates PMI Group will now post a loss of $1.58 per share in the*
     *fourth quarter, 70 cents per share worse than he had previously forecast.*
8
     PMI Group shares fell 86 cents, or 7.5 percent, to $10.59. Shares have traded
9    between $9.82 and $51.46 during the past 12 months.

10       49.    Upon this news, shares in the Company's stock closed down $2.83 per share to close

11   at $7.45 per share on January 9, 2008, a decline of 27%.

12       50.    On January 10, 2008, Blackstone announced that it may write down its investment in

13   FGIC due to the serious deterioration in the subprime market.

14       51.    On January 17, 2008, the U.S. Commerce Department reported a significant decline

15   in new-home construction in the previous year.  The Commerce Department reported that work

16   began on 1.35 million houses and apartments in 2007, down 24.8% from 2006.  This decline was

17   the second-biggest annual decline on record, exceeded only by a 26% percent plunge in 1980.

18   Additionally, on the same date, Moody's announced that it had placed Ambac Financial Group Inc.,

19   one of the nation's leading bond insurers and a close competitor of FGIC, on review for possible

20   downgrades due to much higher than expected losses on mortgage-related bonds.   These

21   announcements were strong indicators as to the depth and severity of the problems in the housing

22   market.

23       52.    Upon this news, shares in the Company's stock closed down $1.29 per share to close

24   at $6.48 per share on January 17, 2008, a one-day decline of 17%.  This was the lowest PMI's stock

25   had traded in its twelve years as a public Company.

26       53.    Thereafter, on January 30, 2008, Fitch downgraded Financial Guaranty's financial

27   strength rating by two notches from "AAA" to "AA."

28

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                    - 24 -

54. The next day, on January 31, 2008, Standard & Poor's made a similar move and downgraded Financial Guaranty's rating by two notches from "AAA" to "AA" and further downgraded FGIC's rating by three notches from "AAA" to "A."

55. Further, on January 31, 2008, Moody's announced that it had placed PMI on review for a possible ratings downgrade.

56. On February 11, 2008, PMI announced that on March 1, 2008, it would stop insuring mortgages with high loan-to-value ratios, again tightening its guidelines on which type of loans the Company underwrites in order to reduce its exposure to risky subprime loans.

57. Then, on March 3, 2008, after the market closed, PMI issued a press release entitled "The PMI Group, Inc. Reports Preliminary Fourth Quarter 2007 Financial Results for Certain Segments." The release stated in part:

> PMI Group, Inc. (the "Company") today announced that due to delays in obtaining 2007 financial results from FGIC Corporation ("FGIC") the Company has filed a Form 12b-25 with the Securities and Exchange Commission ("SEC") for a late filing of its 2007 Form 10-K. In this SEC filing and as outlined below in financial highlights, the Company provides financial results for its U.S. Mortgage Insurance Operations and International Operations and discusses its expectations for its Financial Guaranty segment. The Company plans to issue its financial results for the fourth quarter of 2007 before the financial markets open (approximately 6:00 AM ET) on Wednesday, March 12, 2008, followed by a conference call at 11:30 AM ET.
>
> "Our preliminary fourth quarter results for our U.S. Mortgage Insurance and International Operations demonstrate that we are facing challenging market conditions, particularly in the U.S. housing market," said The PMI Group Inc.'s Chairman and CEO Steve Smith. "We have implemented a plan to address these challenges, which we will discuss in detail on our conference call next week. A cornerstone of the plan and our strategic focus going forward is our core business, mortgage insurance, which we believe offers PMI long term opportunities for growth and profitability. Within our Financial Guaranty segment, we will continue to work to stabilize our equity investments in FGIC and RAM Re, but we will not be contributing any additional capital to these companies."
>
> **Financial Highlights of U.S. and International Mortgage Insurance Operations**
>
> - *U.S. Mortgage Insurance Operations – reported a net loss of $236.0 million in the fourth quarter of 2007 compared to net income of $77.2 million in the fourth quarter of 2006. The loss in the fourth quarter of 2007 was driven in large part by an increase in losses and loss adjustment expenses resulting from an increase in our default inventory, higher claim rates and higher average claim sizes.* For the full year ended December 31, 2007, U.S. Mortgage Insurance Operations reported a net loss of $190.8 million compared to net income of $290.3 million for the full year of 2006. The

Company estimates that U.S. Mortgage Insurance Operations' losses and loss adjustment expenses in 2007 were approximately $1.1 billion.

• International Operations – reported a net loss of $10.1 million in the fourth quarter of 2007 compared to net income of $20.0 million in the fourth quarter of 2006. Fourth quarter 2007 results were driven primarily by a loss of $29.6 million in PMI Europe as a result of increases in losses and loss adjustment expenses and mark-to-market losses associated with credit default swap derivative contracts, net income of $17.8 million in PMI Australia and net income of $2.9 million in PMI Asia. For the full year ended December 31, 2007, International Operations reported net income of $55.0 million compared to net income of $103.5 million for the full year of 2006.

• Corporate and Other – reported a net loss of $3.8 million in the fourth quarter of 2007 compared to a net loss of $25.1 million in the fourth quarter of 2006. For the full year ended December 31, 2007, Corporate and Other reported a net loss of $49.5 million compared to a net loss of $71.4 million for the full year of 2006.

**Financial Guaranty Segment**

Because the Company lacks the necessary financial information from FGIC to complete its consolidated financial statements, the Company is not yet able to calculate its consolidated results of operations for the full year ended 2007 and also is not able to calculate the financial results of its Financial Guaranty segment. *The Company expects that its Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during those periods. In connection with the preparation of the Company's consolidated financial statements, the Company is conducting an analysis to determine whether the value of its investment in FGIC was impaired as of December 31, 2007.* This analysis cannot be completed until the Company receives financial information from FGIC necessary for the Company to complete its consolidated financial statements.

(Footnotes omitted.)

58.    Additionally on March 3, 2008, in a Form 12b-25, the Company announced that it would be delayed in filing its Form 10-K for year-end 2007, stating in part:

The PMI Group, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

The Company is unable to complete its consolidated financial statements for the year ended December 31, 2007 because it is currently awaiting financial information from an equity investee, FGIC Corporation ("FGIC"), that is necessary for the Company to complete its financial statements. *FGIC has informed the Company that it is in the process of completing its financial statements, but that it*

*has not been able to do so due to the time and effort involved in determining the amount of loss reserves related to residential mortgage-backed securities and collateralized debt obligations of asset-backed securities. The determination of such reserves has been affected by the unprecedented rapid and severe deterioration of the residential mortgage market.*

59.    On this news, PMI's stock collapsed to $6.43 per share on March 4, 2008, a one-day decline of 5%. This was the lowest PMI's stock had traded in its twelve years as a public company.

60.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company's investment in FGIC was materially impaired as FGIC's bond insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to the plunge in value of mortgage debt;

(b)    The Company was materially overstating its financial results by failing to properly value its investment in FGIC and by failing to write down that investment in a timely fashion in violation of GAAP;

(c)    The Company was not adequately accounting for its loss reserves in violation of GAAP, causing its financial results to be materially misstated;

(d)    The Company failed to engage in proper underwriting practices for its book of business related to insurance written in 2005 through most of 2007;

(e)    The Company had far greater exposure to anticipated losses and defaults related to its book of business related to insurance written in 2005 through most of 2007 than it had previously disclosed;

(f)    Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its standards and stop writing insurance policies to certain categories of borrowers which would have a direct material negative impact on its book of business going forward; and

(g)    Given the increased volatility in the subprime market, the Company had no reasonable basis to make projections about its incurred losses or about its new insurance written. As a result, the Company's projections issued during the Class Period about its earnings for 2007 and 2008 were at a minimum reckless.

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                    - 27 -

## LOSS CAUSATION/ECONOMIC LOSS

61.     By misrepresenting its ability to withstand the housing decline and the adequacy of its reserves, the defendants presented a misleading picture of PMI's business and prospects. Thus, instead of truthfully disclosing during the Class Period that PMI's business was not as healthy as represented, defendants falsely reported PMI's financial outlook and its actual business prospects going forward.

62.     These claims of profitability caused and maintained the artificial inflation in PMI's stock price throughout the Class Period and until the truth was revealed to the market.

63.     Defendants' false and misleading statements had the intended effect and caused PMI stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $50.21 per share in February 2007.

64.     The truth about PMI's business operations, finances, business metrics, and future business and financial prospects began to enter the market with a series of partial disclosures and revelations beginning in July 2007, which were accompanied by denials and continuing misrepresentations by defendants. As a result, the artificial inflation in PMI's stock price did not come out of the stock all at once, rather the artificial price inflation came out over time, in bits, pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices through January 2008.

65.     As a direct result of defendants' admissions and the public revelations regarding the truth about PMI's overstatement of its financial outlook and its actual business prospects going forward, PMI's stock price plummeted over 87%, falling from $50.21 per share on February 7, 2007 to $6.48 per share on January 17, 2008 – a drop of $43.73 per share. This drop removed the inflation from PMI's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

66.     Plaintiff incorporates ¶¶1-65 by reference.

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                                        - 28 -

67.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PMI common stock during the Class Period.

69.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PMI common stock. Plaintiff and the Class would not have purchased PMI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

70.    Plaintiff incorporates ¶¶1-69 by reference.

71.    The Individual Defendants acted as controlling persons of PMI within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of PMI stock, the Individual Defendants had the power and authority to cause PMI to engage in the wrongful conduct complained of herein. PMI controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

72.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired PMI common stock during the Class Period (the "Class"). Excluded from the Class are defendants.

1    73.    The members of the Class are so numerous that joinder of all members is

2  impracticable. The disposition of their claims in a class action will provide substantial benefits to

3  the parties and the Court. PMI has over 81 million shares of stock outstanding, owned by hundreds

4  if not thousands of persons.

5    74.    There is a well-defined community of interest in the questions of law and fact

6  involved in this case.  Questions of law and fact common to the members of the Class which

7  predominate over questions which may affect individual Class members include: whether the 1934

8  Act was violated by defendants; whether defendants omitted and/or misrepresented material facts;

9  whether defendants' statements omitted material facts necessary to make the statements made, in

10  light of the circumstances under which they were made, not misleading; whether defendants knew or

11  deliberately disregarded that their statements were false and misleading; whether the price of PMI's

12  common stock was artificially inflated; and the extent of damage sustained by Class members and

13  the appropriate measure of damages.

14    75.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

15  sustained damages from defendants' wrongful conduct.

16    76.    Plaintiff will adequately protect the interests of the Class and has retained counsel

17  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

18  with those of the Class.

19    77.    A class action is superior to other available methods for the fair and efficient

20  adjudication of this controversy.

21                              **PRAYER FOR RELIEF**

22    WHEREFORE, plaintiff prays for judgment as follows:

23    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

24    B.    Awarding plaintiff and the members of the Class damages, including interest;

25    C.    Awarding plaintiff reasonable costs and attorneys' fees; and

26    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

27  proper.

28

1    **JURY DEMAND**

2         Plaintiff demands a trial by jury.

3    DATED: March 12, 2008                    COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
4                                             SHAWN A. WILLIAMS

5

6                                             _____
                                                     SHAWN A. WILLIAMS
7
                                              100 Pine Street, Suite 2600
8                                             San Francisco, CA 94111
                                              Telephone: 415/288-4545
9                                             415/288-4534 (fax)

10                                            COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
11                                            DARREN J. ROBBINS
                                              DAVID C. WALTON
12                                            CATHERINE J. KOWALEWSKI
                                              655 West Broadway, Suite 1900
13                                            San Diego, CA 92101
                                              Telephone: 619/231-1058
14                                            619/231-7423 (fax)

15                                            ABRAHAM FRUCHTER & TWERSKY LLP
                                              JACK G. FRUCHTER
16                                            One Pennsylvania Plaza, Suite 2805
                                              New York, NY 10119
17                                            Telephone: 212/279-5050
                                              212/279-3655 (fax)
18
                                              Attorneys for Plaintiff
19
     S:\CptDraft\Securities\Cpt PMI.doc
20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS                          - 31 -

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2      Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3  named parties, there is no such interest to report.

4

_____
ATTORNEY OF RECORD FOR PLAINTIFF
5   LORI WEINRIB

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION OF LORI WEINRIB**
**IN SUPPORT OF CLASS ACTION COMPLAINT**

Lori Weinrib ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the proposed Class Period, plaintiff purchased 100 shares of PMI Group, Inc. Stock at $32.38 per share on September 25, 2007.

5.      In the past three years, plaintiff has not served as a representative party on behalf of a class, but is seeking to be lead plaintiff in an action recently filed under the federal securities laws, *Lori Weinrib v. Centerline Holding Company*, case number 08 CV 01158, pending in the United States District Court, Southern District of New York.

6.      Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

Dated:   March 11, 2008.

_____
Lori Weinrib