1    COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2    JEFFREY W. LAWRENCE (166806)
     DANIEL J. PFEFFERBAUM (248631)
3    100 Pine Street, Suite 2600
     San Francisco, CA 94111
4    Telephone: 415/288-4545
     415/288-4534 (fax)
5    jeffreyl@csgrr.com
     dpfefferbaum@csgrr.com
6
   Lead Counsel for Plaintiffs
7

8                  UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10   In re THE PMI GROUP, INC. SECURITIES LITIGATION | )   Master File No. 3:08-cv-01405-SI |
| 11 | ) |
| | )   CLASS ACTION |
| 12   This Document Relates To: | ) |
| | )   CONSOLIDATED COMPLAINT FOR |
| 13       ALL ACTIONS. | )   VIOLATION OF THE FEDERAL |
| | )   SECURITIES LAWS |
| 14 | ) |
| |    DEMAND FOR JURY TRIAL |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................4

PARTIES ............................................................................................................4

CONTROL PERSONS .......................................................................................5

CONFIDENTIAL WITNESSES ........................................................................8

SUBSTANTATIVE ALLEGATIONS ..............................................................11

DEFENDANTS' SCHEME TO DEFRAUD ....................................................30

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
    DURING THE CLASS PERIOD ...........................................................33

ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER .......................65

FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD ...........73

LOSS CAUSATION/ECONOMIC LOSS ......................................................101

NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
    STATEMENTS ....................................................................................102

CLASS ACTION ALLEGATIONS ................................................................103

# INTRODUCTION

1.　　This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of The PMI Group, Inc. ("PMI" or the "Company") between November 2, 2006 and March 3, 2008, inclusive (the "Class Period"), against PMI and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"). PMI, through its subsidiaries, provides credit enhancement products designed to promote homeownership and facilitate mortgage transactions in the capital markets in the United States, Australia, New Zealand, and the European Union.

2.　　On March 17, 2008, PMI announced a net loss of over $915.3 million as of December 31, 2007 – a decline of about 318% from PMI's reported income of $419.7 million as of December 31, 2006. The Company also reported that for PMI's U.S. Mortgage Insurance Operations, it estimated that its losses and loss adjustment expenses ("LAE") for 2007 would approximate $1.1 billion. Then, on May 12, 2008, PMI announced that it wrote off its entire investment in Financial Guaranty Insurance Company, Inc. ("FGIC") from $103.6 million on December 31, 2007 to zero because PMI acknowledged that its investment was other than temporarily impaired and PMI did not expect to recover any of its previously invested capital. These announcements – which resulted in a decline in PMI's stock price to levels not seen in 12 years – marked the culmination of revelations concerning problems PMI had been experiencing and defendants had been misrepresenting and covering up throughout the Class Period.

3.　　The nearly $1 billion-plus write-down is a direct consequence of defendants' fraud in connection with their failed attempt to salvage PMI's place in the mortgage industry from 2003 through early 2008 by competing against new alternative mortgage loan structures, by writing mortgage insurance for transactions in the "Alt-A"[1] market place, and failing to properly manage and monitor the mortgage originators given delegated authority by PMI. The private mortgage insurance

---

[1]　　"Alt-A" mortgage loans can be defined as borrowers who provide less than full documentation of income, assets, etc. and /or state their respective income, assets, etc. PMI described Alt-A loans as loans "where the borrower's FICO score is 620 or higher and where the loans are originated with reduced or no documentation or verification of borrower information."

1   business decreased significantly with new mortgage loan financing structures in the market place,

2   the expansion of lending to subprime and Alt-A borrowers, and the refinancing of old mortgage

3   loans.  Lenders such as banks, thrifts, and mortgage bankers began to finance high loan-to-value

4   ("LTV") transactions with an 80% LTV first lien loan and a 20% loan to value second lien loan that

5   financed 100% of the value of a residential property.  As defendants attempted to compete in this

6   market place, they caused PMI to insure riskier loans, loosening their underwriting standards and

7   making their portfolio more susceptible to fraud as well as defaults with consequently increasing

8   exposure.  At the same time, defendants caused PMI to make a massive investment in FGIC, a

9   financial guaranty entity that was willing to guaranty subprime residential mortgage backed

10  securities ("RMBS") which are backed by high LTV second lien loans, structured investment

11  vehicles ("SIVs") and collateralized debt obligations ("CDOs").  The guaranties provided by FGIC

12  represented risk exposure that PMI Mortgage Insurance Co. Chief Executive Officer ("CEO") L.

13  Stephen Smith ("Smith") had repeatedly stated that PMI Mortgage Insurance Co. did not want

14  exposure to.

15      4.      Wedded to an aggressive business plan to make PMI – historically a conservative and

16  disciplined monoline insurer[2] defined by its well-defined and well-developed underwriting strategies

17  a major player in the mortgage financing and structural finance markets – defendants abandoned

18  PMI's core principles and tied the Company's growth plan insuring high risk mortgage loans and

19  exposing its investors to even higher risk structured finance transactions, through its majority

20  investments were in FGIC.

21      5.      By at least October 2006, defendants knew that the strategy had failed.  As early

22  payment defaults occurred for mortgage loans and mortgage loan delinquencies increased,

23  defendants learned that massive amounts of their riskiest policies, those over 95% LTV and "low

24

25  _____

26  [2]      Monoline insurers (or simply "monolines") guarantee the timely repayment of bond principal
    and interest when an issuer defaults.  They are so named because they provide services to only one
27  industry – i.e., residential mortgage insurance, in the case of PMI Mortgage Insurance Co. or bonds,
    in the case of FGIC.

28

1   doc" and "no doc" loans,[3] were predicated on fraudulent applications.  Indeed, in 2005, defendants

2   learned that 6,300 loans, for which private mortgage insurance policies had been issued, were subject

3   to fraudulent data and processes by one of the major loan originators, NovaStar Financial, Inc.

4   ("NovaStar"), and PMI sought to rescind the mortgage insurance on the loans on that basis.  In

5   addition, over the course of 2006 through 2007, FGIC had issued massive amounts of financial

6   guaranties on billions of dollars of RMBS and CDOs backed mainly by U.S. subprime mortgages or

7   related RMBS.  These same subprime mortgages and securities performances had been rapidly

8   declining in the 2H06 and 2007.  As a major equity holder in FGIC, and with two members of PMI's

9   management on FGIC's board of directors, PMI knew that as delinquencies and foreclosures

10  increased for subprime and Alt-A mortgage loans, the U.S. real estate market continued its steep

11  decline throughout late 2006 and through 2007 making its investment in FGIC impaired.  However,

12  rather than disclosing the impairment as required, PMI and its executives concealed and

13  misrepresented the depressed value of the portfolio from investors.

14          6.      Specifically, defendants issued materially false and misleading statements regarding,

15  *inter alia*: (i) the nature and scope of PMI's underwriting policies and controls; (ii) PMI's exposure

16  to high risk loans; and (iii) the value of its equity investment in FGIC and its extensive investment in

17  risky credit default swap ("CDS") instruments.

18          7.      Defendants' material misrepresentations and omissions during the Class Period

19  caused the price of PMI's common stock to trade at artificially inflated levels throughout the Class

20  Period.  As the truth was disclosed, the price of PMI's common stock trading on the New York

21  Stock Exchange ("NYSE") fell from a Class Period high of $50.21 per share on February 7, 2007 to

22  $6.43 per share on March 4, 2008, the first trading day following the close of the Class Period,

23  thereby causing investors to suffer hundreds of millions of dollars in damages.

24

25

26  _____

27  [3]     *I.e.*, low documentation and no documentation loans.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

**JURISDICTION AND VENUE**

2        8.       The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C.

3   §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange

4   Commission ("SEC") (17 C.F.R. §240.10b-5). Jurisdiction is conferred by §27 of the 1934 Act (15

5   U.S.C. §78aa). Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false

6   and misleading statements were made in or issued from this District.

7

**PARTIES**

8        9.       Lead plaintiff, Locals 302 and 612 of the International Union of Operating Engineers-

9   Employers Construction Industry Retirement Trust, purchased shares of common stock during the

10  Class Period and suffered substantial damages as a proximate result of the violations of law alleged

11  herein.

12       10.      Defendant PMI is a Delaware corporation with its principal place of business and

13  executive offices located at 3003 Oak Road, Walnut Creek, California, during the Class Period.

14  Through its subsidiaries, PMI provides credit enhancement products that promote homeownership

15  and facilitate mortgage transactions in the capital markets in the United States, Australia, New

16  Zealand, and the European Union. PMI is a monoline insurer, meaning that its subsidiary, PMI

17  Mortgage Insurance Co., may only offer mortgage insurance covering first lien, one to four family

18  residential mortgages. It is licensed in all 50 states, the District of Columbia, Puerto Rico, Guam,

19  and the Virgin Islands. PMI's U.S. Mortgage Insurance Operations generated the vast majority of

20  the Company's revenues in FY06. It accounted for 67.8% of total revenue. In addition, PMI is a

21  majority shareholder in FGIC, the holding company of Financial Guaranty Insurance Company, a

22  New York domiciled financial guaranty insurance company. PMI stock trades under the symbol

23  "PMI" on the NYSE. During the Class Period, PMI had approximately 81 million shares of

24  common stock outstanding, and its shares traded in an efficient market on the NYSE.

25       11.      Defendant L. Stephen Smith joined PMI in 1979. He has served as Chairman of the

26  Board of Directors of PMI since May 2007 and has been a director since February 2002. He has

27  been CEO of PMI since June 1, 2006 and President and Chief Operating Officer ("COO") of PMI

28  since September 1998. Prior to 1998, Smith held various executive positions with the Company.

1   During the Class Period, Smith also served on the board of directors of FGIC along with Bradley M.

2   Shuster ("Shuster"), President of PMI's International and Strategic Investments.  During the Class

3   Period, Smith disposed of $6.9 million of PMI stock while in possession of material non-public

4   information at artificially inflated prices.  Smith signed PMI's Forms 10-K for the years 2006 and

5   2007.

6        12.    Defendant Bradley M. Shuster has been President, International and Strategic

7   Investments of PMI, and President and CEO of PMI Capital Corporation since January 1, 2003.

8   Between 1999 and 2003, Shuster was Executive Vice President ("EVP"), Corporate Development of

9   PMI.  Prior to 1999, he served as Senior Vice President, Treasurer, and Chief Investment Officer of

10  PMI.  Before joining the Company, defendant Shuster was an audit partner with the accounting firm

11  of Deloitte & Touche LLP where he was employed from January 1978 to July 1995.  He remains a

12  certified public accountant.  During the Class Period, Shuster disposed of $2.1 million of PMI stock

13  while in possession of material non-public information at artificially inflated prices.

14       13.    Defendant David H. Katkov ("Katkov") has been EVP of PMI since August 2001 and

15  President and COO of PMI since June 2006.  Prior to that, Katkov held a variety of executive

16  management positions in sales, structured transactions, product development, and portfolio

17  management.  During the Class Period, Katkov disposed of $531,000 of PMI stock while in

18  possession of material non-public information at artificially inflated prices.

19       14.    Defendant Donald P. Lofe, Jr. ("Lofe") has been EVP of PMI since January 2003 and

20  has been Chief Financial Officer ("CFO") of PMI since April 1, 2003.  Lofe is responsible for PMI's

21  financial reporting and signed all of PMI's SEC Forms 10-Q and 10-K during the Class Period.

22                            **CONTROL PERSONS**

23       15.    Defendants Smith, Shuster, Katkov and Lofe (collectively, the "Individual

24  Defendants") were the most senior executive officers of the Company with significant tenure in the

25  financial industry.  Smith had been a senior executive at PMI for 29 years, Shuster for 13 years, and

26  Katkov for seven years.  Lofe, who joined PMI in 2003, was Senior Vice President, Corporate

27  Finance for The CNA Financial Corporation from 1998 to 2003 and an audit partner with

28  PricewaterhouseCoopers LLP for 20 years prior to that.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    16.    Even more significant than their overall experience was that throughout the Class

2    Period, the Individual Defendants repeatedly extolled their direct day-to-day involvement both in

3    evaluating PMI's portfolio and monitoring the housing market in an effort to reassure investors that

4    the Company had correctly assessed the risks and PMI's overall business:

5    (a)    In the November 2, 2006 3Q06 earnings conference call (with all the

6    Individual Defendants participating), Katkov emphasized that the Company's credit risk profile is a

7    reflection of management's decisions: "I think we tried to show you in a lot of detail that we've

8    made very conscious choices about the types of risk that we are taking in the market, both in our

9    flow and in our structure transaction. ***I think it's very consistent with the way we've run the***

10    ***company for years***."

11    (b)    In the February 5, 2007 earnings conference call for 4Q06 and FY06,

12    defendant Lofe stated that not only does management closely watch market developments, but its

13    management's judgment that is a "very important component" of the Company's forecasts:

14        Do we watch Alt-A?  Absolutely.  We watch it like a hawk.  Do we watch
          geographies? Yes we do.  Is it going to be a challenging market in '07?  Yes,
15        undeniably.  But I think the team has proven that we have a very good handle on loss
          development.  And I guess the last answer to the question is, we are not exclusively a
16        model-driven company.  As you know, we look at the model.  They're very
          important to our developmental losses, ***but management judgment is a very***
17        ***important component*** and we take both.

18    Again, Katkov also echoed management's role in forecasting: "I believe the management team over

19    the last several years has been very reliable in terms of how we are forecasting our future loss

20    environment."  The Individual Defendants also monitored the housing market very closely.  As

21    Katkov stated at the February 12, 2007 Goldman Sachs Housing Conference: "We look at home

22    prices as you would imagine, very, very closely."

23    (c)    Throughout the Class Period, risk management remained a dominant theme.

24    At the February 14, 2007 Merrill Lynch Insurance Investor Conference, Smith emphasized

25    management's experience in risk management: "So now, let me get to the one that you're probably

26    most interested in, which is the overall credit outlook for PMI.  Number one, it's the core

27    competency of our company.  We're professional risk managers.  It's what we do day in and day out

28    is the key point."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1           (d)     At the Wachovia Securities CEO Summit on June 26, 2007, Smith discussed

2    how his active role in the Company – which included talking to customers – influenced the

3    Company's risk management: "I have been talking actively with our customers, with the Federal

4    Reserve, with the OCC and others, the National Association of Homebuilders for over three years

5    now about the layering of risk characteristics that have been going on in the marketplace. We were

6    keenly aware of that in our own risk management and portfolio."

7          17.    Even as the Class Period wore on and the reports prepared by confidential witness

8    ("CW") 1 reflected that several of PMI's top ten lenders (who were delegated underwriters) were

9    writing policies that did not comply with PMI's guidelines, and one of those lenders, IndyMac

10   Bancorp Inc. ("IndyMac"), was so deficient that by the end of 2007, PMI disqualified them from the

11   program, but the Individual Defendants continued to reassure investors that they were able to

12   appropriately assess PMI's risks. At the Lehman Brothers 5th Annual Financial Services

13   Conference on September 10, 2007, Smith repeated his reassurances concerning defendants' ability

14   to monitor and appropriately assess PMI's risks: "So now let's talk about probably what you're most

15   interested in is the overall credit outlook for PMI. First, let me say fundamentally we are risk

16   managers. It's what we do day and day out, it's the fundamental franchise, it's understanding the

17   risk, pricing it appropriately, understanding the operational risk and monitoring those and delivering

18   a sound outcome."

19         18.    Because of their positions of control and authority as officers and/or directors of the

20   Company, the Individual Defendants were able to and did control the contents of PMI's quarterly

21   and annual financial reports, SEC filings, and press releases. In addition, as a result of their direct

22   involvement in PMI's business and the reports they received and reviewed, each Individual

23   Defendant had access to the adverse non-public information about PMI's business, finances,

24   products, markets, and present and future business prospects particularized herein, via access to

25   internal corporate documents, conversations or connections with corporate officers and employees,

26   attendance at PMI (and FGIC) management and/or Board of Directors meetings and committees

27   thereof and via reports and other information provided to them in connection therewith.

28

19.     The Individual Defendants are liable under §20(a) of the 1934 Act for the false statements and fraudulent schemes pled herein, as those false statements and fraudulent schemes were the result of the collective action of the Individual Defendants, who were "control persons" of the Company.   In addition to their management roles, the Individual Defendants were directly involved in conference calls throughout the Class Period.  As such, the Individual Defendants are also liable for such statements under §10(b) of the 1934 Act and the "group published information" inference.

## CONFIDENTIAL WITNESSES

20.     Many of the allegations included herein are based on information provided by former PMI and/or FGIC employees referred to as confidential witnesses (CW).  The information provided by former employees is reliable and credible because (1) each witness worked at PMI or FGIC during the Class Period, (2) each witness has personal knowledge of the information provided, (3) the witness' job title, position and responsibilities show he/she has personal knowledge of the information provided, (4) many of the witnesses' accounts corroborate one another, and (5) the witness accounts are corroborated by other information alleged herein.

(a)     CW1 was a former Vice President of National Account Operations with PMI's U.S. mortgage segment from May 2006 until CW1 was let go by the Company in April 2008.  As Vice President of National Account Operations, CW1 was tasked with, among other things, various data tracking and client interfacing functions.  That is, CW1 was required to analyze and monitor the lenders' portfolios and to report on the performance of the portfolios.  While at PMI, CW1 was responsible for Countrywide Financial Corporation ("Countrywide"), Washington Mutual, Inc. ("WAMU"), and IndyMac – three national accounts which were among PMI's top ten customers. During CW1's tenure, all of these lenders were "delegated lenders" meaning they had the authority to issue PMI mortgage insurance certificates because they presumably complied with PMI's underwriting guidelines.  Throughout CW1's employment at PMI, the witness reported that the Countrywide, WAMU, and IndyMac portfolios yielded results that consequently demonstrated that the portfolios of these lenders were often and regularly performing below the standards PMI established.  Additionally, the witness noted that the portfolios of "vintage" years, including 2006

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  and 2007, were particularly performing below PMI's established risk metrics beginning by at least

2  spring 2007.  (The term "vintages" is used regularly in the mortgage investment industry to refer to a

3  year in which the notes in pools of mortgages were originated.)  In fact, according to CW1, in the

4  beginning of 2007, and continuing and escalating throughout the year, IndyMac failed to comply

5  with PMI's standards.  By December 2007, PMI disqualified IndyMac as a qualified delegated

6  lender.

7          (b)      In addition to monitoring lender portfolios, CW1 also prepared and submitted

8  reports regarding the performance of the portfolios.  CW1 prepared reports on an ad hoc, weekly,

9  monthly, and quarterly basis, which were, among other things, extremely comprehensive in terms of

10  setting out portfolio performance and delinquency or default data.  The reports were typically in the

11  form of spreadsheets, which often consisted of some 50 pages or more for each lender.  The reports

12  were submitted via e-mail and sometimes in hard copy format and provided the hard data about the

13  performance of the portfolio which was used in order to publicly report on the results of operations.

14  In fact, CW1 stated that by spring 2007, there was an increasing sense of urgency about the data and

15  he/she was asked to prepare more reports on an ad hoc basis.  According to CW1, even as the reports

16  showed that beginning in at least spring 2007, the portfolios of Countrywide, WAMU, and IndyMac

17  were not performing according to PMI's risk metrics, PMI continued to keep insuring the loans

18  originated by these clients despite the fact that they did not meet PMI's risk standards.

19          (c)      Further, according to CW1, PMI often knew about delinquent loans before the

20  lenders.  As CW1 explained, PMI had more stringent requirements for identifying and tracking

21  delinquencies on loans than the lenders did because of PMI's statutory reporting requirements as an

22  insurance company.  For example, CW1 explained that the lenders considered and reported

23  delinquencies on mortgages they originated after the payment on the loan had not been received for a

24  period of at least 30 days and, in some cases, for as long as 90 days.  In the interim between when

25  the payment was due and the 30-to 90-day period when the lender recorded the loan as being

26  delinquent (and ultimately reported it to PMI as a default), the servicer of the loan had personnel

27  trying to reach the borrower through phone calls and even visiting the residence of the borrower to

28  determine if the borrower intended to make a payment on his or her loan.  If these efforts by the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    servicer personnel failed and the borrower did not make a payment for as long as 90 days, the

2    lenders then considered the loan to be delinquent and/or in default.  However, because PMI is an

3    insurance provider, it is governed by statutory requirements that demand PMI identify delinquencies

4    on loans on "day one" that the loan becomes delinquent – or the first day after the missed payment.

5    PMI was then required to adjust its reserves based on the number of loans that are delinquent during

6    the statutory reporting period.

7            (d)        According to CW1, as PMI began writing policies on no-doc loans, there were

8    few means that PMI could use to avoid paying fraudulently obtained policies.  In fact, according to

9    CW1, the quality control processes at PMI (and at the government-sponsored entities ("GSEs"))

10   were developed prior to wide-spread origination of no-doc loans so that it was difficult to identify

11   and control fraud associated with such loans and/or hold these loans to particular quality control

12   standards.  In the case of no-doc loans, about the only thing PMI had to "hang its hat on" was some

13   type of misrepresentation in the appraisal, which was often hard to prove.

14           21.        CW2 was employed with PMI as a contract underwriter from August 2007 to May

15   2008 and was assigned to underwrite mortgage loans at ABN AMRO in Ann Arbor, Michigan.  In

16   this capacity, CW2 was responsible for underwriting Alt-A loans, which were sometimes wrapped

17   with PMI mortgage insurance, depending on the LTV ratio and other factors.  There were

18   approximately 12 PMI contract underwriters assigned to ABN AMRO when CW2 was assigned to

19   the facility in August 2007.  The underwriters were assigned to groups, including a full

20   documentation group, a stated income – stated asset group, a verified income – stated asset group, a

21   jumbo loan group, and an Alt-A loan group (to which CW2 was assigned).  When CW2 joined PMI

22   in August 2007, he/she was expected to underwrite three to four loans per day.  By November 2007,

23   when Citigroup had acquired ABN AMRO, CW2 was "lucky" to underwrite one loan per day.  The

24   senior underwriters at Citigroup encouraged the underwriters to approve two loans per day, but CW2

25   said that because of the new systems that were implemented and the decline in mortgage originations

26   beginning in at least November 2007, it was becoming increasingly difficult to do any more than one

27   loan per day.  In early 2008, CW2 said that the contract underwriters were "assigned" loans because

28   the inventory was so low.  By contrast, when CW2 joined PMI in August 2007, once a loan was

1   approved, one could simply pull another loan from the system.  By May 2008, CW2 and the other

2   contract underwriters were laid off.

3       22.     CW3 was employed by FGIC as part of its quantification risk management team from

4   approximately July 2006 through April 2008 and was assigned to the role of Corporate Risk

5   Manager, in which he/she was tasked with developing risk models at the Company.  In 2007, CW3

6   noted his/her models showed that particularly with the 2006 vintage, potential losses on the

7   underlying collateral were an estimated 12%, which according to CW3, equated to approximately

8   $100 million.  The 12% loss estimate was between three to four times FGIC's historical range.

9   Further, while CW3 was responsible for running the models and estimating potential losses, he/she

10  did not develop them and reported that one of the factors included in the model was "home price

11  appreciation," which the model used as one of the inputs in determining the likely estimated

12  potential cumulative losses on the mortgages that represented the underlying collateral, in particular

13  special investment vehicles ("SIVs"), credit default swaps, and other similar types of products.

14  According to CW3, by 2H07 and continuing through early 2008, "delinquencies" on the underlying

15  collateral started to "pile up."   As such, the losses were constantly adjusted upwards.  This was

16  significant because, as the witness explained, even at 12% estimated potential losses, the

17  delinquencies on underlying collateral impacted lower rated CDOs tranches where FGIC ***did not***

18  have exposure.  However, in the 14%-15% estimated potential losses on underlying collateral range,

19  losses on tranches where FGIC ***did*** have exposure were inevitable.  Beyond the 14%-15% estimated

20  potential losses on underlying collateral range, CW3 noted that there were "quantum leaps in losses"

21  for FGIC.  By the end of 2007 and into early 2008, it was widely recognized throughout FGIC that

22  the Company faced significant exposure particularly on its asset-backed securities assets.  CW3

23  understood that beginning in October/November 2007, PMI representatives began requesting more

24  information regarding FGIC's potential losses.

25                                    **SUBSTANTIVE ALLEGATIONS**

26  **PMI, a Successful Monoline Insurer, Becomes a Publicly Traded Company in 1995**

27      23.     Founded in 1972, PMI, a private mortgage insurance company, became a publicly

28  traded company through an April 1995 initial public offering ("IPO") that raised approximately

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  $962.5 million through the sale of nearly 27.7 million shares.  Private mortgage insurance typically

2  is used by mortgage lenders to reduce their credit risk in low down payment, high LTV mortgage

3  loans as well as to enhance their ability to sell the loans into the secondary mortgage market,

4  principally to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home

5  Loan Mortgage Corporation ("Freddie Mac").  Mortgage insurance is purchased by mortgage

6  bankers/savings institutions, commercial banks and other mortgage lenders.  Home purchasers who

7  make down payments of less than 20% of the value of their home are usually required by the

8  mortgage lender to qualify and pay for primary mortgage insurance on their mortgage loans.  If the

9  homeowner defaults on the mortgage loan, mortgage insurance reduces and, in some instances,

10 eliminates any loss to the insured lender.

11         24.     PMI's revenues, as those of all mortgage insurers, are derived primarily from

12 premiums earned (and, to a lesser extent, investment income).  As a result, there are three metrics

13 used to measure the success of the business.  Because premiums are charged based on the principal

14 balance of insured mortgage loans, a primary determinant of revenue growth is increases in

15 insurance in force.  Growth in insurance in force is a function of new insurance written ("NIW") as

16 well as persistency (the degree to which existing policies remain in force and continue to generate

17 premiums).  The Company's NIW is also used to determine the Company's success and the degree

18 to which the Company is effectively competing in the marketplace for new business.  When PMI

19 went public, for example, it was the third largest private mortgage insurer in the United States, based

20 both on new primary insurance written in 1994 and direct primary insurance in force on December

21 31, 1994.  PMI's underwriting income is derived from the amount of premiums earned, its loss

22 experience and its level of operating expenses.  Loss experience depends upon claim frequency (the

23 percentage of insured loans resulting in a paid claim) and claim amount.  From its inception and

24 throughout the 1990s, PMI's strategy was to maintain a leading position in the private mortgage

25

26

27

28

1    insurance industry,[4] and increase its profitability by growing its insurance in force from which it

2    earns premiums while sustaining the quality of its insurance portfolio through disciplined

3    underwriting.  PMI's overall risk management is based on loan-by-loan underwriting and utilizes its

4    proprietary underwriting technology designed to improve underwriting results, underwriting

5    efficiency and bring consistency to the underwriting judgment process.

6            25.    PMI touted its development and use of automated underwriting systems in the

7    mortgage insurance industry, having introduced its proprietary automated underwriting model

8    (pmiAURA$^{SM}$) in 1987.  The Company has also used its proprietary automated residential appraisal

9    analysis system (pmiTERRA$^{SM}$) since late 1991.  In 1995, PMI's pmiAURA$^{SM}$ model had a database

10   of approximately 650,000 borrower profiles to predict the likelihood of default for each mortgage

11   loan.  PMI is currently in the process of updating the pmiAURA$^{SM}$ database with newer data and is

12   adding economic and demographic information to the database in order to enhance pmiAURA$^{SM}$'s

13   predictive power.  Further, pmiTERRA$^{SM}$, which contains over 400,000 residential property profiles,

14   complements pmiAURA$^{SM}$ by providing an automated analysis of residential appraisals.  The

15   Economic and Real Estate Trends Report, prepared by PMI's National Real Estate Appraiser, is used

16   by PMI to analyze regional and local market conditions and to help establish territorial underwriting

17   guidelines.  The rating generated by this report is incorporated in the automated appraisal review

18   process during the underwriting evaluation.  These tools, in conjunction with PMI's experienced

19   field underwriting staff, enable PMI to implement risk management approaches tailored to specific

20   real estate markets.  The Company stated that, in addition to improving underwriting results, PMI's

21   automated underwriting systems improved its underwriting efficiency and have brought consistency

22   to the underwriting judgment process.

23           26.    Throughout PMI's existence, in addition to the automated underwriting systems, the

24   Company continually monitored and adjusted the diversification of its insurance portfolio by

25   _____

26   [4]      The private mortgage insurance industry has been and continues to be highly concentrated
     with between seven and nine private companies, as well as various federal and state governmental
27   and quasi-governmental agencies, principally competing for the business.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  emphasizing more profitable geographic regions and risks.  For example, PMI managed its new risk

2  written in California from 26.9% of its total new risk written in 1992 to 21.1% in 1993 and 19.4% in

3  1994 primarily by applying revised underwriting guidelines which addressed the adverse economic

4  conditions experienced by that state during such period and, to a lesser extent, by focusing on other

5  regions, particularly the central region, of the United States.  Further, in December 1993, PMI

6  decided to discontinue its mortgage pool insurance business segment because the risk characteristics

7  and the performance of such business did not meet PMI's expectations, which also had the effect of

8  reducing new primary risk written in California.

9        27.     These processes and procedures enabled the Company, in its IPO Registration

10  Statement, to crow that "[m]anagement believes PMI is a leader in the mortgage insurance industry

11  due to its focus on customer service, value-added products and services, disciplined risk

12  management techniques, experienced sales and management teams, as well as its financial strength."

13  **The Housing Market Explodes in 2002-2005 – PMI Is Marginalized in the Market**

14        28.     In the aftermath of the dot-com bust in 1999, the U.S. economy went into a recession

15  from 2000-2001.  This downturn was further exacerbated by the attacks on September 11, 2001.  In

16  an effort to stimulate the economy by expanding the money supply and encouraging borrowing, the

17  Federal Reserve Board repeatedly cut the federal funds rate[5] – from 6.5% in May 2000 to 1.75% at

18  the end of 2001 and finally to 1% in June 2003.[6]  These interest rate cuts facilitated the inexpensive

19  borrowing by consumers which fueled the housing boom.  From 1980 to 1994, home ownership in

20  the United States hovered around 64%.  It then steadily increased each year though 2004, when it

21  reached the highest point on record, 69.2%.  Thus, the cheap credit in 2002 and 2003 allowed

22  households to purchase homes.

23

24

25  [5]      The federal funds rate is the overnight rate which banks charge to each other for loans made
26  to fulfill reserve funding requirements.

27  [6]      *See* the Federal Reserve Board website, *available at* http://www.federalreserve.gov/fomc/
   fundsrate.htm (last visited Sept. 3, 2008).

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    29.    Additionally, from 2002 to August 2005, speculation in the housing market was
2    rampant, loans were readily available and home prices were soaring. Markets in California, Florida,
3    and the Northeast were experiencing home price appreciation ("HPA") of 10% annually.

4    **Accelerating HPA Drives Up Demand for Faster and Innovative Mortgages**

5    30.    From 2002 to 2005, the average purchase price of homes nationally rose steadily from
6    $266,400 to $274,200 to $287,500 to $318,200, respectively.[7]   However, the housing bubble was a
7    localized phenomenon.  Out of the 20 largest metropolitan areas tracked by S&P/Case-Shiller home
8    price index, six metropolitan areas (Dallas, Cleveland, Detroit, Denver, Atlanta, and Charlotte)
9    experienced less than a 10% price growth in inflation-adjusted terms from 2001 to 2006.[8]   Seven
10   metropolitan areas (Tampa, Miami, San Diego, Los Angeles, Las Vegas, Phoenix, and Washington,
11   D.C.) appreciated more than 80% in the same period of time.[9]

12   31.    Housing prices increased dramatically in comparison to median incomes.  Until 2000,
13   nationally weighted average home prices rose closely in line with median household incomes and
14   general price inflation.  Since then, however, house price appreciation has shot ahead of these
15   benchmarks, outstripping income growth more than six-fold from 2000 to 2005.  As a result, the
16   median house price exceeded the median household income by at least four times in a record 49 of
17   145 metropolitan areas, and by more than six times in 14 metropolitan areas.

18   32.    Fuelled by a belief that HPA would continue indefinitely, buyers ought to obtain, and
19   lenders ought to grant, financing as quickly and easily as possible, creating ever more innovative
20   (and risky) mortgage instruments.  Because lenders were offering loans with no upfront layout,
21   borrowers were easily able to purchase homes for investment.  Rising HPA and cheap access to
22   credit caused speculators to "flip" houses – *i.e.*, purchasing and reselling a home at a profit.  This

23   ─────────────────

24   [7]    Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing* (2008).

25   [8]    *See* S&P/Case-Shiller Home Price Indices, *available at* http://www2.standardandpoors.com/
26   portal/site/sp/en/us/page.topic/indices_csmahp/0,0,0,0,0,0,0,0,0,1,5,0,0,0,0,0.html (last visited Sept. 3, 2008).

27   [9]    *Id.*

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  activity further fuelled the housing boom by creating bidding wars and artificially increasing demand

2  – and in turn generating new loans and new loan programs.

3  **The Growth of the "80/20s" and Low Doc and No Doc Loans**

4      33.    The historically low interest rates coupled with extensive HPA not only drove down

5  the cost of credit but, because the market was so growing so fast, lenders sought to be able to write

6  mortgage loans as quickly as possible by offering loan programs that required less documentation

7  and greater automated processes to underwrite, approve and fund.  The result being that the basic

8  credit decision to lend or not was "watered down" to the point where a lender could not be sure of

9  the integrity of the information being received.

10      34.    The government-sponsored entities ("GSEs"), Fannie Mae and Freddie Mac, are the

11  largest purchasers of residential mortgages.  The GSEs purchase residential mortgages from lenders

12  and investors as part of their governmental mandate to provide liquidity in the secondary mortgage

13  market.  As the GSEs have traditionally been the principal purchasers of conventional mortgage

14  loans, mortgage lenders typically originate loans that conform to their guidelines.  Generally, under

15  the GSEs coverage requirements, lenders have been required to have the original amount be no

16  greater that 80% of the LTV of the property.  In loans that were greater than 80% LTV – low down

17  payment loans – the borrower was required to have private mortgage insurance and comply with the

18  stringent underwriting requirement developed by PMI and the other private mortgage insurers in

19  order to satisfy GSE requirements.  With lenders seeking to underwrite mortgages faster for more

20  borrowers, these restrictions, while guarding against risk, were cumbersome and time consuming.

21  Moreover, private mortgage insurers not only delayed and increased the timing of the loan process,

22  but they added costs that, if eliminated, could be obtained by lenders.

23  **Lax Underwriting Standards Reduce Required Documentation**

24      35.    The secondary market for mortgages grew stronger making mortgage origination

25  highly profitable, highly automated, and led to the development of innovative – and risky – loan

26  products.  Lenders did away with various documentation requirements, creating "low doc" and "no

27  doc" loans.   For instance, lenders typically required that they verify a potential borrower's

28  employment, rental payments, income and assets by supplying pay stubs, W-2 forms and bank

1  statements. As pressure built to originate more mortgages, less and less verified information was

2  required. For instance, a "Stated-income Stated-asset" loan eliminated the requirement basic to the

3  traditional credit approval process, whereby pay stubs and W-2s would be provided by the borrower

4  and verification of assets would be provided by a financial institution. Such a loan typically required

5  no verification of the information provided on the loan application. In addition, the borrower(s) may

6  have completed a form allowing the lender to verify income via past tax returns with the Internal

7  Revenue Service ("IRS") (known as a "Form 4506"), but it was the policy of lenders not to submit

8  such requests to the IRS for fear of finding out that the information on the loan application was

9  misstated. Given the mortgage secondary market, acceptance of low doc/no doc/stated loans, and

10  the desire for ever larger commissions, lenders had no trouble offering these products because the

11  inherent risk of such loans was ultimately shifted to investors who purchased RMBS and CDOs.

12  The result being borrowers who would not have qualified for loans in the past were suddenly being

13  qualified on the spot due to minimal credit requirements and automated processing.[10] Mortgage

14  denial rates for conventional home purchase loans, reported under the Home Mortgage Disclosure

15  Act, dropped from 29% in 1998 to 14% in 2002 and 2003.[11]

16        36.    In addition to lax underwriting standards and credit impaired loan products, the

17  average loan amounts grew during the housing boom. Not only did speculation in the market drive

18  up average home price, thus resulting in larger loan principal amounts, but lenders were willing to

19  loan larger percentages of a home's value – very often loaning up to 100% of the underlying

20  collateral or home value. This increase in high LTV loans was partially driven by the belief that

21  rapid HPA would put the borrower above water in one to two years. Of course, the flip side of this

22  was that borrowers would be underwater if HPA stopped its rapid ascent.

23

24  [10]    An EVP from Countrywide Home Loans, Inc. bragged that: "We are able to produce a

25  decision [on a mortgage application] inside of 30 seconds today." *Available at*
    http://www.banktech.com/story/featured/showArticle.jhtml?articleID=21401117 (last visited Sept. 4,

26  2008).

27  [11]    Federal Financial Institutions Examination Council, Press Release (July 26, 2004), *available
    at* http://www.ffiec.gov/hmcrpr/hm072604.htm (last visited Sept. 4, 2008).

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

37.    In approximately 2001, lenders began to originate mortgages that have a first mortgage lien with 80% LTV and a second mortgage lien ranging from 5%-20% LTV. These loans, referred to variously as "80/20s," "80/10/10," "80/15/5," or "piggyback," loans effectively eliminated the need for private mortgage insurance, and allowed lenders to write both the first and second lien loans, thereby eliminating the constraints that mortgage insurers had placed on mortgage loan transactions in the past. This piggyback structure represented a powerful substitute for mortgage insurance and the mortgage insurance industry was alarmed at the prospect of losing substantial business to this mortgage financing structure. Because the first mortgage is only an 80% LTV, the GSEs do not require mortgage insurance with respect to either mortgage. Although the 80/20s had been in the market since at least the late 1990s, they began to gain in popularity as interest rates rapidly declined and high HPA allowed lenders to tap into home equity line of credit lending in 2001-2003. By 2003, these loan products had cut into PMI's insurance business such that its persistency rate had declined by over 55%, far beyond any historical decline from 2000-2003, as the following table illustrates:

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Average Annual Mortgage Interest Rate* | 7.8% | 7.6% | 6.9% | 7.4% | 8.1% | 7.0% | 6.5% | 5.8% |
| Persistency Rate | 83.3% | 80.8% | 68.0% | 71.9% | 80.3% | 62.0% | 56.2% | 44.6% |

*Average annual thirty-year fixed mortgage interest rate derived from Freddie Mac and Mortgage Bankers Association data.

38.    PMI was faced with a dilemma given the existing market conditions; if it maintained high standards and practices, its NIW and persistency rates would decline dramatically reducing revenue and ultimately PMI's stock price. PMI had two choices: (a) shrink the Company by maintaining standards and waiting for the housing market to implode, or (b) reassert itself in the market by offering to insure higher risk loans and investing in FGIC which provided financial guaranties for transactions that PMI deemed too risky. PMI chose the latter choice where it reasserted itself in the market by offering to insure riskier loans and risky transactions through FGIC. As the Company acknowledged, as the LTV exceeded 90%, and approached 100% or above, the

1    default rate would increase (since the borrower has less or in some cases no equity in the property)

2    and the claim frequency would correspondingly increase.  Moreover, in the lax underwriting

3    environment, at the same time PMI began increasing its portfolio of the riskiest loans, it also

4    increased its Alt-A loans with limited or no documentation – by 400% between 2001 and 2005.  In

5    2005, PMI acknowledged that the increase in these loans was driven by market conditions and was

6    the result of higher concentrations of these loans in both the mortgage origination market as well as

7    the private mortgage insurance market.  Not only are these "low doc and no doc" loans subject to a

8    greater risk of default (frequency), but also subject to greater losses or severity given that loan to

9    values were increasing based on HPA.

10   **In 2003, PMI Invests in FGIC and Takes on Extensive Exposure to Subprime Loans**

11          39.     As the risk of the creative financing and securitizations cut into PMI's core business,

12   defendants sought additional means to participate in the new market.  In 2003, PMI became a

13   majority investor in FGIC with the goal of growing its business.  FGIC, established in 1983, had

14   been focused on financial guaranties for the municipal bond business, and typically guarantees the

15   scheduled payments of principal and interest on an issuer's obligations for public finance and

16   structured finance transactions.

17          40.     FGIC was sold to a group of investors during 2003 by General Electric Company

18   ("GE").  According to a Standard & Poor's ("S&P") article from August 2003, FGIC had only

19   selectively participated in the mortgage and home equity loan sectors prior to being purchased from

20   GE.  However, FGIC planned to broaden its participation from 2004 forward to the RMBS areas to

21   include prime and sub-prime mortgages, home equity loans, high loan-to-value loans, and

22   commercial MBS (mortgage backed securities).  As a February 24, 2004 article in the Bond Buyer

23   by Helen Change stated, "With new management and strategy in place, Financial Guaranty

24   Insurance Co. continues to move away from the conservative approach to underwriting it took when

25   it was owned by General Electric Co.  This quarter [1st quarter of 2004], as the bond insurer

26   completes its reorganization and additional hiring, it will take a more aggressive approach to

27   underwriting, beginning with forays into the housing and health care sectors and structured finance,

28   company officials said."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

41.   As of April 21, 2004, FGIC had announced that it had hired personnel to initiate FGIC's efforts to begin offering financial guaranties in the CDO market.  The CDO effort would be reorganized during June 2006.  The majority of the financial guaranty activity for FGIC related to CDOs took place after January 2005.  During 2005, FGIC established credit default swap execution capacity.  During May 2004, FGIC hired two new personnel to continue to expand its structured financing business.   The majority of the financial guaranty insurance provided for RMBS collateralized by second lien loans took place after September 2004.  As of April 6, 2005, FGIC had hired Donna Troia to join FGIC as Managing Director, Risk Management.  She would be responsible for FGIC's surveillance efforts for its insured book of business.  At the same time, David Howard, at FGIC, Chief Portfolio Risk Officer, noted: "As FGIC grows its book of business, it's imperative that we also dedicate the proper resources to oversee the insured portfolio."

42.   By 2004, FGIC was thus clearly involved in securitized debt transactions which increased over the next several years.  FGIC's financial guaranties for RMBS and typically the CDOs were structured as credit default swap (CDS).  There are no margin or collateral posting requirements in FGIC's CDO exposure.  With respect to the CDO/CDS transactions, FGIC attaches at the senior or super senior attachment point to minimize volatility.  CDS must be marked to market each quarter as they are classified as derivatives for accounting purposes.  FGIC had approximately $12.8 billion in CDO exposure as of September 2007.  The CDOs of ABS are 75% high grade and 25% mezzanine credits.  However, the underlying collateral is concentrated in subprime RMBS, mostly originated in 2005 and 2006.  The subprime RMBS used in the CDO transactions were typically rated BBB and such securities were aggregated in CDO transactions to generate AAA rated bonds.

43.   As of June 16, 2006, FGIC made a strategic decision as outlined in a press release, to expand its CDO-related businesses:

> Tom Adams, Senior Managing Director and head of the Consumer Asset-Backed/CDO Group at FGIC, noted, "FGIC is always looking for areas where we can add value, which is the mission of our newly reconfigured CDO team.  In addition, as FGIC expands its efforts in synthetic risk distribution [*e.g.*, CDS], we decided to combine this with our CDO area, as both businesses use common tools and interact with similar counterparties.  We also felt it made sense to centralize our global coverage in New York to ensure a consistent approach to the CDO market."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI
- 20 -

1   The timing of the decision could not have been worse, however, as the subprime mortgage market

2   (the majority of the collateral or reference portfolio for CDOs/CDS) was beginning to deteriorate

3   rapidly.

4        44.    By November 2006, there were clear signs that CDO performance was suffering due

5   to the delinquency rates of the underlying RMBS.  According to a Deutsche Bank report, about half

6   of 2006 CDO issuance was comprised of structure finance CDOs backed by subprime RMBS (a.k.a.

7   HEL).  There were significant pricing differences with respect CDOs backed by subprime RMBS

8   versus other structure products as noted below:

9

10

11

12

13

14

15

16



17        45.    By 4Q06, there were many indicators pointing to significant problems in both the

18  subprime and Alt-A mortgage loan performance.  In addition, as noted, the 2006 subprime vintage

19  performance had remarkably early payment defaults with higher delinquency rates for the 2006

20  vintage loans – a key indicator of problems in the performance of the loans:

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

## The Crisis in Subprime Mortgage Market

2

3

4



5

6

7

8

9

10

11

12

13

46.      Thus, by December 2006, there was sufficient information known to the Individual

14

Defendants that indicated that PMI's investment in FGIC was threatened as a result of FGIC's

15

subprime and second lien loan exposure embedded in RMBS, CDOs and SIVs with FGIC financial

16

guaranties.  Indeed, by December 2006, the following market events had occurred: (a) the ABX

17

Index (tracking BBB rated subprime RMBS) indicated that subprime security performance was

18

deteriorating and subprime RMBS were selling at steep discounts; (b) there were early payment

19

defaults occurring on mortgage loans which confirmed the existence of fraud; (c) buyers of mortgage

20

loans were requesting that the mortgage banking originators repurchase defaulted loans with

21

misrepresentations; (d) there was a dramatic rise in delinquencies for subprime mortgage loans;

22

(e) CDO performance was deteriorating; (f) home prices began to fall or become stagnate: year-on-

23

year percent change in existing median U.S. home prices; (g) mortgage fraud continued to rise after

24

dramatically increasing in 2005; and (h) subprime and Alt-A mortgage loan originators were closing

25

or winding down business.

26

47.      By 2H07, FGIC had approximately 11% or $34.7 billion of a total of $314.7 billion in

27

net par in force insuring MBS transactions (non-CDO).  Of this exposure, $8.8 billion is tied to

28

subprime mortgages, or 2.7% of the total net par in force.  Another $18.6 billion or 5.9% of total net par in force is related to prime (Alt-A mortgage loans with low documentation) home equity and closed end seconds transactions.  Approximately 80% of the subprime MBS is rated A or higher, with 75% of the vintages post-2004.  Approximately 78% of the prime home equity MBS is rated BBB (lowest investment grade) with 77% of the vintages post-2004.  Countrywide is the largest issuer at 46% of these transactions.  As set out below, defendants' involvement with FGIC and their corresponding knowledge of the problems with the housing market and PMI's portfolio are indicative that PMI's investment in FGIC was other than temporarily impaired by at least 3Q07 and should have been written down by then if not earlier.

**In 2005-2006 Defendants Learn that Many of Their Loans Are the Product of Fraudulent Applications Resulting in Increasing Risk of Default**

48.    Even as defendants continued to insure more and more Alt-A and low doc loans, they learned, both through their monitoring and knowledge of the mortgage and housing market as well as from internal reports, that lenders (particularly PMI's largest ones) were not adhering to strict guidelines and that there was a substantial risk to PMI's portfolio.  For example:

(a)    In 2005, a white paper issued by the Federal Financial Institutions Examination Council ("FFIEC") in Washington, D.C. reported that as many as 10% of all mortgage loan applications annually in the U.S. residential real estate market involved "material misrepresentation."

(b)    In October 2005, *USA Today* reported: "As the U.S. housing market hits record highs, mortgage fraud appears to be rising from California to Florida."  The story quotes the author of a report on mortgage fraud, who noted that "[f]raud is costing the industry at least tens of millions of dollars a year."

(c)    By early 2006, HSBC Holdings PLC ("HSBC"), one of the country's largest lenders, was seeing indications that delinquencies were going to be worse than expected.  In August 2005, HSBC issued a memo to companies from which it was buying loans.  The paper called "Threads of Early Payment Default" reported that delinquencies were rising.  HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-

1   day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened

2   fraud incidents."  When borrowers didn't have to verify their incomes, the report said they were

3   overstating them, and they bolstered their false claims by overstating their job positions.  HSBC

4   recommended that originators verify employment by phoning the human resources departments and

5   asking questions such as: "How many years has John worked there?" and "What is his title?"

6          (d)    An August 23, 2006 story on CBS' *MarketWatch* noted, "July was dry for the

7   U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated

8   and the number of homes on the market soared to a 13-year high, according to a report from the

9   National Association of Realtors released Wednesday."

10         (e)    Foreclosure rates increased dramatically in August 2006, providing further

11  indication that the market was in decline – particularly in several of PMI's largest markets.  A

12  September 15, 2006 article on *CNNMoney.com* noted: "In August, 115,292 properties entered into

13  foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales.  That was 24

14  percent above the level in July and 53 percent higher than a year earlier.  It was the second highest

15  monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.  Some of

16  the bellwether real estate market states are among the leading foreclosure markets.  Florida had more

17  than 16,533 properties in foreclosure in August.  That led all states and was 50 percent higher than in

18  July and 62 percent higher than in August 2005.  California foreclosures are increasing at an even

19  faster annual rate, up 160 percent since last year to 12,506.  And the formerly red-hot Nevada market

20  recorded a spike of 24 percent compared with July and a whopping 255 percent increase from

21  August 2005. . . .  Usually, foreclosures are a lagging [market] indicator. . . .  But we've never had a

22  situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming

23  up for adjustment over the rest of the year. . . .  These exotic mortgages, which have been issued by

24  lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate

25  mortgages.  And sub-prime loans, which are much more common than in the past, have a higher

26  default rate as well."

27         (f)    By late 2006, not only was the market collapse accelerating, but it was

28  becoming clear that the 2006 vintage loans were already performing poorly.  A November 27, 2006

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    article entitled, "Early loan payment defaults getting close attention" highlighted how the new loan

2    products were increasingly the product of fraud: "According to industry experts, the growth of exotic

3    loan products, loose underwriting standards, faulty servicing transfers and out-and-out fraud have all

4    contributed to the proliferation of 'early payment defaults.'. . . At LoanPerformance in San

5    Francisco, Damien Weldon, director of collateral risk analytics, said that first quarter loans with

6    early payment defaults increased 16% over those in first quarter 2005, and 84% over first quarter

7    2004. '*2006* vintage loans are performing very poorly,' Weldon said. LoanPerformance is a unit of

8    First American Real Estate Solutions, which in turn is majority-owned by First American

9    Corporation of Santa Ana, Calif[ornia]. For stated-income loans, Weldon said the first-quarter surge

10   in early payment defaults was even sharper – 19% from 2005 and almost double those of 2004. By

11   contrast, traditional full-documentation loans rose just 4% from a year earlier." According to Kevin

12   Kanouff, President of Clayton Fixed Income Services, "30% to 40% of early payment defaults are

13   related to fraud." "Loose underwriting standards were a factor in the rise of such defaults on loans

14   originating in the last quarter of 2005 and the first two quarters of 2006. 'We think it took too long

15   for everyone to tighten their belts and change some of their underwriting guidelines.'"

16          49.     Further, a substantial portion of PMI's business – over 40% – was concentrated in its

17   ten largest customers, which were generally mortgage lenders, banks and investors. From 2000, ten

18   customers accounted for 40% of PMI's earned premiums. As PMI expanded its business into Alt-A,

19   adjustable rate mortgage ("ARM") and high LTV loans, the concentration of the business generally

20   remained the same. In 2006 and 2005, ten customers accounted for 43.9% and 42.8% of the

21   premiums earned in those years.

22          50.     In addition, while PMI wrote insurance through its "flow channel" – individual

23   policies presented for review and underwriting, as the number of loans increased as with its largest

24   customers, it not only used its "bulk channel" – lenders provided information for specific listed loans

25   that they sought to insure. Each of the "bulk" deliveries contained different loans (*e.g*., Stated

26   Income, No Document or Full Document) and specific information about each loan and each

27   borrower. PMI relied on the lenders to accurately and prudently originate mortgage loans by

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  providing delegated responsibilities for lenders for a majority of its annual mortgage insurance

2  volume from 2000 and through the Class Period.

3      51.    As a result of these programs, defendants knew of problems with PMI's underwriting

4  from the Company's direct experience:

5          (a)    As early as 2003, NovaStar, one of the country's largest subprime and Alt-A

6  lenders, sued PMI for payment under a master policy of insurance it had by supplying information

7  about NovaStar Stated Income loans.  During the course of the litigation, PMI discovered that

8  NovaStar had misrepresented its underwriting guidelines, defrauding PMI into writing mortgage

9  insurance policies that it would otherwise not have written or written on terms which more

10  accurately reflected the insured risk.  As PMI stated in a court filing, "NovaStar's representations in

11  its Underwriting Guidelines and Underwriting Matrices regarding its use of a borrower's stated

12  income were false.  NovaStar did not use or rely on (and never has used or relied on) the borrower's

13  income in deciding whether to underwrite a Stated Income loan.  NovaStar did not consider a

14  borrower's debt-to-income ratio in qualifying the borrower for a Stated Income loan."  Thus, PMI

15  sought to rescind insurance coverage for 6,300 stated income loans it had insured from 2000-2002.

16  PMI had routinely reassured investors that it thoroughly audited lenders with delegated authority and

17  only had relationship with the best of the lenders.  However, 6,300 loans being rejected by PMI

18  indicates that from a statistical perspective, PMI's due diligence process was not working.

19          (b)    CW1 has stated that PMI was aware of fraud and poor performance (*i.e.*

20  nonpayment) of Countrywide, WAMU, and IndyMac loans since mid-2006 and ultimately stripped

21  IndyMac of its delegated status in 2007.  CW1 account has been corroborated by a 2008 report

22  entitled, "IndyMac: What Went Wrong?; How an 'Alt-A' Leader Fueled its Growth with Unsound

23  and Abusive Mortgage Lending" by Mike Hudson, dated June 30, 2008.  "Some insiders [at

24  IndyMac] paint a different picture.  They describe IndyMac as less a victim than a facilitator of bad

25  practices.  The former vice president quoted in California court documents claims [Mike] Perry and

26  other top executives [at IndyMac] were aware that fraud and lying were rampant in the company's

27  loan-approval process.  Another ex-employee – the former fraud investigator – claims that the vice

28  president in charge of the company's fraud investigation department was pressured by upper

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    management not to report fraud, and in one case was pressured to 'sanitize' a report on the

2    company's loan pipeline." Yet during 2007, PMI continued to provide insurance for IndyMac loans

3    even though loan performance problems existed.

4              (c)    In 2007, PMI brought a suit against WMC Mortgage Corp. ("WMC") related

5    to a MASTR securitization whereby WMC sold mortgages to UBS and UBS formed a securitization

6    transaction to purchase the mortgage loans. PMI failed to complete upfront due diligence and agreed

7    to provide mortgage insurance to the securitization trust. PMI stated that WMC's actual practices

8    deviate significantly from its representations for at least 120 loans sold to the securitization trust.

9    Such a deviation on a statistical basis would indicate that this was not an anomaly. As early as

10   March 6, 2007, Clayton, an entity engaged to act as the Credit Risk Manager for the securitization,

11   began notifying the trustee through a series of letters that its initial investigation into a sample of the

12   mortgage loans had uncovered breaches of WMC's representations and/or warranties underlying

13   many of the mortgage loans. As of October 2007, at least 30% of the entire pool of mortgage loans

14   sold into the securitization trust were delinquent, a delinquency rate unheard of until those loans

15   originated during and after 2006.    To quote PMI's complaint: "Instead, the massive

16   underperformance of such Loans demonstrates that WMC in reality followed few, if any, objective

17   standards or criteria in underwriting the Mortgage Loans and showed little concern, if any, for any

18   borrower's ability to repay [the loans]." PMI's failure to properly audit loans upfront before such

19   loans were sold by WMC represents a complete breakdown in the Company's due diligence

20   processes.

21       52.    From the early 1990s, PMI had utilized a delegated underwriting program whereby

22   approved lenders were allowed to determine whether or not loans met PMI's insurance guidelines.

23   Until 2000, this process was relatively straightforward since PMI insured full documentation loans

24   and the borrower was required to submit information that generally allowed both the lender and

25   PMI, during routine audits, to determine if the borrower had sufficient income, assets and capacity to

26   repay the mortgage loan so that PMI could properly underwrite the credit risk.

27       53.    The delegated underwriting program continued and by 2005-2006, it represented

28   approximately 80% of PMI's flow NIW. PMI's delegated underwriting program made the Company

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  susceptible to fraud by the lenders, as had been the case with NovaStar, WMC, Countrywide,

2  WAMU, and IndyMac.  Despite the conduct of "routine audits," the explosion of both the amount

3  and number of loans without supporting documentation made the assessment of insured risk nearly

4  impossible, since PMI could not effectively determine what that risk was.  Rather than tighten its

5  underwriting standards, as the following chart shows, PMI increased its riskiest insurance products

6  from 2005-2007:

7  **Primary Default Rates as of December 31**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Flow Channel** | | | |
| **Loan Type\*** | | | |
| Alt-A-Loans | 11.6% | 4.6% | 3.8% |
| Less-than-A Quality | 18.6% | 16.8% | 17.3% |
| Above 97s | 8.8% | 5.9% | 6.4% |
| ARMs | 15.1% | 7.0% | 5.6% |
| 2/28 Hybrid ARMs | - | - | - |
| Payment option ARMs | 14.5% | 3.7% | 2.4% |
| Interest Only | 9.6% | 3.0% | 23% |
| **Total Flow Channel** | **6.7%** | **4.8%** | **5.1%** |
| | | | |
| **Structured Finance Channel** | | | |
| **Loan Type\*** | | | |
| Alt-A-Loans | 20.8% | 7.8% | 12.1% |
| Less-than-A Quality | 23.6% | 23.2% | 20.9% |
| Above 97s | 10.2% | 9.2% | 10.0% |
| ARMs (excluding 2/28 Hybrid ARMs) | 16.4% | 14.1% | 14.6% |
| 2/28 Hybrid ARMs | 38.6% | 16.0% | 8.5% |
| Payment option ARMs | - | - | - |
| Interest Only | 15.9% | 5.0% | 2.2% |
| **Total Structured Finance Channel** | **13.9%** | **9.9%** | **9.9%** |
| | | | |
| **Total Primary** | | | |
| **Loan Type\*** | | | |
| Alt-A-Loans | 13.9% | 5.7% | 3.8% |
| Less-than-A Quality | 20.2% | 19.0% | 18.5% |
| Above 97s | 9.1% | 6.6% | 7.2% |
| ARMs (excluding 2/28 Hybrid ARMs) | 15.5% | 8.5% | 7.4% |
| 2/28 Hybrid ARMs | 38.6% | 16.0% | 8.5% |
| Payment option ARMs | 14.5% | 3.7% | 2.4% |
| Interest Only | 11.0% | 3.7% | 2.3% |
| **Total Primary** | **7.9%** | **5.6%** | **5.7%** |

*Loan types are not mutually exclusive.

1      54.    The facts known to defendants regarding NovaStar, Countrywide, WMC, IndyMac,

2  and WAMU provide strong evidence that PMI could not properly control the quality of the loans

3  being insured by these top lenders as measured by volume.  The NovaStar and Countrywide

4  examples provide proof that fraud and low doc/no doc loans had severe problems prior to the 3Q06.

5  The WMC example provides evidence that PMI was providing insurance for structured finance

6  transactions with no upfront due diligence and relying on discovering problems after an entity like

7  WMC had sold the mortgage loans to the securitization trust.  The IndyMac example provides

8  evidence that high risk loans were not limited to the subprime segment of the mortgage industry but

9  to the Alt-A segment also, where low doc/no doc loans with high LTV were the norm.  Finally, the

10  WAMU example provides evidence that there was a systematic effort by a top lender in the United

11  States to manipulate appraisals, thus dramatically increasing the severity of losses that PMI would

12  incur.

**Despite the Real Estate Market's Collapse, PMI Insures More and Riskier Loans**

14      55.    Beginning in 2005, home values began to decline, interest rates began to rise, and

15  ARM teaser rates expired.  As a result, the borrowers who overextended themselves – high LTV

16  loans with minimal introductory interest rates – were faced with new, higher mortgage payments that

17  they could neither afford nor refinance.  As early as 1Q05, mortgage default rates began to rise

18  dramatically.  PMI's insurance portfolio was likewise exposed to ever increasing risk.

19      56.    Nevertheless, defendants, facing competitive pressures from lenders and others in the

20  mortgage industry, continued to write policies for Alt-A loans and even riskier ARM loans.  As

21  defendants acknowledged in their Form 10-K, "the percentages of PMI's risk in force containing

22  Above 97s, ARMs, interest only loans, payment option ARMs, and Alt-A loans increased in 2005.

23  We believe that these increases were driven by, and reflect, higher concentrations of these types of

24  loans as percentages of both the 2005 mortgage origination market and the 2005 private mortgage

25  insurance market."

26      57.    By 2006, housing prices had effectively collapsed.  Thus, while PMI continued to

27  face increasing competition to write more and more high risk policies and did so, investors sought

28  reassurance that defendants were able to and had correctly assessed the risks in the Company's

1    underwriting decisions in order to maintain its profitability.  By the end of 2006, however, PMI's

2    risk in force contained so many policies that were dependent upon unverified (and often fraudulent)

3    representations of borrowers, lenders and appraisers that PMI could not accurately assess the risk to

4    its portfolio.

5        58.    As the housing market collapsed, so too did the piggyback loans.  Lenders became

6    unable to move the second liens off their books and into the secondary market (where they were

7    securitized) and hence quit offering this first/second lien finance structure.  This created a vacuum of

8    borrowers seeking high risk, high LTV loans into which PMI quickly moved.  The Company was

9    taking on the same risks as the piggyback structure which had already proved to be susceptible to

10    fraud and poor performance.

11        59.    Moreover, as CW3 stated, housing prices were a factor in FGIC's risk models for

12    determining the FGIC's risk profile.  With the decline in the 2006 vintage loan, the risks increased

13    such that by the 3Q07, FGIC's potential losses were material to PMI Defendants were thus not only

14    aware of the decline in these loans, as CW3 reports, but specifically sought to quantify the number

15    by October 2007.

16                            **DEFENDANTS' SCHEME TO DEFRAUD**

17        60.    Having expanded PMI's business into areas beyond PMI's traditional business,

18    defendants could no longer count on PMI's expertise and its ability to produce the revenue and

19    earnings they had promised and had been able to deliver the market in years past.  Moreover, as the

20    housing market collapsed and defendants learned that more and more of PMI's insured loans were

21    procured by fraud and underperforming, defendants' ability to generate additional business and the

22    quality of that business became more and more suspect.  As market professionals and investors

23    repeatedly questioned defendants' business and business prospects, defendants were desperate to

24    find ways to convince the market that PMI's business was sound.  There was simply no way to do so

25    legitimately given the risks and the reality of the mortgage and housing markets and defendants'

26    knowledge about the performance of PMI's portfolio.  By the end of 2006, the situation was critical

27    and defendants, in an effort to attempt to ride out the crisis, engaged in a scheme to defraud and

28    mislead about PMI's revenues and income as well as the health of the business.

1        61.    As alleged herein, class members who purchased PMI's publicly traded securities did

2  so in reliance upon the accuracy of the publicly available information about the Company, including

3  its financial statements and business prospects.  In particular, investors were attracted to PMI

4  because of its purported ability to properly value its portfolio and its employment of conservative

5  underwriting standards, and its ability to manage risk.  As defendant Katkov stated during the

6  November 2, 2006 conference call in response to a question about why PMI's reserves practices and

7  loss experience were better than other insurers: "we've made very conscious choices about the types

8  of risk that we are taking in the market . . . .  I think it's very consistent with the way we've run the

9  company for years."  In fact, this was simply false.  PMI's business had been predicated on its

10  evaluation of its borrowers in light of PMI's underwriting guidelines that were able to take in

11  account documented facts concerning the insured risk.  The increase in high LTV, Alt-A, and ARMs

12  insured from 2003 throughout 2007 were unable to be properly valued since PMI did not have

13  sufficient documentation and, as defendants knew, or were deliberately reckless in ignoring, the

14  Company's lenders and borrowers could not be depended on to provide accurate information for a

15  proper underwriting decision.  Unable to legitimately inform the market that its underwriting and

16  accounting were proper, defendants engaged in a fraudulent scheme to  perpetuate the illusion that

17  PMI could still accurately assess its risk and value its portfolio, and to mislead investors about PMI's

18  true financial condition and prospects for continued success.  These fraudulent artifices and devices,

19  as particularized elsewhere herein, included:

20        (a)    The Company failed to engage in proper underwriting practices for its book of

21  business related to insurance written throughout the Class Period;

22        (b)    The Company failed to successfully audit and manage its exposure to its

23  largest customers that were given delegated authority to commit PMI to insure mortgages;

24        (c)    The Company was not adequately accounting for its loss reserves in violation

25  of Generally Accepted Accounting Principles ("GAAP"), causing its financial results to be

26  materially misstated;

27

28

1          (d)      The Company had far greater exposure to anticipated losses and defaults

2    related to its book of business related to insurance written in 2005 through most of 2007 than it had

3    previously disclosed;

4          (e)      Given the deterioration and the increased volatility in the housing market and

5    defendants' knowledge of it, defendants completely misled the market about the status of its business

6    throughout the Class Period;

7          (f)      Given the increased volatility in the housing market, the Company had no

8    reasonable basis to make projections about its incurred losses or about its new insurance written.  As

9    a result, the Company's projections issued during the Class Period about its earnings for 2007 and

10   2008 were knowingly false;

11         (g)      The Company reported its highest risk exposure in a table found in "Portfolio

12   Characteristics as of December 31, 2006" presented on March 15, 2007, which failed to focus on the

13   high percentage of insurance provided to borrowers with FICO scores of 620 to 679 and how such

14   borrowers were considered "A" by the Company and included with the traditional prime borrowers.

15   Subsequently, PMI's other mortgage insurers, Fannie Mae and Freddie Mac declared that borrowers

16   with such FICO scores were not "A" or prime, but that prime borrowers had FICO scores of 680 or

17   higher.  Bank regulators prior to 2004 had set the dividing line between subprime and prime at the

18   FICO score of 660.  During 2008, Fannie Mae and Freddie Mac changed guidelines to charge more

19   and restrict lending to borrowers with FICO scores from 621 to 679.  In addition, defendants could

20   not make accurate statements regarding owner occupancy given the incidence of fraudulent

21   representations by borrowers;

22         (h)      The Company's investment in FGIC was materially impaired as FGIC's bond

23   insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to

24   the plunge in value of mortgage debt;

25         (i)      The Company supported FGIC's business with respect to FGIC providing

26   financial guaranties for RMBS, CDOs, and SIVs backed by either subprime mortgage loans or

27   second lien mortgage loans when Smith had previously stated that PMI would not insure second lien

28   mortgage loans and that PMI had minimized its exposure to subprime mortgage loans;

1            (j)      The Company failed to acknowledge that FGIC entering the new segment of

2    financial guaranty business as outlined in "i" above would jeopardize FGIC's "AAA" rating and

3    without an "AAA" rating FGIC had little or no value; and

4            (k)      The Company was materially overstating its financial results by failing to

5    properly value its investment in FGIC and by failing to write down that investment in a timely

6    fashion in violation of GAAP.

7    **DEFENDANTS' FALSE AND MISLEADING**
**STATEMENTS ISSUED DURING THE CLASS PERIOD**

8    **Defendants' Statements Regarding 3Q06 Performance**

9

10          62.     On November 2, 2006, the Company announced its 3Q06 net income of $104.2

11   million, or $1.16 per diluted share.  The same day, defendants, including Katkov, Lofe, Shuster, and

12   Smith,[12] held an earnings conference call with analysts and investors.  On the call, defendants

13   stressed the Company's ability to find opportunities for high-quality growth and continued strong

14   credit quality:

15   > **Smith:** . . . Starting with a look at our U.S. Mortgage Insurance Operations and as
> reviewed at our recent investor conference, *we are seeing continued improvement in*
> *the operating environment* for our domestic mortgage insurance business.  Increased

16   > penetration rates, improving persistency, and higher premium yield resulted in net
> income for our U.S. Mortgage Insurance Operations of $70.8 million, up from $69.5

17   > million in the third quarter of 2005.  *In the third quarter, we continued to focus on*
> *prudent growth while maintaining our high credit quality.*  This was evident in our

18   > sequential increase in our flow and structured new insurance written.  *Credit quality*
> *remained strong* as 93.5% of our risk in force in the flow channel is prime credit.  In

19   > our structured channel, approximately 83% of our risk in force is prime, up from
> 74% one year ago.  *Importantly, we are finding opportunities for high-quality*

20   > *growth.*

21   >                         *      *      *

22   > **Q – Andrew Brill:**  . . . [D]o you have a sense of what may be so different about
> your book of insured loans or about your reserving practices versus the other major

23   > mortgage insurance companies that your loss experience was so much more stable
> this quarter than theirs?

24
25   > **A – Katkov:** All right.  Hi, this is David Katkov.  Let me just refer you to the
> conversation we had in early October at the Investor Conference.  *I think we tried to*
> *show you in a lot of detail that we've made very conscious choices about the types*

26

27   ─────────────────

     [12]    All defendants participated in every earnings conference call except the 4Q07 call.

28

*of risk that we are taking in the market, both in our flow and in our structure transaction. I think it's very consistent with the way we've run the company for years and I expect that the result of that are the reserve positions that you've seen in the third quarter results today.*

*   *   *

**Q – Geoffrey Dunn:** . . . Could you address the big sequential jump in your flow claims domestically? It looked like severity was up a little bit but can you just walk through some more color on what changed from last quarter?

**A – Katkov:** Well, Geoff, I think we've talked about this quite a bit. *We do have the normal seasoning of our books of business, and there is also, as you know, a seasonal effect in the latter part of the calendar year, so I really don't think it's any more than that.* As we described at the Investor Conference, we definitely are seeing some pressure because of the larger claim size, and that's simply as much as anything a factor of rapid home price depreciation over the last couple of years. *But beyond that I don't see any anomalies in the development of the book.*

*   *   *

**Q – Paul Miller:** . . . [C]an you address the insurance in force growth? I mean – and I know a lot of the people in the industry has been saying that you're starting to get better pricing power, you get to look at more books and what not. When do you think we start to see that insurance in force grow on your books?

**A – Katkov:** Hi, this is David Katkov. A couple different things. *We had a question earlier about what's differentiating our book relative to some of our competitors, and I think a lot of that is very careful risk selection.* So you're right, the primary insurance in force has remained relatively constant quarter to quarter. That was really by choice, and so *we're being very careful in ensuring that whatever we put on the book, we're happy to put on the book.*

I'd also direct your attention to our modified pool business. We've talked about this quite consistently the last couple of quarters, as well as in the investor call. You should notice that that business has grown, and the risk in force there is something that we are very attracted to because of the deductible structure that we've described previously. So I don't want to leave you with the impression that the book is not growing in the U.S. MI. I don't think that's the case. What we've been, I think, smart about is what risks are we putting in the portfolio on the primary side where we are in a first loss position and *we've been very cautious there*. And then, with the risk sharing characteristics of modified pool, we've found that we can grow there a bit more.

**Reasons Why Defendants' Statements On November 2, 2006 Were False and Misleading**

63.    The statements made at the November 2, 2006 conference call, ¶62 above, concerning PMI's underwriting standards, business outlook, operating environment and credit quality were false and misleading because, as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to allow the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    proper evaluation of credit risk posed by the new alternative loan products in the market, many of

2    which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

3    the significant changes in the business mix of its portfolio in 2006, when it added greater percentages

4    of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate

5    the risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

6    verified personal financial information; (d) the housing market and the mortgage market were in

7    substantial decline, default rates were on the rise, the 2006 vintage loans were underperforming and

8    the incidence of fraud had been increasing even as PMI had continued to write ever more risky and

9    difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not

10   afford it adequate control over their lender, who, PMI's internal reporting had revealed, had

11   consistently written policies that did not comply with PMI's underwriting standards; (f) defendants

12   were not employing adequately strict underwriting guidelines but were willing to insure whatever

13   loans existed in the market; (g) FGIC's substantial investment in subprime securitizations had

14   resulted in PMI's exposure to extensive risk from the subprime market that made the Company's

15   statements regarding its extensive 'caution' and risk management misleading; (h) the absence of

16   meaningful borrower information in the no doc and low doc loans insured by PMI did not give it a

17   basis to claim that its credit risk profile was superior to its competitors.

18   **Defendants' Statements Regarding 4Q06 Earnings Performance**

19          64.     On February 5, 2007, the Company issued a press release entitled "The PMI Group,

20   Inc. Reports Record 2006 Net Income of $419.7 Million, or $4.57 Per Diluted Share; Fourth Quarter

21   2006 Net Income of $100.5 Million, or $1.19 Per Diluted Share."  The release stated in part:

22               ***Consolidated losses and loss adjustment expenses*** for the fourth quarter and
             full year were $90.5 million and $302.9 million, respectively, compared to $64.8
23           million and $257.8 million in the same periods last year.  The increases in 2006 were
             primarily a result of loss reserve additions in U.S. Mortgage Insurance Operations
24           and an increase in total incurred losses in PMI Australia.  The incurred losses
             increase for PMI Australia was driven principally by increases in claim rates and
25           severity.

26                                      *        *        *

27               ***Consolidated reserve for losses and loss adjustment expenses*** totaled $414.7
             million as of December 31, 2006 compared to $394.2 million as of September 30,
28           2006 and $368.8 million as of December 31, 2005.  Loss reserves in U.S. Mortgage

1       Insurance Operations increased $7.4 million in the fourth quarter of 2006 primarily
        due to higher expected claim rates and claim sizes.  PMI Australia's reserve for
2       losses and LAE increased $12.4 million in the fourth quarter primarily due to higher
        expected claim rates and severity and, to a lesser extent, an increase in the number of
3       delinquent loans.

4       65.     Also on February 5, 2007, the Company issued a press release entitled "The PMI

5   Group, Inc. Issues 2007 Financial Guidance," which stated in part:

6       The PMI Group, Inc. (the "Company") today issued the following financial guidance
        for 2007:
7
            •       Total incurred losses for its U.S. Mortgage Insurance Operations to be
8                   between $280 million to $305 million.

9       66.     On the same day, defendants held a conference call with analysts and investors on

10  which they made the following statements:

11      Smith:  . . . **Our disciplined approach to credit risk management and pricing
        insured that our loss development in 2006 was consistent and predictable.  We
12      expect similar development patterns in 2007.**  As previously disclosed, book years
        2004 and earlier are past their peak losses.  When combined with the normal
13      maturation of book years 2005 and 2006, we expect total incurred losses in 2007 in a
        range between $280 million to $305 million.
14
        Our new insurance written in 2006 was well-balanced between flow, structured, and
15      pool as **we focus on managing our new insurance written volume consistent with
        our risk tolerances.**
16
                                    *       *       *
17
        Q – Geoffrey Dunn: . . . Looking at the premium rate – You indicated it's jumped up
18      to about 72 bps on average this quarter.  And seemed like you were implying the
        pool business drove that.  But when you look at the pool, you wrote $12 billion, but
19      you only assumed about $450 million of risk.  Can you give me a little bit more color
        on why such a little amount of retained risk on that modified pool would drive a 5
20      basis point sequential increase in your premium rate?

21      A – Katkov:  Jeff, this is David Katkov, I'd actually disconnect the two.  As we've
        discussed throughout calendar 2006, we've seen a couple of changes in the mix of
22      our book, which has driven up the average premium yield.  One, the good news is we
        really are making inroads into the piggyback execution.  So as you can see in the
23      financial supplement, everyone can see we've seen an increase in the greater than 97
        LTV.  I would attribute that to be the single largest driver to our premium yield.  As I
24      said, I would disconnect the pool risk and I would really focus on the mix of LTVs.
        **Other than that, there's no other significant trend that we haven't already
25      previously disclosed to the marketplace.**  That answer your question?

26                                  *       *       *

27      Q – Rob Ryan: I was wondering if you're noticing anything in the bulk market yet in
        terms of a better environment, a wider spread, things that make you more optimistic
28      in terms of the new insurance written for '07?

A – Katkov: Rob, this is David Katkov.  Yeah, I think there's little question that spreads have widened out in the domestic structured finance market.  I think that helped us in the fourth quarter – you can see the numbers that we did have a strong structured marketplace.  The caution I would add, though is – as we've discussed throughout '06, it is a challenging credit environment.  *So we will be very selective in 2007 in terms of our participation, whether it be on bulk primary or the modified pool business.  But having said that, I think we are fairly bullish about our opportunity to write business in that sector in 2007.*

*        *        *

Q – Andrew Brill:  I just wanted to go back to the higher premium yield in the U.S.  And you mentioned that the higher premium yield was the function of writing higher LTV business.  But shouldn't we be worried that the loss ratio rises over the next few years, that as this higher LTV business reaches [inaudible], and appreciably now that you're getting the benefit of the higher premiums, but as we move forward there's the risk that the loss ratio rises because of the higher risk?

A – Katkov: Andrew, this is David.  Let me answer the question by your last statement, which is – you're exactly right.  The expectation is that the premium we charge will be sufficient for the risk that we've assumed.  Obviously we don't give guidance for the loss ratio.  We did today give guidance for our total incurred in 2007.  So I know you'll work through that in your model.  *But I believe the management team over the last several years has been very reliable in terms of how we are forecasting our future loss environment, and as Steve said in his prepared remarks, I expect no change in that in 2007.*

*        *        *

Paul Miller:  Yeah, thank you very much.  I was wondering if you could talk a little bit about your flat credit losses that you really are expecting from '06 to '07, especially the Alt-A space.  We're starting to see some pressures in the Alt-A space with credit loss, especially from the '06 vintage book.  You might not have put a lot of '06 on there.  But can you just talk about – is everything coming in within your models?  There's a lot of stuff out there that we're starting to worry about.

Don Lofe:  I guess I'll answer just to [capture again] a couple different things.  First of all, we did mention in Steve's prepared remarks that we feel very confident about the '04 and previous books.  *We see the normal maturation of the '05 and '06 book and that leads to the higher total incurred guidance that we provided today, 280 to 305.*  Obviously if the year transpires that will translate into a particular loss ratio.  *And that's what gives us confidence is that given the revenue expectations we have for '07 decked against those losses, we don't see a meaningful change.  Do we watch Alt-A? Absolutely.  We watch it like a hawk.*  Do we watch geographies? Yes we do.  Is it going to be a challenging market in '07? Yes, undeniably.  But I think the team has proven that we have a very good handle on loss development.  And I guess the last answer to the question is, we are not exclusively a model-driven company.  As you know, we look at the model.  They're very important to our developmental losses, but management judgment is a very important component and we take both.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    **Reasons Why Defendants' Statements on February 5, 2007 Were False and Misleading**

2           67.    The statements on February 5, 2007, ¶¶64-66 above, concerning PMI's credit risk

3    management, risk tolerance, underwriting standards, operating environment and loss reserves were

4    false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses,

5    standards and procedures which defendants had developed that enabled them to properly evaluate

6    PMI's risk while underwriting full documentation loans were not designed, or able to allow the

7    proper evaluation of credit risk posed by the new alternative loan products in the market, many of

8    which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

9    the significant changes in the business mix of its portfolio in 2006, when it added greater percentages

10   of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate

11   the risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

12   verified personal financial information; (d) the housing market and the mortgage market were in

13   substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were

14   underperforming and the incidence of fraud had been increasing even as PMI had continued to write

15   ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting

16   practices did not afford it adequate control over their lenders, who, PMI's internal reporting had

17   revealed, had consistently written policies that did not comply with PMI's underwriting standards;

18   (f) defendants were not employing adequately strict underwriting guidelines but were willing to

19   insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated

20   underwriters and top customers – IndyMac – was deviating significantly from PMI's quality control

21   standards; (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's

22   exposure to extensive risk from the subprime market that made the Company's statements regarding

23   its extensive 'caution' and risk management misleading; (i) contrary to a "disciplined approach,"

24   defendants were willing to insure the loans available in the market; and (j) the Company's financial

25   results were misrepresented as defendants improperly failed to adjust its loan loss reserves to reflect

26   the increase in delinquencies and higher claims and greater claim rates as set forth in ¶¶124-193.

27

28

**Defendants' Statements at the Goldman Sachs Housing Conference on February 12, 2007**

68.    On February 12, 2007, Katkov spoke at the Goldman Sachs Housing Conference. Katkov made false and misleading statements when he indicated that the Company closely monitors the loans it insures – particularly high LTV loans – and additionally indicated that the Company was seeing higher quality mortgage originations in the market:

> Katkov:  This was touched on in the last panel, but I think it is a really important point.  If you are in a market that is seeing appreciation as much as 50 to 100%, you can go down a long way before you personally feel any economic pain.  The only problem with that is if you have been what I would call a serial refi person, where you're constantly pulling out all available cash.  Your dance just ended in a lot of markets.
>
> **So that is something that we watch in our particular sector which, again, is the very high LTV borrower sector, with low and moderate incomes.  They don't have a lot of flexibility, so those are the folks that we watch real closely.  We will see how that plays out over 2007.**
>
> *            *            *
>
> Mike Marschoun – Goldman Sachs – Analyst:  One thing we do is we have our credit scoring models, and we run the loans that are coming in through the models.  We definitely see an improvement in the at-origination credit risk factors.  Now, they can – and based on the last time I have looked at originations that were a couple of months old, I fully expect that given the current environment what is coming out now will be even better than what was before.
>
> For instance in 2000, actually, the at-origination characteristics were probably even worse than what we see now.  In 2000, stronger house prices bailed out markets, and losses were not that dramatic.
>
> Now we have weaker house prices.  So this is my earlier statement that I think ultimate losses will be higher than the 2000 vintage.  But on the other side, credit quality definitely has started to improve.  They will continue to improve, and we have not seen the end of that improvement, yet.
>
> *            *            *
>
> Katkov: . . .  So do I think new originations?  Yes, I would agree with Mike in that regard.  **New originations are definitely looking better.  But moderately seasoned product is still pretty junky.**  We see that through our structured channel, and we just look at some pools and we walk away.  (inaudible)
>
> *            *            *
>
> Katkov: . . .  So when we think about that 575 to 620, we clearly think it is an A-loan; there is no doubt about that.  It is not subprime as you might see come off a street shelf.  And it's certainly not an under 575.
>
> So from our perspective, while you want to limit it in your portfolio, they are profitable loans if underwritten correctly.  They are particularly attractive if they

1    come through the GSE channel.  Because even though I put Dave on the spot earlier
     today, the truth of the matter is they are under a lot of pressure to originate A- loans;
2    they know it; and that sector has to grow for them.

3    **Reasons Why Defendants' Statements on February 12, 2007 Were False and Misleading**

4          69.    The statements on February 12, 2007, ¶68 above, concerning the attention that PMI

5    pays to high LTV loans and defendants' positive market outlook for 2007 were false and misleading

6    for the same reasons stated above, ¶¶67, with regard to defendants' statements on February 5, 2007.

7    Additionally, defendants' February 12, 2007 statements were false and misleading because

8    defendants knew or should have known: (a) that PMI was increasing the percentage of high LTV

9    loans in their portfolio and not taking a cautious approach or "watch[ing] real closely" this sector of

10   loans, defendants were insuring increasing percentages of high LTV loans because that was what

11   was in the market.

12   **Defendants' Statements at the Merrill Lynch Insurance Investor Conference on February
     14, 2007**
13
14         70.    On February 14, 2007, Smith spoke at the Merrill Lynch Insurance Investor

15   Conference.  He repeatedly trumpeted PMI's risk management abilities and downplayed the

16   significant risks in the Company's portfolio:

17         Smith: . . . ***So now, let me get to the one that you're probably most interested in,
           which is the overall credit outlook for PMI.  Number one, it's the core competency
18         of our company.  We're professional risk managers.  It's what we do day in and
           day out is the key point***.  The other point is that our business is really about core
19         housing.  If you look at the fundamentals of our business, we don't have a large
           nonconforming book of business.  If you look at average loan amounts, less than 3%
20         of our book of business has loan amounts in excess of $500,000.

21         If you look at the quality, if you want to judge that by FICO scores, I think
           we have an appendix in your books.  I think it's page 27, 28, I think, that shows the
22         distribution by FICO.  ***And you will find since 2003 we've taken a more
           conservative position in the overall credit profile of our book.  And we've actually
23         improved the credit profile steadily and methodically as there have been layering of
           risk characteristics in the marketplace since 2003.***  What does that mean?  In 2003,
24         we had about 11.9% of our business below 620 in FICOs, but above 575.  In 2006,
           only 8% of our risk in force was below 620 and above 575.  And 92% of our
25         business was considered to be [inaudible] business.

26                              *      *      *

27         Last year, we had total incurred losses of 263 million.  At the beginning of the year,
           we said the losses would be in a tight band of between 250 and 270 million for the
28         year.  And we came in around – approximately in the mid-point of that band at 263
           million.  We've done that several years prior to that, and we've always given you

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  good guidance in terms of expectations and using our modeling in terms of how we
2  view the overall economy.

3  We've given you that number for 2007 and I would reinforce that guidance
   today.  Total incurred losses around $280 to $305 million for PMI in 2007.

4  **Reasons Why Defendants' Statements on February 14, 2007 Were False and Misleading**

5      71.    The statements on February 14, 2007, ¶70 above, concerning PMI's strong credit

6  outlook and the Company's ability to properly evaluate its credit risk were false and misleading for

7  the same reasons stated above, ¶¶67, with regard to defendants' statements on February 5, 2007.

8  Additionally, defendants' February 14, 2007 statements were false and misleading because

9  defendants knew or should have known: (a) Defendants "core competency" was the risk evaluation

10 of full documentation loans, which were its primary business prior to 2003, and this experience did

11 not carry over to evaluating the new and innovative loan products on the market, which featured

12 variable rates, high loan-to-value ratios and reduced documentation; (b) From 2003 to 2007, PMI

13 took on more high LTV loans, more Alt-A, more adjustable rate mortgages and layered these credit

14 risk factors together, which made defendants "overall credit profile" for aggressive, not more

15 conservative;

16 **Defendants' Press Release on March 15, 2007**

17     72.    In an effort to shore up their falling stock price, on March 15, 2007, defendants issued

18 a press release attempting to differentiate PMI from its competitors and welcoming the increased

19 information concerning risky mortgages into the market.  Defendants falsely stated that PMI's credit

20 portfolio was of better quality than that of its competitors and that defendants employed a "prudent

21 approach" to risk management:

22     **PMI Provides Statement on Prime Focus of U.S. Mortgage Insurance Business;**
       **Presentation Highlights Portfolio Characteristics**
23
                             *       *       *
24
25     "In the current market, we believe it's important to differentiate ourselves and
       clarify the prime focus of our business in the United States," said Steve Smith, CEO
       of The PMI Group, Inc. ***"Our principal focus is on sustainable homeownership for***
26     ***individuals and families purchasing homes with less than a 20 percent down***
       ***payment who have 'A' or prime quality credit.  Ultimately we believe that the***
27     ***increased recognition of risk in the mortgage marketplace will be a positive for***
       ***PMI and the market overall."***
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1                                *      *      *

2          David Katkov, President of PMI Mortgage Insurance Co., PMI's U.S.
    subsidiary, explained, "Our mortgage insurance portfolio in the United States is
3   focused in core housing, meaning loans of moderate size to first-time homebuyers
    purchasing a primary residence.  The majority of the loans we insure have fixed
4   rates.  *We believe that we have taken a prudent approach, managing the dispersion
    of risk by credit score, loan and property type, geographic region, and other key
5   characteristics.*"

6   **Reasons Why Defendants' March 15, 2007 Press Release Was False and Misleading**

7          73.    The statements on March 15, 2007, ¶72 above, concerning the increased recognition

8   of risk in the mortgage market and defendants' "prudent approach" to risk management were false

9   and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses,

10  standards and procedures which defendants had  developed that enabled them to properly evaluate

11  PMI's risk while underwriting full documentation loans were not designed, or able to  allow the

12  proper  evaluation  of credit risk posed by the new alternative loan products in the market, many of

13  which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

14  the significant changes in the business mix of its portfolio in 2006, when it added greater percentages

15  of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate

16  the risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

17  verified personal financial information; (d) the housing market and the mortgage market were in

18  substantial  decline,  default  rates  were  on  the  rise,  the  2006  and  2007  vintage  loans  were

19  underperforming and the incidence of fraud had been increasing even as PMI had continued to write

20  ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting

21  practices did not afford them adequate control over their lenders, who, PMI's internal reporting had

22  revealed, had consistently written policies that did not comply with PMI's underwriting standards;

23  (f) defendants were not employing adequately strict underwriting guidelines but were willing to

24  insure whatever loans existed in the market; (g) PMI that at least one of its delegated underwriters

25  and top customers – IndyMac – was deviating significantly from PMI's quality control standards; (h)

26  FGIC's  substantial  investment  in  subprime  securitizations  had  resulted  in  PMI's  exposure  to

27  extensive risk from the subprime market that made the Company's statements regarding its credit

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    quality, prudent approach and risk management misleading; and (i) contrary to a "prudent approach,"

2    defendants were willing to insure the loans available in the market.

3    **Defendants' Statements Regarding 1Q07**

4            74.    On April 30, 2007, the Company issued a press release entitled "The PMI Group, Inc.

5    Reports First Quarter 2007 Net Income of $102.0 Million, or $1.16 per Diluted Share; Record

6    Quarterly Revenues Driven by Growth in U.S. Mortgage Insurance Operations." The release stated

7    in part:

8            ***Consolidated losses and loss adjustment expenses*** for the first quarter of
        2007 were $109.3 million compared to $60.9 million in the same period last year.
9        The increase in first quarter of 2007 was primarily a result of higher incurred losses
        in U.S. Mortgage Insurance Operations and PMI Australia.  The incurred losses
10       increase in U.S. Mortgage Insurance Operations was a result of an increase in claim
        size and claim rates while the increase in PMI Australia was due to higher claim
11       sizes and an increase in the number of delinquent loans.

12                                    *        *        *

13           ***Consolidated reserve for losses and loss adjustment expenses*** totaled $443.0
        million as of March 31, 2007 compared to $414.7 million as of December 31, 2006
14       and $369.9 million as of March 31, 2006.  Loss reserves in U.S. Mortgage Insurance
        Operations increased $19.9 million in the first quarter of 2007 primarily due to lower
15       default cure rates and higher claim sizes.  PMI Australia's reserve for losses and
        LAE increased $7.8 million in the first quarter of 2007 primarily due to an increase
16       in the number of delinquent loans.

17           75.    Also on April 30, 2007, the Company issued a press release entitled "The PMI Group,

18   Inc. Updates 2007 Financial Guidance," which stated in part:

19           The PMI Group, Inc. (the "Company") today updated its financial guidance for 2007:

20           •        Total incurred losses for its U.S. Mortgage Insurance Operations to be
                between $300 million to $360 million.
21

22           76.    On the same day, defendants held a conference call with analysts and investors on

23   which they made the following statements:

24           **Smith:** . . .  As everyone is well aware, the first quarter of this year saw significant
        change in the U.S. mortgage markets.  The rapidly changing credit environment
25       impacted certain segments of the U.S. mortgage market, and we were not immune
        from this effect on a portion of our portfolio.  ***However, with this change we have***
26       ***seen very high demand for our insurance products in both our primary flow and***
        ***primary structure channels.  This will provide significant opportunities for us to***
27       ***grow our domestic business.***

                                    *        *        *
28

1  ***Now as we've always done, we're being mindful of risk in the marketplace,***
2  choosing opportunities to participate in business that offers attractive, risk adjusted
   returns. . . .

3                          *        *        *

4        Addition to the reserve for losses was primarily driven by an increase in loan
   sizes and resulting claim sizes, along with the aging of the loans in the delinquency
5  inventory, principally from primary structure transactions. . . .  Consequently, these
   market conditions are producing some overall changes compared to our expectations
6  coming into the year.  We now believe that our full-year incurred losses, and that
   includes paid claims, loss adjustment expenses and reserve for credit losses will be
7  between $300 million to $360 million.

8                          *        *        *

9  **David Hochstim:** Okay.  And then I wonder if somebody could just expand a little
   on the reserve building this quarter and, kind of, the link between delinquencies and
10 the increase in average claims.  And are you seeing some regional deterioration, like
   increasing delinquencies in California, that's pushing the expected average claim rate
11 up a lot? Or – sounds as though the balance of the year doesn't look that bad, but the
   first quarter, where you normally and did have a decline in delinquencies, still
12 resulted in a pretty healthy increase in reserves.

13 **Katkov**:  David, this is David Katkov.  Let me try to take each of your questions.
   First of all, what we saw in the first quarter, was – we tried to explain in the script in
14 the release was, there is a category of loans, and as Steve described, where there
   clearly seems to be a tremendous amount of work on the part of servicers to try to
15 modify particular notes, put loans into forbearance.  That activity was much higher
   than we anticipated in the first quarter, which is why, after a lot of consideration, we
16 made the decision to widen out the range.  That's first of all.

17       ***I want to reiterate that our flow portfolio is performing exactly as we***
   ***anticipated.  Our modified pool portfolio is performing exactly as we anticipated.***
18 ***It is really that structured primary portfolio, composed largely, as we described in***
   ***the past, of non-prime, A minus type loans.***  And at the moment, and I think you've
19 gotten a sense from this from listening to both lenders and servicers as well as other
   MI's, for the moment, it is not quite clear how those loan will be resolved, but we're
20 optimistic there will be a positive resolution as the year progresses.  So that's number
   one.
21
         Number two, we have not seen, at least at this juncture, a significant change
22 in delinquencies in California.  Clearly they're starting to trend up.  You would
   expect that.  And then I think lastly you asked about severity.  We actually had good
23 performance in terms of severity for the first quarter, and we think, given the skills
   we have in lost mitigation and working with our lenders, we should continue to see
24 good opportunities for effective loss mitigation throughout the year.

25                         *        *        *

26 **Eric Wasserstrom**: Thanks.  If we could just circle back to the growing proportion
   of high LTV loans, to 97% LTV, which I think is growing as a proportion of the
27 NIW written, can you just talk a little bit about why that's appealing to you now and
   how you view the risk-reward dynamics of that on top of the very strong HPA that
28 we've seen over the past couple of years?

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

- 44 -

**Katkov:**  Sure.  This is David Katkov again.  A couple of different things.  As we shared over the last couple of years, one of the strongest competitive products that we face was the piggyback execution, and what you saw particularly, I would say, in the last 12 to 18 months, is there was a tremendous growth in the 80/20 execution, 80% first, 20% second.  As you probably all know, that execution today is dead or nearly so, so it should not be a surprise that a lot of these loans have come back to the mortgage insurance industry.  So the statistics we've shared today are really typical of the mortgage insurance industry generally.

One of the things that is gives us comfort about this business, notwithstanding your HPA comment, was that what we generally are seeing is that these loans are going through GSE sponsored programs.  So programs, that you're probably familiar with, like My Community Mortgage at Fanny Mae or Home Possible at Freddie Mac are not the typical kind of layered risk transactions that you often saw in the 80/20 execution.

*So from our perspective, when we look at the risk of LTV we are obviously very mindful of that.  We get paid for that.  But what we don't want to see, and we're not seeing, is multiple other risks being introduced into that loan instrument So when we wrap it all up, if we look at the risk and the reward we think it is attractive.*  Obviously, we're very conscious and are in regular dialog with both GSEs to be sure that we don't take risks that are inappropriate for these typical borrower types.

Smith:  And just *to add to what David said, as you would expect, we constantly review all of our program types, product types and loan-to-value types to say ensure the proper risk adjusted returns.  So, we're comfortable, as David indicated.*

\*          \*          \*

**Andrew Brill**:  The reason I ask is that I can look to see some of the other mortgage insurance companies reports so far and the MICA data came out today, for the end of March, and you can see that PMI's market share went up to about 19% say of the MICA number from 16% in the fourth quarter.  And I was just curious, is there some business that you're maybe more willing to write that some of the other mortgage insurers are less willing to or is it just a function of chance, just who your lenders are or is there something else we should be thinking about?

**Katkov**:  *Andrew, I want to be very clear that we have not changed our underwriting standards quarter-to-quarter, so if we've grown in the first quarter, it is not because we're looking to grab market shares.*  So I think that is answer number one.  I honestly need to go back and look at the MICA data.  We were really focused on the call today and I wasn't aware that that came on it this morning.  But certainly Bill Costa can follow up with you one on one.

**Andrew Brill**:  I understand.  Just one follow-up question.  I'm just curious again why you guys are comfortable with the top end of your adjusted guidance being lower than the annualized results for the first quarter, given that 1Q is seasonally the best and you're not assuming any subsequent reserve decreases?

**Smith:**  Andrew, this is Steve.  In looking at all of the data that we've seen, and as you would look at – and again our guidance is really, as you know, total incurred guidance which includes claims paid to LAE as well as additions or deletions from loss reserves, et cetera, *and looking at all the data we have, we're very comfortable with that range.*

**Reasons Why Defendants' Statements on April 30, 2007 Were False and Misleading**

77.    The statements on April 30, 2007, ¶¶74-76 above, concerning PMI's credit risk management, demand for its product, performance of high LTV loans, underwriting standards, operating environment and loss reserves were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to  allow the proper  evaluation  of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007  vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not afford them adequate control over their lenders, who, PMI's internal reporting had revealed, had consistently written policies that did not comply with PMI's underwriting standards; (f) defendants were not employing adequately strict underwriting guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated underwriters and top customers – IndyMac – was deviating significantly from PMI's quality control standards; (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the subprime market that made the Company's statements regarding its extensive 'caution' and risk management misleading; and (i) contrary to "being mindful of risk in the marketplace" defendants were willing to insure the loans that were available.

78.    Additionally, defendants knew or recklessly disregarded the fact that the Company's financial results were misrepresented as defendants improperly failed to adjust its loan loss reserves

1    to reflect the increase in delinquencies and higher claims and greater claim rates as set forth in

2    ¶¶124-193.

3    **Defendants' Statements at the Wachovia Securities CEO Summit**

4        79.    On June 26, 2007, defendant Smith spoke at the Wachovia Securities CEO Summit

5    and made the following statements:

6        **Smith:** So fundamentally, the message on that slide is that we feel we have the right
         family of companies, with the right family of ratings, with the right leverage to work
7        with our customers on a worldwide basis to manage their balance sheets and income
         statements and their execution structures to their optimal benefit.

8                                  *        *        *

9
         *We also are the lead strategic investor in FGIC.  We made that investment in*
10       *December of 2003.  That company is doing very well.*  I will talk a little bit about
         that in a moment.
11
                                   *        *        *
12
         There are a couple things going on there.  Obviously, a growing revenue, a growing
13       earned premium story.  But you also have a fundamental reengineering of how we
         connect with the customer on the front end of the business.
14
         But also on our policy maintenance, on the back end of the business, we totally
15       reengineered our connectivity in our systems with our customers in the first quarter
         of 2006.  So our fundamental cost to underwrite an application and to acquire a
16       policy and to maintain a policy on a unit basis has decreased.  So that will also lead
         to an improving expense ratio over time.
17
         Another important thing about that total reengineering is also the format for the
18       infrastructure and support of PMI Guaranty, as well as our worldwide franchise, that
         $330 billion of insurance in force.  It supports that.  So our scale is quite significant.
19
         Let's go to overall credit risk management, which obviously gets a lot of attention in
20       the press these days.  Let me talk about that in a couple different ways. We need to
         work really hard – I said this last year at the October investor conference – to
21       differentiate our piece of the business from the whole market, because there would be
         a lot of noise as you ended 2006 and you entered 2007.
22
         *I have been talking actively with our customers, with the Federal Reserve, with the*
23       *OCC and others, the National Association of Homebuilders for over three years*
         *now about the layering of risk characteristics that have been going on in the*
24       *marketplace.  We were keenly aware of that in our own risk management and*
         *portfolio.*
25
         If you will look at PMI, a couple things I would say.  92% of our book of business is
26       prime business as defined by credit scores of 620 and above; and less than 8% is 620
         or below.  If you look at 2002 and 2003 as more layering of risk was happening in
27       the marketplace, what you saw at PMI was the tightening up on the credit profile and
         a very keen attention on the other risk layering that was going on.
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

At the end of 2006, that insurance in force in terms of below 620 had been diluted from 12% to 8% by the end of 2006, in terms of insurance in force and risk in force. If you look at the actual vintage book that most people are concerned about, the 2006 vintage, less than 6% had FICO scores between below 620. So we have a very small space in terms of the nonprime portion of our book of business.

\*        \*        \*

In terms of new originations, clearly there is a more prudential lending environment. Over the last several years, we hit a low in terms of market penetration for the industry. Last year was plus or minus 10%. So it was a good time, 2006 vintage. It was a good time to have a low penetration rate.

On the other side of that, we have a growing penetration rate. We expect it to be 15% to 20% higher or 11.5% to 12% in 2007 of all one- to four-family residential housing. There is some potential upside beyond that, although we are not currently forecasting that. We are sticking to the 11.5% to 12%.

But it's done at a time of a more prudential lending environment. Subprime guidance will be implemented; nontraditional mortgage guidance; some of the banks are beginning to be examined today. So there will be a more prudential lending environment in 2007. You'll see a shift to more fixed-rate loans as well. So it's a very good time, I think, for PMI to growth [sic] its business

**Reasons Why Defendants' Statements on June 26, 2007 Were False and Misleading**

80.        The statements on June 26, 2007, ¶79 above, concerning the performance of FGIC, PMI's risk management and its exposure to the 2006 vintage loans were false and misleading for the same reasons stated above, ¶¶77-78, with regard to defendants' statements on April 30, 2007. Additionally, defendants' June 26, 2007 statements were false and misleading because defendants knew or should have known: (a) defendants had not insulated themselves from the 2006 vintage loans and had no basis to downplay their exposure to that vintage; (b) FGIC was not "doing very well" but in fact had substantial investment in subprime securitizations and exposure to extensive risk from the subprime market; and (c) defendants' were not "keenly aware" of the risk in their portfolio because they did not have the experience nor information adequate to properly evaluate their credit risk and were aware of increasing incidence of fraud.

**Defendants' Statements Regarding 2Q07**

81.        On July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Second Quarter 2007 Net Income of $83.8 Million, or $0.95 Per Diluted Share." The release stated in part:

1

2

3

Consolidated losses and loss adjustment expenses for the second quarter and first half of 2007 were $146.2 million and $255.5 million, respectively, compared with $71.9 million and $132.8 million for the same periods last year. The increases were primarily a result of higher incurred losses in U.S. Mortgage Insurance Operations as a result of an increase in notices of default, claim size and claim rates.

4

\*        \*        \*

5

6

7

8

9

Consolidated reserve for losses and loss adjustment expenses totaled $507.0 million as of June 30, 2007 compared with $443.0 million as of March 31, 2007 and $384.6 million as of June 30, 2006. Reserves for losses and loss adjustment expenses (LAE) in U.S. Mortgage Insurance Operations increased $58.7 million in the second quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes. PMI Australia's reserve for losses and LAE increased $2.8 million in the second quarter of 2007 due to a higher default inventory.

10

(Footnotes omitted.)

11

82.     Also on July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Updates 2007 Financial Guidance," which stated in part:

12

13

14

15

The PMI Group, Inc. (the "company") today updated its financial guidance for 2007:

•     Paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. Mortgage Insurance Operations to be between $450 million to $550 million.

16

17

83.     On the same day, defendants held a conference call with analysts and investors in which they made the following statements:

18

19

20

[Smith]:  Thank you for joining today's call. The PMI Group had a profitable second quarter both on a consolidated basis and in our U.S. Mortgage Insurance Operations. Clearly the challenging U.S. market conditions affected our second quarter financial results; however as we have for more than 35 years, we will successfully manage through these conditions to continue to optimize our long term performance.

21

\*        \*        \*

22

23

24

[Katkov]:  As a result of the deteriorating market conditions evidenced in the second quarter, we now believe that for the full year, our total incurred losses composed of paid claims, loss adjustment expenses, and reserves for credit losses will be between $450 million and $550 million.

25

\*        \*        \*

26

27

28

[Smith]: Thanks, David. Our Financial Guaranty segment had a strong quarter with growth in segment net income growing to $29 million in the second quarter of 2007, an increase of approximately 21% over 2006. This was driven by our after-tax equity and earnings from FGIC of $25.4 million, in the second quarter compared to $22.9 million in the second quarter of last year. In the second quarter, FGIC reported a mark-to-market adjustment on the mortgage related CDO portfolio of $16.3

1    million. Pre-tax, due to widening credit spreads. Also during the second quarter, the
     benefit of refunding of municipal obligations contributed approximately $4.2 million
2    after-tax to our equity and earnings from FGIC which is slightly higher than the
     benefit received in the second quarter of last year. And FGIC also benefited from a
3    significant recovery related to Hurricane Katrina impacted credit in the second
     quarter. And finally, much like the first quarter of this year, FGIC benefited from a
4    reduced tax rate due to the removal of certain contingent tax reserves.

5                                    *       *       *

6    [Smith]: Thanks, Don. As I reflect on the second quarter, I think it's important to
     realize in spite of the changes we're seeing in the mortgage markets and in our
7    quarterly results, we're also seeing significant and positive long term trends that will
     bode well for our business. For example, a more realistic assessment of risk and a
8    return to provincial lending standards, revenue growth from all of our business
     segments, insurance enforce growth and increasing global demand for our product,
9    and as I said at the beginning of today's call, assuming prevailing forecasts from
     moderate increases in U.S. Interest rates and stable foreign currency rates, we expect
10   to see continued growth in our book value in the high single digit to low double digit
     ranges for the full year of 2007. Bill?

11
                                     *       *       *
12

13   [Mike Grasher]: Good morning, gentlemen. First question specific I guess to
     David. Could you comment a little bit more on the concentration of your
14   delinquencies and any correlation you may be seeing with those loans and the
     underlying product?

15   Katkov: Sure, Mike. This is David. In the first quarter call, we made a comment
     that the structured finance portfolio which is really our default business was coming
16   under stress. That continues to be true but probably not to the same degree. What
     we're seeing now is probably more broad based stress, really specific to the 2006
17   book year. That's not atypical for what you have heard across the mortgage industry.
     At this juncture, Mike, we don't see any other particular products that seems to be
18   under stress today.

19   [Mike Grasher]: Okay, so if it's 100% LTV or low dock, anything like that?

20   [Katkov]: No unusual trends today.

21                                   *       *       *

22   [Unidentified Participant Analyst]: And you talked about a lot of business in the
     first half. Are you making any changes to any relationships to weed out certain types
23   of businesses in the second half?

24   [Katkov]: Oh, absolutely. We've talked about this quite openly that the really great
     news about the demise of the 80/20 piggyback execution is that a lot of that product
25   came back to the mortgage insurance industry. I think that explains in part the
     increased penetration rate that Steve referred to a few minutes ago but we're very
26   selective in terms of what are the risk attributes in that 100%, we have some obvious
     concerns about low doc business in and around that so we've never done business
27   with all lenders. We will not ever do business with all lenders, we'll be very
     selective.
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1                                    *       *       *

2          **[Mark DeVries]**:  Yes, thanks.  Could you talk a little bit about what you're seeing
           right now with the trends and the potential for loss mitigation efforts?  Who knows
3          that your severity numbers haven't really changed much over the last couple quarters
           but with home prices starting to climb in some markets do you see that changing?
4
5          **[Katkov]**: This is David.  The emphasis that we've always put on loss mitigation
           really gets tested in this kind of environment but ***I'm very confident that we have***
6          ***really 35 years experience working through multiple cycles, so we will make a***
           ***meaningful impact on our severity numbers, but I take your point.***  We take your
7          point that the one challenge that we have is that we do have larger loan sizes, we
           called that out in our opening comments so on an absolute dollar basis that will result
8          in higher dollar payout and then we also have in some markets flat home price
           appreciation.  So we'll have to be very very selective when we make a decision in
9          our loss mitigation efforts when do we actually acquire a property and that's
           something we're very skilled at so I'd say on balance we're pulling out all of the
10         stops, we're pretty good at this.  In fact, I think we're very good at it and I think we'll
           have a positive effect on the ultimate outcome of our claims paid.

11    **Reasons Why Defendants' Statements on July 31, 2007 Were False and Misleading**

12         84.      The statements on July 31, 2007, ¶¶81-83 above, concerning PMI's credit risk

13    management, demand for its product, operating environment and loss reserves were false and

14    misleading because as defendants knew or recklessly disregarded: (a) the models, analyses,

15    standards and procedures which defendants had  developed that enabled them to properly evaluate

16    PMI's risk while underwriting full documentation loans were not designed, or able to  allow the

17    proper  evaluation  of credit risk posed by the new alternative loan products in the market, many of

18    which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

19    the significant changes in the business mix of its portfolio in 2006, when it added greater percentages

20    of high risk alternative loan products, as compared to 2005;  (c) PMI could not accurately evaluate

21    the risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

22    verified personal financial information; (d) the housing market and the mortgage market were in

23    substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were

24    underperforming and the incidence of fraud had been increasing even as PMI had continued to write

25    ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting

26    practices did not afford them adequate control over their lenders, who, PMI's internal reporting had

27    revealed, had consistently written policies that did not comply with PMI's underwriting standards;

28    (f) defendants were not employing adequately strict underwriting guidelines but were willing to

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated

2   underwriters and top customers– IndyMac – was deviating significantly from PMI's quality control

3   standards; (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's

4   exposure to extensive risk from the subprime market that made the Company's statements regarding

5   its risk management misleading; and(i) the Company's financial results were misrepresented as

6   defendants improperly failed to adjust the Company's loan loss reserves to reflect the increase in

7   delinquencies and higher claims and greater claim rates as set forth in ¶¶124-193.

8   **The Truth Begins to Be Revealed**

9        85.    In August 2007, as the market continued to decline, defendants were forced to begin

10  to reveal the truth about the Company.  This began a series of partial disclosures and revelations

11  concerning the truth about PMI's business operations, finances, business metrics, and future business

12  and financial prospects.  Nonetheless, PMI's stock continued to trade at artificially inflated levels as

13  this revelation, along with the ones made during the remainder of the Class Period, was accompanied

14  by denials and continued misrepresentations by defendants.  Upon this news, PMI's stock dropped

15  $3.20 per share on July 31, 2007, to close at $34.07 per share, a one-day decline of 8.6% on volume

16  of over five times the average three-month volume.

17  **Defendants' August 20, 2007 Press Release**

18       86.    PMI released a press release on August 20, 2007 entitled "PMI Provides Updated

19  Portfolio Characteristics," stating the following:

20          The PMI Group, Inc. (NYSE:PMI) today posted a presentation outlining the
            characteristics of the Company's mortgage insurance portfolio in the United States
21          on its website at http://www.pmigroup.com/shareholders/.  The presentation also
            includes an update on PMI's Australia portfolio.
22
23          Steve Smith, CEO of The PMI Group, Inc., said, "Our U.S. and Australian
            portfolios are focused primarily in core housing, meaning single family homes that
24          are owner-occupied, and are geographically well diversified, respectively, across the
            U.S. and Australian states."
25
26          David Katkov, President of PMI Mortgage Insurance Co., PMI's U.S.
            subsidiary, explained, "The current market environment has resulted in some positive
27          demand-related trends for PMI.  Alternative loan products have lost much of their
            luster, the GSEs have increased their market share, and tax deductibility has sparked
28          renewed interest in mortgage insurance.  As a result, we're seeing an increased

1
2
3
4

demand for our product, including insurance for loans with a loan-to-value above 95 percent.  As a whole our portfolio continues to be focused on loans of modest size to individuals and families who are purchasing homes they plan to live in, and we remain committed to sustainable homeownership.  In the long run we believe this increased demand will be a strong positive for PMI and the mortgage insurance industry."

5

**Reasons Why Defendants' Statements on August 20, 2007 Were False and Misleading**

6

87.      The statements on August 20, 2007, ¶86 above, concerning PMI's outlook and focus

7

were false and misleading for the same reasons stated above, ¶¶84, with regard to defendants'

8

statements on July 31, 2007.  Additionally, defendants' August 20, 2007 statements were false and

9

misleading because defendants knew or should have known: (a) the extensive evidence of

10

occupancy-related fraud made defendants' statements regarding their focus on families "purchasing

11

homes they plan to live in" misleading– *i.e.* the false representation that a home would be used as a

12

residence – in the mortgage market; (b) the stronger demand for PMI's insurance was caused by the

13

vacuum left over from the collapse of the piggyback loans and was very high risk and the loans

14

which PMI was insuring were no different in quality from the "alternative loan products" which

15

were disappearing from the market; (c) stating that the portfolio above a 620 FICO score is "prime,"

16

as was stated in the accompanying presentation materials, is misleading because traditionally, prime

17

borrowers have a FICO score of 680 to 700 or higher.  Bank regulators typically define subprime

18

loans as those with a FICO score of 660 or less.  In addition, based on other statistics quoted as part

19

of PMI's presentation, at least 30% of the loans with insurance (or more based on the GSE loan

20

programs PMI participates in) were not full document loans.

21

**Defendants' August 29, 2007 Press Release Regarding Fitch Downgrade**

22

88.      On August 29, 2007, the Company issued a press release entitled "The PMI Group,

23

Inc. Comments on Fitch Revisions to U.S. Mortgage Insurance Capital Model and Ratings Actions,"

24

which stated in part:

25
26
27

The PMI Group, Inc. (NYSE: PMI) announced today that consistent with its revisions of its capital model for U.S. mortgage insurance companies, Fitch Ratings (Fitch) has changed the insurer financial strength ratings for PMI Mortgage Insurance Co. and PMI Guaranty Co. to AA from AA+.  Fitch has noted that these changes are the result of revisions Fitch made to its capital model for U.S. mortgage insurance companies.  Fitch affirmed ratings for PMI Australia and PMI Europe at

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

AA and for The PMI Group, Inc. at A+. Fitch's Outlook for The PMI Group, Inc. and related subsidiaries' ratings is Stable.

Steve Smith, CEO of The PMI Group, Inc., said, "It is important to recognize that the ratings changes made by Fitch were primarily driven by a change in their ratings methodology and capital model, not by a deterioration in the financial position or results of The PMI Group, Inc. or our subsidiaries. PMI Mortgage Insurance Co.'s AA ratings from Fitch and Standard and Poor's and Aa2 rating from Moody's Investor Services speak to our position as a strong mortgage insurance counterparty for our customers in the U.S. and international credit enhancement markets. *PMI Guaranty Co.'s AA rating from Fitch, along with AA ratings from Standard and Poor's and Aa3 ratings from Moody's Investors Services, provides strong ratings upon which PMI Guaranty can continue to successfully offer mezzanine and remote loss credit enhancement solutions for structured portfolio transactions and capital markets executions.*"

In announcing its ratings changes, Fitch noted a declining U.S. residential real estate market and PMI's related exposure and cited PMI's solid franchise, strong balance sheet at the AA rating stress level, experienced management team, and high quality insured portfolio as measured by FICO score distribution and other risk layering characteristics. Fitch also noted that The PMI Group, Inc. derives benefit from diverse earnings streams from international mortgage insurance as well as operations outside of the mortgage insurance space, primarily financial guaranty.

**Defendants' Statements at the September 10, 2007 Lehman Brothers' Fifth Annual Financial Services Conference**

89.    On September 10, 2007, Smith spoke at the Lehman Brothers' Fifth Annual Financial Services Conference. He discussed the strength of PMI, reducing costs and personnel in 2006, the continued support for FGIC and the overall positive position of the Company as of September 10, 2007:

[Smith]: So now let's talk about probably what you're most interested in is the overall credit outlook for PMI. *First, let me say fundamentally we are risk managers. It's what we do day [in] and day out, it's the fundamental franchise, it's understanding the risk, pricing it appropriately, understanding the operational risk and monitoring those and delivering a sound outcome*.

\*        \*        \*

If you look at 2006 vintage actual originations, less than 6% of that business had FICO scores below 620. So as we were recognizing layering risk issues in the marketplace, *so one of the things we did do was tighten up on credit*. I'll also mention to you that every one of the loans that we insure, no matter the channel, be it the VPMI product, the LPMI product, or the bulk product, all goes through our own automated underwriting risk analysis assistant, all of those loans get a score not only by the borrower risk profile and the propensity for those loans that go to claim, but also from a loan risk score in terms of the individual MSAs. I think you know we have an economic real estate finish report that strikes some 379 MSAs on a supply-and-demand basis, and it predicts the propensity for an MSA to go with the house price decline. We publish that data. It's on our website. *We use that data to manage our overall books of business.*

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    **Reasons Why Defendants' Statements on September 10, 2007 Were False and Misleading**

2          90.      The statements on September 10, 2007, ¶89 above, concerning PMI's credit risk

3    management, underwriting guidelines and underwriting procedures were false and misleading

4    because defendants knew or recklessly disregarded: (a) the models, analyses, standards and

5    procedures which defendants had  developed that enabled them to properly evaluate PMI's risk

6    while underwriting full documentation loans were not designed, or able to  allow the proper

7    evaluation  of credit risk posed by the new alternative loan products in the market, many of which

8    had reduced documentation and layered risk factors; (b) PMI did not adequately account for the

9    significant changes in the business mix of its portfolio in 2006, when it added greater percentages of

10   high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the

11   risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

12   verified personal financial information; (d) the housing market and the mortgage market were in

13   substantial decline, default rates were on the rise, the 2006 and 2007  vintage loans were

14   underperforming and the incidence of fraud had been increasing even as PMI had continued to write

15   ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting

16   practices did not afford them adequate control over their lenders, who, PMI's internal reporting had

17   revealed, had consistently written policies that did not comply with PMI's underwriting standards;

18   (f) defendants were not employing adequately strict underwriting guidelines but were willing to

19   insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated

20   underwriters and top customers – IndyMac – was deviating significantly from PMI's quality control

21   standards; and (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's

22   exposure to extensive risk from the subprime market that made the Company's statements regarding

23   its risk management misleading;

24          91.      On October 18, 2007, the Company issued a press release entitled "The PMI Group,

25   Inc. Announces Housing, Mortgage and Credit Market Conditions to Adversely Affect Third Quarter

26   2007 Financial Results," which stated in part:

27                  As a result of the continued weak housing and mortgage markets and
            associated dislocation in the credit derivative markets, The PMI Group, Inc. (NYSE:
28          PMI) announced today that it expects to report a net loss per basic and diluted share

     CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    outstanding of approximately $1.05 in the third quarter of 2007.  The primary
2    components of the loss are incurred losses in its U.S. Mortgage Insurance Operations
      and a mark-to-market (or fair value) adjustment at its unconsolidated subsidiary
3    FGIC.

4         The Company's review of the September mortgage default data on its U.S.
      mortgage insurance portfolio indicates that credit performance significantly
5    worsened during the month and now expects paid claims, loss adjustment expenses
      and additions to the reserve for losses (collectively "total incurred losses") for its
6    U.S. mortgage insurance operations of approximately $350 million in the third
      quarter of 2007.  As a result, the Company is withdrawing its full year total incurred
7    loss guidance and other financial guidance.

8         Credit conditions also had an adverse effect on the insured credit derivative
      portfolio of FGIC, in which PMI is the lead strategic investor, with a common equity
9    ownership of 42.0 percent.  FGIC conducted a fair value review of its outstanding
      credit derivative contracts at September 30, 2007 and estimates that mark-to-market
10   adjustments will result in an unrealized loss of approximately $206 million, pre-tax,
      in the third quarter of 2007.  FGIC anticipates that as a result of this adjustment it
11   will report a net loss for the third quarter of 2007 of approximately $65 million.  As a
      result of PMI's equity ownership in FGIC, PMI will realize an earnings per share
12   loss of $0.32 in the third quarter of 2007 (which amount is included in the estimated
      third quarter 2007 net loss per share for The PMI Group, Inc. shown above).

13        92.     On October 18, 2007, the Company's stock closed down $3.44 at $23.31 (adjusted

14   close of $22.98), a drop of 12.91% on trading volume of 8,538,000 shares.

15        93.     On October 19, 2007, S&P, in a news release entitled, "PMI, Mortgage Insurers Fall

16   on S&P Ratings Action (Update 1)," announced that it had placed PMI on negative CreditWatch

17   with negative implications:

18        PMI Group Inc. dropped 11 percent and rival U.S. mortgage insurers fell in New
      York trading after Standard & Poor's put the company's credit and financial strength
19   ratings on negative "creditwatch."

20        Standard & Poor's made the change after Walnut Creek, California-based
      PMI said yesterday it will post a surprise third-quarter loss because borrower defaults
21   "significantly worsened" in September.  Creditwatch means action is likely within
      90 days on PMI, the industry's second-largest company behind MGIC Investment
22   Corp. MGIC was put on creditwatch Oct. 17.

23        PMI said yesterday it will lose about $1.05 a share in the third quarter and it
      withdrew 2007 earnings forecasts amid the worst U.S. housing slump in 16 years.  A
24   day earlier, MGIC said it won't be profitable in the fourth quarter or 2008.  Mortgage
      insurers help lenders recoup losses when homeowners don't pay.

25
      "We believe it is probable – though not certain – that all seven major
26   mortgage insurers will report underwriting losses in 2008," S&P said in a separate
      statement today.

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

2

PMI dropped the most in 12 years yesterday after announcing the loss.  It declined $2.59 today to $20.62 in 4:03 p.m. New York Stock Exchange composite trading.  The stock has fallen 56 percent this year.

3

4

MGIC fell 9.9 percent today and No. 3-ranked Radian Group Inc. lost 13 percent.  All three were among the day's 10 worst performers in the Russell 1000 Index.

5

6

7

"Standard & Poor's views PMI's reserves as less conservative than its peers,'' analyst James Brender wrote in announcing today's rating action.  The cost of paying claims is expected to increase fivefold from the same period a year earlier to about $350 million, PMI said in yesterday's statement.  Stagnant home prices make it harder for banks to recover when loans go bad.

8

9

PMI spokeswoman Beth Haiken declined to comment.  The company will release full financial results for the third quarter before markets open on Oct. 30, it said.

10   94.    On October 19, 2007, the Company's stock closed down $2.59 at $20.62 (adjusted

11   close of $20.42), a drop of 11.16% on trading volume of 7,576,100 shares.

12   95.    In mid-October 2007, as this news surfaced concerning the true state of PMI's

13   financials and business outlook, PMI's stock price began to decline rapidly.  Between October 16,

14   2007 and October 23, 2007, PMI's stock dropped $11.55 per share to close at $17.96 per share on

15   October 23, 2007, a five-day decline of 39% on extremely high volume.

16   96.    Thereafter, as more of PMI's true financials and business outlook emerged, including

17   information concerning FGIC and Financial Guaranty, and more of the artificial inflation in the

18   Company's stock came out, the stock dropped even further.

19   97.    On October 30, 2007, the Company issued a press release entitled "The PMI Group,

20   Inc. Reports Third Quarter 2007 Financial Results," which stated in part:

21

22

23

24

25

The PMI Group, Inc. (the "Company") today reported a net loss for the third quarter of 2007 of $86.8 million, or $1.04 per basic and diluted share.  Net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share.  The net loss for the third quarter of 2007 was primarily due to $348.3 million in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") in the U.S. Mortgage Insurance Operations, and FGIC's negative mark-to-market adjustments on its insured credit derivative portfolio in the Company's Financial Guaranty segment.

*      *      *

26

27

28

*Consolidated losses and LAE* for the third quarter and year to date were $372.8 million and $628.3 million, respectively, compared with $79.6 million and $212.4 million for the same periods last year.  The increases were primarily a result

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    of higher losses and LAE in the U.S. Mortgage Insurance Operations as a result of an
2    increase in notices of default, increased claim rates and larger claim sizes.

     *Consolidated reserve for losses and LAE* totaled $770.4 million as of
3    September 30, 2007 compared with $507.0 million as of June 30, 2007 and $394.2
     million as of September 30, 2006.  Reserves for losses and LAE in the U.S.
4    Mortgage Insurance Operations increased $253.6 million in the third quarter of 2007
     primarily due to an increase in notices of default, increased claim rates and larger
5    claim sizes.  PMI Australia's reserve for losses and LAE increased $7.3 million in
     the third quarter of 2007 principally due to higher claim rates and claim sizes.
6
     (Footnote omitted.)
7
          98.    On the same day, defendants, including Katkov, Lofe and Smith, held an earnings
8
     conference call with analysts and investors.  On the call, Smith repeated the same financial results:
9
          **[Andrew Brill]:** Is there a particular risk of capital that you think about, as
10   somewhat of a threshold?

11        **[Lofe]:** Well, I'd rather not comment at this point in time because as you know, the
     rating agencies are going to have their own view with respect to risk-to-capital ratio
12   and at this time right now, they're evaluating their models and there are facts related
     to this industry, matters that are being dealt with, so at this point in time, just to
13   reiterate, *we're very comfortable with this risk-to-capital ratio and the operations of
     the company*.  We'll see if we'll continue with the capital basis that we have.
14
                              *       *       *
15
          **[David Hochstim]:** Okay, and then for David, can you just talk about the over 97
16   writ written in 2007 in the supplement.  It looks like over 97 insurance written was
     roughly the same in the first two quarters of this year as the whole of 2006 and I was
17   just wondering? Is there something different in the way you structured that insurance
     or is that just now waiting for another 8 billion of insurance written to go bad?
18
          **[Katkov]:**  Let me take the first part of your question, David.  We have talked about
19   this before, but a year ago, just about now the piggyback execution, the 80/20 that
     had taken so much market share from the mortgage insurance industry, was really
20   coming under stress and you know that the second was difficult for lenders to secure
     ties or they may be wondering if they wanted to hold it in portfolio.  So, there was a
21   fairly significant and rapid rotations from that Wall Street-type execution to the
     mortgage insurance industry and that is really what drove the production in Q1 and
22   Q2 of 2007.  Now, we recognize that.  *We have early warning systems and we made
     a decision quite early in the third quarter to significantly change both our pricing
23   and our guidelines and I won't go into it on these comments*.  We're happy to go
     into it offline, it's all public information, but we expect and we have seen a dramatic
24   slowdown in over 95 LPBs.  So, that would include 97s and 100s, *David.  I really
     can't comment on your last point about whether this book will underperform.  We
25   don't expect that but clearly we made guideline adjustments to ensure that all the
     business after October 1st that we wrote, would be very profitable for us and that is
26   our expectation, David.*

27                            *       *       *

28

     CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

**[Michael Berry]:** Thank you. A question from about EA. Can you explain to us what percentage of your flow business was represented by EA 2s and EA 3s by vintage year so we can see the growth from '05 to '06 and '07 and if can you go further and actually give us the breakdown of the quality of that type of business. Six versus arm, you know, fact scores relative to non-EA business.

**[Katkov]:** Michael that is a very good question. You have obviously done your homework. But, unfortunately, we're not going to be able to disclose that information. As we mentioned earlier, the significant growth in our over-97 business was directly related to growth in the affordable housing program of Fannie May [sic] and Freddie Mac and as you know by the nature of your question, a lot of that is in the EA space. We are – we made some judgments. I think it's very reflective in the pricing guideline changes that we made and I direct you to that. We would be happy to have Bill to go through that in detail. You can see by the changes we have made that we will be happier with the business going forward. That is the short answer.

                    *        *        *

**[Smith]:** In closing, let me remind the listeners of some of the key things we discussed with you on today's call. First with regard to the challenges we see in the domestic MI business, we have identified is – identified problem areas of the portfolio and are working diligently to minimize the impact of those loans. Now, the great majority of our U.S. mortgage insurance portfolio, is performing happen within our expectations and we need to keep sight of that. PMI remains a company with a unique business combination of U.S. Mortgage Insurance, International Mortgage Insurance and a Financial Guaranty. We believe this – and Financial Guaranty Insurance Company. ***We believe this will service [sic] us well as we weather the current pressures win [sic] our current domestic mortgage insurance book. PMI continues to have a strong financial foundation with good liquidity, strong capital and market access***. So we look forward to communicating with you more in our fourth quarter investor communications in December, thank you for joining us on today's conference call and as always, we thank you for your ownership and your interest in the PMI Group. Thank you very much.

99.     The October 30, 2007 conference call partially revealed the truth about the Company to the market. The Company's stock closed at $16.73 on October 30, 2007 down $1.85 or 9.96%.

100.     Defendants also revealed that they made changes to the underwriting guidelines dating back to October 1, 2007 relating to Above-97s.

**Reasons Why Statements Made on October 30, 2007 Were False and Misleading**

101.     The statements on October 30, 2007, ¶¶97-98 above, concerning PMI's credit risk management, risk-to-capital ratio, performance of the 2007 vintage and future outlook were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to allow the

1  proper evaluation of credit risk posed by the new alternative loan products in the market, many of

2  which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

3  the significant changes in the business mix of its portfolio in 2006, when it added greater percentages

4  of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate

5  the risk of its reduced documentation loan portfolio because borrowers did not provide adequate,

6  verified personal financial information; (d) the housing market and the mortgage market were in

7  substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were

8  underperforming and the incidence of fraud had been increasing even as PMI had continued to write

9  ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting

10  practices did not afford them adequate control over their lenders, who, PMI's internal reporting had

11  revealed, had consistently written policies that did not comply with PMI's underwriting standards;

12  (f) defendants were not employing adequately strict underwriting guidelines but were willing to

13  insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated

14  underwriters and top customers– IndyMac – was deviating significantly from PMI's quality control

15  standards; (h) PMI had no "early warning" system, in fact it could not properly evaluate the

16  mortgages it had insured based on a lack of experience and the reduced documentation of the loans it

17  had insured; (i) FGIC's substantial investment in subprime securitizations had resulted in PMI's

18  exposure to extensive risk from the subprime market that made the Company's statements regarding

19  its risk management misleading; (j) the Company's financial results were misrepresented as

20  defendants improperly failed to adjust its loan loss reserves to reflect the increase in delinquencies

21  and higher claims and greater claim rates as set forth in ¶¶124-193; and (k) no later than 3Q07, the

22  deterioration in the housing and mortgage markets had rendered PMI's investment in FGIC other

23  than temporarily impaired and it should have been written down;

24      102.    On November 5, 2007, Fitch Rating Services ("Fitch") announced its new

25  methodology in assessing financial guarantors CDOs and further announced that it would be

26  reviewing the capital of the monolines, including Financial Guaranty, to ensure that they had enough

27  capital to warrant their AAA rating.  As a result of the ongoing review, Financial Guaranty faced a

28  "high probability" risk of falling beneath the capital requirements necessary to keep its AAA rating,

1    which would result in either a potential ratings downgrade or force the Company to raise more

2    capital.  The review was expected to last six weeks.

3        103.    In December 2007, Moody's Investor Services, Inc. ("Moody's") and S&P made

4    similar announcements that they were also re-evaluating their ratings of Financial Guaranty and had

5    placed Financial Guaranty on review for possible downgrades.

6        104.    On January 3, 2008, the Mortgage Bankers Association ("MBA") reported a decline

7    in an index measuring the volume of mortgage applications which offered little hope for a recovery

8    in the housing market.

9        105.    On January 8, 2008, Lehman Brothers published a research note concerning the need

10   for PMI to substantially increase its reserves to cover the significant growth in claims.  As reported

11   by the *Associated Press* in an article entitled "Sector Wrap: Mortgage Insurers":

12       Fears of accelerating deterioration in the mortgage market sent shares of
         mortgage insurers lower Tuesday.

13

14       **Lehman Brothers analyst Bruce Harting wrote in research notes MGIC
         Investment Corp., PMI Group Inc. and Radian Group Inc. will all need to
         significantly boost reserves for the fourth quarter and beyond to cover expected
15       jumps in insurance claims**.

16       Mortgage insurers cover principal and interest payments on mortgages when
         borrowers stop paying their loans.  As mortgages have increasingly defaulted, the
17       insurers have been forced to pay out more claims on the failed loans.  Until defaults
         dissipate, the insurers will continue to struggle and likely have to build reserves to
18       cover future losses.

19       **Harting said MGIC, PMI and Radian are all likely to speed up reserve
         building to cover claims because deterioration in the mortgage market is occurring
20       faster than anticipated**.

21                            *        *        *

22       **Harting estimates PMI Group will now post a loss of $1.58 per share in the
         fourth quarter, 70 cents per share worse than he had previously forecast**.
23
         PMI Group shares fell 86 cents, or 7.5 percent, to $10.59.  Shares have traded
24       between $9.82 and $51.46 during the past 12 months.

25       106.    Upon this news, shares in the Company's stock closed down $2.83 per share to close

26   at $7.45 per share on January 9, 2008, a decline of 27%.

27       107.    On January 10, 2008, Blackstone Group LP announced that it might write down its

28   investment in FGIC due to the serious deterioration in the subprime market.  Four days later, on

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  January 14, 2008, further evidence emerged that Alt-A loans were underperforming, just like

2  subprime loans.

3       108.   On January 17, 2008, the U.S. Commerce Department reported a significant decline

4  in new-home construction in the previous year.  The Commerce Department reported that work

5  began on 1.35 million houses and apartments in 2007, down 24.8% from 2006.  This decline was the

6  second-biggest annual decline on record, exceeded only by a 26% plunge in 1980.  Additionally, on

7  the same date, Moody's announced that it had placed Ambac Financial Group Inc., one of the

8  nation's leading bond insurers and a close competitor of FGIC, on review for possible downgrades

9  due to much higher than expected losses on mortgage-related bonds.  These announcements were

10  strong indicators as to the depth and severity of the problems in the housing market.

11       109.   Upon this news, shares in the Company's stock dropped down $1.29 per share to

12  close at $6.48 per share on January 17, 2008, a one-day decline of 17%.  This was the lowest PMI's

13  stock had traded in its 12 years as a public company.

14       110.   Thereafter, on January 30, 2008, Fitch finally downgraded Financial Guaranty's

15  financial strength rating by two notches from "AAA" to "AA."

16       111.   The next day, on January 31, 2008, S&P made a similar move and downgraded

17  Financial Guaranty's rating by two notches from "AAA" to "AA" and further downgraded FGIC's

18  rating by three notches from "AAA" to "A."  Further, Moody's announced that it had placed PMI on

19  review for a possible ratings downgrade.

20       112.   On February 11, 2008, PMI announced that on March 1, 2008, it would stop insuring

21  mortgages with high LTV ratios, again tightening its guidelines on which type of loans the Company

22  underwrites in order to reduce its exposure to risky subprime loans.

23       113.   On March 3, 2008, after the market closed, PMI issued a press release entitled "The

24  PMI Group, Inc. Reports Preliminary Fourth Quarter 2007 Financial Results for Certain Segments."

25  The release stated in part:

26       PMI Group, Inc. (NYSE: PMI) (the "Company") today announced that due to
         delays in obtaining 2007 financial results from FGIC Corporation ("FGIC") the
27       Company has filed a Form 12b-25 with the Securities and Exchange Commission
         ("SEC") for a late filing of its 2007 Form 10-K.  In this SEC filing and as outlined
28       below in financial highlights, the Company provides financial results for its U.S.

Mortgage Insurance Operations and International Operations and discusses its expectations for its Financial Guaranty segment. The Company plans to issue its financial results for the fourth quarter of 2007 before the financial markets open (approximately 6:00 AM ET) on Wednesday, March 12, 2008, followed by a conference call at 11:30 AM ET.

"Our preliminary fourth quarter results for our U.S. Mortgage Insurance and International Operations demonstrate that we are facing challenging market conditions, particularly in the U.S. housing market," said The PMI Group Inc.'s Chairman and CEO Steve Smith. "We have implemented a plan to address these challenges, which we will discuss in detail on our conference call next week. A cornerstone of the plan and our strategic focus going forward is our core business, mortgage insurance, which we believe offers PMI long term opportunities for growth and profitability. Within our Financial Guaranty segment, we will continue to work to stabilize our equity investments in FGIC and RAM Re, but we will not be contributing any additional capital to these companies."

**Financial Highlights of U.S. and International Mortgage Insurance Operations**

- *U.S. Mortgage Insurance Operations[] – reported a net loss of $236.0 million in the fourth quarter of 2007 compared to net income of $77.2 million in the fourth quarter of 2006. The loss in the fourth quarter of 2007 was driven in large part by an increase in losses and loss adjustment expenses resulting from an increase in our default inventory, higher claim rates and higher average claim sizes*. For the full year ended December 31, 2007, U.S. Mortgage Insurance Operations reported a net loss of $190.8 million compared to net income of $290.3 million for the full year of 2006. The Company estimates that U.S. Mortgage Insurance Operations' losses and loss adjustment expenses in 2007 were approximately $1.1 billion.

\*        \*        \*

**Financial Guaranty Segment**

Because the Company lacks the necessary financial information from FGIC to complete its consolidated financial statements, the Company is not yet able to calculate its consolidated results of operations for the full year ended 2007 and also is not able to calculate the financial results of its Financial Guaranty segment. ***The Company expects that its Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during those periods. In connection with the preparation of the Company's consolidated financial statements, the Company is conducting an analysis to determine whether the value of its investment in FGIC was impaired as of December 31, 2007***. This analysis cannot be completed until the Company receives financial information from FGIC necessary for the Company to complete its consolidated financial statements.

114.    Additionally on March 3, 2008, in a Form 12b-25, the Company announced that it would be delayed in filing its Form 10-K for year-end 2007, stating in part:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

The PMI Group, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

The Company is unable to complete its consolidated financial statements for the year ended December 31, 2007 because it is currently awaiting financial information from an equity investee, FGIC Corporation ("FGIC"), that is necessary for the Company to complete its financial statements. *FGIC has informed the Company that it is in the process of completing its financial statements, but that it has not been able to do so due to the time and effort involved in determining the amount of loss reserves related to residential mortgage-backed securities and collateralized debt obligations of asset-backed securities. The determination of such reserves has been affected by the unprecedented rapid and severe deterioration of the residential mortgage market*.

115.    On this news, PMI's stock collapsed to $6.43 per share on March 4, 2008, a one-day decline of 5%. This was the lowest PMI's stock had traded in its twelve years as a public company.

116.    The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company's investment in FGIC was materially impaired as FGIC's bond insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to the plunge in value of mortgage debt;

(b)    The Company was materially overstating its financial results by failing to properly value its investment in FGIC and by failing to write down that investment in a timely fashion in violation of GAAP;

(c)    The Company was not adequately accounting for its loss reserves in violation of GAAP, causing its financial results to be materially misstated;

(d)    The Company failed to engage in proper underwriting practices for its book of business related to insurance written throughout the Class Period and misrepresented its risks to investors; and

(e)    The Company had far greater exposure to anticipated losses and defaults related to its book of business related to insurance during the Class Period than it had previously disclosed.

## ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER

117.    As alleged herein, defendants acted with scienter in that defendants had actual knowledge of the Company's true state of affairs and issued public documents and statements that were materially false and misleading; and knowingly and substantially participated in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding the nature and scope of the Company's underwriting policies and controls, the Company's exposure to high risk loans and the value of its equity investment in FGIC and their control over and responsibility for the Company's financial statements, participated in the fraudulent scheme alleged herein.  This scheme: (a) deceived the investing public regarding the Company's credit risk profile; (b) deceived the public regarding the Company's financial health throughout the Class Period; (c) allowed the Individual Defendants to achieve the economic incentives described below; and (d) caused plaintiffs and other members of the class to purchase or otherwise acquire the Company's common securities at artificially inflated prices.

**The Company's Compensation Scheme Motivated Defendants to Commit Fraud**

118.    Defendants were motivated to conceal the true state of affairs of the Company and thus capitalized on the artificial inflation of the Company's stock.  During the Class Period, the defendants received significant stock and option awards.  Defendants' compensation was in large part determined by the reported financial performance of the Company:

> PMI pays for, and rewards, performance.  At the executive level, this means that nearly all aspects of our compensation program are designed in whole or in part to reward individual excellence and achievement that has led to the achievement of corporate goals.  Accordingly, the Committee's compensation decisions are driven by both PMI's performance and the Committee's assessment of each executive officer's performance.  Stellar individual performance that has not resulted in collective achievement is not the primary goal and, therefore, our executive compensation program metrics are not based primarily on individual achievement. ***Rather, a significant portion of executive compensation is contingent upon the achievement of PMI's short- and long-term financial and other corporate objectives, including earnings growth and the creation of shareholder value.  In particular, annual incentive awards are based upon net income and other quantitative and qualitative factors, including the achievement of pre-established corporate goals.***  The Committee also takes into account the performance of each executive.  Key factors affecting the Committee's individual assessments include the nature and scope of the executive officer's responsibilities, and his or her level of

experience, effectiveness in leading corporate initiatives, and success in creating a culture of integrity and compliance.

\*       \*       \*

PERFORMANCE-BASED ANNUAL INCENTIVES. PMI's compensation program includes annual cash incentive award opportunities. The Committee believes that annual incentives further the goal of tying a significant portion of compensation to PMI's achievement of its strategic annual goals and provides a means by which to reward superior performance. The Committee believes that annual incentive opportunities are necessary to attract and retain talented and experienced executives. Annual incentive awards are primarily designed to focus management on financial measures and corporate initiatives that promote stockholder value. Accordingly, awards are predominantly tied to PMI's performance and, to a lesser extent, the Committee's overall assessment of the executive's performance.

Annual incentive awards to PMI's executives are governed by PMI's Bonus Incentive Plan. *The Plan provides for the payment of bonuses from a pool that is a percentage (not to exceed 5%) of PMI's consolidated net income for the year. The size of the aggregate net income bonus pool is determined annually by the Committee. The Plan does not provide the Committee with the discretion to pay aggregate bonuses under the Plan in excess of the net income pool*. The Plan also limits the amount that can be paid to any one executive to 30% of the net income pool.

\*       \*       \*

*In 2006, the Committee established the following Company criteria for the 2006 performance period*:

1.      *2006 consolidated net income*;

2.      *2006 net income from operations overseen by PMI Capital Corporation, a wholly owned subsidiary of PMI; and*

3.      *2006 net income from PMI's U.S. mortgage insurance operations.*

These criteria excluded realized gains and losses, extraordinary items under GAAP, and any impact of changes in accounting principles, and adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors. The Committee weighted these three criteria 40%, 30% and 30%, respectively.

The Committee selected these criteria for 2006 because, among other things, it believes that: (i) net income is a fundamental criteria of company performance used by management, the Board of Directors and PMI's shareholders; and (ii) the focus on the net income of PMI's two operating segments, PMI Capital Corporation and PMI's U.S. mortgage insurance operations, encourages continued diversification and growth as well as commitment to PMI's core operations. The Committee established threshold, target and maximum numeric goals for the net income criteria. The numerical goals associated with "target" represented the financial goals contained in the Board-approved corporate operating plan for 2006. Based upon the facts that (i) the Committee has not paid bonus awards at the maximum level under the Plan and (ii) the criteria associated with potential maximum bonus payouts for 2006 were significantly higher than the financial goals contained in the operating

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

- 66 -

plan, the Committee believes that the criteria were sufficiently challenging and difficult to focus executives on superior achievement of the Company's short-term objectives.

\*        \*        \*

*Corporate Performance Measures for 2007 Annual Incentives.* In early 2007, the Committee set the maximum bonus pool and maximum bonus amounts that can be earned in 2007 under the Bonus Incentive Plan as follows:

• The bonus pool was set at 5% of net income; and

• The 2007 maximum bonus opportunity, expressed as a percentage of base salary, for each of the Named Executive Officers is: Mr. Smith – 240%, Mr. Lofe – 170%, Mr. Shuster – 185%, Mr. Bacigalupi – 170% and Mr. Katkov – 175%.

The Committee also established the following criteria that it will review, in conjunction with other quantitative and qualitative factors, when it determines whether, and to what extent, to award bonuses from the aggregate bonus pool pursuant to the Plan:

• **The Company income criteria**:

    • 2007 consolidated net income,

    • 2007 net income from operations overseen by PMI Capital Corporation, and

    • 2007 underwriting income from PMI's U.S. mortgage insurance operations.

These criteria exclude realized gains/losses, extraordinary items under GAAP, any impact of changes in accounting principles, adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors and the effect of FGIC refundings. The Committee weighted these three criteria equally; and

• Attainment of various corporate objectives criteria, including financial measures such as return on equity; strategic planning and strategic objectives; capital management; business segment synergies; investor, rating agency and governmental relations activities; and key officer development.

The Committee weighted the income criteria and the corporate objectives criteria at 65% and 35%, respectively.

In addition to these criteria, the Committee considers other quantitative and qualitative factors, including individual performance, retention, reward and motivation. The Committee believes that the net income bonus pool, the criteria and other factors will motivate our executive officers to achieve our 2007 goals in a manner consistent with the creation of long-term shareholder value, and that they are sufficiently challenging and difficult to achieve to focus executives on superior achievement of the Company's short-term objectives.

119. Defendants' compensation prior to and during the Class Period was as follows:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

- 67 -

| Name | Year | Salary ($) | Bonus ($) | Other Annual Compen-sation | Stock Awards ($) | Option Awards* ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| **L. Stephen Smith** | 2007 | 800,000 | 0 | | 462,183 | 2,473,784 | 5,154,217 |
| | 2006 | 649,583 | 0 | | 462,183 | 1,342,969 | 4,475,927 |
| | 2005 | 525,000 | 750,000 | 39,075 | 1,850,000 | | 3,176,675 |
| | 2004 | 500,000 | 767,700 | 20,200 | 0 | | 1,296,900 |
| | 2003 | 425,000 | 213,791 | 29,200 | 0 | | 678,191 |
| **Donald P. Lofe, Jr.** | 2007 | 425,000 | 117,000 | | 231,092 | 629,789 | 1,564,270 |
| | 2006 | 390,000 | 0 | | 231,984 | 379,501 | 1,552,709 |
| | 2005 | 360,000 | 411,250 | 39,075 | 925,000 | | 1,771,294 |
| | 2004 | 315,000 | 400,000 | 201,820 | 0 | | 927,383 |
| | 2003 | 300,000 | 267,375 | 282,771 | 159,150 | | 1,009,296 |
| **Bradley M. Shuster** | 2007 | 475,000 | 0 | | 462,183 | 760,644 | 1,981,546 |
| | 2006 | 415,000 | 0 | | 462,183 | 495,139 | 2,214,346 |
| | 2005 | 400,000 | 506,000 | 39,075 | 1,850,000 | | 2,808,675 |
| | 2004 | 330,000 | 450,384 | 20,200 | 0 | | 809,584 |
| | 2003 | 315,000 | 140,850 | 29,200 | 0 | | 579,985 |
| **David H. Katkov** | 2007 | 430,000 | 0 | | 231,092 | 637,258 | 1,595,091 |
| | 2006 | 385,333 | 0 | | 231,092 | 361,055 | 1,620,502 |

*Option awards not priced during 2003-2005.

**Defendants' Insider Stock Sales**

120.    While insider sales are not necessary to establish scienter in this case, defendants' stock sales are consistent with the scheme to defraud.  During the same time that the Company and the Individual Defendants issued materially false and misleading statements causing the Company's stock price to be artificially inflated, the Individual Defendants took advantage of the inflation of the stock price and sold more than $9 million worth of their PMI shares to the unsuspecting public.  A summary of defendants' stock sales is as follows:

| Date of Trade | Inside Trader | Number of Shares | Price Per Share ($) | Gross Proceeds |
|---|---|---|---|---|
| 7-May-07 | Katkov, David H. | 9,084 | 48.88-48.92 | $444,000 |
| 7-May-07 | Katkov, David H. | 944 | 48.94-48.94 | $46,000 |
| 7-May-07 | Katkov, David H. | 405 | 48.88-48.88 | 20,000 |
| 1-May-07 | Smith, L. Stephen | 13,900 | 48.09-48.09 | 668,000 |
| 1-May-07 | Shuster, Bradley M | 653 | 47.85-47.85 | 31,000 |
| 1-May-07 | Shuster, Bradley M | 31,586 | 48.02-48.30 | 1,521,000 |
| 20-Apr-07 | Smith, L. Stephen | 19,892 | 48.00-48.00 | 955,000 |
| 19-Apr-07 | Smith, L. Stephen | 108 | 48.00-48.00 | 5,184 |
| 16-Apr-07 | Smith, L. Stephen | 10,000 | 46.00-46.00 | 460,000 |

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

| Date of Trade | Inside Trader | Number of Shares | Price Per Share ($) | Gross Proceeds |
|---|---|---|---|---|
| 1-Mar-07 | Smith, L. Stephen | 10,000 | 46.06-46.42 | 462,000 |
| 12-Feb-07 | Katkov, David H. | 449 | 47.34-47.34 | 21,000 |
| 6-Feb-07 | Smith, L. Stephen | 2,821 | 50.49-50.49 | 142,000 |
| 6-Feb-07 | Smith, L. Stephen | 16,100 | 51.07-51.07 | 822,000 |
| 2-Feb-07 | Smith, L. Stephen | 30,000 | 48.19-48.19 | 1,446,000 |
| 3-Jan-07 | Smith, L. Stephen | 30,000 | 48.06-48.06 | 1,442,000 |
| 8-Dec-06 | Shuster, Bradley M | 2,592 | 46.49-46.69 | 121,000 |
| 7-Dec-06 | Smith, L. Stephen | 10,000 | 46.81-46.81 | 468,000 |
| 7-Dec-06 | Shuster, Bradley M | 8,921 | 46.73-46.73 | 417,000 |

**Post-Class Period Events – Further Evidence of Defendants' Fraudulent Conduct**

121.    On March 17, 2008, the Company, including defendants Katkov, Lofe and Smith, held an earnings conference call with analysts and investors.  On the conference call, defendants stated, in part:

> **[Smith]:**  Thanks, Bill and good morning everyone, and thank you for joining today's call.  As you've seen in our financial results, The PMI Group had a net loss in the fourth quarter of approximately $1 billion or $12.51 per share.  For the full year, The PMI Group had a net loss of $915.3 million or $10.81 per share.  Our financial results are driven by a confluence of extraordinary events including the significant challenges facing the housing mortgage and capital markets.  Clearly, 2007 was a very difficult year for the entire financial services industry and PMI.  And we believe that the PMI Group will have losses on a consolidated basis in 2008.
>
> To address the conditions we see in the U.S. economy and global markets today and to position PMI to return to profitability, we have implemented a five-point plan.  That plan is to maintain our financial strength, focus on our core mortgage insurance business, book high quality new business, mitigate losses and manage expenses.  Obviously each of these is critical, but none more so in today's environment than maintaining our financial strength.
>
> *        *        *
>
> The second point of our plan is to focus on core mortgage insurance business.  While we are working to stabilize and improve the value of our financial guaranty investments, particularly FGIC and RAM Re, these investments are no longer strategic to our operations.  Therefore, we have no intention of making further capital contributions to either of these companies.  Our top initiatives, strengthening our financial position and focusing on our core business, mortgage insurance, will position us for growth.
>
> *        *        *
>
> Obviously, as a result of the changing market and economic conditions, there are challenges in the U.S. Mortgage Insurance Operations.  We expect paid claims in 2008 will range between 825 to $975 million.  As shown in our supplement portfolio disclosure document released today, we are seeing heightened defaults for specific

loans, including 2/28 hybrid ARMs, Alt-A, high loan-to-value and particular geographic regions including California, Florida and the auto states of Michigan, Ohio, Illinois and Indiana.

*     *     *

In response to significant deterioration of the housing and mortgage markets, we are intensely focused on measures to ensure that the business we are booking in 2008 throughout our global mortgage insurance operations is of very high quality and would be profitable over time. In the United States, we've made significant changes to our underwriting guidelines, principally related to 100% loan-to-value loans, Alt-A loans in certain geographic areas where we have identified as distressed markets. As a result of this and other measures we're seeing very encouraging trends in our new business production.

These changes will likely reduce the volume of new business that we write, but we believe that they will result in a better, more profitable book of business going forward. The purpose of all these changes is to ensure that we remain true to our mission of facilitating sustainable home ownership while producing profitable books of business and in doing so these changes will ultimately be good for consumers, communities, PMI and our shareholders.

*     *     *

[Lofe]: As Steve discussed, our financial guaranty investments are no longer a core strategic focus of The PMI Group. At this point, our efforts are focused on stabilizing the value of these assets in orderly [sic] to potentially realize value in the future. We recognize that conditions remain unsettled in the markets and this makes it difficult for FGIC and RAM Re to operate. Our equity earnings from these two entities have become more volatile due to the application of fair value or mark-to-market accounting to the portion of their credit enhancement business, which is executed in credit derivative form.

*     *     *

Now transitioning to FGIC, the equity and losses from that entity so significantly reduced the value of our investment, and that an impairment while we tested for it was not deemed necessary at the current time. We also will continue to evaluate this investment for possible future impairment including if ownership in FGIC were to become diluted in connection with any proposed restructuring or if the estimated fair value were to fall below our carrying value. This leaves PMI's carrying value at December 31, 2007 of FGIC at $103.6 million and RAM Re at $60 million.

*     *     *

[David Hochstim]: Yeah, it's Bear Stearns as of today. Wonder if you could talk more about the effect of your underwriting changes and the underwriting tightening that Fannie and Freddie have done on new insurance written and the prospect for new insurance written? And I guess Fannie and Freddie have been losing some market share very recently to Ginnie Mae. Presumably a higher risk business migrates to the government, but is – I guess I am trying to think about how earned premiums might change over the next year possibly or how much they might grow given their kind of mix shift and higher premium rates?

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   [Katkov]: David, this is David Katkov. Of course, there's a lot of questions in your
2   question, so let me try to give you some indication, since we don't forecast revenue
    growth. First and foremost, you're right: FHA has seen an increase in their business.
    We have said in a couple of different forms, for certain segments of that business
3   we're perfectly fine with FHA stepping in specifically, I believe they have a role for
    higher LTV, generally lower credit quality borrowers, and then now to turn it to PMI,
4   those are specifically [sic] segments that we have backed away from starting last fall.
    So, from my perspective – and it really – I want to emphasize Steve's earlier
5   comments, our goal in 2008 is to ensure that the loans that we put on the books are
    certainly of extremely high credit quality with good profitability prospects in the out
6   years. . . .  So I think, again, since we don't forecast revenues, my overall sense is
    that we're very focused on profitability, and we think the changes we have made for
7   underwriting guidelines, even if they have some top line effect, will have very strong
    bottom line effect.
8
                                    *          *          *
9
10  [James Gilligan]: Okay, thanks. Another question on a different topic; on one of
    your supplements that you provided you had a graph that shows kind of issues by
11  year and then the losses over time, starting basically with 2001 all the way through
    2007. 2007 is not on that graph, just wondering if you guys had just a data point for
12  what your experience is in that vintage?

13  [Katkov]: This is David Katkov again. Obviously it's very early to be able to predict
    how that vintage will perform. I do think we can make a general statement
14  because I think this applies really across all mortgage participants and there is a
    general recognition that 2007 was a difficult year for originations in terms of overall
15  quality. But that's not unique to PMI.

16                                  *          *          *

17  [Bob Gottesman]: Yes, First Manhattan Co. Could I just ask a basic question to
    outline what you think is the longer-term investment case to buy PMI stock? . . .

18  [Smith]: Bob, let me start that, this is Steve. As I had indicated in my remarks in
    terms of what we believe to be the quality of business that is available to us in 2008,
19  as you know, markets are very cyclical. We will come out of this cycle. *So we're
    very focused on booking high quality business not only in the United States but
20  also around the world, so we feel good about our prospects there.*

21                                  *          *          *

22  [James Roumell]: . . .  And two, just going back to the '07 vintage regarding an
    earlier question, is it fair to say that the '07 book in how its seasoning is much
23  quicker than what you would normally expect and is that a fair assumption, that that
    is – the losses coming off of the '07 book are coming in quite a bit more rapidly than
24  what you would expect in a normal book of business?

25                                  *          *          *

26  [Katkov]: First of all, as you know, in the fourth quarter we added 434, I am sorry,
    $435 million to our loss reserves. And then let me break it out in terms of how are
27  reserves allocated by vintage because I think this is what you are really asking.

28  [James Roumell]: Yeah.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[**Katkov**]: . . . Back to your specific question on '07, clearly, as I've said before, overall market participants would say that it was a challenging vintage. It is too early to make any forecast as to how that vintage will play out beyond the data that I have just shared with you.

[**Smith**]: Just to complement David's thought there. Clearly, we are in a difficult overall housing, mortgage and capital market. So you would expect those vintages going into the teeth of that market to have some results that wouldn't necessarily conform with all of your historical data.

        *   *   *

[**Lofe**]: And Mike, my comment to the previous caller was that it appeared that there was the acceleration of claims into 2008 and we only provide for what we know is in, if you will, on an incurred basis based upon NODs and other factors. So again, as you know, we can't put a quote provision up for something we don't know about today.

[**Michael Grasher**]: Yeah, I understood with that, yeah.

[**Katkov**]: Mike, again, just to be clear the things that I highlighted in my previous answer was, and I think this is your question, tell me if it's not, is we definitely saw an increase in our NODs, we definitely saw an increase in our claim rate assumptions, we also saw an increase in our claim size assumptions. So, yes to all of those.

[**Michael Grasher**]: Okay. And then just to clarify, Steve, you're talking about your typical maturity being two to four years, are you speaking to paid loss experience on those or are you speaking to delinquencies, if you could clarify?

[**Smith**]: I'm speaking to the total incurred losses by vintage.

  122.  Defendants' statements in the March 17, 2008 conference call further revealed the true state of affairs at the Company. Defendants acknowledged that their poor underwriting practices and mounting losses left PMI under capitalized and they reviewed their options for generating additional capital. PMI's underwriting standards, which had been trumpeted throughout the Class Period, were in fact, not stringent enough and allowed the Company to take on too much risk. Defendants stated that they would only underwrite high-quality loans, as opposed to the high-risk loans they were underwriting during the Class Period. Defendants admitted that stricter underwriting standards would lead to a decrease in volume, further demonstrating that their Class Period underwriting was much riskier than defendants admitted. Finally, it was revealed that FGIC

and RAM Re were so poorly run that these entities were no longer expected to be profitable and the Company would not longer seek to fund them.

123.    On August 26, 2008, the effects of the poor quality of PMI's portfolio was finally exposed; PMI issued a press release announcing the downgrading of its rating by S&P entitled "PMI's Claims-Paying Resources Unaffected by S&P's Actions":

> The PMI Group, Inc. (NYSE: PMI) (the Company) today announced that Standard & Poor's (S&P) lowered the insurer financial strength ratings of PMI Mortgage Insurance Co. (PMI U.S.) to A- from A+. S&P also lowered the ratings of PMI Mortgage Insurance Company Limited (PMI Europe) to A- from A+. The senior debt rating of the holding company was lowered to BBB- from BBB+ and the junior subordinated debt rating lowered to BB from BBB-. S&P placed all of the above ratings on credit watch with negative implications with the possibility of an additional one notch downgrade, or the affirmation of the existing ratings with a negative outlook.

### FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

**PMI's Financial Statements and Statements About Financial Results Were Materially Misstated in Violation of GAAP and SEC Reporting Rules**

124.    The financial statements and the statements about the Company's financial results were false and misleading in the Company's 2006 Form 10-K; 1Q07 Form 10-Q, 2Q07 Form 10-Q; 3Q07 Form 10-Q; 2007 Form 10-K; and 1Q08 Form 10-Q. The Company violated GAAP and SEC reporting rules because said financial information was not prepared in conformity with applicable GAAP literature and SEC requirements, nor was the financial information a fair presentation of the Company's operations because of its improper accounting for, and disclosures about, the investment in FGIC and the equity in losses for unconsolidated subsidiaries (an income statement loss adjustment in connection with the investment in FGIC), and the reserve for losses and loss adjustment expenses (a balance sheet liability account).

125.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosures. SEC Regulation S-X requires that interim financial

1    statements, such as quarterly financial statements, must also comply with GAAP, with the exception

2    that interim financial statements need not include disclosures which would be duplicative of

3    disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

4    **Improper Accounting for, and Disclosures about, PMI's Investment in FGIC**

5           126.    For the period ended March 31, 2008, PMI finally admitted that its 42% share

6    ownership interest in FGIC was other than temporarily impaired.  In PMI's 1Q08 Form 10-Q, PMI

7    reduced its carrying value of FGIC from $103.6 million as of December 31, 2007 to *zero*.  Since the

8    carrying value was dropped to zero, PMI no longer recognized its proportionate share of FGIC's

9    income or losses.  The impairment resulted in PMI recording a loss of nearly $88 million as a pre-tax

10   net realized investment loss in the consolidated statement of operations as of March 31, 2008.

11          127.    In the 1Q08 Form 10-Q, PMI claimed that the decision to reduce the carrying value to

12   zero was based on, *inter alia*, the following reasons:

13          *[C]ontinued uncertainty concerning the future performance of FGIC's insured*
            *collateralized debt obligation ("CDO") and residential mortgage-backed securities*
14          *("RMBS") portfolios and continued widening of credit spreads associated with*
            *credit default swaps*; the cessation of new business writings by FGIC during the first
15          quarter of 2008; the need for FGIC to obtain or generate significant additional capital
            to resume business writings and the absence of a definitive agreement with respect to
16          any capital raise; the likelihood that, were any capital plan to be executed by FGIC,
            the Company's investment in FGIC would be highly diluted since the Company does
17          not intend to fund any portion of such additional capital; and various regulatory and
            other business uncertainties.
18
     The uncertainties and circumstances requiring the write-down to zero, however, existed no later than
19
     3Q07, as described in this Complaint.
20
     **Background on Derivative Instruments and GAAP Literature Pertaining to PMI's**
21   **Improper Accounting for, and Disclosures About, PMI's Investment in FGIC**

22          128.    Collateralized debt obligations (CDO), residential mortgage-backed securities

23   (RMBS), and credit default swaps (CDS) are accounted for as derivative instruments, according to

24   the Statement of Financial Accounting Standards ("SFAS") No. 133, *Accounting for Derivative*

25   *Instruments and Hedging Activities*, issued by the Financial Accounting Standards Board ("FASB")

26   in June 1998, ¶¶6-9.  These derivative instruments may be briefly described as follows:

27          (a)     A CDO is essentially a repackage of existing mortgage bonds, buyout loans,

28   and other assets into new securities with varying risks.  CDOs are a type of asset-backed security and

     CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    structured credit product, constructed from a portfolio of fixed-income assets which are divided into

2    different tranches with different credit ratings and corresponding risks. A CDO investor takes a

3    position in an entity that has a defined risk and reward, not directly in the underlying assets, and the

4    investment is dependent on the quality of the metrics and assumptions used for defining the risk and

5    reward of the corresponding tranches.

6          (b)      A RMBS is a bundled security consisting of such assets as home mortgages,

7    home equity loans, and subprime mortgages, with corresponding credit risks, and whose cash flows

8    are backed by the principal and interest payments from such residential debt.

9          (c)      A CDS is designed to transfer the credit exposure of fixed income products

10    from one party to another, and is similar to an insurance policy in that the buyer of a credit swap

11    receives credit protection, whereas the seller of the CDS guarantees the credit worthiness of the

12    product. For example, PMI or FGIC would typically be a seller of a CDS and a bank may be the

13    buyer. The buyer/bank normally would be the holder of the underlying mortgage or other financial

14    instrument, although the buyer is not required to actually hold the financial asset to buy a CDS. The

15    seller of the CDS guarantees to buy the financial asset at par in the event of default on the underlying

16    financial asset. In exchange, the buyer typically pays quarterly premiums to the seller as protection

17    against the potential default on a five-year CDS contract, although CDSs of almost any maturity can

18    be traded.

19         129.      Such derivative instruments as CDOs, RMBSs, and CDSs must be measured at fair

20    value and are marked-to-market, *i.e.* marked to current fair value. According to GAAP, an entity

21    shall recognize all of its derivative instruments in its statement of financial position as either assets

22    or liabilities depending on the rights or obligations under the contracts. SFAS No. 133, ¶17. FASB

23    provided a detailed definition of fair value in SFAS No. 133:

24           The amount at which an asset (liability) could be bought (incurred) or sold (settled)
            in a current transaction between willing parties, that is, other than in a forced or

25           liquidation sale. Quoted market prices in active markets are the best evidence of fair
            value and should be used as the basis for the measurement, if available. If a quoted

26           market price is available, the fair value is the product of the number of trading units
            times that market price. If a quoted market price is not available, the estimate of fair

27           value should be based on the best information available in the circumstances. The
            estimate of fair value should consider prices for similar assets or similar liabilities

28           and the results of valuation techniques to the extent available in the circumstances.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

Examples of valuation techniques include the present value of estimated expected future cash flows using discount rates commensurate with the risks involved, option-pricing models, matrix pricing, option-adjusted spread models, and fundamental analysis. Valuation techniques for measuring assets and liabilities should be consistent with the objective of measuring fair value. Those techniques should incorporate assumptions that market participants would use in their estimates of values, future revenues, and future expenses, including assumptions about interest rates, default, prepayment, and volatility. In measuring forward contracts, such as foreign currency forward contracts, at fair value by discounting estimated future cash flows, an entity should base the estimate of future cash flows on the changes in the forward rate (rather than the spot rate). In measuring financial liabilities and non-financial derivatives that are liabilities at fair value by discounting estimated future cash flows (or equivalent outflows of other assets), an objective is to use discount rates at which those liabilities could be settled in an arm's-length transaction.

SFAS No. 133, ¶540, Appendix F: Glossary, Fair value.

130. Effective September 2006, for fiscal years beginning after November 15, 2007, FASB issued SFAS No. 157, *Fair Value Measurements*, with the following definition: "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." SFAS No. 157, ¶5. FASB provided further explication of fair value in ¶¶6-15 of SFAS No. 157. SFAS No. 157 also provides detailed guidance on the valuation techniques that are used to measure fair value for financial reporting purposes. Under SFAS No. 157, most derivatives, including CDOs, RMBSs, and CDSs, are accounted for on a marked-to-market basis.

131. The applicable GAAP guidance pertinent to accounting for PMI's investment in FGIC during the Class Period includes Accounting Principles Board Opinion No. 18 ("APB No. 18"), *The Equity Method of Accounting for Investments in Common Stock*. APB No. 18 applies because FGIC was a privately owned entity and was ***required*** when the investment did ***not*** have a readily determinable fair value. According to APB No. 18:

A loss in value of an investment which is other than a temporary decline should be recognized the same as a loss in value of other long-term assets. Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity which would justify the carrying amount of the investment. A current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment. However, a decline in the quoted market price below the carrying amount or the existence of operating losses is not necessarily indicative of a loss in value that is other than temporary. All are factors to be evaluated.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

- 76 -

1    APB No. 18, ¶19(h).  On the other hand, the applicable guidance for investments in equity securities

2    that have readily determinable fair values, and for all investments in debt securities, was SFAS No.

3    115, *Accounting for Certain Investments in Debt and Equity Securities*, as described in SFAS No.

4    115, Summary (FASB: *A Guide to Implementation of Statement 115 on Accounting for Certain*

5    *Investments in Debt and Equity Securities: Questions and Answers*, revised October 2002, question

6    and answer no. 4).

7           132.    The SEC literature pertaining to "other than temporary" impairments of investments

8    has long held that a company's decision to write-down an equity investment – such as PMI's

9    investment in FGIC in this case – is ***not*** subject to the discretion of the company or its accountants.

10   For example, the SEC staff states the following in SEC Staff Accounting Bulletin ("SAB"):

11   *Codification of Staff Accounting Bulletins, Topic 5: Miscellaneous Accounting, M: Other Than*

12   *Temporary Impairment of Certain Investments in Debt and Equity Securities*:

13            Unless evidence exits [*sic*; likely intended "exists"] to support a realizable value
          equal to or greater than the carrying value of the investment, a write-down to fair
14        value accounted for as a realized loss should be recorded.

15   SEC SAB No. 59, *Accounting for Noncurrent Marketable Equity Securities*, reached a similar

16   conclusion:

17            QUESTION 1: Does the [SEC] staff believe that the phrase "other than temporary"
          should be interpreted to mean "permanent"?
18
19            INTERPRETIVE RESPONSE: No.  The staff believes that the FASB consciously
          choose the phrase "other than temporary" because it did not intend that the test be
          "permanent    impairment,"    as    has    been    used    elsewhere    in    accounting
20        practice. . . .  Unless evidence exists to support a realizable value equal to or greater
          than the carrying value of the investment, a write-down accounted for as a realized
21        loss should be recorded.

22   In addition, in a "Speech by SEC Staff: Call Them As You See Them," dated November 2, 2000, by

23   Jackson M. Day, SEC Deputy Chief Accountant, at the American Institute of Certified Public

24   Accounting ("AICPA") National Conference on Banks and Savings Institutions, Mr. Day stated the

25   following in pertinent part:

26            SAB 59 essentially requires that a registrant have evidence to support that the
          amortized cost of a security will be realized.  Unless such evidence exists, a write-
27        down accounted for as a realized loss should be recorded.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

**Write-Down of PMI's Investment in FGIC to Zero Was Required No Later than 3Q07 Based on GAAP Literature and SEC Guidance**

133.     PMI's initial problems with its investment in FGIC can be traced to FGIC's strategic decision to expand its CDO related businesses in response to the weaker municipal finance market in 2006 compared with 2005, a market which had been very important to FGIC's cash flows.  FGIC also expanded its involvement in such other derivative instruments as CDSs, as sellers of the contracts to buyers seeking credit protection.   Such derivative instruments carry with them substantial risks because FGIC became exposed to the risks of defaults on the underlying financial assets.

134.     As part of FGIC's strategy in 2006 of increasing its risk exposures through increased involvement in derivative instruments, FGIC recognized the importance of credit surveillance to FGIC's long-term success, which had already been in place:

> A number of trends and events have heightened the importance of credit surveillance. A cooling housing market, natural disasters, interest rate uncertainty, the prospect of Medicare reform in the U.S. – all of these impact the issues we guarantee. ***Our focus is proactive surveillance, which can lead to early detection and facilitate loss prevention.   In recent years, we've built an industry-leading surveillance infrastructure for new sectors, including a risk management database that facilitates enhanced tracking of exposures.   We've added substantially to our surveillance team and hold frequent and regular meetings to review our exposures.*** Our goal is to surveil to a "no surprise" level of oversight.

FGIC Annual Review of 2006, "A Conversation with Howard C. Pfeffer, President."

Consequently, FGIC and PMI were aware of the need to monitor the factors which would adversely affect FGIC's contracts and cash flows, and FGIC had a program in place that enabled FGIC to ascertain the fair values of its derivative instruments and to record losses when incurred.  Similarly, PMI, with a 42% share in FGIC, was in a position to ascertain the fair value of its investment and to vigilantly write-down the FGIC investment in accordance with GAAP and SEC guidance.

135.     PMI, in fact, had a substantial risk surveillance system of its own.  According to a former PMI manager, CW3, PMI had a solid risk modeling program and access to substantial data that far surpassed FGIC's vaunted data capabilities.

136.     There were several key indicators that were used by industry experts to assess the current state of, and future prospects for, the mortgage market.  These indicators included: (1) the

Housing Price Index, which measures changes in home prices; (2) interest rates; and (3) delinquency rates, which measure the percentage of mortgagors who default on their mortgage obligations.

137.    As the following chart illustrates, U.S. housing prices collapsed in early 2006:



138.    To make matters worse for the mortgage market, as U.S. housing prices fell precipitously, interest rates rose dramatically between 2006 and 2007:



139.    By 2006, the combination of falling housing prices and rising interest rates was devastating for U.S. borrowers who over-extended themselves by purchasing homes that they could not afford without sufficiently low initial interest rates – called "teaser rates" – on ARMs.  Whereas in the early 2000's, buyers could refinance their three, five, or seven-year ARMs at the time the teaser rate expired using the additional equity in their homes to support the refinancing, things later changed for the worse.  Beginning in 2005, home values declined, interest rates rose, and ARM teaser rates expired resulting in the dramatic rise in the mortgage default rate, particularly for subprime loans, which were loans that did not meet Fannie Mae or Freddie Mac guidelines because of one or a combination of factors, including credit status of the borrower, income and job history, and the income to mortgage payment ratio.

140.    As delinquencies related to subprime mortgage loans began to spike in August 2006 and reached historical highs by the end of November 2006, the unfolding deterioration in the housing market meant that FGIC's losses should have been recognized.  As of December 2006, late mortgage payments rapidly increased in 3Q06 as higher interest rates squeezed budgets and made it difficult for homeowners, particularly those with weaker credit records, to maintain their monthly obligations.  The MBA, in its quarterly assessment of the mortgage market, reported that the percentage of monthly payments that were 30 or more days past due for all loans tracked jumped to

4.67% in 3Q06 – the worst performance since 1Q105.  The delinquency rate for subprime borrowers in 3Q06 were even higher at 12.6%—the highest in more than three years.  And for those holding adjustable rate mortgages, the delinquency rate was 13.2% in 3Q06, which was also the worst reading in more than three years.  As of November 2006, there were clear signs that CDO performance was suffering due to the delinquency rates of the underlying RMBS, as many CDOs during this period were backed by subprime RMBS.

141.    By early 2007, the U.S. real estate market was well in the midst of a freefall from its 2005 apex, as property values plummeted and mortgage defaults soared.  Declining property values coupled with rising interest rates caused delinquency rates to rise sharply during the Class Period for U.S. residential subprime and Alt-A mortgages (a category just a notch above subprime mortgages, which has certain characteristics such as reduced documentation verifying the borrower's income, assets deposit information and/or employment), and high LTV loans.  The freefall began in early 2006 and by October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006, nearly twice the delinquency rate on subprime loans recorded a year earlier.  By early 2007, the 60+ day delinquency rate of some Alt-A and subprime mortgages were running at four times the level of loans issued in 2003-2004.

142.    To make matters even worse for FGIC, in 2006, most of the structured finance deals at FGIC were executed as CDSs.  In that time frame, nearly 100% of FGIC's collateralized loan obligation transactions were executed as CDSs, and within the entire CDO book of business, FGIC executed only a few deals as "traditional" financial guaranty insurance deals.

143.    The market signals that RMBS and CDO values were being eroded by increasing defaults of U.S. mortgages were rendered even clearer by the trading platforms that monitored pricing of RMBS.  In January 2006, some of the leading banks and investment banks collaborated with Markit Group Limited, a provider of financial data, to launch the first asset-backed securities index, called the ABX Index.  The many financial institutions involved in creating the ABX Index included, among others, Bank of America, Citigroup, Goldman Sachs, JP Morgan, Merrill Lynch, and Wachovia.  The ABX Index showed that no later than October 2006, subprime mortgages derived fixed income instruments were being adversely affected by the subprime mortgage crisis.

1    144.    During the Class Period, the ABX Index tracked the performance of 15-20 equally-

2    weighted RMBS tranches backed by subprime collateral and was used as a barometer for assessing

3    how subprime loan related assets were performing in the market place.  As noted above, the ABX

4    Index tracked the cost of buying and selling CDS protection on selected RMBS tranches.  Each of

5    the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a

6    representative sample of other RMBS tranches backed by subprime collateral with the same rating.

7    145.    The various components of the ABX Index were classified by vintage (*i.e.*, the year

8    that the underlying subprime collateral was issued).  For example, the ABX Index 07-1 references

9    subprime mortgage-backed RMBS tranches that were originated in the 2H06.  ABX Index 07-2

10    references subprime mortgage-backed RMBS tranches that were originated in the 1H07.  As the

11    trend suggests, new indices were rolled out every six months.

12    146.    For example, below is the complete ABX Index table as of February 23, 2007:

| Index Series | Version | | Coupon Rate | RED ID | Price | High | Low |
|---|---|---|---|---|---|---|---|
| ABX-HE-AAA07-1 | 7 | 1 | 9 | 0A08AHAC6 | 99.15 | 100.09 | 99.15 |
| ABX-HE-AA07-1 | 7 | 1 | 15 | 0A08AGAC8 | 99.15 | 100.09 | 99.15 |
| ABX-HE-A07-1 | 7 | 1 | 64 | 0A08AFAC0 | 92.50 | 100.01 | 92.50 |
| ABX-HE-BBB07-1 | 7 | 1 | 224 | 0A08AIAC4 | 75.21 | 98.35 | 75.21 |
| ABX-HE-BBB-07-1 | 7 | 1 | 389 | 0A08AOAC1 | 68.50 | 97.47 | 68.50 |
| ABX-HE-AAA06-2 | 6 | 2 | 11 | 0A08AHAB8 | 99.15 | 100.12 | 99.15 |
| ABX-HE-AA06-2 | 6 | 2 | 17 | 0A08AGAB0 | 99.15 | 100.12 | 99.15 |
| ABX-HE-A06-2 | 6 | 2 | 44 | 0A08AFAB2 | 92.69 | 100.12 | 92.69 |
| ABX-HE-BBB06-2 | 6 | 2 | 133 | 0A08AIAB6 | 76.80 | 100.58 | 76.80 |
| ABX-HE-BBB-06-2 | 6 | 2 | 242 | 0A08AOAB3 | 69.39 | 100.94 | 69.39 |
| ABX-HE-AAA06-1 | 6 | 1 | 18 | 0A08AHAA1 | 99.54 | 100.38 | 99.54 |
| ABX-HE-AA06-1 | 6 | 1 | 32 | 0A08AGAA9 | 99.76 | 100.73 | 99.76 |
| ABX-HE-A06-1 | 6 | 1 | 54 | 0A08AFAA7 | 96.20 | 100.51 | 96.20 |
| ABX-HE-BBB06-1 | 6 | 1 | 154 | 0A08AIAA4 | 88.50 | 101.20 | 88.50 |
| ABX-HE-BBB-06-1 | 6 | 1 | 267 | 0A08AOAA2 | 85.17 | 102.19 | 85.17 |

22    147.    In the table above, "Index Series" refers to the type of loan ("HE" or Home Equity),

23    the bond's credit rating (*e.g.*, BBB), and the vintage of the referenced mortgage-backed securities

24    (*e.g.*, 06-2).  "Coupon Rate" sets the annual premium payment (measured in basis points) that a

25    protection seller agrees to pay a protection buyer over the life of the CDS.  For example, assuming a

26    CDS notional value of $100 million (representing the total value of the derivative's underlying assets

27    at the spot price), a Coupon Rate of 224 on the ABX-HE-BBB 07-1 means that protection on a BBB-

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    rated RMBS tranche issued during 2H06 would cost roughly $2.24 million over the life of the CDS

2    contract.

3         148.    "Price" is the cost of buying the specific bond protection. Essentially, the "Price" is

4    an expression of the par value of the referenced tranche. The price is set to 100 on the day the

5    particular Index is launched and equal to 100 cents on the dollar. At 100, the only payment made by

6    the protection buyer to the protection seller is the Coupon Rate. If the Index drops below 100,

7    however, it means that protection is becoming more expensive and that protection sellers are

8    demanding an additional premium payment. The amount of the additional premium is expressed by

9    the amount by which the Index drops below 100.

10        149.    By way of example, as of February 23, 2007, the ABX-HE-BBB06-2 was trading at

11   76.80, a 23.2% discount from its 100 par value. This means that, in addition to the coupon payment,

12   protection buyers were also demanding an up-front fee from protection sellers equal to 23.20% of

13   the bond's face value. In the $100 million example above, this would translate into an up-front fee

14   of $23.2 million, in addition to the $2.24 million coupon payment that will be made over the life of

15   the contract. Thus, by tracking the level of additional premiums required by protection sellers, the

16   level of the ABX Index indicates market sentiment as to the likelihood that certain assets backed by

17   subprime mortgages will experience future losses.

18        150.    As set forth in the chart below, during the 4Q06 and the 1H07, the value of the ABX

19   Index plummeted, evidencing that the cost of insuring subprime RMBS and CDO bonds had

20   increased dramatically. Investors thus anticipated that the risks associated with subprime RMBS and

21   CDO tranches would almost certainly cause large losses. Therefore, the collapse of the ABX during

22   the Class Period was yet another powerful indicator that indisputably revealed that the values of

23   RMBSs and CDOs backed by subprime mortgages were falling disastrously, at a near-historic pace

24   during late 2006 and 2007, mandating that PMI ultimately write-down its investment in FGIC to

25   zero no later than 3Q07:

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

**Figure 5: ABX.BBB 06-2**



Source: Markit

151.    The ABX Index served as a benchmark of the market for securities backed by home loans issued to borrowers with weak credit.  The ABX Index was, of course, closely tracked by banks, investments banks, and other market participants in the mortgage market.  For FGIC and PMI, the ABX Index proved to be a critical source of market pricing information for FGIC's collateralized loan obligation transactions that were executed as CDS.  By 2006, most of the structured finance deals at FGIC were executed as CDS.  Nonetheless, while FGIC and PMI were aware of the risks and losses involved in such transactions, PMI did not inform investors of the substantial risks associated with FGIC's applications of these derivative instruments.

152.    In FGIC's financial report as of June 30, 2007, FGIC began to discuss some of the substantial risks as follows:

> The realized and unrealized gains and losses recognized in the Consolidated Statements of Income by recording credit derivatives at fair value are determined each quarter based on quoted market prices, if available.  If quoted market prices are not available, the determination of fair value is based on internally developed models.  These models require market-driven inputs, including contractual terms, credit spreads and ratings on the underlying referenced obligations and yield curves.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    There may be volatility in the use of market-driven inputs obtained from an illiquid
      market, and *differences may exist between available market data and assumptions*
2    *used by management to estimate the fair value of these instruments. Accordingly,*
      *the valuation results from the model could differ materially from amounts that*
3    *would be realized in the market if the derivative were traded.*  Due to the volatile
      nature of the Company's fair value estimate, future valuations could differ materially
4    from those reflected in the current period.

5    FGIC Financial Report, June 30, 2007, Note 9: Derivative Instruments.

6          153.    FGIC's approach to the valuation of its derivative instruments, however, was not in

7    accordance with GAAP, as it was not based on market-based assumptions and factors.  As noted in

8    one of FASB's detailed definitions of fair value: "Valuation techniques for measuring assets and

9    liabilities should be consistent with the objective of measuring fair value.  Those techniques should

10   incorporate assumptions that market participants would use in their estimates of values, future

11   revenues, and future expenses, including assumptions about interest rates, default, prepayment, and

12   volatility."  SFAS No. 133, ¶540, Appendix F: Glossary.  And with respect to "other than temporary

13   impairment," such market-based assumptions and factors mandate write-downs to realizable value,

14   according to SEC guidance.

15         154.    Nonetheless, in 2Q07, PMI did not address the dramatic freefall in the key mortgage

16   indicators and the ABX Index, and proceeded to recognize equity in earnings of about $27.4 million

17   and $56.8 million for the three months and six months ended July 30, 2007, respectively, from its

18   42% share ownership interest in FGIC.  PMI actually *increased* its carrying value of FGIC by about

19   $24.9 million from about $856.5 as of the end of 4Q06 to $881.4 million as of the end of 1Q07.

20   Then, PMI actually *increased* its carrying value of FGIC yet again, by about $15.3 million, from

21   about $881.4 million as of the end of 1Q07 to $896.7 million as of the end of 2Q07, when the ABX

22   Index had already fallen precipitously from its levels in January 2007.

23         155.    In 3Q07, FGIC continued to avoid writing down its derivative contracts to fair value

24   in accordance with GAAP and SEC guidance.  FGIC attempted to justify its accounting for its

25   contracts as follows:

26         The Company [FGIC] believes that the most meaningful presentation of the financial
           statement impact of these credit derivative contracts is to record revenue as
27         installments are received as a component of premiums, and to record claims
           payments, expected claims, loss and loss adjustment expenses, and changes in fair
28         value as "Net realized and unrealized gains (losses) on credit derivative contracts" in

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

the Consolidated Statements of Income. . . . As of September 30, 2007, the Company had recorded no losses or loss adjustment expenses related to these contracts. ***Management's determination that no loss reserves were required at September 30, 2007 was necessarily based upon estimates and subjective judgments about the outcomes of future events. Actual results will likely differ, possibly materially, from these estimates.*** This determination will be evaluated as additional information becomes available, and loss reserves may be recorded on these contracts in future periods.

FGIC Financial Report, September 30, 2007, Note 9: Derivative Instruments.

156.    As of 3Q07, in connection with its FGIC investment, PMI recognized equity in losses from unconsolidated subsidiaries of about $28.9 million for the three months ended September 30, 2007, and recognized equity in earnings of about $27.9 million for the nine months ended September 30, 2007. PMI reported carrying values for its investment in FGIC ranging from $764.7 million in 1Q06 to $896.7 million in 2Q07. In 3Q07, PMI trimmed its carrying value for FGIC by only about $12.7 million from $896.7 million as of June 30, 2007 to $884 million as of September 30, 2007.

157.    Although FGIC acknowledged in 3Q07 that the increase in credit spreads reduced the fair value of FGIC's CDS contracts, with respect to FGIC's investments, FGIC continued to use the ratings of credit rating agencies as the basis for avoiding recognition of losses, even though it was abundantly clear to FGIC and PMI through FGIC's extensive "credit surveillance" practices and PMI's own substantial data resources that the credit rating agencies were exceedingly slow to respond to the economic realities that had already set in *prior* to 3Q07, and should not have been relied on. Nonetheless, in 4Q07, FGIC stated the following:

The Company [FGIC] has evaluated the credit ratings of the securities in its investment portfolio and noted no deterioration. Because the decline in market value is attributable to changes in interest rates and credit spreads on insured investments and not to the credit quality of the underlying investments, and because the Company has the ability and intent to hold these investments until their fair value exceeds their amortized cost or until maturity, the Company did not consider these investments to be other than temporarily impaired at December 31, 2007.

FGIC Financial Report, December 31, 2007, Note 6: Investments.

158.    In 4Q07, PMI reported a net loss of $915.3 million, primarily due to PMI's equity in losses of FGIC of $763.3 million. Despite the deterioration in the U.S. housing and mortgage markets and the global credit markets, PMI still refused to cut its 42% carrying value in FGIC to

1   zero, and reduced the carrying value from $884 million as of September 30, 2007 to $103.6 million

2   as of December 31, 2007.  Only in 1Q08, did PMI ultimately write its investment in FGIC down to

3   zero, finally recognizing that the investment was "other than temporarily impaired."  In 1Q08, PMI

4   also reported a pre-tax net realized investment loss from impairment in FGIC of about $88 million.

5        159.    In the 2007 Form 10-K, PMI stated the following, in pertinent part:

6        ***FGIC had a significant net loss of $1.8 billion in 2007, related primarily to the
         guarantees it provided during 2006 and 2007 on CDOs of asset-backed securities
7        ("ABS") (comprised to a large extent of tranches of RMBS as well as other CDOs)
         and RMBS transactions.  The adverse results in both of these areas was due
8        primarily to negative developments in the U.S. housing and mortgage markets,
         particularly with regard to sub-prime mortgages and second liens.***  As a result of
9        FGIC's realized and unrealized losses in 2007, the carrying value of our investment
         in FGIC Corporation was reduced to $103.6 million as of December 31, 2007 from
10       $856.5 million as of December 31, 2006.  FGIC's "AAA" ratings were downgraded
         by each of the three major rating agencies to "AA" by Fitch, "A" by Standard &
11       Poor's, and "A3" by Moody's.  Further downgrades are possible.

12       160.    Although PMI reduced the carrying value on FGIC from $884 million as of the end of

13  3Q07 to $103.6 million as of the end of 4Q07, PMI continued to falsely represent that the fair value

14  of its investment in FGIC exceeded its carrying value:

15       In connection with the preparation of our financial statements [for the period ended
         December 31, 2007], we conducted an analysis as to whether the significantly
16       reduced value of our investment in FGIC as of December 31, 2007 was impaired.
         Because, among other things, we determined the fair value of our investment in
17       FGIC to be greater than its current carrying value, we concluded that no impairment
         is necessary at the current time.

18
19       161.    PMI waited until 1Q08 to finally "determine" that the fair value no longer exceeded

20  carrying value, at which time PMI reduced the carrying value from $103.6 million as of the end of

21  4Q07 to $0.  The following chart depicts PMI's reported carrying values for its FGIC investment for

22  1Q06 through 1Q08:

23

24

25

26

27

28



162.    In FGIC's financial statements for the period ended March 31, 2008, FGIC stated the following, ironically characterizing most of its statements as "recent developments":

> The deterioration in the U.S. housing and mortgage markets and the global credit markets, which accelerated in the fourth quarter of 2007 and continued during the first quarter of 2008, has adversely affected the Company's business, results of operations and financial condition. During the first quarter of 2008, the company's financial strength and credit ratings were downgraded by various rating agencies. As of June 13, 2008, the financial strength of FGIC and FGIC UK Ltd. was rated BBB by Fitch Ratings Inc. (rating outlook negative), Baa3 by Moody's Investor Services Inc. (on review for possible downgrade) and BB by Standard & Poor's Rating Services (CreditWatch with negative implications). The financial strength ratings downgrades have adversely impacted the Company's ability to generate new business and, unless restored, will impact the Company's future business operations and financial results. During the first quarter of 2008, the Company increased reserves established for the Company's exposure to certain collateralized debt obligations of asset-backed securities ("ABS CDOs"), which are backed primarily by subprime residential mortgage-backed securities, and to certain residential mortgage-backed securities ("RMBS"), primarily backed by second-lien mortgages.
>
> As a result of these developments, the Company ceased writing new business during the first quarter of 2008 for a period of time to preserve capital and is considering various alternatives to enhance its capital, restructure its operations and mitigate losses. However, no assurance can be given that any action taken by the Company will improve its current ratings, that further rating downgrades will not occur, or that the Company will be able to recommence writing new business in the near term or at all. FGIC has proposed a significant restructuring of its insurance operations to the New York State Insurance Department (the "NYSID"), including the organization of a new financial guaranty insurer to be domiciled in New York to provide support for global public finance and infrastructure obligations previously insured by FGIC and to write new business to serve those markets. Any restructuring will require approval from the NYSID, among other requirements and significant new capital investment. No assurance can be given that such restructuring or investment will be completed. [FGIC Financial Report, March 31, 2008, Note 2: Recent Developments]

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

163.     But the "continued uncertainty concerning the future performance of FGIC's insured collateralized debt obligation CDO and residential mortgage-backed securities RMBS portfolios and continued widening of credit spreads associated with credit default swaps" – as noted in PMI's 1Q08 Form 10-Q as among the reasons for the write-off – did ***not*** suddenly emerge in 1Q08 or even 1Q07.

164.     As early as 2Q06, it was clear to both FGIC and PMI that FGIC's securities and the associated underlying collateral or reference portfolios would never meet expectations.  As of the end of 2Q07, FGIC had approximately $10.4 billion in CDOs of ABS, or 3.3% of the $314.7 billion net par outstanding risk exposure in force.  The CDOs of ABS were 75% high grade and 25% mezzanine credits.  However, the underlying collateral was concentrated in subprime RMBS that was mostly originated in 2005 and 2006.  The subprime RMBS used in the CDO transactions were typically rated BBB and such securities were aggregated in CDO transactions to generate AAA rated bonds.  As of the end of 2Q07, FGIC also had approximately 11% or $34.7 billion of a total $314.7 in net par in force insuring MBS transactions (non-CDO).  Of this exposure, $8.8 billion was tied to subprime mortgages, or 2.7% of the total net par in force.  Another $18.6 billion of 5.9% of total net par in force was related to prime home equity (Alt-A mortgage loans with low documentation) and closed end seconds transactions.  Approximately 80% of the subprime MBS was rated A or higher, with 75% of the vintages post-2004.  Approximately 78% of the prime home equity MBS was rated BBB (lowest investment grade) with 77% of the vintages post-2004.

165.     Given FGIC's critical risk exposures, PMI's analysis of its investment in FGIC did not address the dramatic freefall in the key mortgage indicators and the ABX Index during 1H07.  And clearly by 3Q07, PMI knew that FGIC's economic and financial circumstances had changed so drastically for the worse that PMI had no evidence to support a realizable value for FGIC.  In accordance with GAAP, the carrying value of the investment should have been written down to zero no later than 3Q07.

166.     In connection with PMI's improper accounting for its investment in FGIC, PMI also violated the following other GAAP rules:

(a)     the violation of the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the

1  financial reports in making rational investment, credit, and similar decisions (FASB Statement of

2  Concepts No. 1, ¶34);

3         (b)    the violation of the principle that financial reporting should provide

4  information about the economic resources of an enterprise, the claims to those resources, and the

5  effects of transactions, events, and circumstances that change resources and claims to those resources

6  (FASB Statement of Concepts No. 1, ¶40);

7         (c)    the violation of the principle that financial reporting should provide

8  information about an enterprise's financial performance during a period.  Investors and creditors

9  often use information about the past to help in assessing the prospects of an enterprise.  Thus,

10 although investment and credit decisions reflect investors' expectations about future enterprise

11 performance, those expectations are commonly based, at least partly, on evaluations of past

12 enterprise performance (FASB Statement of Concepts No. 1, ¶42);

13        (d)    the violation of the principle that financial reporting should be reliable in that

14 it represents what it purports to represent.  That information should be reliable as well as relevant is a

15 notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

16        (e)    the violation of the principle of completeness, which means that nothing is left

17 out of the information that may be necessary to insure that it validly represents underlying events

18 and conditions (FASB Statement of Concepts No. 2, ¶79);

19        (f)    the violation of the principle that conservatism be used as a prudent reaction to

20 uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately

21 considered (FASB Statement of Concepts No. 2, ¶95); and

22        (g)    the violation of the principle that interim financial reporting should be based

23 upon the same accounting principles and practices used to prepare the annual financial statements

24 (APB No. 28, ¶10).

25        167.   Despite FGIC's and PMI's explanations, however, both FGIC and PMI had all the

26 necessary information about the uncertainties and circumstances concerning FGIC's financial

27 investments that required PMI to write-down its FGIC investment to zero, no later than the 3Q07, in

28 accordance with GAAP and SEC guidance, based on FGIC's proactive surveillance of trends and

events; FGIC's "industry-leading surveillance infrastructure for new sectors, including a risk management database that facilitates enhanced tracking of exposures;" FGIC's substantial surveillance team and frequent and regular meetings that reviewed risk exposures; PMI's own surveillance infrastructure; the key housing and mortgage indicators; and the results of the ABX Index.  As SAB 59 mandated, a registrant must "have evidence to support that the amortized cost of a security will be realized.  Unless such evidence exists, a write-down accounted for as a realized loss should be recorded."

**Improper Accounting for, and Disclosures About, Losses and Loss Adjustment Expenses and the Reserve for Losses and LAE**

168.    PMI estimated reserves for losses and loss adjustment expenses (LAE) to recognize the liability of unpaid losses related to insured mortgages that were in default, including loan defaults that have been incurred but have not been reported by the lenders.  The loss reserves were based upon estimates and judgments by management, including estimates and judgments with respect to the rate and severity of claims.  The process of reserving for losses entails forecasting the interest rate and the employment and housing market environment.  The key assumptions that PMI used in the estimation process were expected claim rates, average claim sizes, and the costs to settle claims.  PMI developed a high-low range of estimates for its loss reserve, rather than a single estimate.  PMI used its actual claim experience in prior years to project the current liability.  The changes in loss reserves had a material impact on PMI's consolidated net income or loss.

169.    As noted in ¶¶136-141, the key indicators that were used by industry experts to assess the current state of the mortgage market included the Housing Price Index, interest rates, and delinquencies.  These indicators established that the mortgage market had severely deteriorated in 2006 and went into a tailspin in 2007.  As shown in the chart in ¶137, U.S. home prices peaked in 3Q05 and had fallen precipitously since that period.  To make matters worse for the mortgage market, interest rates rose as housing prices fell between 2006 and 2007.

170.    Delinquency and foreclosure rates also increased dramatically between 2006 and 2007, as shown in the following schedule based upon data from the National Delinquency Survey prepared by the MBA:

| U.S. Delinquency and Foreclosure Rates | | |
|---|---|---|
| **Period** | **Delinquency Rate** | **Foreclosure Rate** |
| Q4 2005 | 4.7% | 0.99% |
| Q1 2006 | 4.41% | 0.98% |
| Q2 2006 | 4.39% | 0.99% |
| Q3 2006 | 4.67% | 1.05% |
| Q4 2006 | 4.95% | 1.19% |
| Q1 2007 | 4.84% | 1.28% |
| Q2 2007 | 5.12% | 1.40% |
| Q3 2007 | 5.59% | 1.69% |
| Q4 2007 | 5.82% | 2.04% |
| Q1 2008 | 6.35% | 2.47% |

As noted in the MBA's National Delinquency Survey, the delinquency rate for mortgages is based on one-to-four-unit residential properties, and the loans include prime loans, subprime loans, and government loans.

171.    One of the driving forces of the accelerating delinquency rate was the subprime mortgage market, in which PMI had considerable exposure. The freefall began in early 2006 and by October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006, nearly twice the delinquency rate on subprime loans recorded a year earlier. The MBA reported in its quarterly assessment of the mortgage market that the percentage of monthly payments that were 30 or more days past due for all loans tracked jumped to 4.67% in 3Q06 – the worst performance since 1Q05. As of December 2006, late mortgage payments rapidly increased in 3Q06 as higher interest rates squeezed budgets and made it difficult for homeowners, particularly those with weaker credit records, to maintain their monthly obligations. The delinquency rate for subprime borrowers in 3Q06 were even higher at 12.6% – the highest in more than three years. And for those holding adjustable rate mortgages, the delinquency rate was 13.2% in 3Q06, which was also the worst reading in more than three years. By early 2007, the 60+ day delinquency rate of some Alt-A and subprime mortgages were running at four times the level of loans issued in 2003-2004. By 3Q07, the delinquency rate was the highest in the MBA Survey since 1986. At the same time, the rate of foreclosure starts and the percent of loans in the process of foreclosure were at the highest levels ever. By 4Q07, the delinquency rate was the highest in the MBA survey since 1985, and foreclosures reached another new record high.

172.     PMI often knew about delinquent loans before the lenders did.  According to CW1, PMI had more stringent requirements for identifying and tracking delinquencies on loans than the lenders did because of PMI's statutory reporting requirements as an insurance company.  For example, CW1 explained that the lenders considered and reported delinquencies on mortgages they originated after the payment on the loan had not been received for a period of at least 30 days and, in some cases, for as long as 90 days.  In the interim between when the payment was due and the 30-to 90-day period when the lender recorded the loan as being delinquent (and ultimately reported it to PMI as a default), the servicer of the loan had personnel who tried to reach the borrower through phone calls and even visited the residence of the borrower to determine if the borrower intended to make a payment on his or her loan.  If these efforts by the servicer personnel failed and the borrower did not make a payment for as long as 90 days, the lenders then considered the loan to be delinquent and/or in default.

173.     However, because PMI is an insurance provider, it is governed by statutory requirements that demand PMI identify delinquencies on loans on "day one" that the loan becomes delinquent – or the first day after the missed payment.  PMI is then required to adjust its reserves based on the number of loans that are delinquent during the statutory reporting period.  As such, when the lender identified a loan as delinquent, it may have already been categorized as such by PMI for 30 to 90 days or longer.

174.     PMI derived delinquency data from the loan servicers.  CW1 said that the policy Servicing personnel at PMI maintained a database that tracked delinquency data from the loan servicers.  Policy servicing personnel that tracked delinquencies used the data to prepare comprehensive reports of portfolio performance and delinquency or default data.  These reports were submitted to PMI executives.

175.     Given the massive increases in delinquencies and foreclosures, and the ongoing severe trends in home prices and interest rates, PMI was required to substantially increase the reserve for losses in *pari passu* in order to comply with GAAP.  FASB Statement of Concepts No. 5, ¶87, states that "an expense or loss is recognized if it becomes evident that previously recognized

1    future economic benefits of an asset have been reduced or eliminated, or that a liability has been

2    incurred or increased, without associated economic benefits."

3          176.    PMI failed to report an adequate reserve for losses by deliberately underestimating its

4    loan portfolio delinquencies and by using economic assumptions that did not take the ongoing severe

5    trends adequately into account.

6          177.    In the SEC Form 10-K for the period ended December 31, 2006, defendants reported

7    net income of $419.7 million and failed to recognize an adequate amount reserve for losses and loss

8    adjustment expenses in connection with U.S. mortgage insurance operations.  For the period ended

9    December 31, 2006, PMI reported $302.9 million of total losses and LAE, of which $263 million

10   represented losses and LAE for U.S. operations.  For the period ended December 31, 2006, PMI

11   reported $414.7 million total reserve for losses and LAE, of which $366.2 million represented

12   recorded reserves for losses and LAE (gross of insurance recoveries) for U.S. operations.  According

13   to PMI's own actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from

14   $330.5 million to $411.8 million, a difference of $81.3 million.

15         178.    PMI increased the reserve balance for U.S. operations from December 31, 2005 to

16   December 31, 2006 by about $20.7 million, primarily based on higher expected primary claim rates

17   and claim sizes on pending delinquencies, but PMI did not adequately account for the ***significant***

18   ***changes in the business mix of PMI's portfolio*** in 2006 compared with 2005.  In 2006, PMI's

19   portfolio consisted of significantly greater percentages of such high-risk products as interest only,

20   payment option ARMs, Alt-A (a category just a notch above subprime mortgages, which has certain

21   characteristics such as reduced documentation verifying the borrower's income, assets deposit

22   information and/or employment), and high LTV loans.

23         179.    In the SEC Form 10-Q for the 1Q07, defendants reported net income of $102.0

24   million and failed to recognize an adequate amount for losses and LAE, and consequently also failed

25   to recognize an adequate reserve for losses and LAE in connection with U.S. mortgage insurance

26   operations.  For 1Q07, PMI reported $109.3 million of total losses and LAE, of which $92.8 million

27   represented losses and LAE for U.S. operations.  For the period ended 1Q07, PMI reported $443

28   million total reserve for losses and LAE, of which $386 million represented recorded reserves for

1   losses and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own

2   actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from $339.0 million

3   to $463.2 million, a huge difference of $124.2 million.

4        180.    Although PMI increased the reserve balance for U.S. operations from December 31,

5   2006 to March 31, 2007 by about $19.8 million, primarily based on higher expected primary claim

6   rates and claim sizes on pending delinquencies, PMI still did not adequately account for the

7   ***significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates,***

8   ***and claims sizes*** compared with December 31, 2006.  In addition, PMI became aware of a significant

9   increase in "loan workout" activity by loan servicers.  Loan workout activity consisted of the series

10  of steps that lenders engaged in with borrowers to resolve delinquent loan payments.  Despite the

11  significant increase in lenders' loan workout activity to attempt to resolve mounting delinquencies

12  and prevent foreclosures, PMI still selected a recorded loss reserve of $386 million for U.S.

13  operations for March 31, 2007 that was about $15.1 million ***less*** than the $401.1 million of the

14  reserve range of $339 million to $463.2 million estimated by PMI's own actuaries.

15       181.    In the SEC Form 10-Q for the 2Q07, defendants reported net income of $83.8 million

16  and failed to recognize an adequate amount for losses and LAE, and consequently also failed to

17  recognize an adequate reserve for losses and LAE in connection with U.S. mortgage insurance

18  operations.  For 2Q07, PMI reported $146.2 million of total losses and LAE, of which $134.4

19  million represented losses and LAE for U.S. operations.  For 2Q07, PMI reported $507 million total

20  reserve for losses and LAE, of which $444.6 million represented recorded reserves for losses and

21  LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own actuaries, their

22  calculated reserve for losses and LAE for U.S. operations ranged from $385.3 million to $503.8

23  million, a huge difference of $118.5 million.

24       182.    Although PMI increased the reserve balance for U.S. operations from March 31, 2007

25  to June 30, 2007 by about $58.6 million, PMI still did not adequately account for the significant

26  changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims

27  sizes compared with December 31, 2006, and focused primarily on PMI's historical patterns of claim

28  payments and loss experience.  In spite of increasing delinquencies and foreclosures, PMI still

1    selected a recorded loss reserve of $444.6 million for U.S. operations for June 30, 2007 that was the

2    midpoint of the reserve range of $385.3 million to $503.8 million estimated by PMI's own actuaries.

3        183.    In the SEC Form 10-Q for 3Q07, defendants reported a net loss of $86.8 million, but

4    still failed to recognize an adequate amount for losses and LAE, and consequently also failed to

5    recognize an adequate reserve for losses and LAE in connection with U.S. mortgage insurance

6    operations.  For 3Q07, PMI reported $372.8 million of total losses and LAE, of which $348.3

7    million represented losses and LAE for U.S. operations.  For 3Q07, PMI reported $770.3 million

8    total reserve for losses and LAE, of which $698.2 million represented recorded reserves for losses

9    and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own actuaries,

10   their calculated reserve for losses and LAE for U.S. operations ranged from $565.3 million to $768.6

11   million, a huge difference of $132.9 million.

12       184.    In 3Q07, PMI acknowledged that the "[c]ontinuing deterioration in the U.S. housing

13   and mortgage markets has caused PMI's losses and loss adjustment expenses (LAE) and default

14   inventory to increase significantly in the third quarter and the first nine months of 2007."  PMI did

15   not acknowledge such deterioration in the 2006 Form 10-K, 1Q07 10-Q, or the 2Q07 10-Q.

16   Nonetheless, PMI estimated various scenarios for its recorded reserves for losses and LAE for 3Q07

17   by assigning different weightings based upon actual claims experience in prior years to project the

18   liability for this period.  PMI increased the reserve balance for U.S. operations from June 30, 2007 to

19   September 30, 2007 by about $253.6 million, but PMI still did not adequately account for the

20   significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates,

21   and claims sizes compared with December 31, 2006.  PMI selected a recorded loss reserve of

22   $698.2 million for U.S. operations for September 30, 2007 when PMI's own actuaries estimated a

23   reserve range of $565.3 million to $768.6 million.  In spite of substantial home price declines,

24   diminished availability of loan products and the decrease in the percentage of default inventory that

25   returned to current status, PMI continue to focus on historical patterns of claim payments and loss

26   experience.

27       185.    In the SEC Form 10-K for 2007, filed March 17, 2008, defendants reported a net loss

28   of $915.3 million, but still failed to recognize an adequate amount for losses and LAE, and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   consequently also failed to recognize an adequate reserve for losses and LAE in connection with

2   U.S. mortgage insurance operations.  For FY07, PMI reported $1.2 billion of total losses and LAE,

3   of which $1 billion represented losses and LAE for U.S. operations.  For the period ended December

4   31, 2007, PMI reported $1.2 billion total reserve for losses and LAE, of which $1.1 billion

5   represented recorded reserves for losses and LAE (gross of insurance recoveries) for U.S. operations.

6   According to PMI's own actuaries, their calculated reserve for losses and LAE for U.S. operations

7   ranged from $933.8 million to $1.3 billion, a massive difference of about $415 million.

8          186.    In FY07, PMI continued to estimate various scenarios for its recorded reserves for

9   losses and LAE by assigning different weightings based upon actual claims experience in prior years

10  to project the liability for this period.  Although PMI increased the reserve balance for U.S.

11  operations from September 30, 2007 to December 31, 2007 by about $401.8 million, PMI still did

12  not adequately account for the significant changes in the business mix of PMI's portfolio involving

13  higher defaults, claims rates, and claims sizes compared with December 31, 2006.  PMI selected a

14  recorded loss reserve of $1.1 billion for U.S. operations for December 31, 2007 when PMI's own

15  actuaries estimated a reserve range of $933.8 million to $1.3 billion.  In spite of the strong

16  continuing trend of substantial home price declines, diminished availability of loan products, and the

17  decrease in the percentage of default inventory that returned to current status, PMI continued to

18  evaluate its assumptions in light of historical patterns of claim payments and loss experience.

19         187.    For 1Q08, defendants reported a net loss of $273.9 million, and reported $579.8

20  million of total losses and LAE, of which $537 million represented losses and LAE for U.S.

21  operations.  In 1Q08, PMI reported $1.7 billion total reserve for losses and LAE, of which about

22  $1.6 billion represented recorded reserves for losses and LAE (gross of insurance recoveries) for

23  U.S. operations.  According to PMI's own actuaries, their calculated reserve for losses and LAE for

24  U.S. operations ranged from about $1.5 billion to $1.9 billion, a massive difference of about $456.7

25  million.

26         188.    In 1Q08, PMI stated the following:

27         Our increases to the reserve balance in the first quarter of 2008 were primarily due to
           PMI's higher default inventory and higher expected claim rates and claim sizes on
28         reported delinquencies.  Continued deterioration of the U.S. housing market and

1     mortgage markets caused PMI's default inventory, claims rates and claim sizes to
      increase in the first quarter of 2008. Higher claim rates have been driven by, among
2     other things, home price declines and diminished availability of certain loan
      products, both of which constrain refinancing opportunities, and result in a decrease
3     in the percentage of the default inventory that is returning to current status. The
      increase in PMI's average claim sizes has been driven by high loan sizes and
4     coverage levels in PMI's portfolio and declining home prices which limit PMI's loss
      mitigation opportunities.

Nonetheless, PMI still did not acknowledge the impact of the ***significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims sizes*** compared with December 31, 2006. PMI selected a recorded loss reserve of about $1.6 billion for U.S. operations for March 31, 2008, which was about $119 million less that the midpoint of the reserve range of about $1.5 billion to $1.9 billion estimated by PMI's own actuaries.

189.     PMI failed to report an adequate reserve for losses by developing progressively wider ranges between the "low" estimate of the reserve and the "high" estimate of the reserve. PMI selectively used data and assumptions to create unrealistically estimates for the low end of the range, and excessively wide ranges. PMI then typically selected a loss reserve to report that was at about the mid-point of the low-high estimate or even less than the mid-point. PMI low-balled the reserve for losses through this process of manipulating the data. This general pattern is evident in the following schedule:

| PMI's Estimated U.S. Reserves for Losses and LAE (Dollar in Millions) | | | | | |
|---|---|---|---|---|---|
| Period | Low | High | Mid-point | Reported | Range of Low-High |
| Q 4 2006 | $330.5 | $411.8 | $371.2 | $366.2 | $81.3 |
| Q1 2007 | $339 | $463.2 | $401.1 | $386 | $124.2 |
| Q2 2007 | $385.3 | $503.8 | $444.6 | $444.6 | $118.5 |
| Q3 2007 | $565.3 | $768.6 | $667.5 | $698.2 | $132.9 |
| Q4 2007 | $933.8 | $1,300 | $1100 | $1,100 | $415 |
| Q1 2008 | $1,500 | $1,900 | $1700 | $1,600 | $456.7 |

190.     PMI's understatements of the reserve for losses and LAE for U.S. mortgage operations resulted in overstated net income or understatement of net losses. GAAP, as described in FASB Statement of Concepts No. 5, ¶87, states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    191.    PMI also failed to properly apply SFAS No. 5, *Accounting for Contingencies*, which

2    required that PMI accrue charges to income when it was probable (*i.e.*, the event was "likely to

3    occur") that "a liability had been incurred at the date of the financial statements" and the "amount of

4    the loss can be reasonably estimated." SFAS No. 5, ¶¶1, 3(a), 8(a) and 75. As noted in SFAS No. 5:

5    For the purpose of this Statement, a contingency is defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain (hereinafter a "gain contingency") or loss[13] (hereinafter a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. Resolution of the uncertainty may confirm the acquisition of an asset or the reduction of a liability or the loss or impairment of an asset or the incurrence of a liability.

6

7

8

9    *    *    *

10   An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if ***both*** of the following conditions are met:

11

12   a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.[14] It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

13

14   b. The amount of loss can be reasonably estimated.

15   SFAS No. 5, ¶¶1, 8.

16   192.    In addition, PMI's improper accounting for the reserve for losses and LAE for U.S.

17   mortgage operations violated the following other GAAP rules:

18   (a)    the violation of the principle that financial reporting should provide

19   information that is useful to present and potential investors and creditors and other users of the

20   financial reports in making rational investment, credit, and similar decisions (FASB Statement of

21   Concepts No. 1, ¶34);

22   (b)    the violation of the principle that financial reporting should provide

23   information about the economic resources of an enterprise, the claims to those resources, and the

24   _____

25   [13]    The term *loss* is used for convenience to include many charges against income that are commonly referred to as *expenses* and others that are commonly referred to as *losses*. SFAS No. 5, ¶1, n.1.

26

27   [14]    "Date of the financial statements" means the end of the most recent accounting period for which financial statements are being presented.

28

effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(c)    the violation of the principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(d)    the violation of the principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(e)    the violation of the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

(f)    the violation of the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶95); and

(g)    the violation of the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare the annual financial statements (APB No. 28, ¶10).

193.    PMI's improper accounting for the losses and LAE and the reserve for losses and LAE for U.S. mortgage operations were material, given the SEC's guidance on materiality.  SEC Staff Accounting Bulletin (SAB) Topic 1M, *Materiality*, summarizes GAAP definitions of materiality.  SAB Topic 1M represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, *Materiality*, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.  SAB Topic 1M says, *inter alia*: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a

1  significant market reaction; such reaction should be taken into account in determining the materiality

2  of the misstatement.

3  **LOSS CAUSATION/ECONOMIC LOSS**

4  194.    By misrepresenting its ability to withstand the housing decline and the adequacy of its

5  reserves, defendants presented a misleading picture of PMI's business and prospects.  Thus, instead

6  of truthfully disclosing during the Class Period that PMI's business was not as healthy as

7  represented, defendants falsely reported PMI's financial outlook and its actual business prospects

8  going forward.

9  195.    These claims of profitability caused and maintained the artificial inflation in PMI's

10  stock price throughout the Class Period and until the truth was revealed to the market.

11  196.    Defendants' false and misleading statements had the intended effect and caused PMI

12  stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high

13  of $50.21 per share in February 2007.

14  197.    The truth about PMI's business operations, finances, business metrics, and future

15  business and financial prospects began to enter the market with a series of partial disclosures and

16  revelations beginning in July 2007, which were accompanied by denials and continuing

17  misrepresentations by defendants.  As a result, the artificial inflation in PMI's stock price did not

18  come out of the stock all at once, rather the artificial price inflation came out over time, in bits,

19  pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices through

20  January 2008.

21  198.    As a direct result of defendants' admissions and the public revelations regarding the

22  truth about PMI's overstatement of its financial outlook and its actual business prospects going

23  forward, PMI's stock price plummeted over 87%, falling from $50.21 per share on February 7, 2007

24  to $6.47 per share on January 18, 2008 – a drop of $43.74 per share.  This drop removed the inflation

25  from PMI's stock price, causing real economic loss to investors who had purchased the stock during

26  the Class Period.

27

28

1    **NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

2    The statutory safe harbor provided for forward-looking statements under certain

3    circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

4    Many of the specific statements pleaded herein were not identified as "forward-looking statements"

5    when made. To the extent there were any forward-looking statements, there was no meaningful

6    cautionary language identifying important factors that could cause actual results to differ materially

7    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

8    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

9    liable for those false forward-looking statements because at the time each of those forward-looking

10    statements was made, the particular speaker knew that the particular forward-looking statement was

11    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

12    of PMI who knew that those statements were false when made.

13    **COUNT I**

14    **For Violation of Section 10(b) of the 1934 Act and Rule 10b-5**
      **Against All Defendants**
15

16    199.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

17    forth herein.

      200.    During the Class Period, defendants disseminated or approved the false statements
18

19    specified above, which they knew or deliberately disregarded were misleading in that they contained

20    misrepresentations and failed to disclose material facts necessary in order to make the statements

      made, in light of the circumstances under which they were made, not misleading.
21

22    201.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed

23    devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to

      state material facts necessary in order to make the statements made, in light of the circumstances
24

25    under which they were made, not misleading; or engaged in acts, practices and a course of business

26    that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their

      purchases of PMI common stock during the Class Period.
27

28

202.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PMI common stock.  Plaintiffs and the class would not have purchased PMI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

203.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204.    The Individual Defendants acted as controlling persons of PMI within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of PMI stock, the Individual Defendants had the power and authority to cause PMI to engage in the wrongful conduct complained of herein.  PMI controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### CLASS ACTION ALLEGATIONS

205.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired PMI common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

206.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  PMI has over 81 million shares of stock outstanding, owned by hundreds if not thousands of persons.

207.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include: whether the 1934 Act was violated by defendants; whether defendants omitted and/or misrepresented material facts; whether defendants' statements omitted material facts necessary to make the statements made, in

1   light of the circumstances under which they were made, not misleading; whether defendants knew or

2   deliberately disregarded that their statements were false and misleading; whether the price of PMI's

3   common stock was artificially inflated; and the extent of damage sustained by Class members and

4   the appropriate measure of damages.

5       208.    Plaintiffs' claims are typical of those of the Class because plaintiff and the Class

6   sustained damages from defendants' wrongful conduct.

7       209.    Plaintiffs will adequately protect the interests of the Class and has retained counsel

8   who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

9   with those of the Class.

10      210.    A class action is superior to other available methods for the fair and efficient

11  adjudication of this controversy.

12                              **PRAYER FOR RELIEF**

13      WHEREFORE, plaintiffs pray for judgment as follows:

14      A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

15      B.      Awarding plaintiffs and the members of the Class damages, including interest;

16      C.      Awarding plaintiffs reasonable costs and attorneys' fees; and

17      D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

18  proper.

19                              **JURY DEMAND**

20      Plaintiffs demand a trial by jury.

21  DATED:  September 4, 2008              COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
22                                          JEFFREY W. LAWRENCE
                                            DANIEL J. PFEFFERBAUM
23

24                                          _____
                                                             /s/
25                                          JEFFREY W. LAWRENCE

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

2          100 Pine Street, Suite 2600
           San Francisco, CA  94111
           Telephone:  415/288-4545
3          415/288-4534 (fax)

4          Lead Counsel for Plaintiffs

5    T:\CasesSF\PMI Group\CPT00053558_Consolidated.doc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 4, 2008.

  s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE

COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail: jeffreyl@csgrr.com

# Mailing Information for a Case 3:08-cv-01405-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Lawrence Timothy Fisher**
  ltfisher@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **Meredith N. Landy**
  mlandy@omm.com,vtran@omm.com,sfolchi@omm.com,jbaker@omm.com,mpaul@omm.com,jcoakley@omm.com,dshah@omm.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com,GDarwish@csgrr.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union**
  sward@barrack.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Dhaivat H. Shah**
  dshah@omm.com,bredmond@omm.com

- **Samuel M. Ward**
  sward@barrack.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

Alan R. Plutzik
Schiffrein Barroway Topaz & Kessler LLP
2125 Oak Grove Road, Suite 120
08-1806-SI
Walnut Creek, CA 94598

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```