IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* THE PMI GROUP, INC. SECURITIES LITIGATION _____/ | Nos. C 08-1405 SI, C 08-1406 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

Now before the Court is defendants' motion to dismiss plaintiffs' consolidated complaint. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS IN PART AND DENIES IN PART defendants' motion to dismiss, and GRANTS plaintiffs leave to amend.

**BACKGROUND**

This is a securities class action against The PMI Group, Inc. ("PMI") and certain of its officers[1] under Rule 10b-5 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). The lead plaintiff, Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, bring suit on behalf of all those who purchased or otherwise acquired the common stock of PMI between November 2, 2006 and March 3, 2008 ("class period").

PMI is a publicly traded company headquartered in Walnut Creek, California that, through its subsidiaries, provides residential mortgage insurance and other credit enhancement products that expand homeownership and protect lenders against the risk of borrower default. Consol. Compl. ¶¶ 1, 3, 10.

---

[1] The PMI officers named in the complaint include L. Stephen Smith, CEO; Bradley M. Shuster, President, International and Strategic Investments of PMI, President and CEO of PMI Capital Corporation; David H. Katkov, Executive Vice President/President/Chief Operating Officer; and Donald P. Lofe, Jr., Executive Vice President/Chief Financial Officer (collectively, "defendants").

The consolidated complaint alleges that from PMI's inception in 1972 throughout the 1990s, "PMI's strategy was to maintain a leading position in the private mortgage insurance industry, and increase its profitability by growing its insurance in force from which it earns premiums while sustaining the quality of its insurance portfolio through disciplined underwriting." *Id*. ¶ 24. According to the complaint, PMI's overall risk management was based on loan-by-loan underwriting and a proprietary automated underwriting technology designed to improve underwriting results and underwriting efficiency, and bring consistency to the underwriting process. *Id*. ¶¶ 24-25.

The complaint alleges that when the housing market exploded between 2002 and 2005, PMI became marginalized in the mortgage insurance market because, *inter alia*, lenders increasingly originated mortgage loans that effectively eliminated the need for private mortgage insurance. *Id*. ¶¶ 28-37. Plaintiffs allege that PMI responded by increasing its portfolio of riskier loans, including Alt-A loans,[2] which increased in PMI's portfolio by 400% between 2001 and 2005. *Id*. ¶ 38. The complaint alleges that by underwriting more loans to borrowers who provided low to no documentation, defendants abandoned PMI's commitment to disciplined underwriting:

> PMI was faced with a dilemma given the existing market conditions; if it maintained high standards and practices, its NIW and persistency rates[3] would decline dramatically reducing revenue and ultimately PMI's stock price. PMI had two choices: (a) shrink the Company by maintaining standards and waiting for the housing market to implode, or (b) reassert itself in the market by offering to insure higher risk loans and investing in FGIC [Financial Guaranty Insurance Company, Inc.] which provided financial guarantees for transactions that PMI deemed too risky. PMI chose the latter choice where it reasserted itself in the market by offering to insure riskier loans and risky transactions through FGIC.

*Id*.

Plaintiffs allege that as the risk of creative financing and securitizations cut into PMI's core

---

[2] According to the complaint "'Alt-A' mortgage loans can be defined as borrowers who provide less than full documentation of income, assets, etc. and /or state their respective income, assets, etc. PMI described Alt-A loans as loans 'where the borrower's FICO score is 620 or higher and where the loans are originated with reduced or no documentation or verification of borrower information.'" Consol. Compl. at 1 n.1.

[3] According to the complaint, "[g]rowth in insurance in force is a function of new insurance written ('NIW') as well as persistency (the degree to which existing policies remain in force and continue to generate premiums). The Company's NIW is also used to determine the Company's success and the degree to which the Company is effectively competing in the marketplace for new business." Consol. Compl. ¶ 24.

business, defendants sought additional means to participate in the new market. *Id*. ¶ 39. In 2003, PMI became a major equity holder[4] in Financial Guaranty Insurance Company, Inc. ("FGIC"), a privately-held financial guaranty insurance company. *Id.* ¶ 39. FGIC had traditionally been focused on financial guarantees for the municipal bond business, and typically guaranteed the scheduled payments of principal and interest on an issuer's obligations for public finance and structured finance transactions. *Id*. The complaint alleges that in 2004, FGIC moved away from its previous "conservative approach to underwriting" and began offering financial guaranties in the collateralized debt obligation ("CDO") market and expanded its business to residential mortgage-backed securities ("RMBS"). *Id*. ¶¶ 40-42. FGIC expanded its CDO-related business in 2006, which it announced in a press release on June 16, 2006. The complaint alleges that FGIC's decision to expand its CDO-related business "could not have been worse, however, as the subprime mortgage market (the majority of the collateral or reference portfolio for CDOs/CDS) was beginning to deteriorate rapidly." *Id*. ¶ 43. The complaint alleges that by November 2006, there were clear signs that CDO performance was suffering due to problems in the subprime mortgage market. *Id*. ¶¶ 44-45.

On November 2, 2006, the first day of the class period, PMI announced that the net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share. *Id*. ¶ 62. That day, defendants Katkov, Lofe, Shuster and Smith held a conference call with analysts and investors in which Smith stated:

> . . . Starting with a look at our U.S. Mortgage Insurance and as reviewed at our recent investor conference, we are seeing continued improvement in the operating environment for our domestic mortgage insurance business. Increased penetration rates, improving persistency, and higher premium yield resulted in net income for our U.S. Mortgage Insurance Operations of $70.8 million, up from $69.5 million in the third quarter of 2005. In the third quarter, we continued to focus on prudent growth while maintaining our high credit quality. This was evident in our sequential growth in our flow and structured new insurance written. Credit quality remained strong as 93.5% of our risk in force in the flow channel is prime credit. In our structured channel, approximately 83% of our risk in force is prime, up from 74% one year ago. Importantly, we are finding opportunities for high-quality growth.

*Id.*

---

[4] PMI owns a 42% noncontrolling interest in FGIC. Two members of PMI's management, defendants L. Stephen Smith and Bradley M. Shuster, served on FGIC's board of directors during the class period.

3

During the same conference call, Katkov stated, "I think we tried to show you in a lot of detail that we've made very conscious choices about the types of risk we are taking in the market, both in our flow and in our structure transaction. I think it's very consistent with the way we've run the company for years and I expect that the result of that are the reserve positions that you've seen in the third quarter results today." *Id.* In response to a question about the "big sequential jump in your flow claims domestically," Katkov stated that "[w]e do have the normal seasoning of our books of business, and there is also, as you know, a seasonal effect in the latter part of the calendar year, so I really don't think it's any more than that." *Id.* Katlov also stated that the difference in PMI's books compared to some of its competitors was PMI's "very careful risk selection." *Id.*

The complaint alleges that defendants' November 2, 2006 representations were materially false and misleading, and that defendants knew the representations to be materially false and misleading at the time, because PMI was already moving away from its historically conservative and disciplined underwriting standards to riskier investments, yet defendants continued to claim that PMI's risk management remained prudent and conservative. The complaint alleges that throughout the class period defendants continued to knowingly issue materially false and misleading statements in press releases and conference calls with analysts and investors regarding: (1) the nature and scope of PMI's underwriting policies and controls; (2) PMI's exposure to high risk loans; and (3) the value of its equity investment in FGIC and its extensive investment in risky credit default swap instruments. *Id.* ¶ 6. Plaintiffs allege that defendants' statements concerning PMI's credit risk management, risk tolerance, underwriting standards, operating environment and loss reserves were false and misleading because defendants knew that the loans PMI was insuring were not performing to its standards, that PMI's largest lenders were issuing loans below PMI's guidelines, and PMI's investment in FGIC was deteriorating. According to the consolidated complaint, defendants' materially false and misleading statements and information caused its stock to trade at artificially inflated prices throughout the class period, including a high of $50.21 per share on February 7, 2007.

The complaint alleges that in 2005-2006, defendants learned that many of their loans were the product of fraudulent applications, which increased the risk of default. Plaintiffs allege that defendants learned "both through their monitoring and knowledge of the mortgage and housing market as well as

4

from internal reports, that lenders (particularly PMI's largest ones) were not adhering to strict guidelines and that there was a substantial risk to PMI's portfolio." *Id*. ¶ 48; *see also id*. ¶ 48(a)-(f) (newspaper and industry reports about mortgage fraud and delinquencies). The complaint alleges that PMI's delegated underwriting program,[5] which by 2005-2006 represented approximately 80% of PMI's NIW, "made the company susceptible to fraud by the lenders because "the explosion of both the amount and number of loans without supporting documentation made the assessment of insured risk nearly impossible." *Id*. ¶ 53.

In support of this allegation, the complaint relies on two lawsuits between PMI and its lenders, one involving NovaStar and one involving WMC Mortgage Corporation. The complaint alleges that during the course of the NovaStar lawsuit, which NovaStar filed against PMI in 2003, "PMI discovered that NovaStar had misrepresented its underwriting guidelines, defrauding PMI into writing [6,300] mortgage insurance policies that it would otherwise not have written or written on terms which more accurately reflected the insured risk." *Id*. ¶ 51(a). The complaint alleges that the WMC lawsuit related to a "MASTR securitization whereby WMC sold mortgages to UBS and UBS formed a securitization transaction to purchase the mortgage loans." *Id*. ¶ 51(c). Plaintiffs allege that "WMC failed to complete upfront due diligence and agreed to provide mortgage insurance to the securitization trust." *Id*. As of October 2007, at least 30% of the entire pool of mortgage loans sold into the securitization trust were delinquent, and according to PMI's complaint against WMC, "the massive underperformance of such Loans demonstrates that WMC in reality followed few, if any, objective standards or criteria in underwriting the Mortgage Loans and showed little concern, if any, for any borrower's ability to repay [the loans]." *Id*. (quoting PMI's complaint).

The complaint also alleges, based upon a confidential witness, "CW1," that "PMI was aware of fraud and poor performance (*i.e.* nonpayment) of Countrywide, WAMU, and IndyMac loans since mid-2006 and ultimately stripped IndyMac of its delegated status in 2007." *Id*. ¶ 51(b). CW1 is described as a former Vice President of National Account Operations with PMI's U.S. mortgage segment from

---

[5] "Delegated lenders" are lenders that had the "authority to issue PMI mortgage insurance certificates because they presumably complied with PMI's underwriting guidelines." Consol. Compl. ¶ 20.

5

May 2006 until April 2008, and he/she was required to analyze and monitor the lenders' portfolios and to report on the performance of the portfolios. *Id.* ¶ 20(a). CW1 was responsible for Countrywide, Washington Mutual ("WAMU"), and IndyMac, which were all delegated lenders. *Id.* "Throughout CW1's employment at PMI, the witness reported that the Countrywide, WAMU and IndyMac portfolios yielded results that consequently [sic - consistently?] demonstrated that the portfolios of these lenders were often and regularly performing below the standards PMI established." *Id.* By December 2007, PMI disqualified IndyMac as a qualified delegated lender. *Id.* "CW1 prepared reports on an ad hoc, weekly, monthly, and quarterly basis, which were, among other things, extremely comprehensive in terms of setting out portfolio performance and delinquency or default data. . . . [and] by spring 2007, there was an increasing sense of urgency about the data and he/she was asked to prepare more reports on an ad hoc basis." *Id.* ¶ 20(b). According to CW1, "even as the reports showed that beginning in at least spring 2007, the portfolios of Countrywide, WAMU, and IndyMac were not performing according to PMI's risk metrics, PMI continued to keep insuring the loans originated by these clients despite the fact that they did not meet PMI's risk standards." *Id.* The complaint also alleges that, according to CW1, PMI often knew about delinquent loans before the lenders because PMI had more stringent requirements for identifying and tracking delinquencies on loans than the lenders because of PMI's statutory reporting requirements as an insurance company. *Id.* ¶ 20(c). CW1 also stated that as PMI began writing policies on no-doc loans, there were few means that PMI could use to avoid paying fraudulently obtained policies. *Id.* at ¶ 20(d). According to CW1, the quality control processes at PMI were developed prior to widespread origination of no-doc loans so that it was difficulty to identify and control fraud associated with such loans and/or hold these loans to particular quality control standards. *Id.*

Based on the above, the complaint alleges that "[t]he facts known to defendants regarding NovaStar, Countrywide, WMC, IndyMac, and WAMU provide strong evidence that PMI could not properly control the quality of the loans being insured by these top lenders as measured by volume." *Id.* ¶ 54.

> The NovaStar and Countrywide examples provide proof that fraud and low doc/no doc loans had severe problems prior to the 3Q06. The WMC example provides evidence that PMI was providing insurance for structured finance transactions with no upfront due

6

> diligence and relying on discovering problems after an entity like WMC had sold the mortgage loans to the securitization trust. The IndyMac example provides evidence that high risk loans were not limited to the subprime segment of the mortgage industry but to the Alt-A segment also, where low doc/no doc loans with high LTV were the norm. Finally, the WAMU example provides evidence that there was a systematic effort by a top lender in the United States to manipulate appraisals, thus dramatically increasing the severity of losses that PMI would incur.

*Id*.

The complaint also alleges that defendants' financial reporting during the class period violated generally accepted accounting principles ("GAAP") and SEC reporting rules. Plaintiffs allege that PMI should have written down its investment in FGIC to "zero" no later than 3Q07, instead of 1Q08 when it was written down to zero. The complaint alleges that "FGIC and PMI were aware of the need to monitor the factors which would adversely affect FGIC's contracts and cash flows, and FGIC had a program in place that enabled FGIC to ascertain the fair values of its derivative instruments and to record losses when incurred." *Id*. ¶ 134. According to another confidential witness, "CW3", a former PMI manager, PMI had a "solid risk modeling program and access to substantial data that far surpassed FGIC's vaunted data capabilities." *Id*. ¶ 135.[6] Despite these risk surveillance systems, and PMI's and FGIC's knowledge that "the values of RMBSs and CDOs backed by subprime mortgages were falling disastrously, at a near-historic pace during late 2006 and 2007," PMI continued to report inflated carrying values of its investment in FGIC. *Id*. ¶¶ 150-51; ¶ 164 ("As early as 2Q06, it was clear to both FGIC and PMI that FGIC's securities and the associated underlying collateral or reference portfolios would never meet expectations."). PMI reported its carrying value of FGIC as $856.5 million at the end of 4Q06, $881.4 at the end of 1Q07, and $896.7 million at the end of 2Q07, $884 million at the end of 3Q07, $103.6 million at the end of 4Q07, and then zero in 1Q08, when PMI recognized that its investment in FGIC was "other than temporarily impaired." *Id*. ¶¶ 154-58.

---

[6] CW3 was employed by FGIC as a member of FGIC's quantification risk management team from July 2006 through April 2008, and he/she was tasked with developing risk models at FGIC. *Id*. ¶ 22. "In 2007, CW3 noted his/her models showed that particularly with the 2006 vintage, potential losses on the underlying collateral were an estimated 12%, which according to CW3, equated to approximately $100 million. The 12% loss estimate was between three to four times FGIC's historical range." *Id*. "By the end of 2007 and into early 2008, it was widely recognized throughout FGIC that the Company faced significant exposure particularly on its asset-backed securities assets. CW3 understood that beginning in October/November 2007, PMI representatives began requesting more information regarding FGIC's potential losses." *Id*.

7

> [B]oth FGIC and PMI had all the necessary information about the uncertainties and circumstances concerning FGIC's financial investments that required PMI to write-down its FGIC investment to zero, no later than the 3Q07, in accordance with GAAP and SEC guidance, based on FGIC's proactive surveillance of trends and events; "industry-leading surveillance infrastructure for new sectors, including a risk management database that facilitates enhanced tracking of exposures"; FGIC's substantial surveillance team and frequent and regular meetings that reviewed risk exposures; PMI's own surveillance infrastructure; the key housing and mortgage indicators; and the results of the ABX Index. As SAB 59 mandated, a registrant must "have evidence to support that the amortized cost of a security will be realized. Unless such evidence exists, a write-down accounted for as a realized loss should be recorded."

*Id.* ¶ 167.

The complaint also alleges that PMI improperly accounted for and disclosed loss reserves. The complaint alleges that "PMI failed to report an adequate reserve for losses by deliberately underestimating its loan portfolio delinquencies and by using economic assumptions that did not take the ongoing severe trends adequately into account." *Id.* ¶ 176. Changes in loss reserves had a material impact on PMI's consolidated net income or loss. *Id.* ¶ 168. The complaint alleges that during the class period, PMI's loss reserves did not adequately account for the significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims sizes, and instead were based primarily on PMI's historical patterns of claim payments and loss experience.

Plaintiffs allege that as PMI continued to experience publicly undisclosed problems with business operations, underwriting policies and controls, and its investment in FGIC, the individual defendants "capitalized on the artificial inflation of the Company's stock." *Id.* ¶ 118. Plaintiffs allege that during the class period, the individual defendants received "significant stock and options awards" based upon the performance of the annual consolidated net income, the annual net income from operations, and annual net income from PMI's U.S. mortgage insurance operations. *Id.* In addition, the complaint alleges that defendants' "stock sales are consistent with the scheme to defraud" and that the "individual defendants took advantage of the inflation of the stock price and sold more than $9 million worth of their PMI shares to the unsuspecting public." *Id.* ¶ 120.

Plaintiffs also rely on disclosures provided by one additional confidential witness, a contract underwriter employed by PMI from August 2007 to May 2008 ("CW2"). The complaint alleges that CW2 was responsible for underwriting Alt-A loans, "which were sometimes wrapped with PMI mortgage insurance, depending on the LTV ratio and other factors." *Id.* ¶ 21. According to CW2, when

8

he/she joined PMI in August 2007, he/she was expected to underwrite three to four loans per day, but by November 2007, CW2 was "lucky" to underwrite one loan per day. *Id*.

On March 3, 2008, PMI announced a net loss of $236 million for the fourth quarter of 2007 and estimated approximately $1.1 billion of total incurred losses for 2007. *Id*. ¶ 113. PMI additionally stated that it expected that its "Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended in December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during the periods." *Id.* The following day, PMI's common stock traded on the New York Stock Exchange at $6.43 per share.

In March and April 2008, plaintiffs filed two class action complaints against defendants alleging violations of federal securities laws; on September 4, 2008, they filed a consolidated complaint. Now before the Court is defendants' motion to dismiss plaintiffs' consolidated complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that the claim fails to state a claim and fails to comply with Rule 9(b) and the PSLRA.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. "In undertaking this review, we will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold a dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that s plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (internal citations and quotations omitted). "At the pleading stage, a complaint stating claims under Section 10(b) [of the Securities Exchange Act of 1934] and [SEC] Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Id*. at 990. After the PSLRA, a plaintiff must "plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

9

**DISCUSSION**

**I.    False and misleading statements**

The complaint alleges that defendants made misrepresentations about PMI's (1) investment in FGIC, (2) loss reserves, (3) underwriting practices, and (4) exposure to risk. Defendants contend that the complaint fails to meet the heightened pleading requirements of the PSLRA and Rule 9(b) for the alleged misrepresentations in each of these categories.

Defendants argue that there were no misleading statements about PMI's investment in FGIC because PMI disclosed during the class period that "FGIC has expanded its business lines and products into markets and asset classes that historically have experienced higher default rates than those in which it has historically operated" (PMI's Form 10-K filed March 1, 2007 for period ending December 31, 2006, RJN Ex. 6 at 53),[7] and that there was a "fundamental transformation of [FGIC's] book of business, which was about 92% on public finance in 2003, which is high quality but tended to be lower return business, to more structured finance and international." Final Transcript of Sept. 6, 2006 PMI/Keefe, Bruyette & Woods Conference (*Id*. Ex. 33 at 8). Defendants argue that based on PMI's disclosures and information released by FGIC, the market knew that FGIC, and thus PMI through its investment in FGIC, was exposed to risk from investments in mortgage backed securities and collateralized debt obligations. Similarly, defendants contend that plaintiffs' claims fail because PMI disclosed information about its underwriting practices and the characteristics of the loans that it insured.

Plaintiffs contend that precisely because of the significant risk of loss associated with FGIC's business, as well as the increasing risk that PMI had taken on by underwriting Alt-A, High LTV and exotic loans, PMI's repeated statements regarding its conservative and active risk management were misleading. The complaint cites numerous statements by defendants touting PMI's "very careful risk selection," "high credit quality," "very conscious choices about the types of risk that we are taking in the market," and "disciplined approach to credit risk management," as well as statements that PMI was

---

[7] The Court GRANTS defendants' request for judicial notice. (Docket No. 29). "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Information Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citing *In re Silicon Graphics*, 183 F.3d at 986 and *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

10

watching Alt-A "like a hawk," and that "since 2003 we've taken a more conservative position in the overall credit profile of our book. And we've actually improved the credit profile steadily and methodically as there have been layering of risk characteristics in the marketplace since 2003."

The Court finds that plaintiffs have sufficiently alleged that defendants made false and misleading statements. Defendants place great weight on the numerous disclosures that PMI made regarding its book of business, as well as FGIC. However, these disclosures must be viewed along with defendants' repeated statements about PMI's prudent and careful risk management. Plaintiffs allege that defendants falsely assured investors that their core strength was credit risk management, despite the fact that PMI's proprietary systems could no longer adequately evaluate the credit risk of the low doc/no doc mortgages it was insuring. Plaintiffs also allege that defendants falsely stated that they were controlling for risk layering and even avoiding risk layering, while they in fact were increasing risk layering. Under those facts, which the Court must take as true for purposes of analyzing the present motions, the disclosures do not insulate defendants because the statements "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002). For the same reasons, the Court finds that the complaint sufficiently pleads materiality of the alleged omissions and misstatements. *See also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) ("The 'materiality' of an omission is a fact-specific determination that should ordinarily be assessed by a jury [and] [O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law.").

Defendants also challenge the complaint's allegations regarding PMI's reporting of reserves for losses as well as how and when PMI reported its losses in FGIC. The Court finds the complaint's allegations sufficient on both of these matters, as the complaint details how PMI manipulated loss reserves and its carrying value in FGIC. As discussed below, however, the Court agrees with defendants that the complaint does not sufficiently allege scienter with regard to alleged false and misleading statements.

11

## II.     Scienter

Defendants argue that the consolidated complaint does not state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind. "[T]o adequately plead scienter, the complaint must [] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991. The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Inc.,* 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) (emphasis in original). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510 (internal quotation marks omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id*. at 992.

The Court finds that the complaint falls short of alleging particular facts showing that the defendants were aware that the statements were false or misleading when made. Plaintiffs contend that given the importance of monitoring risk and the fact that internal information reflected the problems with PMI's loan portfolio, "it is clear that [defendants'] statements that they adequately controlled PMI's risk were false and misleading." Opposition at 17:23-25. Plaintiffs primarily rely on the confidential witnesses to show scienter. However, the complaint does not specifically allege that any individual defendant was aware of the problems with PMI's loan portfolio. CW1, who appears to be the most important CW, states that he/she prepared reports showing that beginning in September 2007, the portfolios of Countrywide, WAMU, and IndyMac were not performing according to PMI's risk standards but PMI continued to insure loans originated by these lenders. Compl. ¶ 20(b). The

complaint does not allege, however, that any individual defendant received these reports or that CW1 has personal knowledge that the individual defendants were otherwise aware of this information. The complaint also does not describe these reports in any detail, and thus there is no information in the complaint as to whether the reports should have alerted defendants that the lenders were disregarding PMI's underwriting guidelines or whether defendants should have been on notice that the lenders' practices would materially impact PMI's financials. *See In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) ("[G]eneral allegations regarding negative internal reports and stock sales do not give rise to a strong inference of deliberate recklessness."). Similarly, although the complaint alleges that PMI's risk surveillance systems alerted defendants to problems in PMI's loan portfolio and with FGIC, the complaint does not provide any details about these internal monitoring systems.

The allegations of CW2 and CW3 also do not support scienter. CW2 was a contract underwriter who was assigned to underwrite mortgage loans at ABN AMRO in Ann Arbor, Michigan, and he/she was responsible for underwriting Alt-A loans. CW2 states that when he/she joined PMI in August 2007, he/she was expected to underwrite three to four loans per day, but that by November 2007, he/she was "lucky" to underwrite one loan per day. Compl. ¶ 21. The allegations based on CW2 do not support scienter whatsoever, a point implicitly conceded by plaintiffs by their failure to address CW2 in their opposition. Finally, CW3, a former corporate risk manager at FGIC, allegedly prepared risk models showing that the potential losses on the collateral underlying FGIC's 2006 vintage insured loans was 12% of the loans insured. Compl. ¶ 22. The complaint alleges that "[b]y the end of 2007 and into early 2008, it was widely recognized throughout FGIC that the Company faced significant exposure particularly on its asset-based securities." *Id.* However, the complaint does not explain how CW3 would have personal knowledge of what was "widely recognized throughout FGIC," nor does the complaint allege how the individual defendants at PMI were aware of this information.[8]

Plaintiffs assert that they have satisfied the PSLRA's pleading standards by alleging that

---

[8] If plaintiffs allege that defendants Smith and Shuster possessed this information by virtue of their positions on FGIC's board of directors, the complaint must explicitly allege so, and with particularity.

13

defendants are company officers who may be presumed to have knowledge of the company's core operations. Plaintiffs rely on *Berson v. Applied Signal Technology*, 527 F.3d 982 (9th Cir. 2008), and *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). Both cases examine when a plaintiff may rely on the core-operations inference to plead scienter. The *South Ferry* court explained,

> Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware. As a general matter, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegations of specific information conveyed to management and related to the fraud" or other allegations supporting scienter. *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 534 F.3d 1068, 1087 (9th Cir. 2008) (concluding that the bare core operations inference fell short of the *Tellabs* standard).

*South Ferry*, 542 F.3d at 784-85.

The *South Ferry* court noted that in an "exceedingly rare category of cases," such as *Berson v. Applied Signal Technology*, the core operations inference alone may raise the strong inference required by the PSLRA. In *Berson*, the defendants allegedly failed to disclose "stop-work orders" from the company's largest customers even though those orders had a "devastating effect on the corporation's revenue." *Berson*, 527 F.3d at 987. The *Berson* plaintiffs did not allege particular facts indicating that the two individual defendants actually knew about the stop-work orders, and instead inferred knowledge based on the defendants' high level positions in this company. The *Berson* court found the complaint's allegations sufficient: "Yancey and Doyle were directly responsible for Applied Signal's day-to-day operations, so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Id*. at 988. In addition, the complaint alleged that the defendants did actually know about the largest stop-work order two weeks after the allegedly misleading statements because the stop-work order was disclosed in an SEC filing. *Id*. at 988 n.5.

Here, plaintiffs have not shown that this case fits within the unusual circumstances of *Berson*. Thus, under *South Ferry*, in addition to alleging that management had an important role in the company, the complaint must "contain additional detailed allegations about the defendants' actual exposure to information." *South Ferry*, 542 F.3d at 784. As noted above, plaintiffs can cure this deficiency by amending the complaint to add allegations – if they are able – showing that the individual defendants

14

actually had information showing the problems with PMI's loan portfolio, that the delegated underwriters were not adhering to PMI's underwriting standards, and that FGIC was in trouble.

Plaintiffs also rely on PMI's bonus plan and defendants' stock trades during the class period to provide circumstantial evidence of scienter. However, "[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir. 2002) (internal quotation marks omitted) (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir. 1995)). Thus, the simple fact that PMI had a bonus compensation plan, without more, does not support scienter. Similarly, the allegations of three defendants' stock sales[9] do not provide circumstantial evidence of scienter because the complaint does not contain any allegations regarding defendants' prior trading histories. "Insider stock sales are only suspicious when they are 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) (quoting *Silicon Graphics*, 183 F.3d at 986). Without information about prior trading histories, the Court cannot conclude that the stock sales are suspicious. Moreover, defendants Smith, Shuster, and Lofe increased their holdings during the class period, which is inconsistent with an intent to defraud. *See* RJN, Ex. 2, 13. Moreover, 98% of Smith's sales were pursuant to Rule 10b5-1 trading plans. *See* RJN, Ex. 105. As the Ninth Circuit has noted, "[s]ales according to pre-determined plans may rebut an inference of scienter." *Metzler*, 540 F.3d at 1067 n.11 (internal quotations omitted).

### III.   Loss causation

Defendants also contend that the complaint does not plead loss causation. As a threshold matter, defendants assert that the loss causation must be analyzed specifically with regard to the lead plaintiff's purchases; here, the lead plaintiff sold all of its PMI stock on October 31, 2007, and then purchased

---

[9] Defendants Shuster, Smith and Katkov are the only individual defendants who sold PMI stock during the class period.

15

additional shares of PMI stock in February 2008. Opposition at 23 n.4. Defendants note that the complaint alleges that as a result of defendants' disclosures, all artificial inflation was removed from PMI's stock on January 18, 2008, and thus any purchases after that date do not support any claim for loss causation. Consol. Compl. ¶ 198 ("As a direct result of defendants' admissions and the public revelations regarding the truth about PMI's overstatement of its financial outlook and its actual business prospects going forward, PMI's stock price plummeted over 87%, falling from $50.21 per share on February 7, 2007 to $6.47 per share on January 18, 2008 – a drop of $43.74 per share. This drop removed the inflation from PMI's stock price, causing real economic loss to investors who had purchased the stock during the Class Period."). Plaintiff does not address defendants' argument about the inconsistency between this allegation and plaintiff's reliance on its February 2008 purchase of PMI stock as evidence of loss causation (and relatedly, of its asserted class period extending to March 3, 2008).[10]

"[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Here, based on its allegation that by January 18, 2008 all of the artificial inflation of PMI stock had been removed, plaintiff cannot demonstrate loss causation based on its purchase of PMI stock in February 2008. Thus, the Court must determine whether plaintiff has alleged loss causation based on pre-January 18, 2008 allegations. The complaint alleges that "instead of truthfully disclosing during the class period that PMI's business was not as healthy as represented, defendants falsely reported PMI's financial outlook and its actual business prospects going forward." Consol. Compl. ¶ 194. Plaintiff further alleges that defendants revealed the truth about PMI's business operations, finances, business metrics, and future business and financial prospects beginning in July 2007 in a series of partial disclosures and revelations which caused the artificial price inflation not to "come out of the stock all at once, [but] rather the artificial price inflation came out over time, in bits,

---

[10] Defendants state that in the event the complaint is not dismissed, they reserve the right to seek to shorten the class period allegations. Defendants may renew their arguments about the class period in the event plaintiffs move for class certification.

16

pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices throughout January 2008." *Id.* ¶ 197. Not including the February 2008 stock purchase, the lead plaintiff purchased PMI stock between March 21, 2007 and May 1, 2007 for amounts between $45.20 and $48.20, and sold its stock on October 30 and 31, 2007 for amounts between $16.84 and $16.97. Docket No. 11, Ex. A. The complaint also specifically identifies defendants' alleged corrective disclosures. *See, e.g.*, Consol. Compl. ¶ 91 (October 18, 2007 press release entitled "The PMI Group, Inc. Announces Housing, Mortgage and Credit Market Conditions to Adversely Affect Third Quarter 2007 Financial Results"); ¶ 92 (stock drops 12.91% on October 18, 2007).

"A complaint fails to allege loss causation if it does not 'provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]'" *Metzler*, 540 F.3d at 1062 (quoting *Dura*, 544 U.S. at 347). "Stated in the affirmative, the complaint must allege that the defendant's share price fell significantly after the truth became known." *Id.* (internal quotation marks omitted). The Court concludes that the complaint sufficiently alleges loss causation up to the January 18, 2008 date. The Ninth Circuit recently emphasized that a plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *see also Berson*, 527 F.3d at 989-90. In so holding, the Ninth Circuit cited with approval decisions by other circuits suggesting that loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003). Accordingly, the Court concludes that plaintiffs have sufficiently alleged loss causation.

### IV.   Control person liability

As plaintiffs have not adequately alleged a primary violation of federal securities laws, the Court also GRANTS defendants' motion to dismiss plaintiffs' claim for control person liability under § 20(a). *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their

17

claims for violations of § 20(a) . . . plaintiffs must first allege a violation of § 10(b) or Rule 10b-5.").[11]

## CONCLUSION

In conclusion, the Court concludes that plaintiffs have failed to allege scienter with particularity, and thus the Court GRANTS IN PART and DENIES IN PART defendants' motion to dismiss with leave to amend. (Docket No. 28). Should plaintiffs wish to do so, they may file an amended complaint no later than July 24, 2009.

**IT IS SO ORDERED.**

Dated: July 1, 2009

SUSAN ILLSTON
United States District Judge

---

[11] The Court does not reach defendants' additional arguments in support of dismissing defendant Shuster. Plaintiffs contend, *inter alia*, that defendant Shuster is a control person under § 20(a). If plaintiffs wish to pursue their claims against defendant Shuster, the amended complaint should allege why Shuster is a control person.