1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   JEFFREY W. LAWRENCE (166806)
    DANIEL J. PFEFFERBAUM (248631)
3   100 Pine Street, Suite 2600
    San Francisco, CA 94111
4   Telephone: 415/288-4545
    415/288-4534 (fax)
5   jeffreyl@csgrr.com
    dpfefferbaum@csgrr.com
6
    Lead Counsel for Plaintiffs
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10  In re THE PMI GROUP, INC. SECURITIES   )   Master File No. 3:08-cv-01405-SI
    LITIGATION                             )
11                                         )   CLASS ACTION
    ───────────────────────────────────   )   ─────────────────────────────────
12                                         )
    This Document Relates To:              )   FIRST AMENDED COMPLAINT FOR
13                                         )   VIOLATION OF THE FEDERAL
        ALL ACTIONS.                       )   SECURITIES LAWS
14  ───────────────────────────────────   )
                                               DEMAND FOR JURY TRIAL
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE .................................................................................5

PARTIES ...................................................................................................................5

CONTROL PERSONS ..............................................................................................7

CONFIDENTIAL WITNESSES .............................................................................10

SUBSTANTATIVE ALLEGATIONS ....................................................................11

DEFENDANTS' SCIENTER ..................................................................................28

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
    DURING THE CLASS PERIOD ..........................................................45

ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER .....................................77

FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD ..........................86

LOSS CAUSATION/ECONOMIC LOSS ..............................................................115

NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
    STATEMENTS..........................................................................................116

COUNT I ................................................................................................................117

For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All
    Defendants ...............................................................................................117

COUNT II ..............................................................................................................118

For Violation of Section 20(a) of the 1934 Act Against All Defendants .......................118

CLASS ACTION ALLEGATIONS .......................................................................118

PRAYER FOR RELIEF ........................................................................................119

JURY DEMAND ....................................................................................................119

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of The PMI Group, Inc. ("PMI" or the "Company") between November 2, 2006 and March 3, 2008, inclusive ("Class Period"), against PMI and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").  PMI, through its subsidiaries, provides credit enhancement products designed to promote homeownership and facilitate mortgage transactions in the capital markets in the United States, Australia, New Zealand, and the European Union.

2.      On March 17, 2008, PMI announced a net loss of over $915.3 million as of December 31, 2007 – a decline of 318% from PMI's reported income of $419.7 million as of December 31, 2006.  The Company also reported that for PMI's U.S. Mortgage Insurance Operations, it estimated that its losses and loss adjustment expenses ("LAE") for 2007 would approximate $1.1 billion.  Then, on May 12, 2008, PMI announced that it wrote off its entire investment in Financial Guaranty Insurance Company, Inc. ("FGIC") to zero, from $103.6 million on December 31, 2007, because PMI acknowledged that its investment was other than temporarily impaired and PMI did not expect to recover any of its previously invested capital.  These announcements – which resulted in a decline in PMI's stock price to levels not seen in 12 years – marked the culmination of revelations concerning problems PMI had been experiencing and defendants had been misrepresenting and covering up throughout the Class Period.

3.      The $1 billion-plus write-down is a direct consequence of defendants' fraud in connection with their failed attempt to salvage PMI's place in the mortgage industry from 2003 through early 2008 by competing against new alternative mortgage loan structures, by writing mortgage insurance for transactions in the "Alt-A"[1] marketplace and failing to properly manage and monitor the mortgage originators given delegated authority by PMI.  The private mortgage

---

[1]      "Alt-A" mortgage loans can be defined as borrowers who provide less than full documentation of income, assets, etc. and /or state their respective income, assets, etc.  PMI described Alt-A loans as loans "where the borrower's FICO score is 620 or higher and where the loans are originated with reduced or no documentation or verification of borrower information."

insurance business decreased significantly with new mortgage loan financing structures in the marketplace, the expansion of lending to subprime and Alt-A borrowers, and the refinancing of old mortgage loans.  Lenders such as banks, thrifts, and mortgage bankers began to finance high loan-to-value ("LTV") transactions with an 80% LTV first lien loan and a 20% loan to value second lien loan that financed 100% of the value of a residential property.  As defendants attempted to compete in this marketplace, they caused PMI to insure riskier loans, loosening their underwriting standards and making their portfolio more susceptible to fraud as well as defaults with consequently increasing exposure.  At the same time, defendants caused PMI to make a massive investment in FGIC, a financial guaranty entity that was willing to guaranty subprime residential mortgage backed securities ("RMBS") which are backed by high LTV second lien loans, structured investment vehicles ("SIVs") and collateralized debt obligations ("CDOs").  The guaranties provided by FGIC represented risk exposure that PMI Mortgage Insurance Co. Chief Executive Officer ("CEO") L. Stephen Smith ("Smith") had repeatedly stated that PMI Mortgage Insurance Co. did not want exposure to.

4.      Wedded to an aggressive business plan to make PMI – historically a conservative and disciplined monoline insurer[2] defined by its well-defined and well-developed underwriting strategies a major player in the mortgage financing and structural finance markets – defendants abandoned PMI's core principles and tied the Company's growth plan insuring high risk mortgage loans and exposing its investors to even higher risk structured finance transactions, through its majority investments were in FGIC.

5.      By at least October 2006, defendants knew that the strategy had failed.  As early payment defaults occurred for mortgage loans and mortgage loan delinquencies increased, defendants learned that massive amounts of their riskiest policies, those over 95% LTV and "low

---

[2]      Monoline insurers (or simply "monolines") guarantee the timely repayment of bond principal and interest when an issuer defaults.  They are so named because they provide services to only one industry – *i.e.*, residential mortgage insurance in the case of PMI Mortgage Insurance Co., or bonds in the case of FGIC.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   doc" and "no doc" loans,[3] were predicated on fraudulent applications.  Indeed, in 2005, defendants

2   learned that 6,300 loans, for which private mortgage insurance policies had been issued, were

3   subject to fraudulent data and processes by one of the major loan originators, NovaStar Financial,

4   Inc. ("NovaStar"), and PMI sought to rescind the mortgage insurance on the loans on that basis.  In

5   addition, over the course of 2006 through 2007, FGIC had issued massive amounts of financial

6   guaranties on billions of dollars of RMBS and CDOs backed mainly by U.S. subprime mortgages

7   or related RMBS.  These same subprime mortgages and securities performances had been rapidly

8   declining in the 2H06 and 2007.  As a major equity holder in FGIC, and with three members of

9   PMI's management on FGIC's board of directors (each of them Individual Defendants, including

10   two defendants on FGIC's Audit Committee), PMI knew that as delinquencies and foreclosures

11   increased for subprime and Alt-A mortgage loans, the U.S. real estate market continued its steep

12   decline throughout late 2006 and through 2007 making its investment in FGIC impaired.  In 2008,

13   defendants sough to rescind coverage for 5,565 loans underwritten by IndyMac Bancorp

14   ("IndyMac") which were made during the Class Period.  In a lawsuit over these loans, PMI

15   described IndyMac's violation of underwriting guidelines as "egregious."  Confidential witnesses

16   report that Katkov was aware of underwriting problems at IndyMac throughout 2007.

17         6.      Defendants' knowledge of the ever-increasing credit risk (and corresponding loan

18   loss reserve increase) was evident both from their statements to the market and the fact that they

19   had access to and reviewed the reports detailing the problems.  Throughout the Class Period, PMI

20   generated internal reports to specifically evaluate the Company's credit risk and potential losses

21   from mortgage defaults.  Among them were reports on the portfolio performance of delegated

22   underwriters, including Countrywide Financial Corporation ("Countrywide"), Washington Mutual,

23   Inc. ("WAMU") and IndyMac, which demonstrated that these lenders were often and regularly

24   performing below PMI's established standards.  The defendants also had access to Deal Manager,

25

26   _____

27   [3]     *I.e.*, low documentation and no documentation loans.

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    the database that contained the details and models used for each deal as well as the pricing models

2    and pricing sheets.

3        7.    In nearly every conference call from the start of the Class Period until PMI finally

4    admitted the losses, defendants (all of whom were on the conference calls) repeatedly

5    acknowledged that credit quality was critical to PMI's success and that they were directly involved

6    with determining PMI risk management.  For example, as analysts were expressing concern over

7    increasing credit losses from Alt-A loans, during the February 5, 2007 conference call (discussing

8    2006 earnings), defendant Donald P. Lofe ("Lofe") assured investors stating, "Do we watch Alt-A?

9    Absolutely.  We watch it like a hawk."  Lofe also stated that while PMI used models, "we look at

10   the models.  They're very important to our developmental losses, but management judgment is a

11   very important component and we take both."  On June 26, 2007, individual defendant Smith

12   stated, "I have been talking actively with our customers . . . for over three years now about the

13   layering of risk characteristics that have been going on in the marketplace.  We are keenly aware of

14   that in our risk management and portfolio."  On October 30, 2007, defendant Donald H. Katkov

15   ("Katkov ") claimed that PMI had "early warning systems" that allowed them to recognize risks in

16   the marketplace.  Thus, defendants had actual knowledge of the declining credit in PMI's portfolio

17   from the reports that they reviewed in developing their losses, or, at a minimum, they recklessly

18   disregarded the information in these reports.

19       8.    Contrary to their public statements that they closely monitor risk in their portfolio,

20   and only insure loans which they are "happy to put on the book," defendants were forced to make

21   drastic changes to their delegated underwriting process (whereby lenders sold PMI insurance while

22   underwriting a mortgage) stripping one of their ten largest underwriters, IndyMac, of their

23   delegated underwriting status.  Confidential Witnesses ("CWs") also report that PMI stopped

24   insuring mortgages from CountryWide, Chase Bank USA N.A. ("Chase") and Lehman Brothers

25   Holdings, Inc. ("Lehman Brothers") after an internal investigation showed that these lenders were

26   not following published guidelines.  In an effort to further curb mounting losses, defendants

27   implemented "carve-outs" in their bulk deals.  Mortgages with certain characteristics, whether

28   LTV, FICO score, zip code or other attributes, would not be insured.  This led PMI to stop insuring

1   any mortgages from California – its second largest market.  These actions, unknown to investors,

2   demonstrate that defendants' statements regarding credit selection and credit quality were

3   knowingly false when made.

4        9.     As the statements throughout the Class Period reveal, rather than disclosing the

5   impairment as required, PMI and its executives concealed and misrepresented the depressed value

6   of the portfolio from investors.  Specifically, defendants issued materially false and misleading

7   statements regarding, *inter alia*: (i) the nature and scope of PMI's underwriting policies and

8   controls; (ii) PMI's exposure to high risk loans; and (iii) the value of its equity investment in FGIC

9   and its extensive investment in risky credit default swap ("CDS") instruments.

10        10.     Defendants' material misrepresentations and omissions during the Class Period

11   caused the price of PMI's common stock to trade at artificially inflated levels throughout the Class

12   Period.  As the truth was disclosed, the price of PMI's common stock trading on the New York

13   Stock Exchange ("NYSE") fell from a Class Period high of $50.21 per share on February 7, 2007

14   to $6.43 per share on March 4, 2008, the first trading day following the close of the Class Period,

15   thereby causing investors to suffer hundreds of millions of dollars in damages.

16        **JURISDICTION AND VENUE**

17        11.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C.

18   §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange

19   Commission ("SEC") (17 C.F.R. §240.10b-5).  Jurisdiction is conferred by §27 of the 1934 Act (15

20   U.S.C. §78aa).  Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false

21   and misleading statements were made in or issued from this District.

22        **PARTIES**

23        12.     Lead plaintiff, Locals 302 and 612 of the International Union of Operating

24   Engineers-Employers Construction Industry Retirement Trust, purchased shares of common stock

25   during the Class Period and suffered substantial damages as a proximate result of the violations of

26   law alleged herein.

27        13.     Defendant PMI is a Delaware corporation with its principal place of business and

28   executive offices located at 3003 Oak Road, Walnut Creek, California, during the Class Period.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

Through its subsidiaries, PMI provides credit enhancement products that promote homeownership and facilitate mortgage transactions in the capital markets in the United States, Australia, New Zealand, and the European Union.  PMI is a monoline insurer, meaning that its subsidiary, PMI Mortgage Insurance Co., may only offer mortgage insurance covering first lien, one to four family residential mortgages.  It is licensed in all 50 states, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.  PMI's U.S. Mortgage Insurance Operations generated the vast majority of the Company's revenues in FY06.  It accounted for 67.8% of total revenue.  In addition, PMI is a majority shareholder in FGIC, the holding company of Financial Guaranty Insurance Company, a New York domiciled financial guaranty insurance company.  PMI stock trades under the symbol "PMI" on the NYSE.  During the Class Period, PMI had approximately 81 million shares of common stock outstanding, and its shares traded in an efficient market on the NYSE.

14.     Defendant L. Stephen Smith joined PMI in 1979.  He has served as Chairman of the Board of Directors of PMI since May 2007 and has been a director since February 2002.  He has been CEO of PMI since June 1, 2006 and President and Chief Operating Officer ("COO") of PMI since September 1998.  During 2005 and 2006, Smith served on PMI's Financial Oversight Committee which held four meetings per year and oversaw PMI's investment in FGIC.  Prior to 1998, Smith held various executive positions with the Company.  During the Class Period, Smith also served on the board of directors of FGIC.  During the Class Period, Smith disposed of $6.9 million of PMI stock while in possession of material non-public information at artificially inflated prices.  Smith signed PMI's Forms 10-K for the years 2006 and 2007.

15.     Defendant Bradley M. Shuster ("Shuster") has been President, International and Strategic Investments of PMI, and President and CEO of PMI Capital Corporation since January 1, 2003.  Between 1999 and 2003, Shuster was Executive Vice President ("EVP"), Corporate Development of PMI.  Prior to 1999, he served as Senior Vice President, Treasurer, and Chief Investment Officer of PMI.  Before joining the Company, defendant Shuster was an audit partner with the accounting firm of Deloitte & Touche LLP where he was employed from January 1978 to July 1995.  He remains a certified public accountant.  During the Class Period, Shuster also served on the Board of Directors at FGIC and was on FGIC's Audit Committee.  FGIC's Audit Committee

1    was appointed by the FGIC board of directors had responsibilities related to assisting the board

2    with the preparation and integrity of FGIC's financial statements, the engagement and performance

3    of independent auditors and compliance with legal and regulatory requirements.  During the Class

4    Period, Shuster disposed of $2.1 million of PMI stock while in possession of material non-public

5    information at artificially inflated prices.

6           16.     Defendant David H. Katkov has been EVP of PMI since August 2001 and President

7    and COO of PMI since June 2006.  Prior to that, Katkov held a variety of executive management

8    positions in sales, structured transactions, product development, and portfolio management.  During

9    the Class Period, Katkov disposed of $531,000 of PMI stock while in possession of material non-

10   public information at artificially inflated prices.

11          17.     Defendant Donald P. Lofe, Jr. has been EVP of PMI since January 2003 and has

12   been Chief Financial Officer of PMI since April 1, 2003.  Lofe is responsible for PMI's financial

13   reporting and signed all of PMI's SEC Forms 10-Q and 10-K during the Class Period.  Lofe also

14   served on FGIC's board of directors in 2007 and he was Chairman of FGIC's Audit Committee.

15                                    **CONTROL PERSONS**

16          18.     Defendants  Smith,  Shuster,  Katkov  and  Lofe  (collectively,  the  "Individual

17   Defendants") were the most senior executive officers of the Company with significant tenure in the

18   financial industry.  Smith had been a senior executive at PMI for 29 years, Shuster for 13 years, and

19   Katkov for seven years.  Lofe, who joined PMI in 2003, was Senior Vice President, Corporate

20   Finance for The CNA Financial Corporation from 1998 to 2003 and an audit partner with

21   PricewaterhouseCoopers LLP for 20 years prior to that.

22          19.     Defendants Smith, Shuster, and Lofe also served on the board of directors of FGIC

23   during the Class Period.  Shuster and Lofe also served on FGIC's Audit Committee.  During 2007,

24   Lofe was Chairman of the Audit Committee.  As described herein, by virtue of their roles in

25   FGIC's financial reporting process, these defendants were aware of, or deliberately reckless in not

26   knowing, any and all financial information at FGIC.  *See* ¶¶202-204.

27          20.     Even more significant than their overall experience was that throughout the Class

28   Period, the Individual Defendants repeatedly extolled their direct day-to-day involvement both in

1    evaluating PMI's portfolio and monitoring the housing market in an effort to reassure investors that

2    the Company had correctly assessed the risks and PMI's overall business:

3           (a)    In the November 2, 2006 3Q06 earnings conference call (with all the

4    Individual Defendants participating), Katkov emphasized that the Company's credit risk profile is a

5    reflection of management's decisions: "I think we tried to show you in a lot of detail that we've

6    made very conscious choices about the types of risk that we are taking in the market, both in our

7    flow and in our structure transaction. ***I think it's very consistent with the way we've run the***

8    ***company for years***."

9           (b)    In the February 5, 2007 earnings conference call for 4Q06 and FY06,

10   defendant Lofe stated that not only does management closely watch market developments, but its

11   management's judgment that is a "very important component" of the Company's forecasts:

12              Do we watch Alt-A?  Absolutely.  We watch it like a hawk.  Do we watch
                geographies? Yes we do.  Is it going to be a challenging market in '07?  Yes,
13              undeniably.  But I think the team has proven that we have a very good handle on loss
                development.  And I guess the last answer to the question is, we are not exclusively a
14              model-driven company.  As you know, we look at the model.  They're very
                important to our developmental losses, ***but management judgment is a very***
15              ***important component*** and we take both.

16   Again, Katkov also echoed management's role in forecasting: "I believe the management team over

17   the last several years has been very reliable in terms of how we are forecasting our future loss

18   environment."  The Individual Defendants also monitored the housing market very closely.  As

19   Katkov stated at the February 12, 2007 Goldman Sachs Housing Conference: "***We look at home***

20   ***prices as you would imagine, very, very closely***."

21          (c)    Throughout the Class Period, risk management remained a dominant theme.

22   At the February 14, 2007 Merrill Lynch Insurance Investor Conference, Smith emphasized

23   management's experience in risk management: "So now, let me get to the one that you're probably

24   most interested in, which is the overall credit outlook for PMI.  ***Number one, it's the core***

25   ***competency of our company.  We're professional risk managers.  It's what we do day [in] and day***

26   ***out is the key point***."

27          (d)    At the Wachovia Securities CEO Summit on June 26, 2007, Smith discussed

28   how his active role in the Company – which included talking to customers – influenced the

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   Company's risk management: "I have been talking actively with our customers, with the Federal

2   Reserve, with the OCC and others, the National Association of Homebuilders for over three years

3   now about the layering of risk characteristics that have been going on in the marketplace.  We were

4   keenly aware of that in our own risk management and portfolio."

5         21.     As the Class Period wore on the reports prepared by CW1 reflected that several of

6   PMI's top ten lenders (who were delegated underwriters) were writing policies that did not comply

7   with PMI's guidelines, and one of those lenders, IndyMac, was so deficient that by the end of 2007,

8   PMI disqualified them from the program.  Indeed, according to CW4, by September 2007,

9   defendants had instructed deal managers that PMI would no longer insure any bulk transactions

10   from Countrywide or IndyMac.  Similarly, an investigation demonstrated that Chase and Lehman

11   Brothers were not adhering to underwriting guidelines and thus PMI would not insure mortgages by

12   these lenders.  PMI implemented carve-outs that prevented insuring any loans in their bulk channel

13   from California – which was then PMI's second largest market.  Litigation in 2008 confirms that

14   PMI refused to honor insurance policies on 5,565 loans underwritten by IndyMac during the Class

15   Period due to "egregious" deviations from agreed-upon underwriting guidelines.  Nonetheless,

16   throughout the Class Period, the Individual Defendants continued to reassure investors that they

17   were able to appropriately assess PMI's risks.  At the Lehman Brothers 5th Annual Financial

18   Services Conference on September 10, 2007, Smith repeated his reassurances concerning

19   defendants' ability to monitor and appropriately assess PMI's risks: "So now let's talk about

20   probably what you're most interested in is the overall credit outlook for PMI.  First, let me say

21   fundamentally we are risk managers.  It's what we do day [in] and day out, it's the fundamental

22   franchise, it's understanding the risk, pricing it appropriately, understanding the operational risk

23   and monitoring those and delivering a sound outcome."

24         22.     Because of their positions of control and authority as officers and/or directors of the

25   Company, the Individual Defendants were able to and did control the contents of PMI's quarterly

26   and annual financial reports, SEC filings, and press releases.  In addition, as a result of their direct

27   involvement in PMI's business and the reports they received and reviewed, each Individual

28   Defendant had access to the adverse non-public information about PMI's business, finances,

1   products, markets, and present and future business prospects particularized herein, via access to

2   internal corporate documents, conversations or connections with corporate officers and employees,

3   attendance at PMI (and FGIC) management and/or board of directors meetings and committees

4   thereof and via reports and other information provided to them in connection therewith.

5          23.     The Individual Defendants are liable under §20(a) of the 1934 Act for the false

6   statements and fraudulent schemes pled herein, as those false statements and fraudulent schemes

7   were the result of the collective action of the Individual Defendants, who were "control persons" of

8   the Company.  In addition to their management roles, the Individual Defendants were directly

9   involved in conference calls throughout the Class Period.  As such, the Individual Defendants are

10  also liable for such statements under §10(b) of the 1934 Act and the "group published information"

11  inference.

12                          **CONFIDENTIAL WITNESSES**

13         24.     Many of the allegations included herein are based on information provided by

14  former PMI and/or FGIC employees referred to as CWs.  The information provided by former

15  employees is reliable and credible because (1) each witness worked at PMI or FGIC during the

16  Class Period, (2) each witness has personal knowledge of the information provided, (3) the witness'

17  job title, position and responsibilities show s/he has personal knowledge of the information

18  provided, (4) many of the witnesses' accounts corroborate one another, and (5) the witness

19  accounts are corroborated by other information alleged herein.

20             (a)     CW1 was a former Vice President ("VP") of National Account Operations

21  with PMI's U.S. mortgage segment from May 2006 until CW1 was let go by the Company in April

22  2008.  As VP of National Account Operations, CW1 was tasked with, among other things, various

23  data tracking and client interfacing functions.  CW1 was required to analyze and monitor the

24  lenders' portfolios and to report on the performance of the portfolios.  CW1 prepared and submitted

25  extremely detailed reports regarding portfolio performance.

26         25.     CW2 was employed with PMI as a contract underwriter from August 2007 to May

27  2008 and was assigned to underwrite mortgage loans at ABN AMRO in Ann Arbor, Michigan.  In

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  this capacity, CW2 was responsible for underwriting Alt-A loans, which were sometimes wrapped

2  with PMI mortgage insurance, depending on the LTV ratio and other factors.

3      26.    CW3 was employed by FGIC as part of its quantification risk management team

4  from approximately July 2006 through April 2008 and was assigned to the role of Corporate Risk

5  Manager, in which s/he was tasked with developing risk models at the Company and specifically

6  estimating potential losses for the purpose of setting reserves.

7      27.    CW4 is a former Government Sponsored Entity ("GSE") Channel Deal Manager

8  who worked at PMI from March 2007 to February 2008.  As a GSE Deal Manager, CW4 acted as a

9  liaison between the PMI Credit and Pricing divisions and the GSEs on a daily basis in order to

10  facilitate bids that PMI placed on bulk mortgage deals issued by the GSEs.

11      28.    CW5 worked as a Deal Manager in the Structured Finance Group for PMI Mortgage

12  from June 2006 to January 2008, and then in PMI Capital within the Mergers & Acquisitions group

13  until June 2008.  Within Structured Finance, s/he reported to VP Laura Hollabaugh, who was

14  responsible over the "bulk" side of the business.  Hollabaugh reported to SVP Jan Walker, who

15  reported to Katkov.  As a Deal Manager s/he was responsible for bulk transactions, which were

16  mostly RMBS, insured by the Company.

17      29.    CW6 is a former Pricing Analyst who was employed by PMI from May 2005 until

18  April 2008.  S/he was responsible for modeling risk and determining pricing on lender-paid

19  mortgage insurance from approximately mid-2006 until mid-2007.

20                        **SUBSTANTATIVE ALLEGATIONS**

21  **PMI, a Successful Monoline Insurer, Becomes a Publicly Traded Company in 1995**

22      30.    Founded in 1972, PMI, a private mortgage insurance company, became a publicly

23  traded company through an April 1995 initial public offering ("IPO") that raised approximately

24  $962.5 million through the sale of nearly 27.7 million shares.  Private mortgage insurance typically

25  is used by mortgage lenders to reduce their credit risk in low down payment, high LTV mortgage

26  loans as well as to enhance their ability to sell the loans into the secondary mortgage market,

27  principally to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home

28  Loan Mortgage Corporation ("Freddie Mac").  Mortgage insurance is purchased by mortgage

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  bankers/savings institutions, commercial banks and other mortgage lenders.  Home purchasers who

2  make down payments of less than 20% of the value of their home are usually required by the

3  mortgage lender to qualify and pay for primary mortgage insurance on their mortgage loans.  If the

4  homeowner defaults on the mortgage loan, mortgage insurance reduces and, in some instances,

5  eliminates any loss to the insured lender.

6    31.  PMI's revenues, as those of all mortgage insurers, are derived primarily from

7  premiums earned (and, to a lesser extent, investment income).  As a result, there are three metrics

8  used to measure the success of the business.  Because premiums are charged based on the principal

9  balance of insured mortgage loans, a primary determinant of revenue growth is increases in

10  insurance in force.  Growth in insurance in force is a function of new insurance written ("NIW") as

11  well as persistency (the degree to which existing policies remain in force and continue to generate

12  premiums).  The Company's NIW is also used to determine the Company's success and the degree

13  to which the Company is effectively competing in the marketplace for new business.  When PMI

14  went public, for example, it was the third largest private mortgage insurer in the United States,

15  based both on new primary insurance written in 1994 and direct primary insurance in force on

16  December 31, 1994.  PMI's underwriting income is derived from the amount of premiums earned,

17  its loss experience and its level of operating expenses.  Loss experience depends upon claim

18  frequency (the percentage of insured loans resulting in a paid claim) and claim amount.  From its

19  inception and throughout the 1990s, PMI's strategy was to maintain a leading position in the

20  private mortgage insurance industry,[4] and increase its profitability by growing its insurance in force

21  from which it earns premiums while sustaining the quality of its insurance portfolio through

22  disciplined underwriting.  PMI's overall risk management is based on loan-by-loan underwriting

23  and utilizes its proprietary underwriting technology designed to improve underwriting results,

24  underwriting efficiency and bring consistency to the underwriting judgment process.

25

26  [4]  The private mortgage insurance industry has been and continues to be highly concentrated

27  with between seven and nine private companies, as well as various federal and state governmental
and quasi-governmental agencies, principally competing for the business.

28

32.     PMI touted its development and use of automated underwriting systems in the mortgage insurance industry, having introduced its proprietary automated underwriting model (pmiAURA$^{SM}$) in 1987.  The Company has also used its proprietary automated residential appraisal analysis system (pmiTERRA$^{SM}$) since late 1991.  In 1995, PMI's pmiAURA$^{SM}$ model had a database of approximately 650,000 borrower profiles to predict the likelihood of default for each mortgage loan.  PMI is currently in the process of updating the pmiAURA$^{SM}$ database with newer data and is adding economic and demographic information to the database in order to enhance pmiAURA$^{SM}$'s predictive power.  Further, pmiTERRA$^{SM}$, which contains over 400,000 residential property profiles, complements pmiAURA$^{SM}$ by providing an automated analysis of residential appraisals.  The Economic and Real Estate Trends Report, prepared by PMI's National Real Estate Appraiser, is used by PMI to analyze regional and local market conditions and to help establish territorial underwriting guidelines.  The rating generated by this report is incorporated in the automated appraisal review process during the underwriting evaluation.  These tools, in conjunction with PMI's experienced field underwriting staff, enable PMI to implement risk management approaches tailored to specific real estate markets.  The Company stated that, in addition to improving underwriting results, PMI's automated underwriting systems improved its underwriting efficiency and have brought consistency to the underwriting judgment process.

33.     Throughout PMI's existence, in addition to the automated underwriting systems, the Company continually monitored and adjusted the diversification of its insurance portfolio by emphasizing more profitable geographic regions and risks.  For example, PMI managed its new risk written in California from 26.9% of its total new risk written in 1992 to 21.1% in 1993 and 19.4% in 1994 primarily by applying revised underwriting guidelines which addressed the adverse economic conditions experienced by that state during such period and, to a lesser extent, by focusing on other regions, particularly the central region, of the United States.  Further, in December 1993, PMI decided to discontinue its mortgage pool insurance business segment because the risk characteristics and the performance of such business did not meet PMI's expectations, which also had the effect of reducing new primary risk written in California.

34.     These processes and procedures enabled the Company, in its IPO Registration Statement, to crow that "[m]anagement believes PMI is a leader in the mortgage insurance industry due to its focus on customer service, value-added products and services, disciplined risk management techniques, experienced sales and management teams, as well as its financial strength."

**The Housing Market Explodes in 2002-2005 – PMI Is Marginalized in the Market**

35.     In the aftermath of the dot-com bust in 1999, the U.S. economy went into a recession from 2000-2001.  This downturn was further exacerbated by the attacks on September 11, 2001.  In an effort to stimulate the economy by expanding the money supply and encouraging borrowing, the Federal Reserve Board repeatedly cut the federal funds rate[5] – from 6.5% in May 2000 to 1.75% at the end of 2001 and finally to 1% in June 2003.[6]  These interest rate cuts facilitated the inexpensive borrowing by consumers which fueled the housing boom.  From 1980 to 1994, home ownership in the United States hovered around 64%.  It then steadily increased each year though 2004, when it reached the highest point on record, 69.2%.  Thus, the cheap credit in 2002 and 2003 allowed households to purchase homes.

36.     Additionally, from 2002 to August 2005, speculation in the housing market was rampant, loans were readily available and home prices were soaring.  Markets in California, Florida, and the Northeast were experiencing home price appreciation ("HPA") of 10% annually.

**Accelerating HPA Drives Up Demand for Faster and Innovative Mortgages**

37.     From 2002 to 2005, the average purchase price of homes nationally rose steadily from $266,400 to $274,200 to $287,500 to $318,200, respectively.[7]  However, the housing bubble was a localized phenomenon.  Out of the 20 largest metropolitan areas tracked by S&P/Case-Shiller

---

[5]     The federal funds rate is the overnight rate which banks charge to each other for loans made to fulfill reserve funding requirements.

[6]     *See* the Federal Reserve Board website, *available at* http://www.federalreserve.gov/fomc/fundsrate.htm (last visited Sept. 3, 2008).

[7]     Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing* (2008).

home price index, six metropolitan areas (Dallas, Cleveland, Detroit, Denver, Atlanta, and Charlotte) experienced less than a 10% price growth in inflation-adjusted terms from 2001 to 2006.[8] Seven metropolitan areas (Tampa, Miami, San Diego, Los Angeles, Las Vegas, Phoenix, and Washington, D.C.) appreciated more than 80% in the same period of time.[9]

38.     Housing prices increased dramatically in comparison to median incomes.  Until 2000, nationally weighted average home prices rose closely in line with median household incomes and general price inflation.  Since then, however, house price appreciation has shot ahead of these benchmarks, outstripping income growth more than six-fold from 2000 to 2005.  As a result, the median house price exceeded the median household income by at least four times in a record 49 of 145 metropolitan areas, and by more than six times in 14 metropolitan areas.

39.     Fuelled by a belief that HPA would continue indefinitely, buyers ought to obtain, and lenders ought to grant, financing as quickly and easily as possible, creating ever more innovative (and risky) mortgage instruments.  Because lenders were offering loans with no upfront layout, borrowers were easily able to purchase homes for investment.  Rising HPA and cheap access to credit caused speculators to "flip" houses – *i.e.*, purchasing and reselling a home at a profit.  This activity further fuelled the housing boom by creating bidding wars and artificially increasing demand – and in turn generating new loans and new loan programs.

---

[8]     *See* S&P/Case-Shiller Home Price Indices, *available at* http://www2.standardandpoors.com/portal/site/sp/en/us/page.topic/indices_csmahp/0,0,0,0,0,0,0,0,0,1,5,0,0,0,0,0.html (last visited Sept. 3, 2008).

[9]     *Id.*

**The Growth of the "80/20s" and Low Doc and No Doc Loans**

40.     The historically low interest rates coupled with extensive HPA not only drove down the cost of credit but, because the market was so growing so fast, lenders sought to be able to write mortgage loans as quickly as possible by offering loan programs that required less documentation and greater automated processes to underwrite, approve and fund.  The result being that the basic credit decision to lend or not was "watered down" to the point where a lender could not be sure of the integrity of the information being received.

41.     The GSEs, Fannie Mae and Freddie Mac, are the largest purchasers of residential mortgages.  The GSEs purchase residential mortgages from lenders and investors as part of their governmental mandate to provide liquidity in the secondary mortgage market.  As the GSEs have traditionally been the principal purchasers of conventional mortgage loans, mortgage lenders typically originate loans that conform to their guidelines.  Generally, under the GSEs coverage requirements, lenders have been required to have the original amount be no greater that 80% of the LTV of the property.  In loans that were greater than 80% LTV – low down payment loans – the borrower was required to have private mortgage insurance and comply with the stringent underwriting requirement developed by PMI and the other private mortgage insurers in order to satisfy GSE requirements.  With lenders seeking to underwrite mortgages faster for more borrowers, these restrictions, while guarding against risk, were cumbersome and time consuming.  Moreover, private mortgage insurers not only delayed and increased the timing of the loan process, but they added costs that, if eliminated, could be obtained by lenders.

**Lax Underwriting Standards Reduce Required Documentation**

42.     The secondary market for mortgages grew stronger making mortgage origination highly profitable, highly automated, and led to the development of innovative – and risky – loan products.  Lenders did away with various documentation requirements, creating "low doc" and "no doc" loans.  For instance, lenders typically required that they verify a potential borrower's employment, rental payments, income and assets by supplying pay stubs, W-2 forms and bank statements.  As pressure built to originate more mortgages, less and less verified information was required.  For instance, a "Stated-income Stated-asset" loan eliminated the requirement basic to the

traditional credit approval process, whereby pay stubs and W-2s would be provided by the borrower and verification of assets would be provided by a financial institution.  Such a loan typically required no verification of the information provided on the loan application.  In addition, the borrower(s) may have completed a form allowing the lender to verify income via past tax returns with the Internal Revenue Service ("IRS") (known as a "Form 4506"), but it was the policy of lenders not to submit such requests to the IRS for fear of finding out that the information on the loan application was misstated.  Given the mortgage secondary market, acceptance of low doc/no doc/stated loans, and the desire for ever larger commissions, lenders had no trouble offering these products because the inherent risk of such loans was ultimately shifted to investors who purchased RMBS and CDOs.  The result being borrowers who would not have qualified for loans in the past were suddenly being qualified on the spot due to minimal credit requirements and automated processing.[10]  Mortgage denial rates for conventional home purchase loans, reported under the Home Mortgage Disclosure Act, dropped from 29% in 1998 to 14% in 2002 and 2003.[11]

43.     In addition to lax underwriting standards and credit impaired loan products, the average loan amounts grew during the housing boom.  Not only did speculation in the market drive up average home price, thus resulting in larger loan principal amounts, but lenders were willing to loan larger percentages of a home's value – very often loaning up to 100% of the underlying collateral or home value.  This increase in high LTV loans was partially driven by the belief that rapid HPA would put the borrower above water in one to two years.  Of course, the flip side of this was that borrowers would be underwater if HPA stopped its rapid ascent.

44.     In approximately 2001, lenders began to originate mortgages that have a first mortgage lien with 80% LTV and a second mortgage lien ranging from 5%-20% LTV.  These

---

[10]     An EVP from Countrywide Home Loans, Inc. bragged that: "We are able to produce a decision [on a mortgage application] inside of 30 seconds today."  *Available at* http://www.banktech.com/story/featured/showArticle.jhtml?articleID=21401117 (last visited Sept. 4, 2008).

[11]     Federal Financial Institutions Examination Council, Press Release (July 26, 2004), *available at* http://www.ffiec.gov/hmcrpr/hm072604.htm (last visited Sept. 4, 2008).

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

loans, referred to variously as "80/20s," "80/10/10," "80/15/5," or "piggyback," loans effectively eliminated the need for private mortgage insurance, and allowed lenders to write both the first and second lien loans, thereby eliminating the constraints that mortgage insurers had placed on mortgage loan transactions in the past.  This piggyback structure represented a powerful substitute for mortgage insurance and the mortgage insurance industry was alarmed at the prospect of losing substantial business to this mortgage financing structure.  Because the first mortgage is only an 80% LTV, the GSEs do not require mortgage insurance with respect to either mortgage.  Although the 80/20s had been in the market since at least the late 1990s, they began to gain in popularity as interest rates rapidly declined and high HPA allowed lenders to tap into home equity line of credit lending in 2001-2003.  By 2003, these loan products had cut into PMI's insurance business such that its persistency rate had declined by over 55%, far beyond any historical decline from 2000-2003, as the following table illustrates:

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Average Annual Mortgage Interest Rate* | 7.8% | 7.6% | 6.9% | 7.4% | 8.1% | 7.0% | 6.5% | 5.8% |
| Persistency Rate | 83.3% | 80.8% | 68.0% | 71.9% | 80.3% | 62.0% | 56.2% | 44.6% |

*Average annual thirty-year fixed mortgage interest rate derived from Freddie Mac and Mortgage Bankers Association data.

45.     PMI was faced with a dilemma given the existing market conditions; if it maintained high standards and practices, its NIW and persistency rates would decline dramatically reducing revenue and ultimately PMI's stock price.  PMI had two choices: (a) shrink the Company by maintaining standards and waiting for the housing market to implode, or (b) reassert itself in the market by offering to insure higher risk loans and investing in FGIC which provided financial guaranties for transactions that PMI deemed too risky.  PMI chose the latter choice where it reasserted itself in the market by offering to insure riskier loans and risky transactions through FGIC.  As the Company acknowledged, as the LTV exceeded 90%, and approached 100% or above, the default rate would increase (since the borrower has less or in some cases no equity in the property) and the claim frequency would correspondingly increase.  Moreover, in the lax

1    underwriting environment, at the same time PMI began increasing its portfolio of the riskiest loans,

2    it also increased its Alt-A loans with limited or no documentation – by 400% between 2001 and

3    2005.  In 2005, PMI acknowledged that the increase in these loans was driven by market conditions

4    and was the result of higher concentrations of these loans in both the mortgage origination market

5    as well as the private mortgage insurance market.  Not only are these "low doc and no doc" loans

6    subject to a greater risk of default (frequency), but also subject to greater losses or severity given

7    that loan to values were increasing based on HPA.

8    **In 2003, PMI Invests in FGIC and Takes on Extensive Exposure to Subprime Loans**

9           46.     As the risk of the creative financing and securitizations cut into PMI's core business,

10   defendants sought additional means to participate in the new market.  In 2003, PMI became a

11   majority investor in FGIC with the goal of growing its business.  FGIC, established in 1983, had

12   been focused on financial guaranties for the municipal bond business, and typically guarantees the

13   scheduled payments of principal and interest on an issuer's obligations for public finance and

14   structured finance transactions.

15          47.     FGIC was sold to a group of investors during 2003 by General Electric Company

16   ("GE").  According to a Standard & Poor's ("S&P") article from August 2003, FGIC had only

17   selectively participated in the mortgage and home equity loan sectors prior to being purchased from

18   GE.  However, FGIC planned to broaden its participation from 2004 forward to the RMBS areas to

19   include prime and sub-prime mortgages, home equity loans, high loan-to-value loans, and

20   commercial MBS (mortgage backed securities).  As a February 24, 2004 article in the Bond Buyer

21   by Helen Change stated, "With new management and strategy in place, Financial Guaranty

22   Insurance Co. continues to move away from the conservative approach to underwriting it took

23   when it was owned by General Electric Co.  This quarter [1st quarter of 2004], as the bond insurer

24   completes its reorganization and additional hiring, it will take a more aggressive approach to

25   underwriting, beginning with forays into the housing and health care sectors and structured finance,

26   company officials said."

27          48.     As of April 21, 2004, FGIC had announced that it had hired personnel to initiate

28   FGIC's efforts to begin offering financial guaranties in the CDO market.  The CDO effort would be

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    reorganized during June 2006.  The majority of the financial guaranty activity for FGIC related to

2    CDOs took place after January 2005.  During 2005, FGIC established credit default swap execution

3    capacity.  During May 2004, FGIC hired two new personnel to continue to expand its structured

4    financing business.   The majority of the financial guaranty insurance provided for RMBS

5    collateralized by second lien loans took place after September 2004.  As of April 6, 2005, FGIC

6    had hired Donna Troia to join FGIC as Managing Director, Risk Management.  She would be

7    responsible for FGIC's surveillance efforts for its insured book of business.  At the same time,

8    David Howard, at FGIC, Chief Portfolio Risk Officer, noted: "As FGIC grows its book of business,

9    it's imperative that we also dedicate the proper resources to oversee the insured portfolio."

10            49.     By 2004, FGIC was thus clearly involved in securitized debt transactions which

11   increased over the next several years.  FGIC's financial guaranties for RMBS and typically the

12   CDOs were structured as CDS.  There are no margin or collateral posting requirements in FGIC's

13   CDO exposure.  With respect to the CDO/CDS transactions, FGIC attaches at the senior or super

14   senior attachment point to minimize volatility.  CDS must be marked to market each quarter as they

15   are classified as derivatives for accounting purposes.  FGIC had approximately $12.8 billion in

16   CDO exposure as of September 2007.  The CDOs of ABS are 75% high grade and 25% mezzanine

17   credits.  However, the underlying collateral is concentrated in subprime RMBS, mostly originated

18   in 2005 and 2006.  The subprime RMBS used in the CDO transactions were typically rated BBB

19   and such securities were aggregated in CDO transactions to generate AAA rated bonds.

20            50.     As of June 16, 2006, FGIC made a strategic decision as outlined in a press release,

21   to expand its CDO-related businesses:

22           Tom Adams, Senior Managing Director and head of the Consumer Asset-
         Backed/CDO Group at FGIC, noted, "FGIC is always looking for areas where we
23       can add value, which is the mission of our newly reconfigured CDO team.  In
         addition, as FGIC expands its efforts in synthetic risk distribution [*e.g.*, CDS], we
24       decided to combine this with our CDO area, as both businesses use common tools
         and interact with similar counterparties.  We also felt it made sense to centralize our
25       global coverage in New York to ensure a consistent approach to the CDO market."

26   The timing of the decision could not have been worse, however, as the subprime mortgage market

27   (the majority of the collateral or reference portfolio for CDOs/CDS) was beginning to deteriorate

28   rapidly.

51.     By November 2006, there were clear signs that CDO performance was suffering due to the delinquency rates of the underlying RMBS.  According to a Deutsche Bank report, about half of 2006 CDO issuance was comprised of structure finance CDOs backed by subprime RMBS (a.k.a. HEL).  There were significant pricing differences with respect CDOs backed by subprime RMBS versus other structure products as noted below:



52.     By 4Q06, there were many indicators pointing to significant problems in both the subprime and Alt-A mortgage loan performance.  In addition, as noted, the 2006 subprime vintage performance had remarkably early payment defaults with higher delinquency rates for the 2006 vintage loans – a key indicator of problems in the performance of the loans:

1

## The Crisis in Subprime Mortgage Market

2

3

4



5

6

7

8

9

10

11

12

13

53.    Thus, by December 2006, there was sufficient information known to the Individual

14 Defendants that indicated that PMI's investment in FGIC was threatened as a result of FGIC's

15 subprime and second lien loan exposure embedded in RMBS, CDOs and SIVs with FGIC financial

16 guaranties.  Indeed, by December 2006, the following market events had occurred: (a) the ABX

17 Index (tracking BBB rated subprime RMBS) indicated that subprime security performance was

18 deteriorating and subprime RMBS were selling at steep discounts; (b) there were early payment

19 defaults occurring on mortgage loans which confirmed the existence of fraud; (c) buyers of

20 mortgage loans were requesting that the mortgage banking originators repurchase defaulted loans

21 with misrepresentations; (d) there was a dramatic rise in delinquencies for subprime mortgage

22 loans; (e) CDO performance was deteriorating; (f) home prices began to fall or become stagnate:

23 year-on-year percent change in existing median U.S. home prices; (g) mortgage fraud continued to

24 rise after dramatically increasing in 2005; and (h) subprime and Alt-A mortgage loan originators

25 were closing or winding down business.

26

54.    By 2H07, FGIC had approximately 11% or $34.7 billion of a total of $314.7 billion

27 in net par in force insuring MBS transactions (non-CDO).  Of this exposure, $8.8 billion is tied to

28

subprime mortgages, or 2.7% of the total net par in force.  Another $18.6 billion or 5.9% of total net par in force is related to prime (Alt-A mortgage loans with low documentation) home equity and closed end seconds transactions.  Approximately 80% of the subprime MBS is rated A or higher, with 75% of the vintages post-2004.  Approximately 78% of the prime home equity MBS is rated BBB (lowest investment grade) with 77% of the vintages post-2004.  Countrywide is the largest issuer at 46% of these transactions.  As set out below, defendants' involvement with FGIC and their corresponding knowledge of the problems with the housing market and PMI's portfolio are indicative that PMI's investment in FGIC was other than temporarily impaired by at least 3Q07 and should have been written down by then if not earlier.

**In 2005-2006 Defendants Learn that Many of Their Loans Are the Product of Fraudulent Applications Resulting in Increasing Risk of Default**

55.     Even as defendants continued to insure more and more Alt-A and low doc loans, they learned, both through their monitoring and knowledge of the mortgage and housing market as well as from internal reports, that lenders (particularly PMI's largest ones) were not adhering to strict guidelines and that there was a substantial risk to PMI's portfolio.  For example:

(a)     In 2005, a white paper issued by the Federal Financial Institutions Examination Council ("FFIEC") in Washington, D.C. reported that as many as 10% of all mortgage loan applications annually in the U.S. residential real estate market involved "material misrepresentation."

(b)     In October 2005, *USA Today* reported: "As the U.S. housing market hits record highs, mortgage fraud appears to be rising from California to Florida."  The story quotes the author of a report on mortgage fraud, who noted that "[f]raud is costing the industry at least tens of millions of dollars a year."

(c)     By early 2006, HSBC Holdings PLC ("HSBC"), one of the country's largest lenders, was seeing indications that delinquencies were going to be worse than expected.  In August 2005, HSBC issued a memo to companies from which it was buying loans.  The paper called "Threads of Early Payment Default" reported that delinquencies were rising.  HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-

1   day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened

2   fraud incidents."  When borrowers didn't have to verify their incomes, the report said they were

3   overstating them, and they bolstered their false claims by overstating their job positions.  HSBC

4   recommended that originators verify employment by phoning the human resources departments and

5   asking questions such as: "How many years has John worked there?" and "What is his title?"

6         (d)    An August 23, 2006 story on CBS' *MarketWatch* noted, "July was dry for the

7   U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated

8   and the number of homes on the market soared to a 13-year high, according to a report from the

9   National Association of Realtors released Wednesday."

10         (e)    Foreclosure rates increased dramatically in August 2006, providing further

11   indication that the market was in decline – particularly in several of PMI's largest markets.  A

12   September 15, 2006 article on *CNNMoney.com* noted: "In August, 115,292 properties entered into

13   foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales.  That was 24

14   percent above the level in July and 53 percent higher than a year earlier.  It was the second highest

15   monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.  Some of

16   the bellwether real estate market states are among the leading foreclosure markets.  Florida had more

17   than 16,533 properties in foreclosure in August.  That led all states and was 50 percent higher than in

18   July and 62 percent higher than in August 2005.  California foreclosures are increasing at an even

19   faster annual rate, up 160 percent since last year to 12,506.  And the formerly red-hot Nevada market

20   recorded a spike of 24 percent compared with July and a whopping 255 percent increase from

21   August 2005. . . .  Usually, foreclosures are a lagging [market] indicator. . . .  But we've never had a

22   situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming

23   up for adjustment over the rest of the year. . . .  These exotic mortgages, which have been issued by

24   lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate

25   mortgages.  And sub-prime loans, which are much more common than in the past, have a higher

26   default rate as well."

27         (f)    By late 2006, not only was the market collapse accelerating, but it was

28   becoming clear that the 2006 vintage loans were already performing poorly.  A November 27, 2006

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

article entitled, "Early loan payment defaults getting close attention" highlighted how the new loan products were increasingly the product of fraud: "According to industry experts, the growth of exotic loan products, loose underwriting standards, faulty servicing transfers and out-and-out fraud have all contributed to the proliferation of 'early payment defaults.'. . . At LoanPerformance in San Francisco, Damien Weldon, director of collateral risk analytics, said that first quarter loans with early payment defaults increased 16% over those in first quarter 2005, and 84% over first quarter 2004. '*2006* vintage loans are performing very poorly,' Weldon said. LoanPerformance is a unit of First American Real Estate Solutions, which in turn is majority-owned by First American Corporation of Santa Ana, Calif[ornia]. For stated-income loans, Weldon said the first-quarter surge in early payment defaults was even sharper – 19% from 2005 and almost double those of 2004. By contrast, traditional full-documentation loans rose just 4% from a year earlier." According to Kevin Kanouff, President of Clayton Fixed Income Services, "30% to 40% of early payment defaults are related to fraud." "Loose underwriting standards were a factor in the rise of such defaults on loans originating in the last quarter of 2005 and the first two quarters of 2006. 'We think it took too long for everyone to tighten their belts and change some of their underwriting guidelines.'"

56.     Further, a substantial portion of PMI's business – over 40% – was concentrated in its ten largest customers, which were generally mortgage lenders, banks and investors. From 2000, ten customers accounted for 40% of PMI's earned premiums. As PMI expanded its business into Alt-A, adjustable rate mortgage ("ARM") and high LTV loans, the concentration of the business generally remained the same. In 2006 and 2005, ten customers accounted for 43.9% and 42.8% of the premiums earned in those years.

57.     In addition, while PMI wrote insurance through its "flow channel" – individual policies presented for review and underwriting, as the number of loans increased as with its largest customers, it not only used its "bulk channel" – lenders provided information for specific listed loans that they sought to insure. Each of the "bulk" deliveries contained different loans (*e.g.*, Stated Income, No Document or Full Document) and specific information about each loan and each borrower. PMI relied on the lenders to accurately and prudently originate mortgage loans by

1   providing delegated responsibilities for lenders for a majority of its annual mortgage insurance

2   volume from 2000 and through the Class Period.

3        58.     From the early 1990s, PMI had utilized a delegated underwriting program whereby

4   approved lenders were allowed to determine whether or not loans met PMI's insurance guidelines.

5   Until 2000, this process was relatively straightforward since PMI insured full documentation loans

6   and the borrower was required to submit information that generally allowed both the lender and

7   PMI, during routine audits, to determine if the borrower had sufficient income, assets and capacity

8   to repay the mortgage loan so that PMI could properly underwrite the credit risk.

9        59.     The delegated underwriting program continued and by 2005-2006, it represented

10   approximately 80% of PMI's flow NIW.  PMI's delegated underwriting program made the

11   Company susceptible to fraud by the lenders, as had been the case with NovaStar, WMC,

12   Countrywide, WAMU, and IndyMac.  Despite the conduct of "routine audits," the explosion of

13   both the amount and number of loans without supporting documentation made the assessment of

14   insured risk nearly impossible, since PMI could not effectively determine what that risk was.

15   Rather than tighten its underwriting standards, as the following chart shows, PMI increased its

16   riskiest insurance products from 2005-2007:

17   **Primary Default Rates as of December 31**

| | **2007** | **2006** | **2005** |
|---|---|---|---|
| **Flow Channel** | | | |
| **Loan Type*** | | | |
| Alt-A-Loans | 11.6% | 4.6% | 3.8% |
| Less-than-A Quality | 18.6% | 16.8% | 17.3% |
| Above 97s | 8.8% | 5.9% | 6.4% |
| ARMs | 15.1% | 7.0% | 5.6% |
| 2/28 Hybrid ARMs | - | - | - |
| Payment option ARMs | 14.5% | 3.7% | 2.4% |
| Interest Only | 9.6% | 3.0% | 23% |
| **Total Flow Channel** | **6.7%** | **4.8%** | **5.1%** |
| | | | |
| **Structured Finance Channel** | | | |
| **Loan Type*** | | | |
| Alt-A-Loans | 20.8% | 7.8% | 12.1% |
| Less-than-A Quality | 23.6% | 23.2% | 20.9% |
| Above 97s | 10.2% | 9.2% | 10.0% |
| ARMs (excluding 2/28 Hybrid ARMs) | 16.4% | 14.1% | 14.6% |
| 2/28 Hybrid ARMs | 38.6% | 16.0% | 8.5% |

| | **2007** | **2006** | **2005** |
|---|---|---|---|
| Payment option ARMs | - | - | - |
| Interest Only | 15.9% | 5.0% | 2.2% |
| **Total Structured Finance Channel** | **13.9%** | **9.9%** | **9.9%** |
| | | | |
| **Total Primary** | | | |
| **Loan Type\*** | | | |
| Alt-A-Loans | 13.9% | 5.7% | 3.8% |
| Less-than-A Quality | 20.2% | 19.0% | 18.5% |
| Above 97s | 9.1% | 6.6% | 7.2% |
| ARMs (excluding 2/28 Hybrid ARMs) | 15.5% | 8.5% | 7.4% |
| 2/28 Hybrid ARMs | 38.6% | 16.0% | 8.5% |
| Payment option ARMs | 14.5% | 3.7% | 2.4% |
| Interest Only | 11.0% | 3.7% | 2.3% |
| **Total Primary** | **7.9%** | **5.6%** | **5.7%** |
| | | | |

\*Loan types are not mutually exclusive.

**Despite the Real Estate Market's Collapse, PMI Insures More and Riskier Loans**

60.     Beginning in 2005, home values began to decline, interest rates began to rise, and ARM teaser rates expired.  As a result, the borrowers who overextended themselves – high LTV loans with minimal introductory interest rates – were faced with new, higher mortgage payments that they could neither afford nor refinance.  As early as 1Q05, mortgage default rates began to rise dramatically.  PMI's insurance portfolio was likewise exposed to ever increasing risk.

61.     Nevertheless, defendants, facing competitive pressures from lenders and others in the mortgage industry, continued to write policies for Alt-A loans and even riskier ARM loans.  As defendants acknowledged in their Form 10-K, "the percentages of PMI's risk in force containing Above 97s, ARMs, interest only loans, payment option ARMs, and Alt-A loans increased in 2005.  We believe that these increases were driven by, and reflect, higher concentrations of these types of loans as percentages of both the 2005 mortgage origination market and the 2005 private mortgage insurance market."

62.     By 2006, housing prices had effectively collapsed.  Thus, while PMI continued to face increasing competition to write more and more high risk policies and did so, investors sought reassurance that defendants were able to and had correctly assessed the risks in the Company's underwriting decisions in order to maintain its profitability.  By the end of 2006, however, PMI's risk in force contained so many policies that were dependent upon unverified (and often fraudulent)

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

representations of borrowers, lenders and appraisers that PMI could not accurately assess the risk to its portfolio.

63.     As the housing market collapsed, so too did the piggyback loans.  Lenders became unable to move the second liens off their books and into the secondary market (where they were securitized) and hence quit offering this first/second lien finance structure.  This created a vacuum of borrowers seeking high risk, high LTV loans into which PMI quickly moved.  The Company was taking on the same risks as the piggyback structure which had already proved to be susceptible to fraud and poor performance.

64.     Moreover, as CW3 stated, housing prices were a factor in FGIC's risk models for determining the FGIC's risk profile.  With the decline in the 2006 vintage loan, the risks increased such that by the 3Q07, FGIC's potential losses were material to PMI, defendants were thus not only aware of the decline in these loans, as CW3 reports, but specifically sought to quantify the number by October 2007.

## DEFENDANTS' SCIENTER

**Defendants' Scheme to Defraud**

65.     Having expanded PMI's business into areas beyond PMI's traditional business, defendants could no longer count on PMI's expertise or its ability to produce the revenue and earnings they had promised and had been able to deliver the market in years past.  Moreover, as the housing market collapsed and defendants learned that more and more of PMI's insured loans were procured by fraud and underperforming, defendants' ability to generate additional business and the quality of that business became more and more suspect.  As market professionals and investors repeatedly questioned defendants' business and business prospects, defendants were desperate to find ways to convince the market that PMI's business was sound.  There was simply no way to do so legitimately given the risks and the reality of the mortgage and housing markets and defendants' knowledge about the performance of PMI's portfolio.  By the end of 2006, the situation was critical and defendants, in an effort to attempt to ride out the crisis, engaged in a scheme to defraud and mislead about PMI's revenues and income as well as the health of the business.

66.      Having the market believe that PMI was successfully managing its risk portfolio was critical to convincing investors that that PMI was able to create true value for investors.  In virtually every conference call throughout the Class Period, defendants continually sought to convince the market that they were effectively managing risk.  Indeed, in a 2007 Insurance Investor Conference, defendant Smith acknowledged the centrality of the issue for PMI, stating "So now, let me get to the *one [issue] that you're probably most interested in, which is the overall credit outlook* for PMI."

**Defendants Assure the Market That They Personally and Directly Evaluate Risk and Loan Loss Reserves**

67.      In earnings conference calls and investor conferences throughout the Class Period, defendants repeatedly emphasized their direct role in evaluating risk and establishing loss reserves at PMI.  Moreover, defendants assured the market that they had not changed their risk tolerances despite ample internal evidence to the contrary.  For example, on the first day of the Class Period, Katkov stated, "I think we tried to show you in a lot of detail that *we've made very conscious choices* about the types of risk that we are taking in the market . . . . *I think it's very consistent with the way we've run the company for years*."  On the same conference call, Katkov stated, "we're being very careful in ensuring that *whatever we put on the book, we're happy to put on the book*."  On February 5, 2007, Lofe stated: "*Do we watch Alt-A?  Absolutely.  We watch it like a hawk.  Do we watch geographies?  Yes, we do . . .  And I guess the last answer to the question is, we are not exclusively a model-driven company, as you know.  We look at the models, they're very important to our development of losses, but management judgment is a very important component and we take both.*"  Defendants repeated this theme throughout the Class Period, always stressing their own involvement and supervision of PMI's credit risk management.  On February 12, 2007, Katkov said to investors "the very high LTV borrower sector, with low and moderate incomes.  They don't have a lot of flexibility, so *those are the folks that we watch real closely*."  On April 30, 2007, Smith again reminded the market of managements' risk awareness: "*Now as we've always done, we're being mindful of risk in the marketplace*."  On the same call Katkov said, "So from our perspective, when we look at the risk of LTV we are obviously very

mindful of that.  ***We get paid for that***.”  Smith followed up that statement with “And just to add to what David [Katkov] said, as you would expect, ***we constantly review all of our program types, product types and loan-to-value types to say ensure the proper risk adjusted returns.  So, we’re comfortable, as David [Katkov] indicated.***”  On June 27, 2007, Smith stressed his own personal involvement in PMI’s risk management: “***I have been talking actively with our customers, with the Federal Reserve, with the OCC and others, the National Association of Homebuilders for over three years now about the layering of risk characteristics that have been going on in the marketplace.***  We were keenly aware of that in our own risk management and portfolio.”  On September 10, 2007, in an effort to reassure investors, Smith stated, “***First, let me say fundamentally we are risk managers.  It’s what we do day [in] and day out, it’s the fundamental franchise, it’s understanding the risk, pricing it appropriately, understanding the operational risk and monitoring those and delivering a sound outcome***.”

68.     Defendants also assured investors that they relied on a broad base of internal and publicly available data.  In a July 31, 2007 conference call announcing 2Q07 results, defendant Smith stated, “We obviously have our own PMI Risk Index, our own Chief Economist but we also follow very closely all of the major housing economists and reports.”  In an October 30, 2007 conference call announcing 3Q07 financial results, Katkov boasted that PMI had an “early warning” system that allowed them to rapidly change their guidelines to reflect new risks arising in the mortgage market: “Now, we recognize that.  ***We have early warning systems*** and we made a decision quite early in the third quarter to significantly change both our pricing and our guidelines.”  In fact, however, internally, PMI’s reports showed that the Company was not effectively managing its risk or adequately setting its losses, and the reports that were prepared for defendants revealed that PMI’s exposure to bad loans was increasing at a rapid and substantial rate.

**As a Result of Defendants’ “Day [in] and Day out” Evaluation of Risks, Defendants Knew that PMI Faced Far Greater Risk than Defendants Represented to the Market**

69.     Even as defendants were constantly reassuring investors that they were evaluating PMI’s risk “day [in] and day out” and their management of PMI – and the risk it placed on its books – was consistent with the way they had run the Company for years, they knew, or were

1    deliberately reckless in not knowing, that their statements were not true. Throughout the Class

2    Period, PMI's business, and the risks it took on, changed dramatically from its historic practices

3    and the Company could not properly evaluate the new risks it faced.   Indeed, non-public

4    information known to defendants revealed that PMI's credit risk was far greater than defendants

5    represented to investors.

6        70.    CW1, a former VP of National Account Operation with PMI's U.S. mortgage

7    segment, analyzed and monitored lenders' portfolios.  While at PMI, CW1 was responsible for

8    Countrywide, WAMU, and IndyMac – three national accounts which were among PMI's top ten

9    customers.  During CW1's tenure, all of these lenders were "delegated lenders" meaning they had

10   the authority to issue PMI mortgage insurance certificates because they presumably complied with

11   PMI's underwriting guidelines.  Throughout CW1's employment at PMI, the witness reported that

12   the Countrywide, WAMU, and IndyMac portfolios yielded results that consistently demonstrated

13   that the portfolios of these lenders were often and regularly performing below the standards PMI

14   established.  Additionally, the witness noted that the portfolios of "vintage" years, including 2006

15   and 2007, were particularly performing below PMI's established risk metrics beginning by at least

16   spring 2007.  (The term "vintages" is used regularly in the mortgage investment industry to refer to

17   a year in which the notes in pools of mortgages were originated.)  In fact, according to CW1, in the

18   beginning of 2007, and continuing and escalating throughout the year, IndyMac failed to comply

19   with PMI's standards, an issue which Katkov "definitely" knew about.  By December 2007, PMI

20   disqualified IndyMac as a qualified delegated lender.

21       71.    In addition to monitoring lender portfolios, CW1 also prepared and submitted

22   reports regarding the performance of the portfolios.  CW1 prepared reports on an ad hoc, weekly,

23   monthly, and quarterly basis, which were, among other things, extremely comprehensive in terms

24   of setting out portfolio performance and delinquency or default data and included details such as

25   loan delinquencies by geography, product type or FICO score.  The reports were typically in the

26   form of spreadsheets, which often consisted of some 50 pages or more for each lender.  The reports

27   were submitted via e-mail and sometimes in hard copy format and provided the hard data about the

28   performance of the portfolio which was used in order to publicly report on the results of operations.

1   In fact, CW1 stated that by spring 2007, there was an increasing sense of urgency about the data

2   and s/he was asked to prepare more reports on an ad hoc basis.  According to CW1, even as the

3   reports showed that beginning in at least spring 2007, the portfolios of Countrywide, WAMU, and

4   IndyMac were not performing according to PMI's risk metrics, PMI continued to keep insuring the

5   loans originated by these clients despite the fact that they did not meet PMI's risk standards.

6        72.    Further, according to CW1, PMI often knew about delinquent loans before the

7   lenders.  As CW1 explained, PMI had more stringent requirements for identifying and tracking

8   delinquencies on loans than the lenders did because of PMI's statutory reporting requirements as an

9   insurance company.  For example, CW1 explained that the lenders considered and reported

10  delinquencies on mortgages they originated after the payment on the loan had not been received for

11  a period of at least 30 days and, in some cases, for as long as 90 days.  In the interim between when

12  the payment was due and the 30-to 90-day period when the lender recorded the loan as being

13  delinquent (and ultimately reported it to PMI as a default), the servicer of the loan had personnel

14  trying to reach the borrower through phone calls and even visiting the residence of the borrower to

15  determine if the borrower intended to make a payment on his or her loan.  If these efforts by the

16  servicer personnel failed and the borrower did not make a payment for as long as 90 days, the

17  lenders then considered the loan to be delinquent and/or in default.  However, because PMI is an

18  insurance provider, it is governed by statutory requirements that demand PMI identify

19  delinquencies on loans on "day one" that the loan becomes delinquent – or the first day after the

20  missed payment.  PMI was then required to adjust its reserves based on the number of loans that are

21  delinquent during the statutory reporting period.

22        73.    According to CW1, as PMI began writing policies on no-doc loans, there were few

23  means that PMI could use to avoid paying fraudulently obtained policies.  In fact, according to

24  CW1, the quality control processes at PMI (and at the government-sponsored entities ("GSEs")

25  were developed prior to wide-spread origination of no-doc loans so that it was difficult to identify

26  and control fraud associated with such loans and/or hold these loans to particular quality control

27  standards.  In the case of no-doc loans, about the only thing PMI had to "hang its hat on" was some

28  type of misrepresentation in the appraisal, which was often hard to prove.

74.     CW1's account is further corroborated by a 2008 report entitled, "IndyMac: What Went Wrong?; How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending" by Mike Hudson, dated June 30, 2008.  "Some insiders [at IndyMac] paint a different picture.  They describe IndyMac as less a victim than a facilitator of bad practices.  The former vice president quoted in California court documents claims [Mike] Perry and other top executives [at IndyMac] were aware that fraud and lying were rampant in the company's loan-approval process.  Another ex-employee – the former fraud investigator – claims that the vice president in charge of the company's fraud investigation department was pressured by upper management not to report fraud, and in one case was pressured to 'sanitize' a report on the company's loan pipeline."

75.     CW2, a former contract underwriter assigned to underwrite mortgage loans at ABN AMRO in Ann Arbor, Michigan, was responsible for underwriting Alt-A loans which were sometimes wrapped with PMI mortgage insurance depending on the loan's LTV ratio and other factors.  There were approximately 12 PMI contract underwriters assigned to ABN AMRO when CW2 was assigned to the facility in August 2007.  The underwriters were assigned to groups, including a full documentation group, a stated income – stated asset group, a verified income – stated asset group, a jumbo loan group, and an Alt-A loan group (to which CW2 was assigned).  When CW2 joined PMI in August 2007, s/he was expected to underwrite three to four loans per day.  By November 2007, when Citigroup had acquired ABN AMRO, CW2 was "lucky" to underwrite one loan per day.  The senior underwriters at Citigroup encouraged the underwriters to approve two loans per day, but CW2 said that because of the new systems that were implemented and the decline in mortgage originations beginning in at least November 2007, it was becoming increasingly difficult to do any more than one loan per day.  In early 2008, CW2 said that the contract underwriters were "assigned" loans because the inventory was so low.  By contrast, when CW2 joined PMI in August 2007, once a loan was approved, one could simply pull another loan from the system.  By May 2008, CW2 and the other contract underwriters were laid off.

76.     CW3 was hired in 2006 as a Corporate Risk Manager for FGIC and was tasked with designing a new risk model for the purpose of estimating potential losses and setting reserves at the direction of his manager, FGIC Senior Managing Director and Chief Credit Officer Sandy

D'Imperio.  CW3 reported that during the Class Period, FGIC continued to employ a risk model which had been in place since 2000, as the new model was still being tested.  According to CW3, during the Class Period the losses on mortgage instruments, including CDOs and CDSs, were exceeding the loss projections derived by using the existing risk model in place at FGIC.  In 2007, CW3 noted that, particularly with the 2006 vintage, potential losses on the underlying collateral were an estimated 12%, which equated to approximately $100 million.  The 12% loss estimate was between three to four times FGIC's historical range.  In November 2007, CW3 made a presentation to the FGIC Board of Directors, which included three of the Individual Defendants, as well as representatives from PMI.  The purpose of the presentation was to explain how CW3 derived the 12% estimated potential losses using the model in place.    He explained that one of the factors included in the model was "home price appreciation," which the model used as one of the inputs for determining the likely estimated potential cumulative losses on the mortgages that represented the underlying collateral in particular SIVs, credit default swaps, and other similar types of products.  According to CW3, by 2H07 and continuing through early 2008, "delinquencies" on the underlying collateral started to "pile up."  As such, the losses were constantly adjusted upwards.  This was significant because, as the witness explained, even at 12% estimated potential losses, the delinquencies on underlying collateral impacted lower rated CDOs tranches where FGIC did not have exposure.  However, in the 14%-15% estimated potential losses on underlying collateral range, losses on tranches where FGIC did have exposure were inevitable.  Beyond the 14%-15% estimated potential losses on underlying collateral range, CW3 noted that there were "quantum leaps in losses" for FGIC.  As 2007 progressed, CW3 reported that the estimated potential losses on underlying collateral increased from 12% to the 14-15% range where FGIC faced substantial exposure.  By the end of 2007 and into early 2008, it was widely recognized throughout FGIC that the Company faced significant exposure particularly on its asset-backed securities.   CW3 understood that beginning in October/November 2007, PMI representatives began requesting more information regarding FGIC's potential losses.

77.    CW4, a former GSE deal manager, acted as a liaison between the PMI Credit and Pricing divisions and the GSEs to facilitate bulk deals.  According to CW4, in or around June or

July 2007, PMI's business with the GSEs, including Fannie Mae and Freddie Mac, was "going downhill." For example, CW4 reported, there was a notification circulated by VP of Bulk Transactions Laura Hollabaugh in or around September 2007, informing Deal Managers that PMI would no longer insure any bulk transactions in which the loans had been underwritten by delegated underwriters Countrywide or IndyMac because the Credit department had determined that losses on these loans had exceeded PMI's loss estimates and/or expectations. CW4 explained that where PMI could not prove fraud (which was difficult on no-doc loans), it "could not do anything" about the losses on previous deals involving loans underwritten by Countrywide and IndyMac. CW4 indicated that Katkov was aware of these various issues and the decision to no longer insure bulk deals in which the loans had been underwritten by Countrywide or IndyMac because the decision had "come down" from Katkov.

78. According to CW4, in or around June or July 2007, an individual from PMI's Credit department began conducting "interviews" at the lending institutions to determine whether the underwriters had followed their documented underwriting guidelines. CW4 explained, if an underwriter purported to have underwriting guidelines in place that called for employment and income verifications, the individual from the PMI Credit department sampled loans underwritten to determine whether these guidelines had been adhered to in the underwriting process. The results of this testing, which were communicated to CW4 prior to or during October 2007, showed that Lehman Brothers and Chase failed to follow documented underwriting guidelines and as a result PMI would no longer insure mortgages underwritten by these lenders. The witness understood through discussions with Hollabaugh that Katkov knew of this issue.

79. By approximately October 2007, CW4 reported, the Credit department instituted a "carving strategy" – which essentially meant that the Deal Managers were required to exclude various loans from the bulk deal bid requests received from the GSEs. These "carve-outs" were

based on various criteria, including calculation of LTV in a particular manner or zip code. According to CW4, when the "carving strategy" was implemented, PMI would no longer insure loans on homes in California. The "carving strategy" had the impact of making PMI uncompetitive in bids on the bulk transaction GSE deals as the GSEs were more inclined to accept the bids from PMI's competitors who did not have carve-outs. CW4 stated that based on this approach, the bulk channel went from representing approximately 40% of PMI's overall mortgage insurance business, to a state in which there were "no bulk transactions at all." According to CW4 by the time that s/he departed from PMI, there was essentially "no work."

80. CW5, a former Deal Manager in the Structured Finance Group for PMI, was responsible for bulk transactions, which were mostly RMBS, insured by PMI. CW5 worked directly with various entities, including lenders, banks, and GSEs issuing these securities. Specifically, CW5 was assigned Fannie Mae, Freddie Mac, Wells Fargo, Bear Stearns, and half of Bank of America. CW5 explained that "higher ups" in the Credit Committee had to approve each deal for which PMI issued insurance and that furthermore, Smith and Katkov had to approve "large deals."

81. CW5 indicated that the bulk transactions group represented 50% of the entire Company's revenues in 2006, but that in 2007 the quality of the RMBS was so poor revenue for the group decreased by 75%. According to CW5, Senior Vice President Jan Walker met with Smith (and sometimes Katkov) throughout 2007 to discuss the declining revenues in structured finance due to the low quality RMBS being offered by banks and other entities. As result of declining revenues, the group was eventually dissolved. CW5 reported that s/he was the last person to leave the bulk transactions group. When s/he was transferred to PMI Capital in January 2008, everyone else had already been transferred or laid off.

82. CW6, a former Pricing Analyst, was responsible for modeling risk and determining pricing on lender-paid mortgage insurance from approximately mid-2006 until mid-2007. S/he

reported that members of the Risk Committee made decisions about the deals for which PMI would issue insurance. S/he stated that Smith and Katkov both had access to Deal Manager, the database that contained the details and models used for each deal including the lender, types of underlying loans, the overall value, the amount of insurance, the premium and the model used to determine the premium. CW6 reported that Smith and Katkov were hands on and involved executives that understood the pricing models and pricing sheets at PMI.

**Throughout the Class Period, PMI's Delegated Underwriting Program Resulted in Thousands of Improper Loans Which Increased PMI's Credit Risk and Resulted in Defendants Filing Lawsuits Against NovaStar, WMC Mortgage Corp. and IndyMac – Two of Which Were Among PMI's Top Ten Lenders**

83.     Defendants were involved in multiple lawsuits prior to and during the Class Period which relate to their delegated underwriting program. These lawsuits demonstrate that PMI was unable to effectively monitor its delegated underwriters and thus was insuring loans which did not meet its established underwriting guidelines - thereby dramatically increasing the amount of risk in its portfolio. As a result, defendants knew, or were deliberately reckless in not knowing, that their statements to the market that PMI was carefully monitoring risk and and insuring loans consistent with its historic practices were false and misleading.

84.     As early as 2003, NovaStar, one of the country's largest subprime and Alt-A lenders, sued PMI for payment under a master policy of insurance it had by supplying information about NovaStar Stated Income loans. During the course of the litigation, PMI discovered that NovaStar had misrepresented its underwriting guidelines, defrauding PMI into writing mortgage insurance policies that it would otherwise have written or would have written on terms which more accurately reflected the insured risk. As PMI stated in a court filing, "NovaStar's representations in its Underwriting Guidelines and Underwriting Matrices regarding its use of a borrower's stated income were false. NovaStar did not use or rely on (and never has used or relied on) the borrower's income in deciding whether to underwrite a Stated Income loan. NovaStar did not consider a borrower's debt-to-income ratio in qualifying the borrower for a Stated Income loan." Thus, PMI sought to rescind insurance coverage for 6,300 stated income loans it had insured from 2000-2002. PMI had routinely reassured investors that it thoroughly audited lenders with delegated

1    authority and only had relationships with the best of the lenders.  However, the fact that 6,300 loans

2    were rejected by PMI indicates that from a statistical perspective, PMI's due diligence process was

3    not working.

4              85.    In 2007, PMI brought a suit against WMC Mortgage Corp. ("WMC") related to a

5    MASTR securitization whereby WMC sold mortgages to UBS and UBS formed a securitization

6    transaction to purchase the mortgage loans.  PMI failed to complete upfront due diligence and

7    agreed to provide mortgage insurance to the securitization trust.  PMI stated that WMC's actual

8    practices deviate significantly from its representations for at least 120 loans sold to the

9    securitization trust.  Such a deviation on a statistical basis would indicate that this was not an

10   anomaly.  As early as March 6, 2007, Clayton, an entity engaged to act as the Credit Risk Manager

11   for the securitization, began notifying the trustee through a series of letters that its initial

12   investigation into a sample of the mortgage loans had uncovered breaches of WMC's

13   representations and/or warranties underlying many of the mortgage loans.  As of October 2007, at

14   least 30% of the entire pool of mortgage loans sold into the securitization trust were delinquent, a

15   delinquency rate unheard of until those loans originated during and after 2006.  To quote PMI's

16   complaint: "Instead, the massive underperformance of such Loans demonstrates that WMC in

17   reality followed few, if any, objective standards or criteria in underwriting the Mortgage Loans and

18   showed little concern, if any, for any borrower's ability to repay [the loans]."  PMI's failure to

19   properly audit loans upfront before such loans were sold by WMC represents a complete

20   breakdown in the Company's due diligence processes.

21             86.    In 2008, IndyMac filed suit against PMI for, among other causes of action, breach of

22   contract and injunctive relief, after PMI rescinded coverage on 5,565 loans underwritten by

23   IndyMac almost entirely between May and August 2007.  CW1 reported that Katkov "definitely"

24   knew of the issues with IndyMac.  According to IndyMac's lawsuit and PMI's counter-claim, in

25   December 1995, Katkov, on behalf of PMI, signed a master policy agreement with IndyMac

26   to provide borrower-paid mortgage insurance.  This agreement was amended by the Partner

27   Delivered Quality ("PDQ") Endorsement – which provides that the lender will abide by the

28   appropriate underwriter guidelines and that PMI is relying on the underwriter's adherence to these

1   guidelines.   On February 8, 2006, the agreement was amended to allow IndyMac to purchase

2   lender paid mortgage insurance ("LPMI") wherein IndyMac paid the premiums and received

3   coverage in the event of borrower default.   Again, Katkov signed the agreement on behalf of

4   PMI.   In or about April to May 2007, IndyMac delivered 550 loans to PMI.   On May 4, 2007, PMI

5   advised IndyMac that the February 2006 agreement would not be renewed at the end of its 6 month

6   period on August 7, 2007.   It provided that any new agreement between PMI and IndyMac must

7   include stringent new underwriting standards.   Specifically, for loans with LTV greater than 95%,

8   PMI would require: (i) full documentation; (ii) minimum FICO score of 680; and (iii) must be own

9   occupied.   In addition, any interest-only loan could not exceed 95% LTV.   Between May 4 and

10  August 7, 2007, IndyMac underwrote 6,242 loans with PMI mortgage insurance with a total

11  aggregate risk in force of over $500 million.   According to PMI's counter claim, after auditing the

12  loans delivered by IndyMac, PMI concluded that IndyMac failed "miserably," and the "nature of

13  the findings was egregious."   PMI described these loans as "so woefully deficient that IndyMac

14  could not have complied with its contractual obligation to perform reasonably and in good faith by

15  adhering to its own underwriting guidelines and to follow reasonable and prudent quality assurance,

16  quality control, and underwriting practices."   PMI stated that 80% of the loans reviewed contained

17  material underwriting discrepancies.   Realizing the increased risk of these poor quality loans and

18  the deteriorating market conditions, PMI canceled their renewed LPMI agreement with IndyMac on

19  December 4, 2007.   Based on its findings, PMI then requested the loan files for more than 5,000

20  mortgages.   When IndyMac failed to deliver these files within 30 days, the time established in the

21  PDQ Endorsement, PMI sought to rescind coverage on 5,565 loans.

22         87.     The claims and counterclaims between PMI and IndyMac further corroborate the

23  statements of the CWs and the fact that defendants knowingly made false and misleading

24  statements concerning PMI's "understanding and monitoring risk" or were deliberately reckless in

25  doing so.   The allegations in the lawsuits demonstrate that PMI was unable to properly monitor its

26  delegated underwriters during the Class Period.   PMI insured more than $500 million of mortgages

27  from IndyMac between May and August 2007 the vast majority of which did not meet its

28  underwriting guidelines.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

88.     The facts known to defendants regarding NovaStar, Countrywide, WMC, IndyMac, WAMU, Chase and Lehman Brothers provide strong evidence that PMI could not properly control the quality of the loans being insured by these top lenders as measured by volume.  The NovaStar and Countrywide examples provide proof that fraud and low doc/no doc loans had severe problems prior to the 3Q06.  The WMC example provides evidence that PMI was providing insurance for structured finance transactions with no upfront due diligence and relying on discovering problems after an entity like WMC had sold the mortgage loans to the securitization trust.  The IndyMac example provides evidence that high risk loans were not limited to the subprime segment of the mortgage industry but to the Alt-A segment also, where low doc/no doc loans with high LTV were the norm.  Finally, the WAMU example provides evidence that there was a systematic effort by a top lender in the United States to manipulate appraisals, thus dramatically increasing the severity of losses that PMI would incur.

**Defendants Fail to Control for Risk Layering**

89.     Despite repeated claims to the contrary, when PMI filed its 2007 Form 10-K with the SEC in March 2008, it revealed to the public for the first time the risk layering present in its portfolio.  Contrary to their public statements, PMI was adding significant layered risk to its portfolio.

- Layered Risk.  PMI insures loans that may possess one or more of the above characteristics.  For example:

  - Approximately 2.9% of PMI's primary risk in force consists of Above-97s with FICO scores below 620;

  - Approximately 0.3% of PMI's primary risk in force consists of 2/28 Hybrid ARMs that are also Above-97s;

  - Approximately 0.5% of PMI's primary risk in force consists of 2/28 Hybrid ARMs with FICO scores below 620;

  - Approximately 4.0% of PMI's primary risk in force consists of Alt-A loans that are also Above-97s;

  - Approximately 4.5% of PMI's primary risk in force consists of interest only loans that are also Above-97s; and

  - Approximately 0.2% of PMI's primary risk in force consists of interest only loans with FICO scores below 620.

1  Accompanying this data was the statement: "This 'layering' of risk has, in recent experience, further

2  increased the risk of borrower default."

3  **Defendants' Scienter Regarding FGIC Loan Loss Reserves**

4         90.     Smith, Shuster, and Lofe were each directors of FGIC during the Class Period.  In

5  addition, Shuster was a member of the FGIC Audit Committee and Lofe was the Chairman of the

6  Audit Committee.  As described herein, by virtue of their roles in FGIC's financial reporting

7  process and the financial information necessary to fulfill those duties, Lofe, Shuster and Smith

8  knew or were deliberately reckless in ignoring the ever increasing losses at FGIC.  Defendant

9  Smith also served on PMI's Financial Guaranty Oversight Committee, which was responsible for

10  the oversight of PMI's investment in FGIC.

11        91.     The FGIC Audit Committee charter states:

12         The Audit Committee (the "Committee") shall be appointed by the Board of
           Directors (the "Board") of FGIC Corporation (the "Company") to assist the Board in
13         fulfilling its oversight responsibility relating to (A) ***the preparation and integrity of
           the Company's financial statements***; (B) the qualifications, independence,
14         engagement and performance of the Company's independent auditor; (C) the
           independent auditor's annual audit of the company's financial statements; (D) the
15         resources, performance and scope of work of the Company's internal audit function;
           and (E) the Company's compliance with legal and regulatory requirements and its
16         compliance policies.

17  The FGIC Audit Committee provided that:

18         The Committee ***shall meet at least quarterly*** and as frequently as it determines, and
           it shall have regular meetings ***(to be scheduled by the Chair of the Committee)***
19         preceding each regular quarterly meeting of the Board . . . .

20         ***The Chair shall preside at all Committee meetings*** at which he or she is present and,
           with input from the directors, shall set the agendas for Committee meetings.

21
22        92.     As detailed in the charter, the Audit Committee took several steps to ensure it met its

23  obligation of overseeing "the preparation and integrity of the Company's financial statements,"

24  including the following actions:

25         The Committee shall meet periodically in separate ***private sessions with
           management, the internal auditor, the independent auditor and the Company's
           General Counsel***, and in "executive" sessions without Company employees present .
26         . . .  The Committee shall have ***full, free and unrestricted access to the Company's
           senior management and employees***, and to the Company's internal and independent
27         auditors.

28

93.     As stated in the charter, the Committee's  functions and duties included the following:

A.     Financial Statements and Disclosure Matters

1.     The Committee shall review and discuss with management, internal audit and the independent auditor the Company's annual audited and quarterly financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations prior to their release to the public.

*          *          *

2.     The Committee shall review and discuss the annual and quarterly reports from the independent auditor on:

(a)     All critical accounting policies and practices used by the Company.

(b)     All material alternative treatments of financial information within generally accepted accounting principles (or statutory accounting practices) that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

*          *          *

3.     The Committee shall review and discuss with management, internal audit and the independent auditor any asset impairment or other significant investment accounting issues.

94.     Thus, Lofe, Smith and Shuster received FGIC's financial information.  Among the adverse information known to FGIC's directors was that FGIC faced mounting losses due to the low quality of loans backing the RMBS and CDO's that FGIC insured.  Information surrounding the quality of the loans that FGIC was indirectly guaranteeing was available to defendants  prior to December 31, 2007 when FGIC was forced to increase its reserves by more than $1.2 billion- a 4300% increase from the reserves at December 31, 2006.  The 4300% increase occurred over the Class Period.  Indeed, while FGIC attributed many of its problems during the class period, including the losses it sustained on its CDS portfolio, on "mark-to-market" accounting rules, the true cause of FGIC's loss exposure on its RMBS and CDO  financial guaranty obligations was revealed in January 2008 when FGIC admitted  that the over 4300% increase in its reserves was the result of "the establishment of loss reserves for financial guaranty obligations impacted by the deterioration in mortgage underwriting quality in the U.S. mortgage market *during 2007 and*

1  **2006.**" Underwriting quality was known to FGIC and its directors in 2006 and 2007 and was not

2  the result of new accounting rules, the collapse in the housing market, or any other external events.

3  However, FGIC and its directors knowingly failed to record adequate loss reserves earlier in 2007

4  as to avoid breaching statutory capital requirements.

5       95.    According to CW3, s/he made presentations to the FGIC's board of directors

6  regarding the "quantum leaps in losses" which FGIC faced were the value of underlying collateral

7  to fall around 14-15% in value – a scenario which FGIC's model predicted.  The defendants, as

8  members of FGIC's board of directors, as well as Lofe and Shuster being members of the Audit

9  Committee, therefore knew this information or were deliberately reckless in not knowing it.

10       96.    As alleged herein, class members who purchased PMI's publicly traded securities

11  did so in reliance upon the accuracy of the publicly available information about the Company,

12  including its financial statements and business prospects.  In particular, investors were attracted to

13  PMI because of its purported ability to properly value its portfolio and its employment of

14  conservative underwriting standards, and its ability to manage risk.  As defendant Katkov stated

15  during the November 2, 2006 conference call in response to a question about why PMI's reserves

16  practices and loss experience were better than other insurers: "we've made very conscious choices

17  about the types of risk that we are taking in the market . . . .  I think it's very consistent with the

18  way we've run the company for years."  In fact, this was simply false.  PMI's business had been

19  predicated on its evaluation of its borrowers in light of PMI's underwriting guidelines that were

20  able to take in account documented facts concerning the insured risk.  The increase in high LTV,

21  Alt-A,  and ARMs insured from 2003 throughout 2007 were unable to be properly valued since

22  PMI did not have sufficient documentation and, as defendants knew, or were deliberately reckless

23  in ignoring, the Company's lenders and borrowers could not be depended on to provide accurate

24  information for a proper underwriting decision.  Unable to legitimately inform the market that its

25  underwriting and accounting were proper, defendants engaged in a fraudulent scheme to  perpetuate

26  the illusion that PMI could still accurately assess its risk and value its portfolio, and to mislead

27  investors about PMI's true financial condition and prospects for continued success.  These

28  fraudulent artifices and devices, as particularized elsewhere herein, included:

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1          (a)     The Company failed to engage in proper underwriting practices for its book of

2   business related to insurance written throughout the Class Period;

3          (b)     The Company failed to successfully audit and manage its exposure to its

4   largest customers that were given delegated authority to commit PMI to insure mortgages;

5          (c)     The Company was not adequately accounting for its loss reserves in violation

6   of Generally Accepted Accounting Principles ("GAAP"), causing its financial results to be

7   materially misstated;

8          (d)     The Company had far greater exposure to anticipated losses and defaults

9   related to its book of business related to insurance written in 2005 through most of 2007 than it had

10   previously disclosed;

11          (e)     Given the deterioration and the increased volatility in the housing market and

12   defendants' knowledge of it, defendants completely misled the market about the status of its business

13   throughout the Class Period;

14          (f)     Given the increased volatility in the housing market, the Company had no

15   reasonable basis to make projections about its incurred losses or about its new insurance written.  As

16   a result, the Company's projections issued during the Class Period about its earnings for 2007 and

17   2008 were knowingly false;

18          (g)     The Company reported its highest risk exposure in a table found in "Portfolio

19   Characteristics as of December 31, 2006" presented on March 15, 2007, which failed to focus on the

20   high percentage of insurance provided to borrowers with FICO scores of 620 to 679 and how such

21   borrowers were considered "A" by the Company and included with the traditional prime borrowers.

22   Subsequently, PMI's other mortgage insurers, Fannie Mae and Freddie Mac declared that borrowers

23   with such FICO scores were not "A" or prime, but that prime borrowers had FICO scores of 680 or

24   higher.  Bank regulators prior to 2004 had set the dividing line between subprime and prime at the

25   FICO score of 660.  During 2008, Fannie Mae and Freddie Mac changed guidelines to charge more

26   and restrict lending to borrowers with FICO scores from 621 to 679.  In addition, defendants could

27   not make accurate statements regarding owner occupancy given the incidence of fraudulent

28   representations by borrowers;

(h)     The Company's investment in FGIC was materially impaired as FGIC's bond insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to the plunge in value of mortgage debt;

(i)     The Company supported FGIC's business with respect to FGIC providing financial guaranties for RMBS, CDOs, and SIVs backed by either subprime mortgage loans or second lien mortgage loans when Smith had previously stated that PMI would not insure second lien mortgage loans and that PMI had minimized its exposure to subprime mortgage loans;

(j)     The Company failed to acknowledge that FGIC entering the new segment of financial guaranty business as outlined in "i" above would jeopardize FGIC's "AAA" rating and without an "AAA" rating FGIC had little or no value; and

(k)     The Company was materially overstating its financial results by failing to properly value its investment in FGIC and by failing to write down that investment in a timely fashion in violation of GAAP.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**Defendants' Statements Regarding 3Q06 Performance**

97.     On November 2, 2006, the Company announced its 3Q06 net income of $104.2 million, or $1.16 per diluted share.  The same day, defendants, including Katkov, Lofe, Shuster, and Smith,[12] held an earnings conference call with analysts and investors.  On the call, defendants stressed the Company's ability to find opportunities for high-quality growth and continued strong credit quality:

> **Smith:** . . . Starting with a look at our U.S. Mortgage Insurance Operations and as reviewed at our recent investor conference, *we are seeing continued improvement in the operating environment* for our domestic mortgage insurance business.  Increased penetration rates, improving persistency, and higher premium yield resulted in net income for our U.S. Mortgage Insurance Operations of $70.8 million, up from $69.5 million in the third quarter of 2005.  *In the third quarter, we continued to focus on prudent growth while maintaining our high credit quality.*  This was evident in our sequential increase in our flow and structured new insurance written.  *Credit quality remained strong* as 93.5% of our risk in force in the flow channel is prime credit.  In

---

[12]     All defendants participated in every earnings conference call except the 4Q07 call.

our structured channel, approximately 83% of our risk in force is prime, up from 74% one year ago.  **Importantly, we are finding opportunities for high-quality growth.**

*       *       *

**Q – Andrew Brill:**  . . . [D]o you have a sense of what may be so different about your book of insured loans or about your reserving practices versus the other major mortgage insurance companies that your loss experience was so much more stable this quarter than theirs?

**A – Katkov:** All right.  Hi, this is David Katkov.  Let me just refer you to the conversation we had in early October at the Investor Conference.  **I think we tried to show you in a lot of detail that we've made very conscious choices about the types of risk that we are taking in the market, both in our flow and in our structure transaction.  I think it's very consistent with the way we've run the company for years and I expect that the result of that are the reserve positions that you've seen in the third quarter results today.**

*       *       *

**Q – Geoffrey Dunn:** . . . Could you address the big sequential jump in your flow claims domestically? It looked like severity was up a little bit but can you just walk through some more color on what changed from last quarter?

**A – Katkov:** Well, Geoff, I think we've talked about this quite a bit.  **We do have the normal seasoning of our books of business, and there is also, as you know, a seasonal effect in the latter part of the calendar year, so I really don't think it's any more than that.**  As we described at the Investor Conference, we definitely are seeing some pressure because of the larger claim size, and that's simply as much as anything a factor of rapid home price depreciation over the last couple of years.  **But beyond that I don't see any anomalies in the development of the book.**

*       *       *

**Q – Paul Miller:** . . . [C]an you address the insurance in force growth? I mean – and I know a lot of the people in the industry has been saying that you're starting to get better pricing power, you get to look at more books and what not.  When do you think we start to see that insurance in force grow on your books?

**A – Katkov:**  Hi, this is David Katkov.  A couple different things.  **We had a question earlier about what's differentiating our book relative to some of our competitors, and I think a lot of that is very careful risk selection.**  So you're right, the primary insurance in force has remained relatively constant quarter to quarter. That was really by choice, and so **we're being very careful in ensuring that whatever we put on the book, we're happy to put on the book.**

I'd also direct your attention to our modified pool business.  We've talked about this quite consistently the last couple of quarters, as well as in the investor call. You should notice that that business has grown, and the risk in force there is something that we are very attracted by because of the deductible structure that we've described previously.  So I don't want to leave you with the impression that the book is not growing in the U.S. MI.  I don't think that's the case.  What we've been, I think, smart about is what risks are we putting in the portfolio on the primary side where we are in a first loss position and **we've been very cautious there**.  And

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    then, with the risk sharing characteristics of modified pool, we've found that we can
2    grow there a bit more.

**Reasons Why Defendants' Statements On November 2, 2006 Were False and Misleading**

98.     The statements made at the November 2, 2006 conference call, ¶97 above,
concerning PMI's underwriting standards, business outlook, operating environment and credit
quality were false and misleading because, as defendants knew or recklessly disregarded: (a) the
models, analyses, standards and procedures which defendants had developed that enabled them to
properly evaluate PMI's risk while underwriting full documentation loans were not designed, or
able to allow the proper evaluation of credit risk posed by the new alternative loan products in the
market, many of which had reduced documentation and layered risk factors; (b) PMI did not
adequately account for the significant changes in the business mix of its portfolio in 2006, when it
added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI
could not accurately evaluate the risk of its reduced documentation loan portfolio because
borrowers did not provide adequate, verified personal financial information; (d) the housing market
and the mortgage market were in substantial decline, default rates were on the rise, the 2006
vintage loans were underperforming and the incidence of fraud had been increasing even as PMI
had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants'
delegated underwriting practices did not afford it adequate control over their lender, who, PMI's
internal reporting had revealed, had consistently written policies that did not comply with PMI's
underwriting standards; (f) defendants were not employing adequately strict underwriting
guidelines but were willing to insure whatever loans existed in the market; (g) FGIC's substantial
investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the
subprime market that made the Company's statements regarding its extensive 'caution' and risk
management misleading; (h) the absence of meaningful borrower information in the no doc and low
doc loans insured by PMI did not give it a basis to claim that its credit risk profile was superior to
its competitors.

**Defendants' Statements Regarding 4Q06 Earnings Performance**

99.     On February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Record 2006 Net Income of $419.7 Million, or $4.57 Per Diluted Share; Fourth Quarter 2006 Net Income of $100.5 Million, or $1.19 Per Diluted Share."  The release stated in part:

> ***Consolidated losses and loss adjustment expenses*** for the fourth quarter and full year were $90.5 million and $302.9 million, respectively, compared to $64.8 million and $257.8 million in the same periods last year.  The increases in 2006 were primarily a result of loss reserve additions in U.S. Mortgage Insurance Operations and an increase in total incurred losses in PMI Australia.  The incurred losses increase for PMI Australia was driven principally by increases in claim rates and severity.

*        *        *

> ***Consolidated reserve for losses and loss adjustment expenses*** totaled $414.7 million as of December 31, 2006 compared to $394.2 million as of September 30, 2006 and $368.8 million as of December 31, 2005.  Loss reserves in U.S. Mortgage Insurance Operations increased $7.4 million in the fourth quarter of 2006 primarily due to higher expected claim rates and claim sizes.  PMI Australia's reserve for losses and LAE increased $12.4 million in the fourth quarter primarily due to higher expected claim rates and severity and, to a lesser extent, an increase in the number of delinquent loans.

100.     Also on February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Issues 2007 Financial Guidance," which stated in part:

> The PMI Group, Inc. (the "Company") today issued the following financial guidance for 2007:

> • Total incurred losses for its U.S. Mortgage Insurance Operations to be between $280 million to $305 million.

101.     On the same day, defendants held a conference call with analysts and investors on which they made the following statements:

> Smith:  . . . ***Our disciplined approach to credit risk management and pricing insured that our loss development in 2006 was consistent and predictable.  We expect similar development patterns in 2007.***  As previously disclosed, book years 2004 and earlier are past their peak losses.  When combined with the normal maturation of book years 2005 and 2006, we expect total incurred losses in 2007 in a range between $280 million to $305 million.

> Our new insurance written in 2006 was well-balanced between flow, structured, and pool as ***we focus on managing our new insurance written volume consistent with our risk tolerances.***

*        *        *

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

Q – Geoffrey Dunn: . . . Looking at the premium rate – You indicated it's jumped up to about 72 bps on average this quarter.  And seemed like you were implying the pool business drove that.  But when you look at the pool, you wrote $12 billion, but you only assumed about $450 million of risk.  Can you give me a little bit more color on why such a little amount of retained risk on that modified pool would drive a 5 basis point sequential increase in your premium rate?

A – Katkov:  Jeff, this is David Katkov, I'd actually disconnect the two.  As we've discussed throughout calendar 2006, we've seen a couple of changes in the mix of our book, which has driven up the average premium yield.  One, the good news is we really are making inroads into the piggyback execution.  So as you can see in the financial supplement, everyone can see we've seen an increase in the greater than 97 LTV.  I would attribute that to be the single largest driver to our premium yield.  As I said, I would disconnect the pool risk and I would really focus on the mix of LTVs.  *Other than that, there's no other significant trend that we haven't already previously disclosed to the marketplace.*  That answer your question?

*          *          *

Q – Rob Ryan: I was wondering if you're noticing anything in the bulk market yet in terms of a better environment, a wider spread, things that make you more optimistic in terms of the new insurance written for '07?

A – Katkov: Rob, this is David Katkov.  Yeah, I think there's little question that spreads have widened out in the domestic structured finance market.  I think that helped us in the fourth quarter – you can see the numbers that we did have a strong structured marketplace.  The caution I would add, though is – as we've discussed throughout '06, it is a challenging credit environment.  *So we will be very selective in 2007 in terms of our participation, whether it be on bulk primary or the modified pool business.  But having said that, I think we are fairly bullish about our opportunity to write business in that sector in 2007.*

*          *          *

Q – Andrew Brill:  I just wanted to go back to the higher premium yield in the U.S.  And you mentioned that the higher premium yield was the function of writing higher LTV business.  But shouldn't we be worried that the loss ratio rises over the next few years, that as this higher LTV business reaches [inaudible], and appreciably now that you're getting the benefit of the higher premiums, but as we move forward there's the risk that the loss ratio rises because of the higher risk?

A – Katkov: Andrew, this is David.  Let me answer the question by your last statement, which is – you're exactly right.  The expectation is that the premium we charge will be sufficient for the risk that we've assumed.  Obviously we don't give guidance for the loss ratio.  We did today give guidance for our total incurred in 2007.  So I know you'll work through that in your model.  *But I believe the management team over the last several years has been very reliable in terms of how we are forecasting our future loss environment, and as Steve said in his prepared remarks, I expect no change in that in 2007.*

*          *          *

Paul Miller:  Yeah, thank you very much.  I was wondering if you could talk a little bit about your flat credit losses that you really are expecting from '06 to '07, especially the Alt-A space.  We're starting to see some pressures in the Alt-A space

with credit loss, especially from the '06 vintage book.  You might not have put a lot of '06 on there.  But can you just talk about – is everything coming in within your models?  There's a lot of stuff out there that we're starting to worry about.

Don Lofe:  I guess I'll answer just to [capture again] a couple different things.  First of all, we did mention in Steve's prepared remarks that we feel very confident about the '04 and previous books.  *We see the normal maturation of the '05 and '06 book and that leads to the higher total incurred guidance that we provided today, 280 to 305.*  Obviously if the year transpires that will translate into a particular loss ratio.  *And that's what gives us confidence is that given the revenue expectations we have for '07 decked against those losses, we don't see a meaningful change.  Do we watch Alt-A? Absolutely.  We watch it like a hawk.*  Do we watch geographies? Yes we do.  Is it going to be a challenging market in '07? Yes, undeniably.  But I think the team has proven that we have a very good handle on loss development.  And I guess the last answer to the question is, we are not exclusively a model-driven company.  As you know, we look at the model.  They're very important to our developmental losses, but management judgment is a very important component and we take both.

**Reasons Why Defendants' Statements on February 5, 2007 Were False and Misleading**

102.    The statements on February 5, 2007, ¶¶99-101 above, concerning PMI's credit risk management, risk tolerance, underwriting standards, operating environment and loss reserves were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had  developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to allow the proper evaluation of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not afford it adequate control over their lenders, who, PMI's internal reporting had revealed, had consistently written policies that did not comply with PMI's underwriting standards; (f) defendants were not employing adequately strict underwriting

1   guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that

2   at least one of its delegated underwriters and top customers – IndyMac – was deviating

3   significantly from PMI's quality control standards; (h) FGIC's substantial investment in subprime

4   securitizations had resulted in PMI's exposure to extensive risk from the subprime market that

5   made the Company's statements regarding its extensive 'caution' and risk management misleading;

6   (i) contrary to a "disciplined approach," defendants were willing to insure the loans available in the

7   market; and (j) the Company's financial results were misrepresented as defendants improperly

8   failed to adjust its loan loss reserves to reflect the increase in delinquencies and higher claims and

9   greater claim rates as set forth in ¶¶205-230.

10   **Defendants' Statements at the Goldman Sachs Housing Conference on February 12, 2007**

11          103.     On February 12, 2007, Katkov spoke at the Goldman Sachs Housing Conference.

12   Katkov made false and misleading statements when he indicated that the Company closely

13   monitors the loans it insures – particularly high LTV loans – and additionally indicated that the

14   Company was seeing higher quality mortgage originations in the market:

15          Katkov:  This was touched on in the last panel, but I think it is a really important
           point.  If you are in a market that is seeing appreciation as much as 50 to 100%, you
16          can go down a long way before you personally feel any economic pain.  The only
           problem with that is if you have been what I would call a serial refi person, where
17          you're constantly pulling out all available cash.  Your dance just ended in a lot of
           markets.

18
                   ***So that is something that we watch in our particular sector which, again, is***
19          ***the very high LTV borrower sector, with low and moderate incomes.  They don't***
           ***have a lot of flexibility, so those are the folks that we watch real closely.  We will***
20          ***see how that plays out over 2007.***

21                                      *        *        *

22          Mike Marschoun – Goldman Sachs – Analyst: One thing we do is we have our credit
           scoring models, and we run the loans that are coming in through the models.  We
23          definitely see an improvement in the at-origination credit risk factors.  Now, they can
           – and based on the last time I have looked at originations that were a couple of
24          months old, I fully expect that given the current environment what is coming out now
           will be even better than what was before.

25
                   For instance in 2000, actually, the at-origination characteristics were probably
26          even worse than what we see now.  In 2000, stronger house prices bailed out
           markets, and losses were not that dramatic.

27
                   Now we have weaker house prices.  So this is my earlier statement that I
28          think ultimate losses will be higher than the 2000 vintage.  But on the other side,

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    credit quality definitely has started to improve.  They will continue to improve, and
2    we have not seen the end of that improvement, yet.

3                                    *          *          *

4    Katkov: . . .  So do I think new originations?  Yes, I would agree with Mike in that
     regard.  **New originations are definitely looking better.  But moderately seasoned**
5    **product is still pretty junky.**  We see that through our structured channel, and we just
     look at some pools and we walk away.  (inaudible)

6                                    *          *          *

7    Katkov: . . .  So when we think about that 575 to 620, we clearly think it is an A-
     loan; there is no doubt about that.  It is not subprime as you might see come off a
8    street shelf.  And it's certainly not an under 575.

9              So from our perspective, while you want to limit it in your portfolio, they are
     profitable loans if underwritten correctly.  They are particularly attractive if they
10   come through the GSE channel.  Because even though I put Dave on the spot earlier
     today, the truth of the matter is they are under a lot of pressure to originate A- loans;
11   they know it; and that sector has to grow for them.

12   **Reasons Why Defendants' Statements on February 12, 2007 Were False and Misleading**

13              104.    The statements on February 12, 2007, ¶103 above, concerning the attention that PMI

14   pays to high LTV loans and defendants' positive market outlook for 2007 were false and

15   misleading for the same reasons stated above, ¶102, with regard to defendants' statements on

16   February 5, 2007.   Additionally, defendants' February 12, 2007 statements were false and

17   misleading because defendants knew or should have known: (a) that PMI was increasing the

18   percentage of high LTV loans in their portfolio and not taking a cautious approach or "watch[ing]

19   real closely" this sector of loans, defendants were insuring increasing percentages of high LTV

20   loans because that was what was in the market.

21   **Defendants' Statements at the Merrill Lynch Insurance Investor Conference on February**
     **14, 2007**
22
              105.    On February 14, 2007, Smith spoke at the Merrill Lynch Insurance Investor
23
     Conference.   He repeatedly trumpeted PMI's risk management abilities and downplayed the
24
     significant risks in the Company's portfolio:
25
     Smith: . . .  **So now, let me get to the one that you're probably most interested in,**
26   **which is the overall credit outlook for PMI.  Number one, it's the core competency**
     **of our company.  We're professional risk managers.  It's what we do day in and**
27   **day out is the key point**.  The other point is that our business is really about core
     housing.  If you look at the fundamentals of our business, we don't have a large
28

nonconforming book of business.  If you look at average loan amounts, less than 3% of our book of business has loan amounts in excess of $500,000.

If you look at the quality, if you want to judge that by FICO scores, I think we have an appendix in your books.  I think it's page 27, 28, I think, that shows the distribution by FICO.  ***And you will find since 2003 we've taken a more conservative position in the overall credit profile of our book.  And we've actually improved the credit profile steadily and methodically as there have been layering of risk characteristics in the marketplace since 2003.***  What does that mean?  In 2003, we had about 11.9% of our business below 620 in FICOs, but above 575.  In 2006, only 8% of our risk in force was below 620 and above 575.  And 92% of our business was considered to be [inaudible] business.

\*          \*          \*

Last year, we had total incurred losses of 263 million.  At the beginning of the year, we said the losses would be in a tight band of between 250 and 270 million for the year.  And we came in around – approximately in the mid-point of that band at 263 million.  We've done that several years prior to that, and we've always given you good guidance in terms of expectations and using our modeling in terms of how we view the overall economy.

We've given you that number for 2007 and I would reinforce that guidance today.  Total incurred losses around $280 to $305 million for PMI in 2007.

**Reasons Why Defendants' Statements on February 14, 2007 Were False and Misleading**

106.    The statements on February 14, 2007, ¶105 above, concerning PMI's strong credit outlook and the Company's ability to properly evaluate its credit risk were false and misleading for the same reasons stated above, ¶102, with regard to defendants' statements on February 5, 2007.  Additionally, defendants' February 14, 2007 statements were false and misleading because defendants knew or should have known: (a) Defendants "core competency" was the risk evaluation of full documentation loans, which were its primary business prior to 2003, and this experience did not carry over to evaluating the new and innovative loan products on the market, which featured variable rates, high loan-to-value ratios and reduced documentation; (b) From 2003 to 2007, PMI took on more high LTV loans, more Alt-A, more adjustable rate mortgages and layered these credit risk factors together, which made defendants "overall credit profile" for aggressive, not more conservative;

**Defendants' Press Release on March 15, 2007**

107.    In an effort to shore up their falling stock price, on March 15, 2007, defendants issued a press release attempting to differentiate PMI from its competitors and welcoming the

increased information concerning risky mortgages into the market.  Defendants falsely stated that PMI's credit portfolio was of better quality than that of its competitors and that defendants employed a "prudent approach" to risk management:

> **PMI Provides Statement on Prime Focus of U.S. Mortgage Insurance Business; Presentation Highlights Portfolio Characteristics**
>
> \*        \*        \*
>
> "In the current market, we believe it's important to differentiate ourselves and clarify the prime focus of our business in the United States," said Steve Smith, CEO of The PMI Group, Inc. ***"Our principal focus is on sustainable homeownership for individuals and families purchasing homes with less than a 20 percent down payment who have 'A' or prime quality credit.  Ultimately we believe that the increased recognition of risk in the mortgage marketplace will be a positive for PMI and the market overall."***
>
> \*        \*        \*
>
> David Katkov, President of PMI Mortgage Insurance Co., PMI's U.S. subsidiary, explained, "Our mortgage insurance portfolio in the United States is focused in core housing, meaning loans of moderate size to first-time homebuyers purchasing a primary residence.  The majority of the loans we insure have fixed rates. ***We believe that we have taken a prudent approach, managing the dispersion of risk by credit score, loan and property type, geographic region, and other key characteristics."***

**Reasons Why Defendants' March 15, 2007 Press Release Was False and Misleading**

108.    The statements on March 15, 2007, ¶107 above, concerning the increased recognition of risk in the mortgage market and defendants' "prudent approach" to risk management were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had  developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to allow the proper evaluation of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans

1   were underperforming and the incidence of fraud had been increasing even as PMI had continued

2   to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated

3   underwriting practices did not afford them adequate control over their lenders, who, PMI's internal

4   reporting had revealed, had consistently written policies that did not comply with PMI's

5   underwriting standards; (f) defendants were not employing adequately strict underwriting

6   guidelines but were willing to insure whatever loans existed in the market; (g) PMI that at least one

7   of its delegated underwriters and top customers – IndyMac – was deviating significantly from

8   PMI's quality control standards; (h) FGIC's substantial investment in subprime securitizations had

9   resulted in PMI's exposure to extensive risk from the subprime market that made the Company's

10  statements regarding its credit quality, prudent approach and risk management misleading; and (i)

11  contrary to a "prudent approach," defendants were willing to insure the loans available in the

12  market.

13  **Defendants' Statements Regarding 1Q07**

14  109.    On April 30, 2007, the Company issued a press release entitled "The PMI Group,

15  Inc. Reports First Quarter 2007 Net Income of $102.0 Million, or $1.16 per Diluted Share; Record

16  Quarterly Revenues Driven by Growth in U.S. Mortgage Insurance Operations."  The release stated

17  in part:

18          ***Consolidated losses and loss adjustment expenses*** for the first quarter of
        2007 were $109.3 million compared to $60.9 million in the same period last year.
19      The increase in first quarter of 2007 was primarily a result of higher incurred losses
        in U.S. Mortgage Insurance Operations and PMI Australia.  The incurred losses
20      increase in U.S. Mortgage Insurance Operations was a result of an increase in claim
        size and claim rates while the increase in PMI Australia was due to higher claim
21      sizes and an increase in the number of delinquent loans.

22                              *       *       *

23          ***Consolidated reserve for losses and loss adjustment expenses*** totaled $443.0
        million as of March 31, 2007 compared to $414.7 million as of December 31, 2006
24      and $369.9 million as of March 31, 2006.  Loss reserves in U.S. Mortgage Insurance
        Operations increased $19.9 million in the first quarter of 2007 primarily due to lower
25      default cure rates and higher claim sizes.  PMI Australia's reserve for losses and
        LAE increased $7.8 million in the first quarter of 2007 primarily due to an increase
26      in the number of delinquent loans.

27  110.    Also on April 30, 2007, the Company issued a press release entitled "The PMI

28  Group, Inc. Updates 2007 Financial Guidance," which stated in part:

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

The PMI Group, Inc. (the "Company") today updated its financial guidance for 2007:

- Total incurred losses for its U.S. Mortgage Insurance Operations to be between $300 million to $360 million.

111.    On the same day, defendants held a conference call with analysts and investors on which they made the following statements:

**Smith:** . . .  As everyone is well aware, the first quarter of this year saw significant change in the U.S. mortgage markets.  The rapidly changing credit environment impacted certain segments of the U.S. mortgage market, and we were not immune from this effect on a portion of our portfolio. ***However, with this change we have seen very high demand for our insurance products in both our primary flow and primary structure channels.  This will provide significant opportunities for us to grow our domestic business.***

\*       \*       \*

***Now as we've always done, we're being mindful of risk in the marketplace,*** choosing opportunities to participate in business that offers attractive, risk adjusted returns. . . .

\*       \*       \*

Addition to the reserve for losses was primarily driven by an increase in loan sizes and resulting claim sizes, along with the aging of the loans in the delinquency inventory, principally from primary structure transactions. . . .  Consequently, these market conditions are producing some overall changes compared to our expectations coming into the year.  We now believe that our full-year incurred losses, and that includes paid claims, loss adjustment expenses and reserve for credit losses will be between $300 million to $360 million.

\*       \*       \*

**David Hochstim:** Okay.  And then I wonder if somebody could just expand a little on the reserve building this quarter and, kind of, the link between delinquencies and the increase in average claims.  And are you seeing some regional deterioration, like increasing delinquencies in California, that's pushing the expected average claim rate up a lot?  Or – sounds as though the balance of the year doesn't look that bad, but the first quarter, where you normally and did have a decline in delinquencies, still resulted in a pretty healthy increase in reserves.

**Katkov**:  David, this is David Katkov.  Let me try to take each of your questions.  First of all, what we saw in the first quarter, was – we tried to explain in the script in the release was, there is a category of loans, and as Steve described, where there clearly seems to be a tremendous amount of work on the part of servicers to try to modify particular notes, put loans into forbearance.  That activity was much higher than we anticipated in the first quarter, which is why, after a lot of consideration, we made the decision to widen out the range.  That's first of all.

***I want to reiterate that our flow portfolio is performing exactly as we anticipated.  Our modified pool portfolio is performing exactly as we anticipated.  It is really that structured primary portfolio, composed largely, as we described in the past, of non-prime, A minus type loans.***  And at the moment, and I think you've

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   gotten a sense from this from listening to both lenders and servicers as well as other
2   MI's, for the moment, it is not quite clear how those loan will be resolved, but we're
    optimistic there will be a positive resolution as the year progresses.  So that's number
    one.
3
4       Number two, we have not seen, at least at this juncture, a significant change
    in delinquencies in California.  Clearly they're starting to trend up.  You would
5   expect that.  And then I think lastly you asked about severity.  We actually had good
    performance in terms of severity for the first quarter, and we think, given the skills
6   we have in lost mitigation and working with our lenders, we should continue to see
    good opportunities for effective loss mitigation throughout the year.

7                           *       *       *

8   **Eric Wasserstrom**: Thanks.  If we could just circle back to the growing proportion
    of high LTV loans, to 97% LTV, which I think is growing as a proportion of the
9   NIW written, can you just talk a little bit about why that's appealing to you now and
    how you view the risk-reward dynamics of that on top of the very strong HPA that
10  we've seen over the past couple of years?

11  **Katkov:**  Sure.  This is David Katkov again.  A couple of different things.  As we
    shared over the last couple of years, one of the strongest competitive products that
12  we face was the piggyback execution, and what you saw particularly, I would say, in
    the last 12 to 18 months, is there was a tremendous growth in the 80/20 execution,
13  80% first, 20% second.  As you probably all know, that execution today is dead or
    nearly so, so it should not be a surprise that a lot of these loans have come back to the
14  mortgage insurance industry.  So the statistics we've shared today are really typical
    of the mortgage insurance industry generally.
15
16      One of the things that is gives us comfort about this business, notwithstanding
    your HPA comment, was that what we generally are seeing is that these loans are
17  going through GSE sponsored programs.  So programs, that you're probably familiar
    with, like My Community Mortgage at Fanny Mae or Home Possible at Freddie Mac
18  are not the typical kind of layered risk transactions that you often saw in the 80/20
    execution.

19  *So from our perspective, when we look at the risk of LTV we are obviously*
    *very mindful of that.  We get paid for that.  But what we don't want to see, and*
20  *we're not seeing, is multiple other risks being introduced into that loan instrument*
    *So when we wrap it all up, if we look at the risk and the reward we think it is*
21  *attractive.*  Obviously, we're very conscious and are in regular dialog with both
    GSEs to be sure that we don't take risks that are inappropriate for these typical
22  borrower types.

23  Smith:  And just *to add to what David said, as you would expect, we constantly*
    *review all of our program types, product types and loan-to-value types to say*
24  *ensure the proper risk adjusted returns.  So, we're comfortable, as David indicated.*

25                          *       *       *

26  **Andrew Brill**:  The reason I ask is that I can look to see some of the other mortgage
    insurance companies reports so far and the MICA data came out today, for the end of
27  March, and you can see that PMI's market share went up to about 19% say of the
    MICA number from 16% in the fourth quarter.  And I was just curious, is there some
28  business that you're maybe more willing to write that some of the other mortgage

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

insurers are less willing to or is it just a function of chance, just who your lenders are or is there something else we should be thinking about?

**Katkov**:  ***Andrew, I want to be very clear that we have not changed our underwriting standards quarter-to-quarter, so if we've grown in the first quarter, it is not because we're looking to grab market shares.***  So I think that is answer number one.  I honestly need to go back and look at the MICA data.  We were really focused on the call today and I wasn't aware that that came on it this morning.  But certainly Bill Costa can follow up with you one on one.

**Andrew Brill:**  I understand.  Just one follow-up question.  I'm just curious again why you guys are comfortable with the top end of your adjusted guidance being lower than the annualized results for the first quarter, given that 1Q is seasonally the best and you're not assuming any subsequent reserve decreases?

**Smith:**  Andrew, this is Steve.  In looking at all of the data that we've seen, and as you would look at – and again our guidance is really, as you know, total incurred guidance which includes claims paid to LAE as well as additions or deletions from loss reserves, et cetera, ***and looking at all the data we have, we're very comfortable with that range.***

**Reasons Why Defendants' Statements on April 30, 2007 Were False and Misleading**

112.    The statements on April 30, 2007, ¶¶111-113 above, concerning PMI's credit risk management, demand for its product, performance of high LTV loans, underwriting standards, operating environment and loss reserves were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to  allow the proper  evaluation  of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007  vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not afford them adequate control over their lenders, who, PMI's internal reporting had revealed, had consistently written policies that did

not comply with PMI's underwriting standards; (f) defendants were not employing adequately strict underwriting guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated underwriters and top customers – IndyMac – was deviating significantly from PMI's quality control standards; (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the subprime market that made the Company's statements regarding its extensive 'caution' and risk management misleading; (i) contrary to "being mindful of risk in the marketplace" defendants were willing to insure the loans that were available; and (j) additionally, defendants knew or recklessly disregarded the fact that the Company's financial results were misrepresented as defendants improperly failed to adjust its loan loss reserves to reflect the increase in delinquencies and higher claims and greater claim rates as set forth in ¶¶205-30.

**Defendants' Statements at the Wachovia Securities CEO Summit**

113.    On June 26, 2007, defendant Smith spoke at the Wachovia Securities CEO Summit and made the following statements:

> **Smith:** So fundamentally, the message on that slide is that we feel we have the right family of companies, with the right family of ratings, with the right leverage to work with our customers on a worldwide basis to manage their balance sheets and income statements and their execution structures to their optimal benefit.
>
> *                    *                    *
>
> ***We also are the lead strategic investor in FGIC.  We made that investment in December of 2003.  That company is doing very well.***  I will talk a little bit about that in a moment.
>
> *                    *                    *
>
> There are a couple things going on there.  Obviously, a growing revenue, a growing earned premium story.  But you also have a fundamental reengineering of how we connect with the customer on the front end of the business.
>
> But also on our policy maintenance, on the back end of the business, we totally reengineered our connectivity in our systems with our customers in the first quarter of 2006.  So our fundamental cost to underwrite an application and to acquire a policy and to maintain a policy on a unit basis has decreased.  So that will also lead to an improving expense ratio over time.
>
> Another important thing about that total reengineering is also the format for the infrastructure and support of PMI Guaranty, as well as our worldwide franchise, that $330 billion of insurance in force.  It supports that.  So our scale is quite significant.

Let's go to overall credit risk management, which obviously gets a lot of attention in the press these days. Let me talk about that in a couple different ways. We need to work really hard – I said this last year at the October investor conference – to differentiate our piece of the business from the whole market, because there would be a lot of noise as you ended 2006 and you entered 2007.

*I have been talking actively with our customers, with the Federal Reserve, with the OCC and others, the National Association of Homebuilders for over three years now about the layering of risk characteristics that have been going on in the marketplace. We were keenly aware of that in our own risk management and portfolio.*

If you will look at PMI, a couple things I would say. 92% of our book of business is prime business as defined by credit scores of 620 and above; and less than 8% is 620 or below. If you look at 2002 and 2003 as more layering of risk was happening in the marketplace, what you saw at PMI was the tightening up on the credit profile and a very keen attention on the other risk layering that was going on.

At the end of 2006, that insurance in force in terms of below 620 had been diluted from 12% to 8% by the end of 2006, in terms of insurance in force and risk in force. If you look at the actual vintage book that most people are concerned about, the 2006 vintage, less than 6% had FICO scores between below 620. So we have a very small space in terms of the nonprime portion of our book of business.

\*       \*       \*

In terms of new originations, clearly there is a more prudential lending environment. Over the last several years, we hit a low in terms of market penetration for the industry. Last year was plus or minus 10%. So it was a good time, 2006 vintage. It was a good time to have a low penetration rate.

On the other side of that, we have a growing penetration rate. We expect it to be 15% to 20% higher or 11.5% to 12% in 2007 of all one- to four-family residential housing. There is some potential upside beyond that, although we are not currently forecasting that. We are sticking to the 11.5% to 12%.

But it's done at a time of a more prudential lending environment. Subprime guidance will be implemented; nontraditional mortgage guidance; some of the banks are beginning to be examined today. So there will be a more prudential lending environment in 2007. You'll see a shift to more fixed-rate loans as well. So it's a very good time, I think, for PMI to growth [sic] its business

**Reasons Why Defendants' Statements on June 26, 2007 Were False and Misleading**

114.    The statements on June 26, 2007, ¶113 above, concerning the performance of FGIC, PMI's risk management and its exposure to the 2006 vintage loans were false and misleading for the same reasons stated above, ¶112, with regard to defendants' statements on April 30, 2007. Additionally, defendants' June 26, 2007 statements were false and misleading because defendants knew or should have known: (a) defendants had not insulated themselves from the 2006 vintage loans and had no basis to downplay their exposure to that vintage; (b) FGIC was not "doing very

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    well" but in fact had substantial investment in subprime securitizations and exposure to extensive

2    risk from the subprime market; (c) defendants' were not "keenly aware" of the risk in their

3    portfolio because they did not have the experience nor information adequate to properly evaluate

4    their credit risk and were aware of increasing incidence of fraud; and (d) defendants had

5    commenced an investigation into the delegated underwriters' compliance with published guidelines

6    which would lead to the exclusion of Chase and Lehman Brothers loans from the bulk channel.

7    **Defendants' Statements Regarding 2Q07**

8         115.    On July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc.

9    Reports Second Quarter 2007 Net Income of $83.8 Million, or $0.95 Per Diluted Share."  The

10   release stated in part:

11            Consolidated losses and loss adjustment expenses for the second quarter and
         first half of 2007 were $146.2 million and $255.5 million, respectively, compared
12       with $71.9 million and $132.8 million for the same periods last year.  The increases
         were primarily a result of higher incurred losses in U.S. Mortgage Insurance
13       Operations as a result of an increase in notices of default, claim size and claim rates.

14                              *         *         *

15            Consolidated reserve for losses and loss adjustment expenses totaled $507.0
         million as of June 30, 2007 compared with $443.0 million as of March 31, 2007 and
16       $384.6 million as of June 30, 2006.  Reserves for losses and loss adjustment
         expenses (LAE) in U.S. Mortgage Insurance Operations increased $58.7 million in
17       the second quarter of 2007 primarily due to an increase in notices of default,
         increased claim rates and larger claim sizes.  PMI Australia's reserve for losses and
18       LAE increased $2.8 million in the second quarter of 2007 due to a higher default
         inventory.

19   (Footnotes omitted.)

20        116.    Also on July 31, 2007, the Company issued a press release entitled "The PMI

21   Group, Inc. Updates 2007 Financial Guidance," which stated in part:

22       The PMI Group, Inc. (the "company") today updated its financial guidance for 2007:

23            •    Paid claims, loss adjustment expenses and additions to the reserve for
24                 losses (collectively "total incurred losses") for its U.S. Mortgage
                   Insurance Operations to be between $450 million to $550 million.
25

26        117.    On the same day, defendants held a conference call with analysts and investors in

27   which they made the following statements:

28       **[Smith]:**  Thank you for joining today's call.  The PMI Group had a profitable
         second quarter both on a consolidated basis and in our U.S. Mortgage Insurance

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   Operations.  Clearly the challenging U.S. market conditions affected our second
2   quarter financial results; however as we have for more than 35 years, we will
    successfully manage through these conditions to continue to optimize our long term
3   performance.

4                                   *          *          *

5   [Katkov]: As a result of the deteriorating market conditions evidenced in the second
    quarter, we now believe that for the full year, our total incurred losses composed of
6   paid claims, loss adjustment expenses, and reserves for credit losses will be between
    $450 million and $550 million.
7
                                    *          *          *
8
    [Smith]: Thanks, David.  Our Financial Guaranty segment had a strong quarter with
9   growth in segment net income growing to $29 million in the second quarter of 2007,
    an increase of approximately 21% over 2006.  This was driven by our after-tax
10  equity and earnings from FGIC of $25.4 million, in the second quarter compared to
    $22.9 million in the second quarter of last year.  In the second quarter, FGIC reported
11  a mark-to-market adjustment on the mortgage related CDO portfolio of $16.3
    million.  Pre-tax, due to widening credit spreads.  Also during the second quarter, the
12  benefit of refunding of municipal obligations contributed approximately $4.2 million
    after-tax to our equity and earnings from FGIC which is slightly higher than the
13  benefit received in the second quarter of last year.  And FGIC also benefited from a
    significant recovery related to Hurricane Katrina impacted credit in the second
14  quarter.  And finally, much like the first quarter of this year, FGIC benefited from a
    reduced tax rate due to the removal of certain contingent tax reserves.
15
                                    *          *          *
16
    [Smith]: Thanks, Don.  As I reflect on the second quarter,  I think it's important to
17  realize in spite of the changes we're seeing in the mortgage markets and in our
    quarterly results, we're also seeing significant and positive long term trends that will
18  bode well for our business.  For example, a more realistic assessment of risk and a
    return to provincial lending standards, revenue growth from all of our business
19  segments, insurance enforce growth and increasing global demand for our product,
    and as I said at the beginning of today's call, assuming prevailing forecasts from
20  moderate increases in U.S. interest rates and stable foreign currency rates, we expect
    to see continued growth in our book value in the high single digit to low double digit
21  ranges for the full year of 2007.  Bill?

22                                  *          *          *

23  [Mike Grasher]:  Good morning, gentlemen.  First question specific I guess to
    David.  Could you comment a little bit more on the concentration of your
24  delinquencies and any correlation you may be seeing with those loans and the
    underlying product?

25  Katkov:  Sure, Mike.  This is David.  In the first quarter call, we made a comment
    that the structured finance portfolio which is really our default business was coming
26  under stress.  That continues to be true but probably not to the same degree.  What
    we're seeing now is probably more broad based stress, really specific to the 2006
27  book year.  That's not atypical for what you have heard across the mortgage industry.
    At this juncture, Mike, we don't see any other particular products that seems to be
28  under stress today.

1    **[Mike Grasher]**:  Okay, so if it's 100% LTV or low dock, anything like that ?

2    **[Katkov]**:  No unusual trends today.

3                  *      *      *

4    **[Unidentified Participant Analyst]:**  And you talked about a lot of business in the first half.  Are you making any changes to any relationships to weed out certain types of businesses in the second half?

6    **[Katkov]:**  Oh, absolutely.  We've talked about this quite openly that the really great news about the demise of the 80/20 piggyback execution is that a lot of that product came back to the mortgage insurance industry.  I think that explains in part the increased penetration rate that Steve referred to a few minutes ago but we're very selective in terms of what are the risk attributes in that 100%, we have some obvious concerns about low doc business in and around that so we've never done business with all lenders.  We will not ever do business with all lenders, we'll be very selective.

10                   *      *      *

11    **[Mark DeVries]**:  Yes, thanks.  Could you talk a little bit about what you're seeing right now with the trends and the potential for loss mitigation efforts?  Who knows that your severity numbers haven't really changed much over the last couple quarters but with home prices starting to climb in some markets do you see that changing?

14    **[Katkov]**: This is David.  The emphasis that we've always put on loss mitigation really gets tested in this kind of environment but ***I'm very confident that we have really 35 years experience working through multiple cycles, so we will make a meaningful impact on our severity numbers, but I take your point.***  We take your point that the one challenge that we have is that we do have larger loan sizes, we called that out in our opening comments so on an absolute dollar basis that will result in higher dollar payout and then we also have in some markets flat home price appreciation.  So we'll have to be very very selective when we make a decision in our loss mitigation efforts when do we actually acquire a property and that's something we're very skilled at so I'd say on balance we're pulling out all of the stops, we're pretty good at this.  In fact, I think we're very good at it and I think we'll have a positive effect on the ultimate outcome of our claims paid.

**Reasons Why Defendants' Statements on July 31, 2007 Were False and Misleading**

       118.    The statements on July 31, 2007, ¶¶115-117 above, concerning PMI's credit risk management, demand for its product, operating environment and loss reserves were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had  developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to  allow the proper  evaluation  of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for

the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005;  (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not afford them adequate control over their lenders, who, PMI's internal reporting had revealed, had consistently written policies that did not comply with PMI's underwriting standards; (f) defendants were not employing adequately strict underwriting guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that at least one of its delegated underwriters and top customers– IndyMac – was deviating significantly from PMI's quality control standards; (h) FGIC's substantial investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the subprime market that made the Company's statements regarding its risk management misleading; and(i) the Company's financial results were misrepresented as defendants improperly failed to adjust the Company's loan loss reserves to reflect the increase in delinquencies and higher claims and greater claim rates as set forth in ¶¶205-230.

**The Truth Begins to Be Revealed**

119.    In August 2007, as the market continued to decline, defendants were forced to begin to reveal the truth about the Company.  This began a series of partial disclosures and revelations concerning the truth about PMI's business operations, finances, business metrics, and future business and financial prospects.  Nonetheless, PMI's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by defendants.  Upon this news, PMI's stock dropped $3.20 per share on July 31, 2007, to close at $34.07 per share, a one-day decline of 8.6% on volume of over five times the average three-month volume.

**Defendants' August 20, 2007 Press Release**

120.    PMI released a press release on August 20, 2007 entitled "PMI Provides Updated Portfolio Characteristics," stating the following:

> The PMI Group, Inc. (NYSE:PMI) today posted a presentation outlining the characteristics of the Company's mortgage insurance portfolio in the United States on its website at http://www.pmigroup.com/shareholders/.  The presentation also includes an update on PMI's Australia portfolio.

> Steve Smith, CEO of The PMI Group, Inc., said, "Our U.S. and Australian portfolios are focused primarily in core housing, meaning single family homes that are owner-occupied, and are geographically well diversified, respectively, across the U.S. and Australian states."

> David Katkov, President of PMI Mortgage Insurance Co., PMI's U.S. subsidiary, explained, "The current market environment has resulted in some positive demand-related trends for PMI.  Alternative loan products have lost much of their luster, the GSEs have increased their market share, and tax deductibility has sparked renewed interest in mortgage insurance.  As a result, we're seeing an increased demand for our product, including insurance for loans with a loan-to-value above 95 percent.  As a whole our portfolio continues to be focused on loans of modest size to individuals and families who are purchasing homes they plan to live in, and we remain committed to sustainable homeownership.  In the long run we believe this increased demand will be a strong positive for PMI and the mortgage insurance industry."

**Reasons Why Defendants' Statements on August 20, 2007 Were False and Misleading**

121.    The statements on August 20, 2007, ¶120 above, concerning PMI's outlook and focus were false and misleading for the same reasons stated above, ¶118, with regard to defendants' statements on July 31, 2007.  Additionally, defendants' August 20, 2007 statements were false and misleading because defendants knew or should have known: (a) the extensive evidence of occupancy-related fraud made defendants' statements regarding their focus on families "purchasing homes they plan to live in" misleading – *i.e.* the false representation that a home would be used as a residence – in the mortgage market; (b) the stronger demand for PMI's insurance was caused by the vacuum left over from the collapse of the piggyback loans and was very high risk and the loans which PMI was insuring were no different in quality from the "alternative loan products" which were disappearing from the market; and (c) stating that the portfolio above a 620 FICO score is "prime," as was stated in the accompanying presentation materials, is misleading because

traditionally, prime borrowers have a FICO score of 680 to 700 or higher.  Bank regulators typically define subprime loans as those with a FICO score of 660 or less.  In addition, based on other statistics quoted as part of PMI's presentation, at least 30% of the loans with insurance (or more based on the GSE loan programs PMI participates in) were not full document loans.

**Defendants' August 29, 2007 Press Release Regarding Fitch Downgrade**

122.    On August 29, 2007, the Company issued a press release entitled "The PMI Group, Inc. Comments on Fitch Revisions to U.S. Mortgage Insurance Capital Model and Ratings Actions," which stated in part:

> The PMI Group, Inc. (NYSE: PMI) announced today that consistent with its revisions of its capital model for U.S. mortgage insurance companies, Fitch Ratings (Fitch) has changed the insurer financial strength ratings for PMI Mortgage Insurance Co. and PMI Guaranty Co. to AA from AA+.  Fitch has noted that these changes are the result of revisions Fitch made to its capital model for U.S. mortgage insurance companies.  Fitch affirmed ratings for PMI Australia and PMI Europe at AA and for The PMI Group, Inc. at A+.  Fitch's Outlook for The PMI Group, Inc. and related subsidiaries' ratings is Stable.

> Steve Smith, CEO of The PMI Group, Inc., said, "It is important to recognize that the ratings changes made by Fitch were primarily driven by a change in their ratings methodology and capital model, not by a deterioration in the financial position or results of The PMI Group, Inc. or our subsidiaries.  PMI Mortgage Insurance Co.'s AA ratings from Fitch and Standard and Poor's and Aa2 rating from Moody's Investor Services speak to our position as a strong mortgage insurance counterparty for our customers in the U.S. and international credit enhancement markets.  ***PMI Guaranty Co.'s AA rating from Fitch, along with AA ratings from Standard and Poor's and Aa3 ratings from Moody's Investors Services, provides strong ratings upon which PMI Guaranty can continue to successfully offer mezzanine and remote loss credit enhancement solutions for structured portfolio transactions and capital markets executions***."

> In announcing its ratings changes, Fitch noted a declining U.S. residential real estate market and PMI's related exposure and cited PMI's solid franchise, strong balance sheet at the AA rating stress level, experienced management team, and high quality insured portfolio as measured by FICO score distribution and other risk layering characteristics.  Fitch also noted that The PMI Group, Inc. derives benefit from diverse earnings streams from international mortgage insurance as well as operations outside of the mortgage insurance space, primarily financial guaranty.

**Defendants' Statements at the September 10, 2007 Lehman Brothers' Fifth Annual Financial Services Conference**

123.    On September 10, 2007, Smith spoke at the Lehman Brothers' Fifth Annual Financial Services Conference.  He discussed the strength of PMI, reducing costs and personnel in

2006, the continued support for FGIC and the overall positive position of the Company as of September 10, 2007:

> **[Smith]:** So now let's talk about probably what you're most interested in is the overall credit outlook for PMI. ***First, let me say fundamentally we are risk managers. It's what we do day [in] and day out, it's the fundamental franchise, it's understanding the risk, pricing it appropriately, understanding the operational risk and monitoring those and delivering a sound outcome***.

> \* \* \*

> If you look at 2006 vintage actual originations, less than 6% of that business had FICO scores below 620.  So as we were recognizing layering risk issues in the marketplace, ***so one of the things we did do was tighten up on credit***.  I'll also mention to you that every one of the loans that we insure, no matter the channel, be it the VPMI product, the LPMI product, or the bulk product, all goes through our own automated underwriting risk analysis assistant, all of those loans get a score not only by the borrower risk profile and the propensity for those loans that go to claim, but also from a loan risk score in terms of the individual MSAs. I think you know we have an economic real estate finish report that strikes some 379 MSAs on a supply-and-demand basis, and it predicts the propensity for an MSA to go with the house price decline.  We publish that data.  It's on our website.  ***We use that data to manage our overall books of business.***

**Reasons Why Defendants' Statements on September 10, 2007 Were False and Misleading**

124.    The statements on September 10, 2007, ¶123 above, concerning PMI's credit risk management, underwriting guidelines and underwriting procedures were false and misleading because defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had  developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to  allow the proper evaluation  of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007   vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated

1  underwriting practices did not afford them adequate control over their lenders, who, PMI's internal

2  reporting had revealed, had consistently written policies that did not comply with PMI's

3  underwriting standards; (f) defendants were not employing adequately strict underwriting

4  guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that

5  at least one of its delegated underwriters and top customers – IndyMac – was deviating

6  significantly from PMI's quality control standards; (h) defendants had commenced an investigation

7  into the delegated underwriters' compliance with published guidelines which would lead to the

8  exclusion of Chase and Lehman Brothers loans from the bulk channel; and (i) FGIC's substantial

9  investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the

10  subprime market that made the Company's statements regarding its risk management misleading.

11       125.   On October 18, 2007, the Company issued a press release entitled "The PMI Group,

12  Inc. Announces Housing, Mortgage and Credit Market Conditions to Adversely Affect Third

13  Quarter 2007 Financial Results," which stated in part:

> As a result of the continued weak housing and mortgage markets and associated dislocation in the credit derivative markets, The PMI Group, Inc. (NYSE: PMI) announced today that it expects to report a net loss per basic and diluted share outstanding of approximately $1.05 in the third quarter of 2007. The primary components of the loss are incurred losses in its U.S. Mortgage Insurance Operations and a mark-to-market (or fair value) adjustment at its unconsolidated subsidiary FGIC.

> The Company's review of the September mortgage default data on its U.S. mortgage insurance portfolio indicates that credit performance significantly worsened during the month and now expects paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. mortgage insurance operations of approximately $350 million in the third quarter of 2007. As a result, the Company is withdrawing its full year total incurred loss guidance and other financial guidance.

> Credit conditions also had an adverse effect on the insured credit derivative portfolio of FGIC, in which PMI is the lead strategic investor, with a common equity ownership of 42.0 percent. FGIC conducted a fair value review of its outstanding credit derivative contracts at September 30, 2007 and estimates that mark-to-market adjustments will result in an unrealized loss of approximately $206 million, pre-tax, in the third quarter of 2007. FGIC anticipates that as a result of this adjustment it will report a net loss for the third quarter of 2007 of approximately $65 million. As a result of PMI's equity ownership in FGIC, PMI will realize an earnings per share loss of $0.32 in the third quarter of 2007 (which amount is included in the estimated third quarter 2007 net loss per share for The PMI Group, Inc. shown above).

126.    On October 18, 2007, the Company's stock closed down $3.44 at $23.31 (adjusted close of $22.98), a drop of 12.91% on trading volume of 8,538,000 shares.

127.    On October 19, 2007, S&P, in a news release entitled, "PMI, Mortgage Insurers Fall on S&P Ratings Action (Update 1)," announced that it had placed PMI on negative CreditWatch with negative implications:

> PMI Group Inc. dropped 11 percent and rival U.S. mortgage insurers fell in New York trading after Standard & Poor's put the company's credit and financial strength ratings on negative "creditwatch.''
>
> Standard & Poor's made the change after Walnut Creek, California-based PMI said yesterday it will post a surprise third-quarter loss because borrower defaults "significantly worsened'' in September.  Creditwatch means action is likely within 90 days on PMI, the industry's second-largest company behind MGIC Investment Corp.  MGIC was put on creditwatch Oct. 17.
>
> PMI said yesterday it will lose about $1.05 a share in the third quarter and it withdrew 2007 earnings forecasts amid the worst U.S. housing slump in 16 years.  A day earlier, MGIC said it won't be profitable in the fourth quarter or 2008.  Mortgage insurers help lenders recoup losses when homeowners don't pay.
>
> "We believe it is probable – though not certain – that all seven major mortgage insurers will report underwriting losses in 2008,'' S&P said in a separate statement today.
>
> PMI dropped the most in 12 years yesterday after announcing the loss.  It declined $2.59 today to $20.62 in 4:03 p.m. New York Stock Exchange composite trading.  The stock has fallen 56 percent this year.
>
> MGIC fell 9.9 percent today and No. 3-ranked Radian Group Inc. lost 13 percent.  All three were among the day's 10 worst performers in the Russell 1000 Index.
>
> "Standard & Poor's views PMI's reserves as less conservative than its peers,'' analyst James Brender wrote in announcing today's rating action.  The cost of paying claims is expected to increase fivefold from the same period a year earlier to about $350 million, PMI said in yesterday's statement.  Stagnant home prices make it harder for banks to recover when loans go bad.
>
> PMI spokeswoman Beth Haiken declined to comment.  The company will release full financial results for the third quarter before markets open on Oct. 30, it said.

128.    On October 19, 2007, the Company's stock closed down $2.59 at $20.62 (adjusted close of $20.42), a drop of 11.16% on trading volume of 7,576,100 shares.

129.    In mid-October 2007, as this news surfaced concerning the true state of PMI's financials and business outlook, PMI's stock price began to decline rapidly.  Between October 16,

2007 and October 23, 2007, PMI's stock dropped $11.55 per share to close at $17.96 per share on

October 23, 2007, a five-day decline of 39% on extremely high volume.

130.    Thereafter, as more of PMI's true financials and business outlook emerged,

including information concerning FGIC and Financial Guaranty, and more of the artificial inflation

in the Company's stock came out, the stock dropped even further.

131.    On October 30, 2007, the Company issued a press release entitled "The PMI Group,

Inc. Reports Third Quarter 2007 Financial Results," which stated in part:

> The PMI Group, Inc. (the "Company") today reported a net loss for the third quarter of 2007 of $86.8 million, or $1.04 per basic and diluted share.  Net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share.  The net loss for the third quarter of 2007 was primarily due to $348.3 million in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") in the U.S. Mortgage Insurance Operations, and FGIC's negative mark-to-market adjustments on its insured credit derivative portfolio in the Company's Financial Guaranty segment.

*        *        *

> *Consolidated losses and LAE* for the third quarter and year to date were $372.8 million and $628.3 million, respectively, compared with $79.6 million and $212.4 million for the same periods last year.  The increases were primarily a result of higher losses and LAE in the U.S. Mortgage Insurance Operations as a result of an increase in notices of default, increased claim rates and larger claim sizes.

> *Consolidated reserve for losses and LAE* totaled $770.4 million as of September 30, 2007 compared with $507.0 million as of June 30, 2007 and $394.2 million as of September 30, 2006.  Reserves for losses and LAE in the U.S. Mortgage Insurance Operations increased $253.6 million in the third quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes.  PMI Australia's reserve for losses and LAE increased $7.3 million in the third quarter of 2007 principally due to higher claim rates and claim sizes.

(Footnote omitted.)

132.    On the same day, defendants, including Katkov, Lofe and Smith, held an earnings

conference call with analysts and investors.  On the call, Smith repeated the same financial results:

> **[Andrew Brill]:** Is there a particular risk of capital that you think about, as somewhat of a threshold?

> **[Lofe]:** Well, I'd rather not comment at this point in time because as you know, the rating agencies are going to have their own view with respect to risk-to-capital ratio and at this time right now, they're evaluating their models and there are facts related to this industry, matters that are being dealt with, so at this point in time, just to reiterate, ***we're very comfortable with this risk-to-capital ratio and the operations of the company***.  We'll see if we'll continue with the capital basis that we have.

1                                    *       *       *

2    **[David Hochstim]:** Okay, and then for David, can you just talk about the over 97 writ
     written in 2007 in the supplement.  It looks like over 97 insurance written was
3    roughly the same in the first two quarters of this year as the whole of 2006 and I was
     just wondering? Is there something different in the way you structured that insurance
4    or is that just now waiting for another 8 billion of insurance written to go bad?

5    **[Katkov]:**  Let me take the first part of your question, David.  We have talked about
     this before, but a year ago, just about now the piggyback execution, the 80/20 that
6    had taken so much market share from the mortgage insurance industry, was really
     coming under stress and you know that the second was difficult for lenders to secure
7    ties or they may be wondering if they wanted to hold it in portfolio.  So, there was a
     fairly significant and rapid rotations from that Wall Street-type execution to the
8    mortgage insurance industry and that is really what drove the production in Q1 and
     Q2 of 2007.  Now, we recognize that. ***We have early warning systems and we made***
9    ***a decision quite early in the third quarter to significantly change both our pricing***
     ***and our guidelines and I won't go into it on these comments***.  We're happy to go
10   into it offline, it's all public information, but we expect and we have seen a dramatic
     slowdown in over 95 LPBs.  So, that would include 97s and 100s, ***David.  I really***
11   ***can't comment on your last point about whether this book will underperform.  We***
     ***don't expect that but clearly we made guideline adjustments to ensure that all the***
12   ***business after October 1st that we wrote, would be very profitable for us and that is***
     ***our expectation, David.***
13
                                     *       *       *
14
15   **[Michael Berry]:** Thank you.  A question from about EA.  Can you explain to us
     what percentage of your flow business was represented by EA 2s and EA 3s by
16   vintage year so we can see the growth from '05 to '06 and '07 and if can you go
     further and actually give us the breakdown of the quality of that type of business.
17   Six versus arm, you know, fact scores relative to non-EA business.

18   **[Katkov]:** Michael that is a very good question.  You have obviously done your
     homework.  But, unfortunately, we're not going to be able to disclose that
19   information.  As we mentioned earlier, the significant growth in our over-97 business
     was directly related to growth in the affordable housing program of Fannie May [sic]
20   and Freddie Mac and as you know by the nature of your question, a lot of that is in
     the EA space.  We are – we made some judgments.  I think it's very reflective in the
21   pricing guideline changes that we made and I direct you to that.  We would be happy
     to have Bill to go through that in detail.  You can see by the changes we have made
22   that we will be happier with the business going forward.  That is the short answer.

                                     *       *       *
23
24   **[Smith]:**  In closing, let me remind the listeners of some of the key things we
     discussed with you on today's call.  First with regard to the challenges we see in the
25   domestic MI business, we have identified is – identified problem areas of the
     portfolio and are working diligently to minimize the impact of those loans.  Now, the
26   great majority of our U.S. mortgage insurance portfolio, is performing within our
     expectations and we need to keep sight of that.  PMI remains a company with a
27   unique business combination of U.S. Mortgage Insurance, International Mortgage
     Insurance and a Financial Guaranty.  We believe this – and Financial Guaranty
28   Insurance Company.  ***We believe this will service [sic] us well as we weather the***
     ***current pressures win [sic] our current domestic mortgage insurance book.  PMI***

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

*continues to have a strong financial foundation with good liquidity, strong capital and market access*.  So we look forward to communicating with you more in our fourth quarter investor communications in December, thank you for joining us on today's conference call and as always, we thank you for your ownership and your interest in the PMI Group.  Thank you very much.

133.    The October 30, 2007 conference call partially revealed the truth about the Company to the market.  The Company's stock closed at $16.73 on October 30, 2007 down $1.85 or 9.96%.

134.    Defendants also revealed that they made changes to the underwriting guidelines dating back to October 1, 2007 relating to Above-97s.

**Reasons Why Statements Made on October 30, 2007 Were False and Misleading**

135.    The statements on October 30, 2007, ¶¶131-132 above, concerning PMI's credit risk management, risk-to-capital ratio, performance of the 2007 vintage and future outlook were false and misleading because as defendants knew or recklessly disregarded: (a) the models, analyses, standards and procedures which defendants had  developed that enabled them to properly evaluate PMI's risk while underwriting full documentation loans were not designed, or able to allow the proper evaluation of credit risk posed by the new alternative loan products in the market, many of which had reduced documentation and layered risk factors; (b) PMI did not adequately account for the significant changes in the business mix of its portfolio in 2006, when it added greater percentages of high risk alternative loan products, as compared to 2005; (c) PMI could not accurately evaluate the risk of its reduced documentation loan portfolio because borrowers did not provide adequate, verified personal financial information; (d) the housing market and the mortgage market were in substantial decline, default rates were on the rise, the 2006 and 2007 vintage loans were underperforming and the incidence of fraud had been increasing even as PMI had continued to write ever more risky and difficult to evaluate insurance policies; (e) defendants' delegated underwriting practices did not afford them adequate control over their lenders, who, PMI's internal reporting had revealed, had consistently written policies that did not comply with PMI's underwriting standards; (f) defendants were not employing adequately strict underwriting guidelines but were willing to insure whatever loans existed in the market; (g) PMI was aware that

1    at least one of its delegated underwriters and top customers – IndyMac – was deviating

2    significantly from PMI's quality control standards; (h) defendants had commenced an investigation

3    into the delegated underwriters' compliance with published guidelines which would lead to the

4    exclusion of Chase and Lehman Brothers loans from the bulk channel; (i) PMI had implemented a

5    carving strategy in its bulk channel to limit future losses on risky loans; (j) PMI had no "early

6    warning" system, in fact it could not properly evaluate the mortgages it had insured based on a lack

7    of experience and the reduced documentation of the loans it had insured; (k) FGIC's substantial

8    investment in subprime securitizations had resulted in PMI's exposure to extensive risk from the

9    subprime market that made the Company's statements regarding its risk management misleading;

10   (l) the Company's financial results were misrepresented as defendants improperly failed to adjust

11   its loan loss reserves to reflect the increase in delinquencies and higher claims and greater claim

12   rates as set forth in ¶¶205-230; and (m) no later than 3Q07, the deterioration in the housing and

13   mortgage markets had rendered PMI's investment in FGIC other than temporarily impaired and it

14   should have been written down;

15          136.    On November 5, 2007, Fitch Rating Services ("Fitch") announced its new

16   methodology in assessing financial guarantors CDOs and further announced that it would be

17   reviewing the capital of the monolines, including Financial Guaranty, to ensure that they had

18   enough capital to warrant their AAA rating.  As a result of the ongoing review, Financial Guaranty

19   faced a "high probability" risk of falling beneath the capital requirements necessary to keep its

20   AAA rating, which would result in either a potential ratings downgrade or force the Company to

21   raise more capital.  The review was expected to last six weeks.

22          137.    In December 2007, Moody's Investor Services, Inc. ("Moody's") and S&P made

23   similar announcements that they were also re-evaluating their ratings of Financial Guaranty and

24   had placed Financial Guaranty on review for possible downgrades.

25          138.    On January 3, 2008, the Mortgage Bankers Association ("MBA") reported a decline

26   in an index measuring the volume of mortgage applications which offered little hope for a recovery

27   in the housing market.

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

139.    On January 8, 2008, Lehman Brothers published a research note concerning the need for PMI to substantially increase its reserves to cover the significant growth in claims.  As reported by the *Associated Press* in an article entitled "Sector Wrap: Mortgage Insurers":

> Fears of accelerating deterioration in the mortgage market sent shares of mortgage insurers lower Tuesday.
>
> ***Lehman Brothers analyst Bruce Harting wrote in research notes MGIC Investment Corp., PMI Group Inc. and Radian Group Inc. will all need to significantly boost reserves for the fourth quarter and beyond to cover expected jumps in insurance claims***.
>
> Mortgage insurers cover principal and interest payments on mortgages when borrowers stop paying their loans.  As mortgages have increasingly defaulted, the insurers have been forced to pay out more claims on the failed loans.  Until defaults dissipate, the insurers will continue to struggle and likely have to build reserves to cover future losses.
>
> ***Harting said MGIC, PMI and Radian are all likely to speed up reserve building to cover claims because deterioration in the mortgage market is occurring faster than anticipated***.
>
> *            *            *
>
> ***Harting estimates PMI Group will now post a loss of $1.58 per share in the fourth quarter, 70 cents per share worse than he had previously forecast***.
>
> PMI Group shares fell 86 cents, or 7.5 percent, to $10.59.  Shares have traded between $9.82 and $51.46 during the past 12 months.

140.    Upon this news, shares in the Company's stock closed down $2.83 per share to close at $7.45 per share on January 9, 2008, a decline of 27%.

141.    On January 10, 2008, Blackstone Group LP announced that it might write down its investment in FGIC due to the serious deterioration in the subprime market.  Four days later, on January 14, 2008, further evidence emerged that Alt-A loans were underperforming, just like subprime loans.

142.    On January 17, 2008, the U.S. Commerce Department reported a significant decline in new-home construction in the previous year.  The Commerce Department reported that work began on 1.35 million houses and apartments in 2007, down 24.8% from 2006.  This decline was the second-biggest annual decline on record, exceeded only by a 26% plunge in 1980.  Additionally, on the same date, Moody's announced that it had placed Ambac Financial Group Inc., one of the nation's leading bond insurers and a close competitor of FGIC, on review for possible

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1  downgrades due to much higher than expected losses on mortgage-related bonds.   These
2  announcements were strong indicators as to the depth and severity of the problems in the housing
3  market.

4       143.    Upon this news, shares in the Company's stock dropped down $1.29 per share to
5  close at $6.48 per share on January 17, 2008, a one-day decline of 17%.  This was the lowest PMI's
6  stock had traded in its 12 years as a public company.

7       144.    Thereafter, on January 30, 2008, Fitch finally downgraded Financial Guaranty's
8  financial strength rating by two notches from "AAA" to "AA."

9       145.    The next day, on January 31, 2008, S&P made a similar move and downgraded
10  Financial Guaranty's rating by two notches from "AAA" to "AA" and further downgraded FGIC's
11  rating by three notches from "AAA" to "A."  Further, Moody's announced that it had placed PMI
12  on review for a possible ratings downgrade.

13       146.    On February 11, 2008, PMI announced that on March 1, 2008, it would stop
14  insuring mortgages with high LTV ratios, again tightening its guidelines on which type of loans the
15  Company underwrites in order to reduce its exposure to risky subprime loans.

16       147.    On March 3, 2008, after the market closed, PMI issued a press release entitled "The
17  PMI Group, Inc. Reports Preliminary Fourth Quarter 2007 Financial Results for Certain
18  Segments."  The release stated in part:

19         PMI Group, Inc. (NYSE: PMI) (the "Company") today announced that due to
       delays in obtaining 2007 financial results from FGIC Corporation ("FGIC") the
20         Company has filed a Form 12b-25 with the Securities and Exchange Commission
       ("SEC") for a late filing of its 2007 Form 10-K.  In this SEC filing and as outlined
21         below in financial highlights, the Company provides financial results for its U.S.
       Mortgage Insurance Operations and International Operations and discusses its
22         expectations for its Financial Guaranty segment.  The Company plans to issue its
       financial results for the fourth quarter of 2007 before the financial markets open
23         (approximately 6:00 AM ET) on Wednesday, March 12, 2008, followed by a
       conference call at 11:30 AM ET.

24
25         "Our preliminary fourth quarter results for our U.S. Mortgage Insurance and
       International Operations demonstrate that we are facing challenging market
26         conditions, particularly in the U.S. housing market," said The PMI Group Inc.'s
       Chairman and CEO Steve Smith.  "We have implemented a plan to address these
27         challenges, which we will discuss in detail on our conference call next week.  A
       cornerstone of the plan and our strategic focus going forward is our core business,
28         mortgage insurance, which we believe offers PMI long term opportunities for growth
       and profitability.  Within our Financial Guaranty segment, we will continue to work

to stabilize our equity investments in FGIC and RAM Re, but we will not be contributing any additional capital to these companies."

**Financial Highlights of U.S. and International Mortgage Insurance Operations**

- ***U.S. Mortgage Insurance Operations[] – reported a net loss of $236.0 million in the fourth quarter of 2007 compared to net income of $77.2 million in the fourth quarter of 2006. The loss in the fourth quarter of 2007 was driven in large part by an increase in losses and loss adjustment expenses resulting from an increase in our default inventory, higher claim rates and higher average claim sizes***. For the full year ended December 31, 2007, U.S. Mortgage Insurance Operations reported a net loss of $190.8 million compared to net income of $290.3 million for the full year of 2006. The Company estimates that U.S. Mortgage Insurance Operations' losses and loss adjustment expenses in 2007 were approximately $1.1 billion.

\*       \*       \*

**Financial Guaranty Segment**

Because the Company lacks the necessary financial information from FGIC to complete its consolidated financial statements, the Company is not yet able to calculate its consolidated results of operations for the full year ended 2007 and also is not able to calculate the financial results of its Financial Guaranty segment. ***The Company expects that its Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during those periods. In connection with the preparation of the Company's consolidated financial statements, the Company is conducting an analysis to determine whether the value of its investment in FGIC was impaired as of December 31, 2007***. This analysis cannot be completed until the Company receives financial information from FGIC necessary for the Company to complete its consolidated financial statements.

148.    Additionally on March 3, 2008, in a Form 12b-25, the Company announced that it would be delayed in filing its Form 10-K for year-end 2007, stating in part:

The PMI Group, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended December 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

The Company is unable to complete its consolidated financial statements for the year ended December 31, 2007 because it is currently awaiting financial information from an equity investee, FGIC Corporation ("FGIC"), that is necessary for the Company to complete its financial statements. ***FGIC has informed the Company that it is in the process of completing its financial statements, but that it has not been able to do so due to the time and effort involved in determining the amount of loss reserves related to residential mortgage-backed securities and collateralized debt obligations of asset-backed securities. The determination of***

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    *such reserves has been affected by the unprecedented rapid and severe*
2    *deterioration of the residential mortgage market*.

3    149.    On this news, PMI's stock collapsed to $6.43 per share on March 4, 2008, a one-day

4    decline of 5%.  This was the lowest PMI's stock had traded in its twelve years as a public company.

5    150.    The true facts, which were known by defendants but concealed from the investing

6    public during the Class Period, were as follows:

7    (a)    The Company's investment in FGIC was materially impaired as FGIC's bond

8    insurance arm, Financial Guaranty, had significant exposure to defaults on bonds it insured due to

9    the plunge in value of mortgage debt;

10    (b)    The Company was materially overstating its financial results by failing to

11    properly value its investment in FGIC and by failing to write down that investment in a timely

12    fashion in violation of GAAP;

13    (c)    The Company was not adequately accounting for its loss reserves in violation

14    of GAAP, causing its financial results to be materially misstated;

15    (d)    The Company failed to engage in proper underwriting practices for its book of

16    business related to insurance written throughout the Class Period and misrepresented its risks to

17    investors; and

18    (e)    The Company had far greater exposure to anticipated losses and defaults

19    related to its book of business related to insurance during the Class Period than it had previously

20    disclosed.

**ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER**

21    151.    As alleged herein, defendants acted with scienter in that defendants had actual

22    knowledge of the Company's true state of affairs and issued public documents and statements that

23    were materially false and misleading; and knowingly and substantially participated in the issuance

24    or dissemination of such statements or documents as primary violations of the federal securities

25    laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information

26    reflecting the true facts regarding the nature and scope of the Company's underwriting policies and

27    controls, the Company's exposure to high risk loans and the value of its equity investment in FGIC

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    and their control over and responsibility for the Company's financial statements, participated in the

2    fraudulent scheme alleged herein.  This scheme: (a) deceived the investing public regarding the

3    Company's credit risk profile; (b) deceived the public regarding the Company's financial health

4    throughout the Class Period; (c) allowed the Individual Defendants to achieve the economic

5    incentives described below; and (d) caused plaintiffs and other members of the class to purchase or

6    otherwise acquire the Company's common securities at artificially inflated prices.

7    **The Company's Compensation Scheme Motivated Defendants to Commit Fraud**

8    152.    Defendants were motivated to conceal the true state of affairs of the Company and

9    thus capitalized on the artificial inflation of the Company's stock.  During the Class Period, the

10   defendants received significant stock and option awards.  Defendants' compensation was in large

11   part determined by the reported financial performance of the Company:

12   PMI pays for, and rewards, performance.  At the executive level, this means that nearly all aspects of our compensation program are designed in whole or in part to reward individual excellence and achievement that has led to the achievement of corporate goals.  Accordingly, the Committee's compensation decisions are driven by both PMI's performance and the Committee's assessment of each executive officer's performance.  Stellar individual performance that has not resulted in collective achievement is not the primary goal and, therefore, our executive compensation program metrics are not based primarily on individual achievement.  ***Rather, a significant portion of executive compensation is contingent upon the achievement of PMI's short- and long-term financial and other corporate objectives, including earnings growth and the creation of shareholder value.  In particular, annual incentive awards are based upon net income and other quantitative and qualitative factors, including the achievement of pre-established corporate goals.***  The Committee also takes into account the performance of each executive. Key factors affecting the Committee's individual assessments include the nature and scope of the executive officer's responsibilities, and his or her level of experience, effectiveness in leading corporate initiatives, and success in creating a culture of integrity and compliance.

*       *       *

PERFORMANCE-BASED ANNUAL INCENTIVES.  PMI's compensation program includes annual cash incentive award opportunities.  The Committee believes that annual incentives further the goal of tying a significant portion of compensation to PMI's achievement of its strategic annual goals and provides a means by which to reward superior performance.  The Committee believes that annual incentive opportunities are necessary to attract and retain talented and experienced executives.  Annual incentive awards are primarily designed to focus management on financial measures and corporate initiatives that promote stockholder value.  Accordingly, awards are predominantly tied to PMI's performance and, to a lesser extent, the Committee's overall assessment of the executive's performance.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

Annual incentive awards to PMI's executives are governed by PMI's Bonus Incentive Plan. **The Plan provides for the payment of bonuses from a pool that is a percentage (not to exceed 5%) of PMI's consolidated net income for the year. The size of the aggregate net income bonus pool is determined annually by the Committee. The Plan does not provide the Committee with the discretion to pay aggregate bonuses under the Plan in excess of the net income pool**. The Plan also limits the amount that can be paid to any one executive to 30% of the net income pool.

\*       \*       \*

*In 2006, the Committee established the following Company criteria for the 2006 performance period*:

1.       *2006 consolidated net income*;

2.       *2006 net income from operations overseen by PMI Capital Corporation, a wholly owned subsidiary of PMI; and*

3.       *2006 net income from PMI's U.S. mortgage insurance operations.*

These criteria excluded realized gains and losses, extraordinary items under GAAP, and any impact of changes in accounting principles, and adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors. The Committee weighted these three criteria 40%, 30% and 30%, respectively.

The Committee selected these criteria for 2006 because, among other things, it believes that: (i) net income is a fundamental criteria of company performance used by management, the Board of Directors and PMI's shareholders; and (ii) the focus on the net income of PMI's two operating segments, PMI Capital Corporation and PMI's U.S. mortgage insurance operations, encourages continued diversification and growth as well as commitment to PMI's core operations. The Committee established threshold, target and maximum numeric goals for the net income criteria. The numerical goals associated with "target" represented the financial goals contained in the Board-approved corporate operating plan for 2006. Based upon the facts that (i) the Committee has not paid bonus awards at the maximum level under the Plan and (ii) the criteria associated with potential maximum bonus payouts for 2006 were significantly higher than the financial goals contained in the operating plan, the Committee believes that the criteria were sufficiently challenging and difficult to focus executives on superior achievement of the Company's short-term objectives.

\*       \*       \*

*Corporate Performance Measures for 2007 Annual Incentives*. In early 2007, the Committee set the maximum bonus pool and maximum bonus amounts that can be earned in 2007 under the Bonus Incentive Plan as follows:

• The bonus pool was set at 5% of net income; and

• The 2007 maximum bonus opportunity, expressed as a percentage of base salary, for each of the Named Executive Officers is: Mr. Smith – 240%, Mr. Lofe – 170%, Mr. Shuster – 185%, Mr. Bacigalupi – 170% and Mr. Katkov – 175%.

The Committee also established the following criteria that it will review, in conjunction with other quantitative and qualitative factors, when it determines whether, and to what extent, to award bonuses from the aggregate bonus pool pursuant to the Plan:

- ***The Company income criteria***:

    - 2007 consolidated net income,

    - 2007 net income from operations overseen by PMI Capital Corporation, and

    - 2007 underwriting income from PMI's U.S. mortgage insurance operations.

    These criteria exclude realized gains/losses, extraordinary items under GAAP, any impact of changes in accounting principles, adjustments to reflect lost investment income from stock repurchase activities authorized by the Board of Directors and the effect of FGIC refundings.  The Committee weighted these three criteria equally; and

- Attainment of various corporate objectives criteria, including financial measures such as return on equity; strategic planning and strategic objectives; capital management; business segment synergies; investor, rating agency and governmental relations activities; and key officer development.

    The Committee weighted the income criteria and the corporate objectives criteria at 65% and 35%, respectively.

    In addition to these criteria, the Committee considers other quantitative and qualitative factors, including individual performance, retention, reward and motivation.  The Committee believes that the net income bonus pool, the criteria and other factors will motivate our executive officers to achieve our 2007 goals in a manner consistent with the creation of long-term shareholder value, and that they are sufficiently challenging and difficult to achieve to focus executives on superior achievement of the Company's short-term objectives.

    153.   Defendants' compensation prior to and during the Class Period was as follows:

| Name | Year | Salary ($) | Bonus ($) | Other Annual Compen-sation | Stock Awards ($) | Option Awards* ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| **L. Stephen Smith** | 2007 | 800,000 | 0 | | 462,183 | 2,473,784 | 5,154,217 |
| | 2006 | 649,583 | 0 | | 462,183 | 1,342,969 | 4,475,927 |
| | 2005 | 525,000 | 750,000 | 39,075 | 1,850,000 | | 3,176,675 |
| | 2004 | 500,000 | 767,700 | 20,200 | 0 | | 1,296,900 |
| | 2003 | 425,000 | 213,791 | 29,200 | 0 | | 678,191 |
| **Donald P. Lofe, Jr.** | 2007 | 425,000 | 117,000 | | 231,092 | 629,789 | 1,564,270 |
| | 2006 | 390,000 | 0 | | 231,984 | 379,501 | 1,552,709 |
| | 2005 | 360,000 | 411,250 | 39,075 | 925,000 | | 1,771,294 |
| | 2004 | 315,000 | 400,000 | 201,820 | 0 | | 927,383 |
| | 2003 | 300,000 | 267,375 | 282,771 | 159,150 | | 1,009,296 |
| **Bradley M. Shuster** | 2007 | 475,000 | 0 | | 462,183 | 760,644 | 1,981,546 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2006 | 415,000 | 0 | | 462,183 | 495,139 | 2,214,346 |
| | 2005 | 400,000 | 506,000 | 39,075 | 1,850,000 | | 2,808,675 |
| | 2004 | 330,000 | 450,384 | 20,200 | 0 | | 809,584 |
| | 2003 | 315,000 | 140,850 | 29,200 | 0 | | 579,985 |
| **David H. Katkov** | 2007 | 430,000 | 0 | | 231,092 | 637,258 | 1,595,091 |
| | 2006 | 385,333 | 0 | | 231,092 | 361,055 | 1,620,502 |

*Option awards not priced during 2003-2005.

**Defendants' Insider Stock Sales**

154.    While insider sales are not necessary to establish scienter in this case, defendants' stock sales are consistent with the scheme to defraud.  During the same time that the Company and the Individual Defendants issued materially false and misleading statements causing the Company's stock price to be artificially inflated, the Individual Defendants took advantage of the inflation of the stock price and sold more than $9 million worth of their PMI shares to the unsuspecting public.  A summary of defendants' stock sales is as follows:

| Date of Trade | Inside Trader | Number of Shares | Price Per Share ($) | Gross Proceeds |
|---|---|---|---|---|
| 7-May-07 | Katkov, David H. | 9,084 | 48.88-48.92 | $444,000 |
| 7-May-07 | Katkov, David H. | 944 | 48.94-48.94 | $46,000 |
| 7-May-07 | Katkov, David H. | 405 | 48.88-48.88 | 20,000 |
| 1-May-07 | Smith, L. Stephen | 13,900 | 48.09-48.09 | 668,000 |
| 1-May-07 | Shuster, Bradley M | 653 | 47.85-47.85 | 31,000 |
| 1-May-07 | Shuster, Bradley M | 31,586 | 48.02-48.30 | 1,521,000 |
| 20-Apr-07 | Smith, L. Stephen | 19,892 | 48.00-48.00 | 955,000 |
| 19-Apr-07 | Smith, L. Stephen | 108 | 48.00-48.00 | 5,184 |
| 16-Apr-07 | Smith, L. Stephen | 10,000 | 46.00-46.00 | 460,000 |
| 1-Mar-07 | Smith, L. Stephen | 10,000 | 46.06-46.42 | 462,000 |
| 12-Feb-07 | Katkov, David H. | 449 | 47.34-47.34 | 21,000 |
| 6-Feb-07 | Smith, L. Stephen | 2,821 | 50.49-50.49 | 142,000 |
| 6-Feb-07 | Smith, L. Stephen | 16,100 | 51.07-51.07 | 822,000 |
| 2-Feb-07 | Smith, L. Stephen | 30,000 | 48.19-48.19 | 1,446,000 |
| 3-Jan-07 | Smith, L. Stephen | 30,000 | 48.06-48.06 | 1,442,000 |
| 8-Dec-06 | Shuster, Bradley M | 2,592 | 46.49-46.69 | 121,000 |
| 7-Dec-06 | Smith, L. Stephen | 10,000 | 46.81-46.81 | 468,000 |
| 7-Dec-06 | Shuster, Bradley M | 8,921 | 46.73-46.73 | 417,000 |

**Post-Class Period Events – Further Evidence of Defendants' Fraudulent Conduct**

155.     On March 17, 2008, the Company, including defendants Katkov, Lofe and Smith, held an earnings conference call with analysts and investors.  On the conference call, defendants stated, in part:

> **[Smith]:**  Thanks, Bill and good morning everyone, and thank you for joining today's call.  As you've seen in our financial results, The PMI Group had a net loss in the fourth quarter of approximately $1 billion or $12.51 per share.  For the full year, The PMI Group had a net loss of $915.3 million or $10.81 per share.  Our financial results are driven by a confluence of extraordinary events including the significant challenges facing the housing mortgage and capital markets.  Clearly, 2007 was a very difficult year for the entire financial services industry and PMI.  And we believe that the PMI Group will have losses on a consolidated basis in 2008.
>
> To address the conditions we see in the U.S. economy and global markets today and to position PMI to return to profitability, we have implemented a five-point plan.  That plan is to maintain our financial strength, focus on our core mortgage insurance business, book high quality new business, mitigate losses and manage expenses.  Obviously each of these is critical, but none more so in today's environment than maintaining our financial strength.
>
> *     *     *
>
> The second point of our plan is to focus on core mortgage insurance business.  While we are working to stabilize and improve the value of our financial guaranty investments, particularly FGIC and RAM Re, these investments are no longer strategic to our operations.  Therefore, we have no intention of making further capital contributions to either of these companies.  Our top initiatives, strengthening our financial position and focusing on our core business, mortgage insurance, will position us for growth.
>
> *     *     *
>
> Obviously, as a result of the changing market and economic conditions, there are challenges in the U.S. Mortgage Insurance Operations.  We expect paid claims in 2008 will range between 825 to $975 million.  As shown in our supplement portfolio disclosure document released today, we are seeing heightened defaults for specific loans, including 2/28 hybrid ARMs, Alt-A, high loan-to-value and particular geographic regions including California, Florida and the auto states of Michigan, Ohio, Illinois and Indiana.
>
> *     *     *
>
> In response to significant deterioration of the housing and mortgage markets, we are intensely focused on measures to ensure that the business we are booking in 2008 throughout our global mortgage insurance operations is of very high quality and would be profitable over time.  In the United States, we've made significant changes to our underwriting guidelines, principally related to 100% loan-to-value loans, Alt-A loans in certain geographic areas where we have identified as distressed markets.  As a result of this and other measures we're seeing very encouraging trends in our new business production.

1    These changes will likely reduce the volume of new business that we write, but we
     believe that they will result in a better, more profitable book of business going
2    forward.  The purpose of all these changes is to ensure that we remain true to our
     mission of facilitating sustainable home ownership while producing profitable books
3    of business and in doing so these changes will ultimately be good for consumers,
     communities, PMI and our shareholders.
4
                                    *        *        *
5
     **[Lofe]:**  As Steve discussed, our financial guaranty investments are no longer a core
6    strategic focus of The PMI Group.  At this point, our efforts are focused on
     stabilizing the value of these assets in orderly [sic] to potentially realize value in the
7    future.  We recognize that conditions remain unsettled in the markets and this makes
     it difficult for FGIC and RAM Re to operate.  Our equity earnings from these two
8    entities have become more volatile due to the application of fair value or mark-to-
     market accounting to the portion of their credit enhancement business, which is
9    executed in credit derivative form.

10                                  *        *        *

11   Now transitioning to FGIC, the equity and losses from that entity so significantly
     reduced the value of our investment, and that an impairment while we tested for it
12   was not deemed necessary at the current time.  We also will continue to evaluate this
     investment for possible future impairment including if ownership in FGIC were to
13   become diluted in connection with any proposed restructuring or if the estimated fair
     value were to fall below our carrying value.  This leaves PMI's carrying value at
14   December 31, 2007 of FGIC at $103.6 million and RAM Re at $60 million.

15                                  *        *        *

16   **[David Hochstim]**:  Yeah, it's Bear Stearns as of today.  Wonder if you could talk
     more about the effect of your underwriting changes and the underwriting tightening
17   that Fannie and Freddie have done on new insurance written and the prospect for new
     insurance written? And I guess Fannie and Freddie have been losing some market
18   share very recently to Ginnie Mae.  Presumably a higher risk business migrates to the
     government, but is – I guess I am trying to think about how earned premiums might
19   change over the next year possibly or how much they might grow given their kind of
     mix shift and higher premium rates?
20
     **[Katkov]**:  David, this is David Katkov.  Of course, there's a lot of questions in your
21   question, so let me try to give you some indication, since we don't forecast revenue
     growth.  First and foremost, you're right: FHA has seen an increase in their business.
22   We have said in a couple of different forms, for certain segments of that business
     we're perfectly fine with FHA stepping in specifically, I believe they have a role for
23   higher LTV, generally lower credit quality borrowers, and then now to turn it to PMI,
     those are specifically [sic] segments that we have backed away from starting last fall.
24   So, from my perspective – and it really – I want to emphasize Steve's earlier
     comments, our goal in 2008 is to ensure that the loans that we put on the books are
25   certainly of extremely high credit quality with good profitability prospects in the out
     years. . . .  So I think, again, since we don't forecast revenues, my overall sense is
26   that we're very focused on profitability, and we think the changes we have made for
     underwriting guidelines, even if they have some top line effect, will have very strong
27   bottom line effect.

28                                  *        *        *

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1   [James Gilligan]:  Okay, thanks.  Another question on a different topic; on one of
2   your supplements that you provided you had a graph that shows kind of issues by
    year and then the losses over time, starting basically with 2001 all the way through
3   2007.  2007 is not on that graph, just wondering if you guys had just a data point for
    what your experience is in that vintage?

4   [Katkov]:  This is David Katkov again.  Obviously it's very early to be able to
    predict how that vintage will perform.  I do think we can make a general statement
5   because I think this applies really across all mortgage participants and there is a
    general recognition that 2007 was a difficult year for originations in terms of overall
6   quality.  But that's not unique to PMI.

7                           *       *       *

8   [Bob Gottesman]:  Yes, First Manhattan Co.  Could I just ask a basic question to
    outline what you think is the longer-term investment case to buy PMI stock? . . .
9
    [Smith]:  Bob, let me start that, this is Steve.  As I had indicated in my remarks in
10  terms of what we believe to be the quality of business that is available to us in 2008,
    as you know, markets are very cyclical.  We will come out of this cycle.  *So we're*
11  *very focused on booking high quality business not only in the United States but*
    *also around the world, so we feel good about our prospects there.*
12
                            *       *       *
13
    [James Roumell]: . . .  And two, just going back to the '07 vintage regarding an
14  earlier question, is it fair to say that the '07 book in how its seasoning is much
    quicker than what you would normally expect and is that a fair assumption, that that
15  is – the losses coming off of the '07 book are coming in quite a bit more rapidly than
    what you would expect in a normal book of business?
16
                            *       *       *
17
    [Katkov]:  First of all, as you know, in the fourth quarter we added 434, I am sorry,
18  $435 million to our loss reserves.  And then let me break it out in terms of how are
    reserves allocated by vintage because I think this is what you are really asking.
19
    [James Roumell]:  Yeah.
20
    [Katkov]: . . .  Back to your specific question on '07, clearly, as I've said before,
21  overall market participants would say that it was a challenging vintage.  It is too early
    to make any forecast as to how that vintage will play out beyond the data that I have
22  just shared with you.

23  [Smith]:  Just to complement David's thought there.  Clearly, we are in a difficult
    overall housing, mortgage and capital market.  So you would expect those vintages
24  going into the teeth of that market to have some results that wouldn't necessarily
    conform with all of your historical data.
25
                            *       *       *
26
    [Lofe]:  And Mike, my comment to the previous caller was that it appeared that there
27  was the acceleration of claims into 2008 and we only provide for what we know is in,
    if you will, on an incurred basis based upon NODs and other factors.  So again, as
28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

you know, we can't put a quote provision up for something we don't know about today.

**[Michael Grasher]**:  Yeah, I understood with that, yeah.

**[Katkov]**:  Mike, again, just to be clear the things that I highlighted in my previous answer was, and I think this is your question, tell me if it's not, is we definitely saw an increase in our NODs, we definitely saw an increase in our claim rate assumptions, we also saw an increase in our claim size assumptions.  So, yes to all of those.

**[Michael Grasher]**:  Okay.  And then just to clarify, Steve, you're talking about your typical maturity being two to four years, are you speaking to paid loss experience on those or are you speaking to delinquencies, if you could clarify?

**[Smith]**:  I'm speaking to the total incurred losses by vintage.

156.    Defendants' statements in the March 17, 2008 conference call further revealed the true state of affairs at the Company.  Defendants acknowledged that their poor underwriting practices and mounting losses left PMI under capitalized and they reviewed their options for generating additional capital.  PMI's underwriting standards, which had been trumpeted throughout the Class Period, were in fact, not stringent enough and allowed the Company to take on too much risk.  Defendants stated that they would only underwrite high-quality loans, as opposed to the high-risk loans they were underwriting during the Class Period.  Defendants admitted that stricter underwriting standards would lead to a decrease in volume, further demonstrating that their Class Period underwriting was much riskier than defendants admitted.  Finally, it was revealed that FGIC and RAM Re were so poorly run that these entities were no longer expected to be profitable and the Company would not longer seek to fund them.

157.    On August 26, 2008, the effects of the poor quality of PMI's portfolio was finally exposed; PMI issued a press release announcing the downgrading of its rating by S&P entitled "PMI's Claims-Paying Resources Unaffected by S&P's Actions":

The PMI Group, Inc. (NYSE: PMI) (the Company) today announced that Standard & Poor's (S&P) lowered the insurer financial strength ratings of PMI Mortgage Insurance Co. (PMI U.S.) to A- from A+. S&P also lowered the ratings of PMI Mortgage Insurance Company Limited (PMI Europe) to A- from A+.  The senior debt rating of the holding company was lowered to BBB- from BBB+ and the junior subordinated debt rating lowered to BB from BBB-.  S&P placed all of the

above ratings on credit watch with negative implications with the possibility of an additional one notch downgrade, or the affirmation of the existing ratings with a negative outlook.

## FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

**PMI's Financial Statements and Statements About Financial Results Were Materially Misstated in Violation of GAAP and SEC Reporting Rules**

158.    The financial statements and the statements about the Company's financial results were false and misleading in the Company's 2006 Form 10-K; 1Q07 Form 10-Q; 2Q07 Form 10-Q; 3Q07 Form 10-Q; 2007 Form 10-K; and 1Q08 Form 10-Q.  The Company violated GAAP and SEC reporting rules because said financial information was not prepared in conformity with applicable GAAP literature and SEC requirements, nor was the financial information a fair presentation of the Company's operations because of its improper accounting for, and disclosures about, the investment in FGIC and the equity in losses for unconsolidated subsidiaries (an income statement loss adjustment in connection with the investment in FGIC), and the reserve for losses and loss adjustment expenses (a balance sheet liability account).

159.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosures.  SEC Regulation S-X requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

**Improper Accounting for, and Disclosures About, PMI's Investment in FGIC**

160.    For the period ended March 31, 2008, PMI finally admitted that its 42% share ownership interest in FGIC was other than temporarily impaired.  In PMI's 1Q08 Form 10-Q, PMI reduced its carrying value of FGIC from $103.6 million as of December 31, 2007 to ***zero***.  Since the carrying value was dropped to zero, PMI no longer recognized its proportionate share of FGIC's income or losses.  The impairment resulted in PMI recording a loss of nearly $88 million as

a pre-tax net realized investment loss in the consolidated statement of operations as of March 31, 2008.

161.    In the 1Q08 Form 10-Q, PMI claimed that the decision to reduce the carrying value to zero was based on, *inter alia*, the following reasons:

> **[C]ontinued uncertainty concerning the future performance of FGIC's insured collateralized debt obligation ("CDO") and residential mortgage-backed securities ("RMBS") portfolios and continued widening of credit spreads associated with credit default swaps**; the cessation of new business writings by FGIC during the first quarter of 2008; the need for FGIC to obtain or generate significant additional capital to resume business writings and the absence of a definitive agreement with respect to any capital raise; the likelihood that, were any capital plan to be executed by FGIC, the Company's investment in FGIC would be highly diluted since the Company does not intend to fund any portion of such additional capital; and various regulatory and other business uncertainties.

The uncertainties and circumstances requiring the write-down to zero, however, existed no later than 3Q07, as described in this Complaint.

**Background on Derivative Instruments and GAAP Literature Pertaining to PMI's Improper Accounting for, and Disclosures About, PMI's Investment in FGIC**

162.    Collateralized debt obligations (CDO), residential mortgage-backed securities (RMBS), and credit default swaps (CDS) are accounted for as derivative instruments, according to the Statement of Financial Accounting Standards ("SFAS") No. 133, *Accounting for Derivative Instruments and Hedging Activities*, issued by the Financial Accounting Standards Board ("FASB") in June 1998, ¶¶6-9.  These derivative instruments may be briefly described as follows:

(a)    A CDO is essentially a repackage of existing mortgage bonds, buyout loans, and other assets into new securities with varying risks.  CDOs are a type of asset-backed security and structured credit product, constructed from a portfolio of fixed-income assets which are divided into different tranches with different credit ratings and corresponding risks.  A CDO investor takes a position in an entity that has a defined risk and reward, not directly in the underlying assets, and the investment is dependent on the quality of the metrics and assumptions used for defining the risk and reward of the corresponding tranches.

(b)    A RMBS is a bundled security consisting of such assets as home mortgages, home equity loans, and subprime mortgages, with corresponding credit risks, and whose cash flows are backed by the principal and interest payments from such residential debt.

1        (c)    A CDS is designed to transfer the credit exposure of fixed income products

2    from one party to another, and is similar to an insurance policy in that the buyer of a credit swap

3    receives credit protection, whereas the seller of the CDS guarantees the credit worthiness of the

4    product.  For example, PMI or FGIC would typically be a seller of a CDS and a bank may be the

5    buyer.  The buyer/bank normally would be the holder of the underlying mortgage or other financial

6    instrument, although the buyer is not required to actually hold the financial asset to buy a CDS.  The

7    seller of the CDS guarantees to buy the financial asset at par in the event of default on the underlying

8    financial asset.  In exchange, the buyer typically pays quarterly premiums to the seller as protection

9    against the potential default on a five-year CDS contract, although CDSs of almost any maturity can

10   be traded.

11       163.    Such derivative instruments as CDOs, RMBSs, and CDSs must be measured at fair

12   value and are marked-to-market, *i.e.* marked to current fair value.  According to GAAP, an entity

13   shall recognize all of its derivative instruments in its statement of financial position as either assets

14   or liabilities depending on the rights or obligations under the contracts.  SFAS No. 133, ¶17.  FASB

15   provided a detailed definition of fair value in SFAS No. 133:

16       The amount at which an asset (liability) could be bought (incurred) or sold (settled)
    in a current transaction between willing parties, that is, other than in a forced or

17       liquidation sale.  Quoted market prices in active markets are the best evidence of fair
    value and should be used as the basis for the measurement, if available.  If a quoted

18       market price is available, the fair value is the product of the number of trading units
    times that market price.  If a quoted market price is not available, the estimate of fair

19       value should be based on the best information available in the circumstances.  The
    estimate of fair value should consider prices for similar assets or similar liabilities

20       and the results of valuation techniques to the extent available in the circumstances.
    Examples of valuation techniques include the present value of estimated expected

21       future cash flows using discount rates commensurate with the risks involved, option-
    pricing models, matrix pricing, option-adjusted spread models, and fundamental

22       analysis.  Valuation techniques for measuring assets and liabilities should be
    consistent with the objective of measuring fair value.  Those techniques should

23       incorporate assumptions that market participants would use in their estimates of
    values, future revenues, and future expenses, including assumptions about interest

24       rates, default, prepayment, and volatility.  In measuring forward contracts, such as
    foreign currency forward contracts, at fair value by discounting estimated future cash

25       flows, an entity should base the estimate of future cash flows on the changes in the
    forward rate (rather than the spot rate).  In measuring financial liabilities and non-

26       financial derivatives that are liabilities at fair value by discounting estimated future
    cash flows (or equivalent outflows of other assets), an objective is to use discount

27       rates at which those liabilities could be settled in an arm's-length transaction.

28   SFAS No. 133, ¶540, Appendix F: Glossary, Fair value.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1     164.    Effective September 2006, for fiscal years beginning after November 15, 2007,

2   FASB issued SFAS No. 157, *Fair Value Measurements*, with the following definition: "Fair value

3   is the price that would be received to sell an asset or paid to transfer a liability in an orderly

4   transaction between market participants at the measurement date."  SFAS No. 157, ¶5.  FASB

5   provided further explication of fair value in ¶¶6-15 of SFAS No. 157. SFAS No. 157 also provides

6   detailed guidance on the valuation techniques that are used to measure fair value for financial

7   reporting purposes.  Under SFAS No. 157, most derivatives, including CDOs, RMBSs, and CDSs,

8   are accounted for on a marked-to-market basis.

9     165.    The applicable GAAP guidance pertinent to accounting for PMI's investment in

10   FGIC during the Class Period includes Accounting Principles Board Opinion No. 18 ("APB No.

11   18"), *The Equity Method of Accounting for Investments in Common Stock*.  APB No. 18 applies

12   because FGIC was a privately owned entity and was ***required*** when the investment did ***not*** have a

13   readily determinable fair value.  According to APB No. 18:

> A loss in value of an investment which is other than a temporary decline should be
> recognized the same as a loss in value of other long-term assets.  Evidence of a loss
> in value might include, but would not necessarily be limited to, absence of an ability
> to recover the carrying amount of the investment or inability of the investee to
> sustain an earnings capacity which would justify the carrying amount of the
> investment.  A current fair value of an investment that is less than its carrying
> amount may indicate a loss in value of the investment.  However, a decline in the
> quoted market price below the carrying amount or the existence of operating losses is
> not necessarily indicative of a loss in value that is other than temporary.  All are
> factors to be evaluated.

APB No. 18, ¶19(h).  On the other hand, the applicable guidance for investments in equity securities

that have readily determinable fair values, and for all investments in debt securities, was SFAS No.

115, *Accounting for Certain Investments in Debt and Equity Securities*, as described in SFAS No.

115, Summary (FASB: *A Guide to Implementation of Statement 115 on Accounting for Certain

Investments in Debt and Equity Securities: Questions and Answers*, revised October 2002, question

and answer no. 4).

166.    The SEC literature pertaining to "other than temporary" impairments of investments

has long held that a company's decision to write-down an equity investment – such as PMI's

investment in FGIC in this case – is ***not*** subject to the discretion of the company or its accountants.

For example, the SEC staff states the following in SEC Staff Accounting Bulletin ("SAB"): *Codification of Staff Accounting Bulletins, Topic 5: Miscellaneous Accounting, M: Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities*:

> Unless evidence exits [*sic*; likely intended "exists"] to support a realizable value equal to or greater than the carrying value of the investment, a write-down to fair value accounted for as a realized loss should be recorded.

SEC SAB No. 59, *Accounting for Noncurrent Marketable Equity Securities*, reached a similar conclusion:

> QUESTION 1: Does the [SEC] staff believe that the phrase "other than temporary" should be interpreted to mean "permanent"?
>
> INTERPRETIVE RESPONSE: No.  The staff believes that the FASB consciously choose the phrase "other than temporary" because it did not intend that the test be "permanent impairment," as has been used elsewhere in accounting practice. . . .  Unless evidence exists to support a realizable value equal to or greater than the carrying value of the investment, a write-down accounted for as a realized loss should be recorded.

In addition, in a "Speech by SEC Staff: Call Them As You See Them," dated November 2, 2000, by Jackson M. Day, SEC Deputy Chief Accountant, at the American Institute of Certified Public Accounting ("AICPA") National Conference on Banks and Savings Institutions, Mr. Day stated the following in pertinent part:

> SAB 59 essentially requires that a registrant have evidence to support that the amortized cost of a security will be realized.  Unless such evidence exists, a write-down accounted for as a realized loss should be recorded.

**Write-Down of PMI's Investment in FGIC to Zero Was Required No Later than 3Q07 Based on GAAP Literature and SEC Guidance**

167.    PMI's initial problems with its investment in FGIC can be traced to FGIC's strategic decision to expand its CDO related businesses in response to the weaker municipal finance market in 2006 compared with 2005, a market which had been very important to FGIC's cash flows.  FGIC also expanded its involvement in such other derivative instruments as CDSs, as sellers of the contracts to buyers seeking credit protection.  Such derivative instruments carry with them substantial risks because FGIC became exposed to the risks of defaults on the underlying financial assets.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

168.     As part of FGIC's strategy in 2006 of increasing its risk exposures through increased involvement in derivative instruments, FGIC recognized the importance of credit surveillance to FGIC's long-term success, which had already been in place:

> A number of trends and events have heightened the importance of credit surveillance. A cooling housing market, natural disasters, interest rate uncertainty, the prospect of Medicare reform in the U.S. – all of these impact the issues we guarantee. ***Our focus is proactive surveillance, which can lead to early detection and facilitate loss prevention.   In recent years, we've built an industry-leading surveillance infrastructure for new sectors, including a risk management database that facilitates enhanced tracking of exposures.  We've added substantially to our surveillance team and hold frequent and regular meetings to review our exposures.*** Our goal is to surveil to a "no surprise" level of oversight.

FGIC Annual Review of 2006, "A Conversation with Howard C. Pfeffer, President." Consequently, FGIC and PMI were aware of the need to monitor the factors which would adversely affect FGIC's contracts and cash flows, and FGIC had a program in place that enabled FGIC to ascertain the fair values of its derivative instruments and to record losses when incurred.  Similarly, PMI, with a 42% share in FGIC, was in a position to ascertain the fair value of its investment and to vigilantly write-down the FGIC investment in accordance with GAAP and SEC guidance.

169.     PMI, in fact, had a substantial risk surveillance system of its own.  According to a former PMI manager, CW3, PMI had a solid risk modeling program and access to substantial data that far surpassed FGIC's vaunted data capabilities.

170.     There were several key indicators that were used by industry experts to assess the current state of, and future prospects for, the mortgage market.  These indicators included: (1) the Housing Price Index, which measures changes in home prices; (2) interest rates; and (3) delinquency rates, which measure the percentage of mortgagors who default on their mortgage obligations.

171.     As the following chart illustrates, U.S. housing prices collapsed in early 2006:

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   172.   To make matters worse for the mortgage market, as U.S. housing prices fell

16   precipitously, interest rates rose dramatically between 2006 and 2007:

17
18
19
20
21
22
23
24
25
26
27
28



FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

173.    By 2006, the combination of falling housing prices and rising interest rates was devastating for U.S. borrowers who over-extended themselves by purchasing homes that they could not afford without sufficiently low initial interest rates – called "teaser rates" – on ARMs.  Whereas in the early 2000's, buyers could refinance their three, five, or seven-year ARMs at the time the teaser rate expired using the additional equity in their homes to support the refinancing, things later changed for the worse.  Beginning in 2005, home values declined, interest rates rose, and ARM teaser rates expired resulting in the dramatic rise in the mortgage default rate, particularly for subprime loans, which were loans that did not meet Fannie Mae or Freddie Mac guidelines because of one or a combination of factors, including credit status of the borrower, income and job history, and the income to mortgage payment ratio.

174.    As delinquencies related to subprime mortgage loans began to spike in August 2006 and reached historical highs by the end of November 2006, the unfolding deterioration in the housing market meant that FGIC's losses should have been recognized.  As of December 2006, late mortgage payments rapidly increased in 3Q06 as higher interest rates squeezed budgets and made it difficult for homeowners, particularly those with weaker credit records, to maintain their monthly obligations.  The MBA, in its quarterly assessment of the mortgage market, reported that the percentage of monthly payments that were 30 or more days past due for all loans tracked jumped to 4.67% in 3Q06 – the worst performance since 1Q105.  The delinquency rate for subprime borrowers in 3Q06 were even higher at 12.6%—the highest in more than three years.  And for those holding adjustable rate mortgages, the delinquency rate was 13.2% in 3Q06, which was also the worst reading in more than three years.  As of November 2006, there were clear signs that CDO performance was suffering due to the delinquency rates of the underlying RMBS, as many CDOs during this period were backed by subprime RMBS.

175.    By early 2007, the U.S. real estate market was well in the midst of a freefall from its 2005 apex, as property values plummeted and mortgage defaults soared.  Declining property values coupled with rising interest rates caused delinquency rates to rise sharply during the Class Period for U.S. residential subprime and Alt-A mortgages (a category just a notch above subprime mortgages, which has certain characteristics such as reduced documentation verifying the

borrower's income, assets deposit information and/or employment), and high LTV loans. The freefall began in early 2006 and by October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006, nearly twice the delinquency rate on subprime loans recorded a year earlier. By early 2007, the 60+ day delinquency rate of some Alt-A and subprime mortgages were running at four times the level of loans issued in 2003-2004.

176. To make matters even worse for FGIC, in 2006, most of the structured finance deals at FGIC were executed as CDSs. In that time frame, nearly 100% of FGIC's collateralized loan obligation transactions were executed as CDSs, and within the entire CDO book of business, FGIC executed only a few deals as "traditional" financial guaranty insurance deals.

177. The market signals that RMBS and CDO values were being eroded by increasing defaults of U.S. mortgages were rendered even clearer by the trading platforms that monitored pricing of RMBS. In January 2006, some of the leading banks and investment banks collaborated with Markit Group Limited, a provider of financial data, to launch the first asset-backed securities index, called the ABX Index. The many financial institutions involved in creating the ABX Index included, among others, Bank of America, Citigroup, Goldman Sachs, JP Morgan, Merrill Lynch, and Wachovia. The ABX Index showed that no later than October 2006, subprime mortgages derived fixed income instruments were being adversely affected by the subprime mortgage crisis.

178. During the Class Period, the ABX Index tracked the performance of 15-20 equally-weighted RMBS tranches backed by subprime collateral and was used as a barometer for assessing how subprime loan related assets were performing in the market place. As noted above, the ABX Index tracked the cost of buying and selling CDS protection on selected RMBS tranches. Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating.

179. The various components of the ABX Index were classified by vintage (*i.e.*, the year that the underlying subprime collateral was issued). For example, the ABX Index 07-1 references subprime mortgage-backed RMBS tranches that were originated in the 2H06. ABX Index 07-2

references subprime mortgage-backed RMBS tranches that were originated in the 1H07.  As the trend suggests, new indices were rolled out every six months.

180.    For example, below is the complete ABX Index table as of February 23, 2007:

| Index Series | Version | | Coupon Rate | RED ID | Price | High | Low |
|---|---|---|---|---|---|---|---|
| ABX-HE-AAA07-1 | 7 | 1 | 9 | 0A08AHAC6 | 99.15 | 100.09 | 99.15 |
| ABX-HE-AA07-1 | 7 | 1 | 15 | 0A08AGAC8 | 99.15 | 100.09 | 99.15 |
| ABX-HE-A07-1 | 7 | 1 | 64 | 0A08AFAC0 | 92.50 | 100.01 | 92.50 |
| ABX-HE-BBB07-1 | 7 | 1 | 224 | 0A08AIAC4 | 75.21 | 98.35 | 75.21 |
| ABX-HE-BBB-07-1 | 7 | 1 | 389 | 0A08AOAC1 | 68.50 | 97.47 | 68.50 |
| ABX-HE-AAA06-2 | 6 | 2 | 11 | 0A08AHAB8 | 99.15 | 100.12 | 99.15 |
| ABX-HE-AA06-2 | 6 | 2 | 17 | 0A08AGAB0 | 99.15 | 100.12 | 99.15 |
| ABX-HE-A06-2 | 6 | 2 | 44 | 0A08AFAB2 | 92.69 | 100.12 | 92.69 |
| ABX-HE-BBB06-2 | 6 | 2 | 133 | 0A08AIAB6 | 76.80 | 100.58 | 76.80 |
| ABX-HE-BBB-06-2 | 6 | 2 | 242 | 0A08AOAB3 | 69.39 | 100.94 | 69.39 |
| ABX-HE-AAA06-1 | 6 | 1 | 18 | 0A08AHAA1 | 99.54 | 100.38 | 99.54 |
| ABX-HE-AA06-1 | 6 | 1 | 32 | 0A08AGAA9 | 99.76 | 100.73 | 99.76 |
| ABX-HE-A06-1 | 6 | 1 | 54 | 0A08AFAA7 | 96.20 | 100.51 | 96.20 |
| ABX-HE-BBB06-1 | 6 | 1 | 154 | 0A08AIAA4 | 88.50 | 101.20 | 88.50 |
| ABX-HE-BBB-06-1 | 6 | 1 | 267 | 0A08AOAA2 | 85.17 | 102.19 | 85.17 |

181.    In the table above, "Index Series" refers to the type of loan ("HE" or Home Equity), the bond's credit rating (*e.g.*, BBB), and the vintage of the referenced mortgage-backed securities (*e.g.*, 06-2).  "Coupon Rate" sets the annual premium payment (measured in basis points) that a protection seller agrees to pay a protection buyer over the life of the CDS.  For example, assuming a CDS notional value of $100 million (representing the total value of the derivative's underlying assets at the spot price), a Coupon Rate of 224 on the ABX-HE-BBB 07-1 means that protection on a BBB-rated RMBS tranche issued during 2H06 would cost roughly $2.24 million over the life of the CDS contract.

182.    "Price" is the cost of buying the specific bond protection.  Essentially, the "Price" is an expression of the par value of the referenced tranche.  The price is set to 100 on the day the particular Index is launched and equal to 100 cents on the dollar.  At 100, the only payment made by the protection buyer to the protection seller is the Coupon Rate.  If the Index drops below 100, however, it means that protection is becoming more expensive and that protection sellers are demanding an additional premium payment.  The amount of the additional premium is expressed by the amount by which the Index drops below 100.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

183. By way of example, as of February 23, 2007, the ABX-HE-BBB06-2 was trading at 76.80, a 23.2% discount from its 100 par value. This means that, in addition to the coupon payment, protection buyers were also demanding an up-front fee from protection sellers equal to 23.20% of the bond's face value. In the $100 million example above, this would translate into an up-front fee of $23.2 million, in addition to the $2.24 million coupon payment that will be made over the life of the contract. Thus, by tracking the level of additional premiums required by protection sellers, the level of the ABX Index indicates market sentiment as to the likelihood that certain assets backed by subprime mortgages will experience future losses.

184. As set forth in the chart below, during the 4Q06 and the 1H07, the value of the ABX Index plummeted, evidencing that the cost of insuring subprime RMBS and CDO bonds had increased dramatically. Investors thus anticipated that the risks associated with subprime RMBS and CDO tranches would almost certainly cause large losses. Therefore, the collapse of the ABX during the Class Period was yet another powerful indicator that indisputably revealed that the values of RMBSs and CDOs backed by subprime mortgages were falling disastrously, at a near-historic pace during late 2006 and 2007, mandating that PMI ultimately write-down its investment in FGIC to zero no later than 3Q07:

**Figure 5: ABX.BBB 06-2**



Source: Markit

185.    The ABX Index served as a benchmark of the market for securities backed by home loans issued to borrowers with weak credit.  The ABX Index was, of course, closely tracked by banks, investments banks, and other market participants in the mortgage market.  For FGIC and PMI, the ABX Index proved to be a critical source of market pricing information for FGIC's collateralized loan obligation transactions that were executed as CDS.  By 2006, most of the structured finance deals at FGIC were executed as CDS.  Nonetheless, while FGIC and PMI were aware of the risks and losses involved in such transactions, PMI did not inform investors of the substantial risks associated with FGIC's applications of these derivative instruments.

186.    In FGIC's financial report as of June 30, 2007, FGIC began to discuss some of the substantial risks as follows:

> The realized and unrealized gains and losses recognized in the Consolidated Statements of Income by recording credit derivatives at fair value are determined each quarter based on quoted market prices, if available.  If quoted market prices are not available, the determination of fair value is based on internally developed models.  These models require market-driven inputs, including contractual terms, credit spreads and ratings on the underlying referenced obligations and yield curves.

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1    There may be volatility in the use of market-driven inputs obtained from an illiquid
     market, and ***differences may exist between available market data and assumptions***
2    ***used by management to estimate the fair value of these instruments. Accordingly,***
     ***the valuation results from the model could differ materially from amounts that***
3    ***would be realized in the market if the derivative were traded.*** Due to the volatile
     nature of the Company's fair value estimate, future valuations could differ materially
4    from those reflected in the current period.

5   FGIC Financial Report, June 30, 2007, Note 9: Derivative Instruments.

6          187.    FGIC's approach to the valuation of its derivative instruments, however, was not in

7   accordance with GAAP, as it was not based on market-based assumptions and factors. As noted in

8   one of FASB's detailed definitions of fair value: "Valuation techniques for measuring assets and

9   liabilities should be consistent with the objective of measuring fair value. Those techniques should

10  incorporate assumptions that market participants would use in their estimates of values, future

11  revenues, and future expenses, including assumptions about interest rates, default, prepayment, and

12  volatility."  SFAS No. 133, ¶540, Appendix F: Glossary.  And with respect to "other than

13  temporary impairment," such market-based assumptions and factors mandate write-downs to

14  realizable value, according to SEC guidance.

15         188.    Nonetheless, in 2Q07, PMI did not address the dramatic freefall in the key mortgage

16  indicators and the ABX Index, and proceeded to recognize equity in earnings of about $27.4

17  million and $56.8 million for the three months and six months ended July 30, 2007, respectively,

18  from its 42% share ownership interest in FGIC. PMI actually ***increased*** its carrying value of FGIC

19  by about $24.9 million from about $856.5 as of the end of 4Q06 to $881.4 million as of the end of

20  1Q07. Then, PMI actually ***increased*** its carrying value of FGIC yet again, by about $15.3 million,

21  from about $881.4 million as of the end of 1Q07 to $896.7 million as of the end of 2Q07, when the

22  ABX Index had already fallen precipitously from its levels in January 2007.

23         189.    In 3Q07, FGIC continued to avoid writing down its derivative contracts to fair value

24  in accordance with GAAP and SEC guidance.  FGIC attempted to justify its accounting for its

25  contracts as follows:

26    The Company [FGIC] believes that the most meaningful presentation of the financial
      statement impact of these credit derivative contracts is to record revenue as
27    installments are received as a component of premiums, and to record claims
      payments, expected claims, loss and loss adjustment expenses, and changes in fair
28    value as "Net realized and unrealized gains (losses) on credit derivative contracts" in

the Consolidated Statements of Income. . . . As of September 30, 2007, the Company had recorded no losses or loss adjustment expenses related to these contracts. ***Management's determination that no loss reserves were required at September 30, 2007 was necessarily based upon estimates and subjective judgments about the outcomes of future events. Actual results will likely differ, possibly materially, from these estimates.*** This determination will be evaluated as additional information becomes available, and loss reserves may be recorded on these contracts in future periods.

FGIC Financial Report, September 30, 2007, Note 9: Derivative Instruments.

190.    As of 3Q07, in connection with its FGIC investment, PMI recognized equity in losses from unconsolidated subsidiaries of about $28.9 million for the three months ended September 30, 2007, and recognized equity in earnings of about $27.9 million for the nine months ended September 30, 2007.  PMI reported carrying values for its investment in FGIC ranging from $764.7 million in 1Q06 to $896.7 million in 2Q07.  In 3Q07, PMI trimmed its carrying value for FGIC by only about $12.7 million from $896.7 million as of June 30, 2007 to $884 million as of September 30, 2007.

191.    Although FGIC acknowledged in 3Q07 that the increase in credit spreads reduced the fair value of FGIC's CDS contracts, with respect to FGIC's investments, FGIC continued to use the ratings of credit rating agencies as the basis for avoiding recognition of losses, even though it was abundantly clear to FGIC and PMI through FGIC's extensive "credit surveillance" practices and PMI's own substantial data resources that the credit rating agencies were exceedingly slow to respond to the economic realities that had already set in ***prior*** to 3Q07, and should not have been relied on.  Nonetheless, in 4Q07, FGIC stated the following:

The Company [FGIC] has evaluated the credit ratings of the securities in its investment portfolio and noted no deterioration.  Because the decline in market value is attributable to changes in interest rates and credit spreads on insured investments and not to the credit quality of the underlying investments, and because the Company has the ability and intent to hold these investments until their fair value exceeds their amortized cost or until maturity, the Company did not consider these investments to be other than temporarily impaired at December 31, 2007.

FGIC Financial Report, December 31, 2007, Note 6: Investments.

192.    In 4Q07, PMI reported a net loss of $915.3 million, primarily due to PMI's equity in losses of FGIC of $763.3 million.  Despite the deterioration in the U.S. housing and mortgage markets and the global credit markets, PMI still refused to cut its 42% carrying value in FGIC to

zero, and reduced the carrying value from $884 million as of September 30, 2007 to $103.6 million as of December 31, 2007.  Only in 1Q08, did PMI ultimately write its investment in FGIC down to zero, finally recognizing that the investment was "other than temporarily impaired."  In 1Q08, PMI also reported a pre-tax net realized investment loss from impairment in FGIC of about $88 million.

193.    In the 2007 Form 10-K, PMI stated the following, in pertinent part:

> *FGIC had a significant net loss of $1.8 billion in 2007, related primarily to the guarantees it provided during 2006 and 2007 on CDOs of asset-backed securities ("ABS") (comprised to a large extent of tranches of RMBS as well as other CDOs) and RMBS transactions.  The adverse results in both of these areas was due primarily to negative developments in the U.S. housing and mortgage markets, particularly with regard to sub-prime mortgages and second liens.*  As a result of FGIC's realized and unrealized losses in 2007, the carrying value of our investment in FGIC Corporation was reduced to $103.6 million as of December 31, 2007 from $856.5 million as of December 31, 2006.  FGIC's "AAA" ratings were downgraded by each of the three major rating agencies to "AA" by Fitch, "A" by Standard & Poor's, and "A3" by Moody's.  Further downgrades are possible.

194.    Although PMI reduced the carrying value on FGIC from $884 million as of the end of 3Q07 to $103.6 million as of the end of 4Q07, PMI continued to falsely represent that the fair value of its investment in FGIC exceeded its carrying value:

> In connection with the preparation of our financial statements [for the period ended December 31, 2007], we conducted an analysis as to whether the significantly reduced value of our investment in FGIC as of December 31, 2007 was impaired.  Because, among other things, we determined the fair value of our investment in FGIC to be greater than its current carrying value, we concluded that no impairment is necessary at the current time.

195.    PMI waited until 1Q08 to finally "determine" that the fair value no longer exceeded carrying value, at which time PMI reduced the carrying value from $103.6 million as of the end of 4Q07 to $0.  The following chart depicts PMI's reported carrying values for its FGIC investment for 1Q06 through 1Q08:



196.    In FGIC's financial statements for the period ended March 31, 2008, FGIC stated the following, ironically characterizing most of its statements as "recent developments":

> The deterioration in the U.S. housing and mortgage markets and the global credit markets, which accelerated in the fourth quarter of 2007 and continued during the first quarter of 2008, has adversely affected the Company's business, results of operations and financial condition.  During the first quarter of 2008, the company's financial strength and credit ratings were downgraded by various rating agencies.  As of June 13, 2008, the financial strength of FGIC and FGIC UK Ltd. was rated BBB by Fitch Ratings Inc. (rating outlook negative), Baa3 by Moody's Investor Services Inc. (on review for possible downgrade) and BB by Standard & Poor's Rating Services (CreditWatch with negative implications).  The financial strength ratings downgrades have adversely impacted the Company's ability to generate new business and, unless restored, will impact the Company's future business operations and financial results.  During the first quarter of 2008, the Company increased reserves established for the Company's exposure to certain collateralized debt obligations of asset-backed securities ("ABS CDOs"), which are backed primarily by subprime residential mortgage-backed securities, and to certain residential mortgage-backed securities ("RMBS"), primarily backed by second-lien mortgages.
>
> As a result of these developments, the Company ceased writing new business during the first quarter of 2008 for a period of time to preserve capital and is considering various alternatives to enhance its capital, restructure its operations and mitigate losses.  However, no assurance can be given that any action taken by the Company will improve its current ratings, that further rating downgrades will not occur, or that the Company will be able to recommence writing new business in the near term or at all.  FGIC has proposed a significant restructuring of its insurance operations to the New York State Insurance Department (the "NYSID"), including the organization of a new financial guaranty insurer to be domiciled in New York to provide support for global public finance and infrastructure obligations previously insured by FGIC and to write new business to serve those markets.  Any restructuring will require approval from the NYSID, among other requirements and significant new capital investment.  No assurance can be given that such restructuring or investment will be completed. [FGIC Financial Report, March 31, 2008, Note 2: Recent Developments]

197.     But the "continued uncertainty concerning the future performance of FGIC's insured collateralized debt obligation CDO and residential mortgage-backed securities RMBS portfolios and continued widening of credit spreads associated with credit default swaps" – as noted in PMI's 1Q08 Form 10-Q as among the reasons for the write-off – did ***not*** suddenly emerge in 1Q08 or even 1Q07.

198.     As early as 2Q06, it was clear to both FGIC and PMI that FGIC's securities and the associated underlying collateral or reference portfolios would never meet expectations.  As of the end of 2Q07, FGIC had approximately $10.4 billion in CDOs of ABS, or 3.3% of the $314.7 billion net par outstanding risk exposure in force.  The CDOs of ABS were 75% high grade and 25% mezzanine credits.  However, the underlying collateral was concentrated in subprime RMBS that was mostly originated in 2005 and 2006.  The subprime RMBS used in the CDO transactions were typically rated BBB and such securities were aggregated in CDO transactions to generate AAA rated bonds.  As of the end of 2Q07, FGIC also had approximately 11% or $34.7 billion of a total $314.7 in net par in force insuring MBS transactions (non-CDO).  Of this exposure, $8.8 billion was tied to subprime mortgages, or 2.7% of the total net par in force.  Another $18.6 billion of 5.9% of total net par in force was related to prime home equity (Alt-A mortgage loans with low documentation) and closed end seconds transactions.  Approximately 80% of the subprime MBS was rated A or higher, with 75% of the vintages post-2004.  Approximately 78% of the prime home equity MBS was rated BBB (lowest investment grade) with 77% of the vintages post-2004.

199.     Given FGIC's critical risk exposures, PMI's analysis of its investment in FGIC did not address the dramatic freefall in the key mortgage indicators and the ABX Index during 1H07.  And clearly by 3Q07, PMI knew that FGIC's economic and financial circumstances had changed so drastically for the worse that PMI had no evidence to support a realizable value for FGIC.  In accordance with GAAP, the carrying value of the investment should have been written down to zero no later than 3Q07.

200.     In connection with PMI's improper accounting for its investment in FGIC, PMI also violated the following other GAAP rules:

1        (a)     the violation of the principle that financial reporting should provide

2 information that is useful to present and potential investors and creditors and other users of the

3 financial reports in making rational investment, credit, and similar decisions (FASB Statement of

4 Concepts No. 1, ¶34);

5        (b)     the violation of the principle that financial reporting should provide

6 information about the economic resources of an enterprise, the claims to those resources, and the

7 effects of transactions, events, and circumstances that change resources and claims to those resources

8 (FASB Statement of Concepts No. 1, ¶40);

9        (c)     the violation of the principle that financial reporting should provide

10 information about an enterprise's financial performance during a period.  Investors and creditors

11 often use information about the past to help in assessing the prospects of an enterprise.  Thus,

12 although investment and credit decisions reflect investors' expectations about future enterprise

13 performance, those expectations are commonly based, at least partly, on evaluations of past

14 enterprise performance (FASB Statement of Concepts No. 1, ¶42);

15        (d)     the violation of the principle that financial reporting should be reliable in that

16 it represents what it purports to represent.  That information should be reliable as well as relevant is a

17 notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

18        (e)     the violation of the principle of completeness, which means that nothing is left

19 out of the information that may be necessary to insure that it validly represents underlying events

20 and conditions (FASB Statement of Concepts No. 2, ¶79);

21        (f)     the violation of the principle that conservatism be used as a prudent reaction to

22 uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately

23 considered (FASB Statement of Concepts No. 2, ¶95); and

24        (g)     the violation of the principle that interim financial reporting should be based

25 upon the same accounting principles and practices used to prepare the annual financial statements

26 (APB No. 28, ¶10).

27        201.    Despite FGIC's and PMI's explanations, however, both FGIC and PMI had all the

28 necessary information about the uncertainties and circumstances concerning FGIC's financial

1    investments that required PMI to write-down its FGIC investment to zero, no later than the 3Q07,

2    in accordance with GAAP and SEC guidance, based on FGIC's proactive surveillance of trends and

3    events; FGIC's "industry-leading surveillance infrastructure for new sectors, including a risk

4    management database that facilitates enhanced tracking of exposures;" FGIC's substantial

5    surveillance team and frequent and regular meetings that reviewed risk exposures; PMI's own

6    surveillance infrastructure; the key housing and mortgage indicators; and the results of the ABX

7    Index.  As SAB 59 mandated, a registrant must "have evidence to support that the amortized cost of

8    a security will be realized.  Unless such evidence exists, a write-down accounted for as a realized

9    loss should be recorded."

10   **The Defendants as Members of FGIC's Board of Directors Knew, or Were Reckless in Not
     Knowing, of PMI's Improper Accounting for, and Its Disclosures About, PMI's Investment**

11   **in FGIC**

12          202.    Defendants Smith, Schuster and Lofe, as members of FGIC's Board of Directors,

13   and in particular, Shuster and Lofe, who served on the FGIC Audit Committee (Lofe as Chairman)

14   during the Class Period, knew of or recklessly ignored the problems facing FGIC, including the

15   adverse information that FGIC faced mounting losses due to the low quality of loans backing the

16   RMBS and CDO's that it insured.  Smith also knew of or was deliberately reckless in not knowing

17   this information by virtue of his position on PMI's Financial Guaranty Oversight Committee –

18   which was responsible for the oversight of PMI's investment in FGIC.  With regard to Lofe and

19   Shuster, the FGIC Audit Committee charter states that the responsibility of the Audit Committee

20   includes assisting the board of directors in fulfilling its oversight of the preparation and integrity of

21   the Company's financial statements.  The chairperson of the Audit Committee presides over all

22   Committee meetings – which are to occur at least quarterly.  As detailed in the charter, to fulfill its

23   obligation, the Audit Committee "[met] periodically in separate private sessions with management,

24   the internal auditor, the independent auditor and the Company's General Counsel, and in executive

25   sessions without Company employees present. . . .  The Committee shall have full, free and

26   unrestricted access to the Company's senior management and employees, and to the Company's

27   internal and independent auditors."

28

203.    The Audit Committee is obligated to review and discuss annual and quarterly reports from the independent auditor regarding "[a]ll critical accounting policies and practices used by the Company" and "[a]ll material alternative treatments of financial information within generally accepted accounting principles (or statutory accounting practices) that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor."   In addition, the charter states that "[t]he Committee shall review and discuss with management, internal audit and the independent auditor any asset impairment or other significant investment accounting issues."

204.    Defendants Smith, Schuster, and in particular Lofe, knew or were reckless in not knowing, that FGIC faced mounting losses due to the low quality of loans backing the RMBS and CDO's that it insured.  Information surrounding the quality of the loans  that FGIC was indirectly guaranteeing was available to defendants prior to December 31, 2007 when FGIC was forced to increase its reserves by more than $1.2 billion- a 4300% increase from the reserves at December 31, 2006.  Underwriting quality was known to FGIC and its directors in 2006 and 2007 and was not the result of new accounting rules, the collapse in the housing market or any other external events.  FGIC and its directors, including Lofe, knowingly failed to record adequate loss reserves earlier in 2007 as to avoid breaching statutory capital requirements.  Finally in January 2008, when FGIC could no longer ignore its mounting losses, FGIC increased its reserves by over 4300% and disclosed the following:

> FGIC has established statutory loss reserves related to its exposure on certain ABS CDOs and RMBS, which has substantially reduced FGIC's statutory capital and surplus position as of December 31, 2007. As a result of this reduction, as of December 31, 2007, FGIC's aggregate net liability under its insured exposures exceeded the aggregate risk limit prescribed by New York State Insurance Law and FGIC's insured exposure under certain individual policies exceeded the applicable single risk limits prescribed by New York State Insurance Law.

**Improper Accounting for, and Disclosures About, Losses and Loss Adjustment Expenses and the Reserve for Losses and LAE**

205.    PMI estimated reserves for losses and loss adjustment expenses to recognize the liability of unpaid losses related to insured mortgages that were in default, including loan defaults

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

that have been incurred but have not been reported by the lenders.  The loss reserves were based upon estimates and judgments by management, including estimates and judgments with respect to the rate and severity of claims.  The process of reserving for losses entails forecasting the interest rate and the employment and housing market environment.  The key assumptions that PMI used in the estimation process were expected claim rates, average claim sizes, and the costs to settle claims.  PMI developed a high-low range of estimates for its loss reserve, rather than a single estimate.  PMI used its actual claim experience in prior years to project the current liability.  The changes in loss reserves had a material impact on PMI's consolidated net income or loss.

206.    As noted in ¶¶170-175, the key indicators that were used by industry experts to assess the current state of the mortgage market included the Housing Price Index, interest rates, and delinquencies.  These indicators established that the mortgage market had severely deteriorated in 2006 and went into a tailspin in 2007.  As shown in the chart in ¶171, U.S. home prices peaked in 3Q05 and had fallen precipitously since that period.  To make matters worse for the mortgage market, interest rates rose as housing prices fell between 2006 and 2007.

207.    Delinquency and foreclosure rates also increased dramatically between 2006 and 2007, as shown in the following schedule based upon data from the National Delinquency Survey prepared by the MBA:

| U.S. Delinquency and Foreclosure Rates | | |
|---|---|---|
| **Period** | **Delinquency Rate** | **Foreclosure Rate** |
| Q4 2005 | 4.7% | 0.99% |
| Q1 2006 | 4.41% | 0.98% |
| Q2 2006 | 4.39% | 0.99% |
| Q3 2006 | 4.67% | 1.05% |
| Q4 2006 | 4.95% | 1.19% |
| Q1 2007 | 4.84% | 1.28% |
| Q2 2007 | 5.12% | 1.40% |
| Q3 2007 | 5.59% | 1.69% |
| Q4 2007 | 5.82% | 2.04% |
| Q1 2008 | 6.35% | 2.47% |

As noted in the MBA's National Delinquency Survey, the delinquency rate for mortgages is based on one-to-four-unit residential properties, and the loans include prime loans, subprime loans, and government loans.

208.     One of the driving forces of the accelerating delinquency rate was the subprime mortgage market, in which PMI had considerable exposure.  The freefall began in early 2006 and by October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006, nearly twice the delinquency rate on subprime loans recorded a year earlier.  The MBA reported in its quarterly assessment of the mortgage market that the percentage of monthly payments that were 30 or more days past due for all loans tracked jumped to 4.67% in 3Q06 – the worst performance since 1Q05.  As of December 2006, late mortgage payments rapidly increased in 3Q06 as higher interest rates squeezed budgets and made it difficult for homeowners, particularly those with weaker credit records, to maintain their monthly obligations.  The delinquency rate for subprime borrowers in 3Q06 were even higher at 12.6% – the highest in more than three years.  And for those holding adjustable rate mortgages, the delinquency rate was 13.2% in 3Q06, which was also the worst reading in more than three years.  By early 2007, the 60+ day delinquency rate of some Alt-A and subprime mortgages were running at four times the level of loans issued in 2003-2004.  By 3Q07, the delinquency rate was the highest in the MBA Survey since 1986.  At the same time, the rate of foreclosure starts and the percent of loans in the process of foreclosure were at the highest levels ever.  By 4Q07, the delinquency rate was the highest in the MBA survey since 1985, and foreclosures reached another new record high.

209.     PMI often knew about delinquent loans before the lenders did.  According to CW1, PMI had more stringent requirements for identifying and tracking delinquencies on loans than the lenders did because of PMI's statutory reporting requirements as an insurance company.  For example, CW1 explained that the lenders considered and reported delinquencies on mortgages they originated after the payment on the loan had not been received for a period of at least 30 days and, in some cases, for as long as 90 days.  In the interim between when the payment was due and the 30-to 90-day period when the lender recorded the loan as being delinquent (and ultimately reported it to PMI as a default), the servicer of the loan had personnel who tried to reach the borrower through phone calls and even visited the residence of the borrower to determine if the borrower intended to make a payment on his or her loan.  If these efforts by the servicer personnel failed and

1    the borrower did not make a payment for as long as 90 days, the lenders then considered the loan to

2    be delinquent and/or in default.

3           210.    However, because PMI is an insurance provider, it is governed by statutory

4    requirements that demand PMI identify delinquencies on loans on "day one" that the loan becomes

5    delinquent – or the first day after the missed payment.  PMI is then required to adjust its reserves

6    based on the number of loans that are delinquent during the statutory reporting period.  As such,

7    when the lender identified a loan as delinquent, it may have already been categorized as such by

8    PMI for 30 to 90 days or longer.

9           211.    PMI derived delinquency data from the loan servicers.  CW1 said that the policy

10   Servicing personnel at PMI maintained a database that tracked delinquency data from the loan

11   servicers.   Policy servicing personnel that tracked delinquencies used the data to prepare

12   comprehensive reports of portfolio performance and delinquency or default data.  These reports

13   were submitted to PMI executives.

14          212.    Given the massive increases in delinquencies and foreclosures, and the ongoing

15   severe trends in home prices and interest rates, PMI was required to substantially increase the

16   reserve for losses in *pari passu* in order to comply with GAAP.  FASB Statement of Concepts No.

17   5, ¶87, states that "an expense or loss is recognized if it becomes evident that previously recognized

18   future economic benefits of an asset have been reduced or eliminated, or that a liability has been

19   incurred or increased, without associated economic benefits."

20          213.    PMI failed to report an adequate reserve for losses by deliberately underestimating

21   its loan portfolio delinquencies and by using economic assumptions that did not take the ongoing

22   severe trends adequately into account.

23          214.    In the SEC Form 10-K for the period ended December 31, 2006, defendants reported

24   net income of $419.7 million and failed to recognize an adequate amount reserve for losses and loss

25   adjustment expenses in connection with U.S. mortgage insurance operations.  For the period ended

26   December 31, 2006, PMI reported $302.9 million of total losses and LAE, of which $263 million

27   represented losses and LAE for U.S. operations.  For the period ended December 31, 2006, PMI

28   reported $414.7 million total reserve for losses and LAE, of which $366.2 million represented

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

recorded reserves for losses and LAE (gross of insurance recoveries) for U.S. operations. According to PMI's own actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from $330.5 million to $411.8 million, a difference of $81.3 million.

215.    PMI increased the reserve balance for U.S. operations from December 31, 2005 to December 31, 2006 by about $20.7 million, primarily based on higher expected primary claim rates and claim sizes on pending delinquencies, but PMI did not adequately account for the ***significant changes in the business mix of PMI's portfolio*** in 2006 compared with 2005.  In 2006, PMI's portfolio consisted of significantly greater percentages of such high-risk products as interest only, payment option ARMs, Alt-A (a category just a notch above subprime mortgages, which has certain characteristics such as reduced documentation verifying the borrower's income, assets deposit information and/or employment), and high LTV loans.

216.    In the SEC Form 10-Q for the 1Q07, defendants reported net income of $102.0 million and failed to recognize an adequate amount for losses and LAE, and consequently also failed to recognize an adequate reserve for losses and LAE in connection with U.S. mortgage insurance operations.  For 1Q07, PMI reported $109.3 million of total losses and LAE, of which $92.8 million represented losses and LAE for U.S. operations.  For the period ended 1Q07, PMI reported $443 million total reserve for losses and LAE, of which $386 million represented recorded reserves for losses and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from $339.0 million to $463.2 million, a huge difference of $124.2 million.

217.    Although PMI increased the reserve balance for U.S. operations from December 31, 2006 to March 31, 2007 by about $19.8 million, primarily based on higher expected primary claim rates and claim sizes on pending delinquencies, PMI still did not adequately account for the ***significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims sizes*** compared with December 31, 2006.  In addition, PMI became aware of a significant increase in "loan workout" activity by loan servicers.  Loan workout activity consisted of the series of steps that lenders engaged in with borrowers to resolve delinquent loan payments. Despite the significant increase in lenders' loan workout activity to attempt to resolve mounting

1    delinquencies and prevent foreclosures, PMI still selected a recorded loss reserve of $386 million

2    for U.S. operations for March 31, 2007 that was about $15.1 million *less* than the $401.1 million of

3    the reserve range of $339 million to $463.2 million estimated by PMI's own actuaries.

4              218.    In the SEC Form 10-Q for the 2Q07, defendants reported net income of $83.8

5    million and failed to recognize an adequate amount for losses and LAE, and consequently also

6    failed to recognize an adequate reserve for losses and LAE in connection with U.S. mortgage

7    insurance operations.  For 2Q07, PMI reported $146.2 million of total losses and LAE, of which

8    $134.4 million represented losses and LAE for U.S. operations.  For 2Q07, PMI reported $507

9    million total reserve for losses and LAE, of which $444.6 million represented recorded reserves for

10   losses and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own

11   actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from $385.3

12   million to $503.8 million, a huge difference of $118.5 million.

13            219.    Although PMI increased the reserve balance for U.S. operations from March 31,

14   2007 to June 30, 2007 by about $58.6 million, PMI still did not adequately account for the

15   significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates,

16   and claims sizes compared with December 31, 2006, and focused primarily on PMI's historical

17   patterns of claim payments and loss experience.  In spite of increasing delinquencies and

18   foreclosures, PMI still selected a recorded loss reserve of $444.6 million for U.S. operations for

19   June 30, 2007 that was the midpoint of the reserve range of $385.3 million to $503.8 million

20   estimated by PMI's own actuaries.

21            220.    In the SEC Form 10-Q for 3Q07, defendants reported a net loss of $86.8 million, but

22   still failed to recognize an adequate amount for losses and LAE, and consequently also failed to

23   recognize an adequate reserve for losses and LAE in connection with U.S. mortgage insurance

24   operations.  For 3Q07, PMI reported $372.8 million of total losses and LAE, of which $348.3

25   million represented losses and LAE for U.S. operations.  For 3Q07, PMI reported $770.3 million

26   total reserve for losses and LAE, of which $698.2 million represented recorded reserves for losses

27   and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own actuaries,

28

1   their calculated reserve for losses and LAE for U.S. operations ranged from $565.3 million to

2   $768.6 million, a huge difference of $132.9 million.

3        221.    In 3Q07, PMI acknowledged that the "[c]ontinuing deterioration in the U.S. housing

4   and mortgage markets has caused PMI's losses and loss adjustment expenses (LAE) and default

5   inventory to increase significantly in the third quarter and the first nine months of 2007." PMI did

6   not acknowledge such deterioration in the 2006 Form 10-K, 1Q07 10-Q, or the 2Q07 10-Q.

7   Nonetheless, PMI estimated various scenarios for its recorded reserves for losses and LAE for

8   3Q07 by assigning different weightings based upon actual claims experience in prior years to

9   project the liability for this period.  PMI increased the reserve balance for U.S. operations from

10   June 30, 2007 to September 30, 2007 by about $253.6 million, but PMI still did not adequately

11   account for the significant changes in the business mix of PMI's portfolio involving higher

12   defaults, claims rates, and claims sizes compared with December 31, 2006.  PMI selected a

13   recorded loss reserve of $698.2 million for U.S. operations for September 30, 2007 when PMI's

14   own actuaries estimated a reserve range of $565.3 million to $768.6 million.  In spite of substantial

15   home price declines, diminished availability of loan products and the decrease in the percentage of

16   default inventory that returned to current status, PMI continue to focus on historical patterns of

17   claim payments and loss experience.

18        222.    In the SEC Form 10-K for 2007, filed March 17, 2008, defendants reported a net

19   loss of $915.3 million, but still failed to recognize an adequate amount for losses and LAE, and

20   consequently also failed to recognize an adequate reserve for losses and LAE in connection with

21   U.S. mortgage insurance operations.  For FY07, PMI reported $1.2 billion of total losses and LAE,

22   of which $1 billion represented losses and LAE for U.S. operations.  For the period ended

23   December 31, 2007, PMI reported $1.2 billion total reserve for losses and LAE, of which $1.1

24   billion represented recorded reserves for losses and LAE (gross of insurance recoveries) for U.S.

25   operations.  According to PMI's own actuaries, their calculated reserve for losses and LAE for U.S.

26   operations ranged from $933.8 million to $1.3 billion, a massive difference of about $415 million.

27        223.    In FY07, PMI continued to estimate various scenarios for its recorded reserves for

28   losses and LAE by assigning different weightings based upon actual claims experience in prior

years to project the liability for this period.  Although PMI increased the reserve balance for U.S. operations from September 30, 2007 to December 31, 2007 by about $401.8 million, PMI still did not adequately account for the significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims sizes compared with December 31, 2006.  PMI selected a recorded loss reserve of $1.1 billion for U.S. operations for December 31, 2007 when PMI's own actuaries estimated a reserve range of $933.8 million to $1.3 billion.   In spite of the strong continuing trend of substantial home price declines, diminished availability of loan products, and the decrease in the percentage of default inventory that returned to current status, PMI continued to evaluate its assumptions in light of historical patterns of claim payments and loss experience.

224.    For 1Q08, defendants reported a net loss of $273.9 million, and reported $579.8 million of total losses and LAE, of which $537 million represented losses and LAE for U.S. operations.  In 1Q08, PMI reported $1.7 billion total reserve for losses and LAE, of which about $1.6 billion represented recorded reserves for losses and LAE (gross of insurance recoveries) for U.S. operations.  According to PMI's own actuaries, their calculated reserve for losses and LAE for U.S. operations ranged from about $1.5 billion to $1.9 billion, a massive difference of about $456.7 million.

225.    In 1Q08, PMI stated the following:

> Our increases to the reserve balance in the first quarter of 2008 were primarily due to PMI's higher default inventory and higher expected claim rates and claim sizes on reported delinquencies.  Continued deterioration of the U.S. housing market and mortgage markets caused PMI's default inventory, claims rates and claim sizes to increase in the first quarter of 2008.  Higher claim rates have been driven by, among other things, home price declines and diminished availability of certain loan products, both of which constrain refinancing opportunities, and result in a decrease in the percentage of the default inventory that is returning to current status.  The increase in PMI's average claim sizes has been driven by high loan sizes and coverage levels in PMI's portfolio and declining home prices which limit PMI's loss mitigation opportunities.

Nonetheless, PMI still did not acknowledge the impact of the ***significant changes in the business mix of PMI's portfolio involving higher defaults, claims rates, and claims sizes*** compared with December 31, 2006.  PMI selected a recorded loss reserve of about $1.6 billion for U.S. operations for March 31, 2008, which was about $119 million less that the midpoint of the reserve range of about $1.5 billion to $1.9 billion estimated by PMI's own actuaries.

226.    PMI failed to report an adequate reserve for losses by developing progressively wider ranges between the "low" estimate of the reserve and the "high" estimate of the reserve.  PMI selectively used data and assumptions to create unrealistically estimates for the low end of the range, and excessively wide ranges.  PMI then typically selected a loss reserve to report that was at about the mid-point of the low-high estimate or even less than the mid-point.  PMI low-balled the reserve for losses through this process of manipulating the data.  This general pattern is evident in the following schedule:

| PMI's Estimated U.S. Reserves for Losses and LAE (Dollar in Millions) | | | | | |
|---|---|---|---|---|---|
| Period | Low | High | Mid-point | Reported | Range of Low-High |
| Q 4 2006 | $330.5 | $411.8 | $371.2 | $366.2 | $81.3 |
| Q1 2007 | $339 | $463.2 | $401.1 | $386 | $124.2 |
| Q2 2007 | $385.3 | $503.8 | $444.6 | $444.6 | $118.5 |
| Q3 2007 | $565.3 | $768.6 | $667.5 | $698.2 | $132.9 |
| Q4 2007 | $933.8 | $1,300 | $1100 | $1,100 | $415 |
| Q1 2008 | $1,500 | $1,900 | $1700 | $1,600 | $456.7 |

227.    PMI's understatements of the reserve for losses and LAE for U.S. mortgage operations resulted in overstated net income or understatement of net losses.  GAAP, as described in FASB Statement of Concepts No. 5, ¶87, states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits."

228.    PMI also failed to properly apply SFAS No. 5, *Accounting for Contingencies*, which required that PMI accrue charges to income when it was probable (*i.e.*, the event was "likely to occur") that "a liability had been incurred at the date of the financial statements" and the "amount of the loss can be reasonably estimated."  SFAS No. 5, ¶¶1, 3(a), 8(a) and 75.  As noted in SFAS No. 5:

> For the purpose of this Statement, a contingency is defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain

1    (hereinafter a "gain contingency") or loss[13] (hereinafter a "loss contingency") to an
2    enterprise that will ultimately be resolved when one or more future events occur or
     fail to occur.  Resolution of the uncertainty may confirm the acquisition of an asset or
     the reduction of a liability or the loss or impairment of an asset or the incurrence of a
3    liability.

4                            *         *         *

5            An estimated loss from a loss contingency (as defined in paragraph 1) shall
     be accrued by a charge to income if **both** of the following conditions are met:
6
7            a.  Information available prior to issuance of the financial statements indicates
     that it is probable that an asset had been impaired or a liability had been incurred at
     the date of the financial statements.[14]  It is implicit in this condition that it must be
8    probable that one or more future events will occur confirming the fact of the loss.

9            b.  The amount of loss can be reasonably estimated.

10   SFAS No. 5, ¶¶1, 8.

11       229.    In addition, PMI's improper accounting for the reserve for losses and LAE for U.S.

12   mortgage operations violated the following other GAAP rules:

13           (a)    the violation of the principle that financial reporting should provide

14   information that is useful to present and potential investors and creditors and other users of the

15   financial reports in making rational investment, credit, and similar decisions (FASB Statement of

16   Concepts No. 1, ¶34);

17           (b)    the violation of the principle that financial reporting should provide

18   information about the economic resources of an enterprise, the claims to those resources, and the

19   effects of transactions, events, and circumstances that change resources and claims to those resources

20   (FASB Statement of Concepts No. 1, ¶40);

21           (c)    the violation of the principle that financial reporting should provide

22   information about an enterprise's financial performance during a period.  Investors and creditors

23   often use information about the past to help in assessing the prospects of an enterprise.  Thus,

24   ────────────────────

25   [13]    The term *loss* is used for convenience to include many charges against income that are
     commonly referred to as *expenses* and others that are commonly referred to as *losses*.  SFAS No. 5,
26   ¶1, n.1.

27   [14]    "Date of the financial statements" means the end of the most recent accounting period for
     which financial statements are being presented.

28

1   although investment and credit decisions reflect investors' expectations about future enterprise

2   performance, those expectations are commonly based, at least partly, on evaluations of past

3   enterprise performance (FASB Statement of Concepts No. 1, ¶42);

4            (d)    the violation of the principle that financial reporting should be reliable in that

5   it represents what it purports to represent.  That information should be reliable as well as relevant is a

6   notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

7            (e)    the violation of the principle of completeness, which means that nothing is left

8   out of the information that may be necessary to insure that it validly represents underlying events

9   and conditions (FASB Statement of Concepts No. 2, ¶79);

10            (f)    the violation of the principle that conservatism be used as a prudent reaction to

11   uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately

12   considered (FASB Statement of Concepts No. 2, ¶95); and

13            (g)    the violation of the principle that interim financial reporting should be based

14   upon the same accounting principles and practices used to prepare the annual financial statements

15   (APB No. 28, ¶10).

16        230.    PMI's improper accounting for the losses and LAE and the reserve for losses and

17   LAE for U.S. mortgage operations were material, given the SEC's guidance on materiality.  SEC

18   Staff Accounting Bulletin (SAB) Topic 1M, *Materiality*, summarizes GAAP definitions of

19   materiality.  SAB Topic 1M represents the codification of certain Staff Accounting Bulletins,

20   including SAB No. 99, *Materiality*, as of May 9, 2003.  SAB No. 99 was effective August 12,

21   1999. SAB Topic 1M says, *inter alia*: "A matter is 'material' if there is a substantial likelihood that

22   a reasonable person would consider it important."  It also stresses that materiality requires

23   qualitative, as well as quantitative, considerations.  For example, if a known misstatement would

24   cause a significant market reaction; such reaction should be taken into account in determining the

25   materiality of the misstatement.

26                      **LOSS CAUSATION/ECONOMIC LOSS**

27        231.    By misrepresenting its ability to withstand the housing decline and the adequacy of

28   its reserves, defendants presented a misleading picture of PMI's business and prospects.  Thus,

1  instead of truthfully disclosing during the Class Period that PMI's business was not as healthy as

2  represented, defendants falsely reported PMI's financial outlook and its actual business prospects

3  going forward.

4          232.    These claims of profitability caused and maintained the artificial inflation in PMI's

5  stock price throughout the Class Period and until the truth was revealed to the market.

6          233.    Defendants' false and misleading statements had the intended effect and caused PMI

7  stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high

8  of $50.21 per share in February 2007.

9          234.    The truth about PMI's business operations, finances, business metrics, and future

10  business and financial prospects began to enter the market with a series of partial disclosures and

11  revelations beginning in July 2007, which were accompanied by denials and continuing

12  misrepresentations by defendants.  As a result, the artificial inflation in PMI's stock price did not

13  come out of the stock all at once, rather the artificial price inflation came out over time, in bits,

14  pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices through

15  January 2008.

16          235.    As a direct result of defendants' admissions and the public revelations regarding the

17  truth about PMI's overstatement of its financial outlook and its actual business prospects going

18  forward, PMI's stock price plummeted over 87%, falling from $50.21 per share on February 7,

19  2007 to $6.47 per share on January 18, 2008 – a drop of $43.74 per share.  This drop removed the

20  inflation from PMI's stock price, causing real economic loss to investors who had purchased the

21  stock during the Class Period.

22          **NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

23          The statutory safe harbor provided for forward-looking statements under certain

24  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

25  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

26  when made.  To the extent there were any forward-looking statements, there was no meaningful

27  cautionary language identifying important factors that could cause actual results to differ materially

28  from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

1  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

2  liable for those false forward-looking statements because at the time each of those forward-looking

3  statements was made, the particular speaker knew that the particular forward-looking statement was

4  false, and/or the forward-looking statement was authorized and/or approved by an executive officer

5  of PMI who knew that those statements were false when made.

### COUNT I

**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

6

7

8       236.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

9  set forth herein.

10

11      237.    During the Class Period, defendants disseminated or approved the false statements

12  specified above, which they knew or deliberately disregarded were misleading in that they

13  contained misrepresentations and failed to disclose material facts necessary in order to make the

14  statements made, in light of the circumstances under which they were made, not misleading.

15      238.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed

16  devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to

17  state material facts necessary in order to make the statements made, in light of the circumstances

18  under which they were made, not misleading; or engaged in acts, practices and a course of business

19  that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with

20  their purchases of PMI common stock during the Class Period.

21      239.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of

22  the market, they paid artificially inflated prices for PMI common stock.  Plaintiffs and the class

23  would not have purchased PMI common stock at the prices they paid, or at all, if they had been

24  aware that the market prices had been artificially and falsely inflated by defendants' misleading

25  statements.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

240.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

241.   The Individual Defendants acted as controlling persons of PMI within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of PMI stock, the Individual Defendants had the power and authority to cause PMI to engage in the wrongful conduct complained of herein.  PMI controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### CLASS ACTION ALLEGATIONS

242.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired PMI common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

243.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  PMI has over 81 million shares of stock outstanding, owned by hundreds if not thousands of persons.

244.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include: whether the 1934 Act was violated by defendants; whether defendants omitted and/or misrepresented material facts; whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; whether defendants knew or deliberately disregarded that their statements were false and misleading; whether the price of PMI's common stock was artificially inflated; and the extent of damage sustained by Class members and the appropriate measure of damages.

1    245.    Plaintiffs' claims are typical of those of the Class because plaintiff and the Class

2    sustained damages from defendants' wrongful conduct.

3    246.    Plaintiffs will adequately protect the interests of the Class and has retained counsel

4    who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

5    with those of the Class.

6    247.    A class action is superior to other available methods for the fair and efficient

7    adjudication of this controversy.

8                                **PRAYER FOR RELIEF**

9    WHEREFORE, plaintiffs pray for judgment as follows:

10    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

11    B.    Awarding plaintiffs and the members of the Class damages, including interest;

12    C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

13    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

14    proper.

15                                **JURY DEMAND**

16    Plaintiffs demand a trial by jury.

17    DATED:  July 24, 2009                 COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
18                                          JEFFREY W. LAWRENCE
                                            DANIEL J. PFEFFERBAUM
19

20                                                    /s/
21                                          JEFFREY W. LAWRENCE

22                                          100 Pine Street, Suite 2600
                                            San Francisco, CA  94111
23                                          Telephone:  415/288-4545
                                            415/288-4534 (fax)
24
                                            Lead Counsel for Plaintiffs
25    S:\CasesSD\PMI Group\CPT00060684_DJP Edits.doc

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on July 24, 2009, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7    I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9    I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on July 24, 2009.

11

12                                                        /s/
                                              JEFFREY W. LAWRENCE
                                              COUGHLIN STOIA GELLER
13                                                  RUDMAN & ROBBINS LLP
                                              100 Pine Street, 26th Floor
14                                            San Francisco, CA  94111
                                              Telephone:  415/288-4545
15                                            415/288-4534 (fax)
                                              E-mail:jlawrence@csgrr.com
16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FED SEC LAWS – 3:08-CV-01405-SI

# Mailing Information for a Case 3:08-cv-01405-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lawrence Timothy Fisher**
  ltfisher@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **Meredith N. Landy**
  mlandy@omm.com,vtran@omm.com,sfolchi@omm.com,mpaul@omm.com,jcoakley@omm.com,bredmond@omm.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,jdecena@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Daniel Jacob Pfefferbaum**
  aserros@csgrr.com,DPfefferbaum@csgrr.com,khuang@csgrr.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union**
  sward@barrack.com

- **George A. Riley**
  griley@omm.com,mhenderson@omm.com,cchiu@omm.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Dhaivat H. Shah**
  dshah@omm.com,jcoakley@omm.com,bredmond@omm.com

- **Samuel M. Ward**
  sward@barrack.com,lxlamb@barrack.com,kisbell@barrack.com

- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

Alan R. Plutzik
Barroway Topaz Kessler Meltzer & Check LLP
2125 Oak Grove Road
Suite 120
Walnut Creek, CA 94598

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```