ROBBINS GELLER RUDMAN
   & DOWD LLP
KEITH F. PARK (54275)
DANIEL S. DROSMAN (200643)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
keithp@rgrdlaw.com
ddrosman@rgrdlaw.com
   – and –
DANIEL J. PFEFFERBAUM (248631)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re THE PMI GROUP, INC. SECURITIES LITIGATION | Master File No. 3:08-cv-01405-SI |
| | CLASS ACTION |
| This Document Relates To: | DECLARATION OF DANIEL S. DROSMAN IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR (1) FINAL APPROVAL OF SETTLEMENT; (2) APPROVAL OF THE PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; AND (3) LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES AND LEAD PLAINTIFF'S EXPENSES |
|    ALL ACTIONS. | |
| | DATE:     December 16, 2010 |
| | TIME:     9:00 a.m. |
| | COURTROOM:  The Honorable Susan Illston |

579437_1

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ..................................................................1

II.     FACTUAL SUMMARY OF LEAD PLAINTIFF'S CLAIMS .........................6

III.    PROCEDURAL HISTORY.....................................................................10

        A.      Plaintiffs' Consolidated Complaint..........................................10

        B.      Lead Plaintiff's FAC and Defendants' Motion to Dismiss...................11

        C.      The Court's November 2, 2009 Order Denying Defendants' Motion to
                Dismiss the FAC ...............................................................12

        D.      Fact Discovery ................................................................12

                1.      Discovery Overview ..................................................12

                2.      Lead Plaintiff's Discovery Requests.................................13

        E.      Lead Plaintiff's Discovery Requests to Third Parties.....................14

        F.      Defendants' Discovery Requests Propounded to Lead Plaintiff..............15

        G.      Discovery Requests Propounded to Experts .................................15

        H.      Protective Order .............................................................16

IV.     INVESTIGATORS, CONSULTANTS, AND EXPERTS ......................................16

        A.      Investigators................................................................16

        B.      Consultants..................................................................16

        C.      Market Efficiency Expert.....................................................17

        D.      Class Certification Proceedings .............................................18

V.      THE STRENGTHS AND WEAKNESSES OF THE CASE .............................18

VI.     SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT...................21

VII.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND
        WARRANTS APPROVAL ......................................................................23

VIII.   THE PLAN OF ALLOCATION ..............................................................23

IX.     LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS
        REASONABLE ...............................................................................26

        A.      The Requested Fee of 24.5% of the Settlement Fund is Fair and
                Reasonable, is Consistent with Percentages Routinely Awarded by Courts,

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,      - i -
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

Page

is Amply Justified by the Specific Facts and Circumstances in This Case and is Supported by the Lead Plaintiff....................................................26

1. Nature and Extent of Litigation ................................................26

2. The Support of the Lead Plaintiff ............................................27

3. The Settlement Achieved .........................................................27

4. The Risk of Contingent Class Action Litigation.......................27

5. The Diligent Prosecution of This Case ....................................28

6. The Complexity of This Action's Factual and Legal Questions................28

7. The Contingent Nature of the Case and the Financial Burden Carried by Lead Counsel ................................................29

X. CONCLUSION....................................................................................29

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

- ii -

1    I, DANIEL S. DROSMAN, declare as follows:

2        1.    I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), Lead

3    Counsel for the Lead Plaintiff in this action. I was actively involved in the prosecution of this

4    action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein

5    based upon my participation in all material aspects of the Litigation.[1]

6        2.    I submit this declaration in support of Lead Plaintiff's application, pursuant to Rule

7    23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation for a cash settlement

8    on behalf of the Class[2] of $31.25 million (the "Settlement Amount"); (b) the proposed Plan of

9    Allocation of settlement proceeds; and (c) Lead Counsel's application for attorneys' fees and

10   expenses and Lead Plaintiff's[3] expenses.

11   **I.    PRELIMINARY STATEMENT**

12       3.    This case has been vigorously litigated from its commencement in March 2008

13   through the settlement with The PMI Group, Inc. ("PMI" or the "Company") and certain officer and

14   director defendants in July 2010, a settlement that was reached after Lead Plaintiff filed two

15   _____

16   [1]    Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the
17   Stipulation of Settlement dated as of August 30, 2010 (the "Stipulation"), previously filed with the
     Court on August 31, 2010. Dkt. No. 89. Because I began working on the Litigation in January 2010,
18   my knowledge of events before that date is based on a review of the records in the Litigation and
     conversations with other attorneys in my office who were involved in the Litigation.

19   [2]    References to the "Class" are to the Class certified by the Court for settlement purposes only,
20   defined as:

21       All Persons (other than those Persons who timely and validly request exclusion from
         the Class) who purchased or otherwise acquired the common stock of The PMI
22       Group, Inc. during the period from November 2, 2006 to March 3, 2008, inclusive,
         excluding the Defendants herein, members of the immediate family of the
23       Defendants, the directors, officers, subsidiaries and affiliates of The PMI Group, Inc.,
         any person, firm, trust, corporation, officer, director or other individual or entity in
24       which any Defendant has a controlling interest, and the legal representatives,
         affiliates, heirs, successors-in-interest or assigns of any such excluded party.

25   Order Preliminarily Approving Settlement and Providing for Notice, ¶2. Dkt. No. 93.

26   [3]    The Lead Plaintiff in this action is Locals 302 and 612 of the International Union of
27   Operating Engineers-Employers Construction Industry Retirement Trust (the "Operating
     Engineers").

28

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI          - 1 -

consolidated amended complaints, both of which were the subject of extensive motions to dismiss by Defendants, which were fully briefed, and substantial merits and class discovery was conducted. At every stage of the Litigation, counsel for Defendants asserted aggressive defenses and expressed their belief that the Class could not prevail on the claims asserted. The settlement was not achieved until Lead Plaintiff, *inter alia*: (a) filed two amended complaints alleging violation of the federal securities laws; (b) opposed two motions to dismiss Lead Plaintiff's complaints; (c) conducted merits and class discovery, including reviewing and analyzing over 44,000 pages of documents produced by Defendants; (d) filed a motion to certify a this action as a class action supported by the expert declaration of an economist; (e) assessed the risks of prevailing on its claims at the summary judgment stage and at trial; and (f) prepared for and participated in two mediation sessions.

4.     The settlement with the Defendants was negotiated with the assistance of a respected mediator, the Honorable Layn R. Phillips (Ret.), a former United States District Court Judge. A full-day settlement mediation session was conducted by Judge Phillips on June 10, 2010 in San Francisco, California. Counsel for Lead Plaintiff and the Defendants each prepared comprehensive mediation briefs and expended substantial efforts in connection with this mediation. Lead Plaintiff's counsel made a presentation at the mediation highlighting the strengths of Lead Plaintiff's claims and key evidence obtained in discovery. The parties were unable to resolve this case during the course of the first day of mediation. A second day of mediation was held with Judge Phillips in New York City on July 13, 2010, wherein the parties were able to resolve their differences and settle the matter.

5.     This settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel for Lead Plaintiff and the Defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

6.     Lead Plaintiff believes that this settlement represents an excellent result for the Class, especially under the circumstances of this case. Substantial fact discovery, investigation, motion practice and legal research informed Lead Plaintiff that, while it believed its case was meritorious, it also had weaknesses which had to be carefully evaluated in determining what course (*i.e.*, whether to

settle and on what terms, or to continue to litigate through summary judgment and a trial on the merits) was in the best interests of the Class. As set forth in further detail below, despite the fact that Lead Plaintiff's allegations and claims were supported by legal authority, expert opinion and the evidence, the specific circumstances involved here presented many uncertainties with respect to Lead Plaintiff's ability to prevail if the case proceeded to summary judgment or trial.

7.     The operative complaint in this action is brought against PMI and certain of its officers and directors for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).[4]

8.     Lead Plaintiff alleges that Defendants engaged in a scheme to conceal PMI's exposure to delinquencies and defaults on home mortgage loans it insured and that Defendants improperly accounted for this exposure.  Lead Plaintiff alleges that PMI deviated from its conservative historical business practices and took on substantial risk by insuring high risk, low quality mortgages.  Through its subsidiary Financial Guaranty Insurance Company ("FGIC"), PMI was exposed to massive losses on financial guarantees on subprime mortgage backed securities. Lead Plaintiff alleges that Defendants knowingly made material false and misleading statements throughout the Class Period.  For example, Defendants: (a) assured the market that their core strength was credit risk management, despite the fact that PMI's systems could no longer adequately evaluate the exotic loan products and reduced documentation loans it was insuring; (b) assured investors that they were controlling for, or avoiding, risk layering when in fact risk layering was increasing; (c) manipulated loss reserves and loss adjustment expenses in violation of Generally Accepted Accounting Principles ("GAAP") to present a misleadingly positive projection of PMI's risk exposure; and (d) failed to timely write down their investment in FGIC in violation of GAAP.

---

[4]     The officer and director defendants are: L. Stephen Smith ("Smith") (CEO and Chairman of the Board of Directors), Bradley M. Shuster ("Shuster") (President, International and Strategic Investments of PMI, President and CEO of PMI Capital Corporation), David H. Katkov ("Katkov") (COO and Executive Vice President of PMI) and Donald P. Lofe, Jr. ("Lofe") (CFO and Executive Vice President).

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI                     - 3 -

These statements appeared in press releases, investor conference call transcripts and SEC filings, and allegedly caused PMI stock to trade at artificially inflated prices throughout the Class Period. The First Amended Complaint for Violation of the Federal Securities Laws alleges that the truth regarding PMI's business operations, finances, business metrics and future business and financial prospects began to be revealed to the market through a series of partial disclosures from July 2007 through January 2008, reducing PMI's stock price by 87%, from $50.21 per share on February 7, 2007, to $6.47 per share on January 18, 2008.

9. Proceeding with this Litigation through the summary judgment stage poses a number of real and substantial risks for the Class. To prevail, Lead Plaintiff must demonstrate to the Court that a genuine issue of material fact exists with regard to each element of its securities fraud claims. This allows both Lead Plaintiff and Defendants to present their strongest evidence to the Court. Defendants made clear that they would mount a strong and vigorous defense of each element of Lead Plaintiff's claims, including falsity, materiality, loss causation and scienter. While Lead Plaintiff believes there is evidence supporting each element of its claims, Lead Plaintiff recognized that countervailing evidence might be developed, or changes in the law might occur, which could result in dismissal of this case at summary judgment, at trial, or on appeal. There was also a substantial risk that the Court would find the evidence proffered by Lead Plaintiff in support of loss causation and/or scienter did not create a genuine issue of material fact.

10. Proceeding with this Litigation through trial also poses a number of real and substantial risks for the Class. For example, there is a substantial risk that Lead Plaintiff would not be able to prove at trial that the Defendants acted with the required state of mind – knowledge or deliberate recklessness. A defendant's state of mind in a securities case is often the most difficult element of proof, and one which is rarely supported by direct evidence such as an admission. There is also a substantial risk that, despite the use of testimony from respected experts, Lead Plaintiff would not be able to prove loss causation at trial.

11. Lead Plaintiff's burden at trial would require the testimony of experts on the mortgage underwriting and mortgage insurance, accounting, financial products, loss causation and damages. Even with experts who are among the most respected in these fields, there could be no

1  guarantee that Lead Plaintiff would prevail on liability and damages, as the Defendants would

2  likewise hire equally competent experts to counter Lead Plaintiff's experts' conclusions.

3      12.    Finally, even if Lead Plaintiff survived summary judgment and prevailed on any or all

4  of its claims at trial and was awarded damages, Defendants almost certainly would appeal any

5  verdict or award.  The appeals process could take years, during which time the Class would receive

6  no recovery.  Further, any appeal would also create the risk of reversal, in which case the Class

7  would receive nothing even though it prevailed on the claims at trial.

8      13.    These issues and others were carefully considered by Lead Plaintiff and its counsel in

9  deciding to settle the Litigation for $31.25 million.  In reaching the determination to settle, Lead

10 Plaintiff and Lead Counsel weighed the evidence and legal authority supporting their allegations

11 against the documents and legal authority that the Defendants believe undercut Lead Plaintiff's

12 claims, as well as their characterizations and interpretations of the evidence in this case.

13     14.    On balance, considering all the circumstances and risks the parties faced at summary

14 judgment and at trial, Lead Plaintiff concluded that settlement on the terms agreed upon was in the

15 best interests of the Class.

16     15.    The settlement confers a substantial benefit on the Class and eliminates the significant

17 costs of continued discovery and the significant risks of an adverse result at summary judgment or

18 trial.  It is respectfully submitted that the settlement should be approved as fair, reasonable and

19 adequate; and the Plan of Allocation should be approved.

20     16.    Lead Counsel prosecuted this action on a wholly contingent basis for more than two

21 years and advanced or incurred substantial litigation expenses.  By doing so, Lead Counsel have

22 borne the risk of an unfavorable result.  They have not received any compensation for their

23 substantial effort; nor have they been paid the expenses they seek.  The vigorous nature of the

24 Litigation, which proceeded through two dispositive motions and discovery, has resulted in expenses

25 of over $247,000.00 as well as the investment of over 3,500 hours of attorney and other professional

26 time.

27     17.    The fee application for 24.5% of the Settlement Fund is fair both to the Class and

28 Lead Counsel and warrants this Court's approval.  This fee request is within the range of fees

1  frequently awarded in these types of actions and is entirely justified in light of the substantial

2  benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature

3  and extent of legal services performed. Lead Plaintiff supports the award.

4      18.    Lead Counsel also seek an award of $247,924.15 in expenses reasonably and

5  necessarily incurred in prosecuting the Litigation. This amount includes, among other things: (a) the

6  fees and expenses of investigators, consultants and experts whose services Lead Counsel required in

7  the successful prosecution and resolution of this case; (b) photocopying, imaging and printing tens of

8  thousands of pages of documents; (c) online factual and legal research; (d) travel-related expenses;

9  and (e) mediation fees. As illustrated by the discussion herein of Lead Counsel's efforts required to

10  achieve this settlement, these expenses were reasonably and necessarily incurred to obtain this result.

11  Lead Plaintiff requests an award of $1,416.00 in expenses incurred in representing the Class.

12      19.    The following is a summary of the nature of the Class's claims, the principal events

13  that occurred during the course of this Litigation, and the legal services provided by Lead Counsel.

14  **II.    FACTUAL SUMMARY OF LEAD PLAINTIFF'S CLAIMS**

15      20.    This securities class action has been brought on behalf of investors who purchased or

16  acquired PMI common stock between November 2, 2006 and March 3, 2008 (the "Class Period").

17      21.    PMI is a Delaware corporation headquartered in Walnut Creek, California. PMI

18  trades on the New York Stock Exchange and had approximately 81 million shares of stock

19  outstanding during the Class Period ¶13.[5] Through its subsidiaries, PMI provides credit

20  enhancement products that promote homeownership and facilitate mortgage transactions in the

21  capital markets in the United States, Australia, New Zealand, and the European Union. Through its

22  subsidiary, PMI Mortgage Insurance Co., PMI offers mortgage insurance covering first lien, one to

23  four family residential mortgages. ¶13. PMI is also the largest shareholder of FGIC, the holding

24  company of Financial Guaranty Insurance Company, a financial guaranty insurance company.

25

26  _____

27  [5]    References to "¶__" are to paragraphs of the operative complaint, the First Amended
    Complaint for Violation of the Federal Securities Laws, filed July 24, 2009 (the "FAC").

28

1    22.    Founded in 1972, PMI was historically a conservative insurer of full documentation

2    home loans. ¶30.[6] PMI developed proprietary computer systems to evaluate home loans based on a

3    variety of factors which made underwriting essentially formulaic. ¶32. The Company used

4    approved lenders to sell PMI's insurance by applying PMI's underwriting guidelines and software.

5    ¶58.

6    23.    Lead Plaintiff alleges that in the booming housing market of the early 2000s, PMI

7    was marginalized as new loan products eliminated the need for mortgage insurance. ¶¶37-44.[7] Lead

8    Plaintiff alleges that, faced with a steadily declining persistency rate,[8] Defendants abandoned their

9    conservative underwriting practices and began insuring riskier loans, including: subprime loans,

10   loans with loan-to-value ratios exceeding 95% or even 97%; loans with exotic payment structures

11   and loans with increasingly large principal amounts. ¶¶45, 59, 61. Lead Plaintiff alleges that

12   Defendants also started insuring loans with reduced documentation – meaning that the borrower's

13   information was not verified or not provided at all. ¶45. Many loans contained more than one of

14   these risk factors. ¶89. Additionally, in 2003, Defendants purchased a controlling share of FGIC, a

15   subsidiary through which PMI sold financial guarantees on some of the market's most complex

16   investment vehicles, including residential mortgage-backed securities. ¶¶46-54. Lead Plaintiff

17   alleges that Defendants' decision to drastically shift PMI's business practices and abandon its

18   historical underwriting practices significantly increased PMI's risk exposure. ¶¶3-5, 45, 89, 96.

19   Ultimately, this caused PMI to incur massive losses from insuring risky loans. *See, e.g.*, ¶¶115, 125,

20   131, 147.

---

23  [6]    Mortgage insurance is typically purchased by borrowers making less than a 20% down
24  payment on a home. In the event of default, mortgage insurance covers the gap between the amount
    put down by the borrower and of the purchase price for the home. ¶30.

25  [7]    For instance, piggy-back loans replaced mortgage insurance with a second smaller, higher-
26  risk loan, which together avoided the mortgage insurance requirement. *See* ¶44.

27  [8]    "Persistency" refers to the degree to which existing insurance policies remain in force and
28  generate premiums. ¶31.

24.     Lead Plaintiff alleges that as the housing market collapsed, and Defendants learned that more and more of PMI's insured loans were procured by fraud and were underperforming, Defendants' ability to generate revenue diminished and the risk of loss increased. ¶¶55-59. Throughout the Class Period, Lead Plaintiff alleges, Defendants attempted to convince the market that PMI's business was sound by knowingly or recklessly making material false and misleading statements. *See, e.g.*, ¶¶67-68. For example, in virtually every conference call throughout the Class Period, Defendants sought to convince the market that they were effectively managing risk: "[W]e watch Alt-A . . . like a hawk. . . . [W]e are risk managers. It's what we do day [in] and day out." *See, e.g.*, ¶¶67-68. Moreover, Defendants assured the market that they had not changed their risk tolerances. ¶¶67-68.

25.     Lead Plaintiff also alleges that Defendants falsely assured investors that they were avoiding risk layering when in fact risk layering in PMI's portfolio was growing and presented a substantial credit risk. ¶¶89, 113.[9] Defendants manipulated loss reserves and loss adjustment expenses ("LAEs") by ignoring PMI's loan portfolio delinquencies and improperly accounting for losses and LAEs. In addition, Defendants ignored glaring red flags that significantly impacted PMI's insured loans, including increasing delinquency, default and foreclosure rates, collapsing housing prices, and the precipitous decline in the ABX index. ¶¶205-230.

26.     Lead Plaintiff further alleges that Defendants failed to timely write down their investment in FGIC, which should have been written off entirely by 3Q07 based on GAAP and SEC guidance. ¶¶167-204. FGIC's value was severely diminished during the Class Period because FGIC insured CDOs containing subprime assets, exposing FGIC to the riskiest of all financial assets.

27.     The alleged false statements appeared in press releases, investor conference call transcripts and SEC filings and caused PMI's stock to trade at inflated values throughout the Class

---

[9]     "Risk layering" refers to loans which had more than one factor indicative of increased risk, including, for instance, low FICO score, large principal amount and interest-only payment structure. *See* ¶89.

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI                    - 8 -

Period.[10] In contrast to Defendants' positive public statements, Lead Plaintiff alleges (in part based upon reports from former PMI employees), that Defendants were aware of the looming crisis facing the Company. For instance, a former Vice President of National Account Operations during the Class Period, monitored the lending portfolios of three of PMI's top ten customers – all large national lending institutions – and reported that these portfolios regularly performed below PMI's established standards during the Class Period. Additionally, by Spring 2007, the 2006 and 2007 vintage loans insured by PMI were significantly under-performing and one institution was failing to comply with PMI's standards. ¶¶70, 77.

28. The truth regarding PMI's business operations, finances, metrics and future prospects was revealed through a series of partial disclosures, often coupled with new (or an affirmation of prior) allegedly false statements. *See* ¶¶231-235. Beginning on July 31, 2007, Defendants announced 2Q07 earnings of $0.95 per share but revealed increased quarterly losses and increased full year guidance for losses, which Defendants attributed to "deteriorating market conditions." ¶¶115, 117. Nonetheless, Defendants remained bullish – "we're also seeing significant and positive long term trends that will bode well for our business." ¶117. On this news, the stock declined 8.6% in heavy trading. ¶119. On October 18, 2007, Defendants pre-announced a 3Q07 loss of $1.05 per share and withdrew previously-announced full year guidance, causing the stock price to fall 12.9% on heavy trading. ¶¶125-126. On October 30, 2007, the Company announced a 3Q07 loss of $1.04 per share, which it attributed to continued deterioration of the housing and mortgage market. ¶¶131-134. Katkov also admitted that the Company "made a decision quite early in the third quarter to *significantly change both our pricing and our guidelines and I won't go into it on these comments*." ¶132.

29. Finally on March 3, 2008, the Company announced a net loss of $236 million in 4Q07 and a delay in the filing of its year-end 2007 SEC Form 10-K due to a delay in FGIC reporting

---

[10] Lead Plaintiff alleges that Defendants made false and misleading statements of material fact on the following dates: 11/2/06, 2/5/07, 2/12/07, 2/14/07, 3/15/07, 4/30/07, 6/26/07, 7/31/07, 8/20/07, 9/10/07, and 10/30/07.

1  its financials. ¶¶147-149. On March 17, 2008, PMI announced a net loss of $915.3 million as of

2  December 31, 2007 – a decline of 318% from PMI's reported income of $419 million a year earlier.

3  ¶¶155-156. The Company also estimated that 2007 losses would approximate $1.1 billion.

4      30.    Lead Plaintiff alleges that Class Members purchased PMI stock at artificially inflated

5  prices caused by the Defendants' false and misleading statements and omissions and were damaged

6  as a result. ¶10.

7  **III.    PROCEDURAL HISTORY**

8      **A.    Plaintiffs' Consolidated Complaint**

9      31.    In March and April 2008, two securities class action complaints were filed in the

10  United States District Court for the Northern District of California, both naming PMI and certain of

11  its officers and directors as defendants.[11]   On April 17, 2008, these cases were related and

12  consolidated into *In re The PMI Group, Inc. Securities Litigation*, Master File No. 3:08-cv-01405-SI.

13  On May 12, 2008, the Operating Engineers moved for appointment as lead plaintiff, with the firm of

14  Robbins Geller[12] as lead counsel.  The Court held a hearing on this motion on June 20, 2008, and

15  granted Lead Plaintiff's motion on June 20, 2008.

16      32.    On September 4, 2008, Lead Plaintiff filed the Consolidated Complaint for Violation

17  of the Federal Securities Laws ("CC") against PMI, Smith, Shuster, Katkov and Lofe for violations

18  of §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated

19  thereunder by the SEC (17 C.F.R. §240.10b-5). Dkt. No. 27. All discovery in the matter was stayed

20  pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

21      33.    On October 14, 2008, Defendants filed a motion to dismiss the CC on grounds that

22  Lead Plaintiff had not sufficiently pled that Defendants' statements regarding PMI's investment in

23  FGIC, loss reserves, underwriting practices and risk exposure were false or misleading. Dkt. No. 28.

24  _____

25  [11]    *See Weinrib v. The PMI Group, Inc. et al.,* No. C-08-01405-SI (filed March 12, 2008); and

26  *Holt v. The PMI Group, Inc. et al.,* No. C-08-01806-SC (filed April 3, 2008).

27  [12]    Robbins Geller Rudman & Dowd LLP was previously known as Coughlin Stoia Geller
    Rudman & Robbins LLP.

28

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI           - 10 -

Defendants also argued that the CC failed to raise a strong inference of scienter and that, in any event, the statements were subject to PSLRA "safe-harbor" protection. Defendants also argued that the CC did not sufficiently plead loss causation. Lead Plaintiff opposed Defendants' motion on November 5, 2008, and Defendants filed a reply brief on November 21, 2008. Dkt. Nos. 33, 34. The Court heard oral argument on the motion on December 12, 2008.

34.    On July 1, 2009, the Court granted Defendants' motion to dismiss the CC. Dkt. No. 46. The Court held that Lead Plaintiff sufficiently pled the falsity and materiality of Defendants' statements regarding: (a) PMI's investment in FGIC, (b) loss reserves, (c) underwriting practices, and (d) exposure to risk. *Id.* at 11. The Court also held that Lead Plaintiff had sufficiently pled loss causation. *Id.* at 17. However, the Court held that the CC did not sufficiently plead a strong inference of scienter. *Id.* at 12-15. The Court reviewed the allegations in the CC attributable to former employee confidential witnesses and held that the CC failed to plead particularized facts that demonstrated that Defendants knew their statements to be false or misleading when made. *Id.* The Court also rejected the application of the core inference theory to find scienter. *Id.* at 14-15. The Court granted Lead Plaintiff leave to amend its complaint.

**B.    Lead Plaintiff's FAC and Defendants' Motion to Dismiss**

35.    On July 24, 2009, Lead Plaintiff filed the FAC. Dkt. No. 48. The FAC bolstered the allegations related to scienter to address the Court's previous finding. The FAC explained that Defendants managed PMI's credit risk "day in and day out," that they were "keenly aware" of risk layering and that they had "early warning systems" were sufficient to allege a strong inference of scienter. Lead Plaintiff further clarified the accounts of existing confidential witness reports and added three confidential witnesses identified through the course of continued investigation. Each of these witnesses provided information consistent with allegations in the CC and corroborated the accounts of the other confidential witnesses. Lead Plaintiff also added allegations based on relevant litigation arising after the filing of the CC between PMI and IndyMac Bancorp – a member of PMI's delegated underwriting program during the Class Period.

36.    Defendants filed a motion to dismiss the FAC on September 2, 2009. Dkt. No. 51. Defendants again argued that the FAC failed to plead scienter, that the core business inference did

not apply and that the FAC did not plead loss causation. Lead Plaintiff opposed Defendants' motion on October 7, 2009, and Defendants filed a reply brief on October 30, 2009. Dkt. Nos. 55, 58.

## C. The Court's November 2, 2009 Order Denying Defendants' Motion to Dismiss the FAC

37.     On November 2, 2009, the Court denied Defendants' motion to dismiss. Dkt. No. 60. The Court held that the FAC cured the pleading deficiencies of the CC with regard to scienter. *Id.* at 3-5.   The Court held that the FAC sufficiently alleged that, throughout the Class Period, PMI generated internal reports specifically to evaluate the Company's credit risk and potential losses from mortgage defaults, and that these reports showed that PMI's delegated underwriters were regularly performing below PMI's established standards and that PMI's portfolio was suffering mounting losses.   Based on additional and expanded investigations and confidential witness allegations, the Court found that Lead Plaintiff sufficiently pleaded that Defendants were made aware of these problems.   The Court also noted that the FAC contained additional allegations regarding Defendants' roles and duties as members of the FGIC audit committee and their knowledge of FGIC's risk exposure.   The Court held that Lead Plaintiff sufficiently alleged violations of §10(b) and, in light of the Defendants' high-ranking positions and responsibilities, §20(a).

38.     On February 11, 2010, Defendants filed an answer to the FAC in which they denied Lead Plaintiff's substantive allegations. Dkt. No. 69.

## D. Fact Discovery

### 1. Discovery Overview

39.     On November 2, 2009, the Court set a case management conference for December 16, 2009. Dkt. No. 60. On December 14, 2009, the Court approved the parties' joint stipulation seeking to move the case management conference to February 19, 2010, but allowed discovery to commence on December 16, 2009. Dkt. Nos. 63, 64. Pursuant to stipulation, the parties exchanged initial disclosures on December 21, 2009.

40.     Counsel for the parties participated in multiple and lengthy telephonic meet and confer sessions during November and December 2009, and February 2010, to discuss the subjects

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI          - 12 -

1 | identified in Federal Rule of Civil Procedure 26(f) and the Court's Standing Order, as well as other
2 | case management issues. On February 11, 2010, the parties submitted a joint case management
3 | statement setting forth the parties' respective positions. Dkt. No. 68.

4 |      41.    The Court held a case management conference on February 19, 2010. At the case
5 | management conference, the Court scheduled the following: a hearing on class certification for
6 | August 13, 2010; a discovery cutoff date of January 28, 2011; a hearing on dispositive motions for
7 | July 29, 2011; a pretrial conference for September 20, 2011; and a trial date of October 3, 2011.
8 | Dkt. Nos. 70, 71. The Court also directed the parties to attend mediation.

9 | **2.    Lead Plaintiff's Discovery Requests**

10 |      42.    On January 11, 2010, Lead Plaintiff initiated discovery by serving its First Set of
11 | Requests for Production of Documents to All Defendants. Lead Plaintiff's document requests
12 | contained 46 requests, and sought documents regarding all aspects of its claims, including: (i)
13 | documents concerning the Company's delegated underwriting program, including monitoring and
14 | evaluation of delegated underwriters; (ii) the Company's policies and procedures for each of its
15 | business segments; (iii) documents related to its databases of lender and loan information; (iv)
16 | documents related to the Company's declining persistency rate; (v) documents related to delinquent
17 | borrowers and borrowers in foreclosure; (vi) documents related to the quality of loans insured; (vii)
18 | documents related to FGIC; (viii) documents related to subprime lending; (ix) documents identified
19 | in Defendants' initial disclosures; and (x) organizational charts for PMI and FGIC for the Class
20 | Period. Defendants served their objections to Lead Plaintiff's requests on February 25, 2010.

21 |      43.    Defendants objected to all of Lead Plaintiff's requests and indicated that they would
22 | meet and confer regarding the scope and relevant time period of the requests. Lead Counsel and
23 | counsel for the Defendants met and conferred repeatedly during March, April and May 2010, and
24 | exchanged multiple letters regarding the definitions, scope and time period of Lead Plaintiff's first
25 | set of document requests. Counsel for Lead Plaintiff and counsel for Defendants expended
26 | significant time reaching an agreement regarding which employees' electronic files would be
27 | searched for responsive documents. Based upon organizational charts and job descriptions,
28 |

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

1 Defendants agreed to search in excess of 100 current and former employees' electronic files for
2 responsive documents.

3      44.    On May 27, 2010, Lead Plaintiff served a Second Set of Requests for Production of
4 Documents to All Defendants containing an additional 45 requests covering additional aspects of
5 Lead Plaintiff's claims, including: (i) documents related to PMI's quarterly and annual audits
6 performed by Ernst & Young LLP ("E&Y"); (ii) documents related to insider trading and trading
7 plans; (iii) documents related to investigations by governmental or regulatory bodies; (iv) documents
8 related to investor relations and communications with analysts; (v) documents related to the purchase
9 and control of FGIC; and (vi) documents related to the termination of any senior executives.
10 Defendants served their objections to Lead Plaintiff's requests on June 28, 2010. Defendants
11 objected to all of Lead Plaintiff's requests and indicated that they would meet and confer regarding
12 the scope and relevant time period of the requests.

13      45.    Pursuant to the parties' agreement reached through this extensive meet and confer
14 process, Defendants produced responsive documents on April 16, and May 12, 21, and 28, 2010.
15 Lead Plaintiff received over 44,000 pages of documents in electronic format. Lead Counsel spent
16 significant time reviewing and analyzing these documents for information relevant to Lead
17 Plaintiff's claims. Documents identified in this analysis were used by Lead Plaintiff at the June and
18 July 2010 mediation sessions.

19      **E.    Lead Plaintiff's Discovery Requests to Third Parties**

20      46.    On January 27, 2010, Lead Plaintiff also served a subpoena for documents on the
21 Company's outside auditors, E&Y. Lead Plaintiff's subpoena sought E&Y's workpapers and
22 documents related to: (i) all professional services rendered by E&Y to PMI, including audits,
23 consulting, tax work, reviews and evaluations; (ii) documents and communications with any
24 Individual Defendant; and (iii) documents related to any investigation or communication with a
25 regulatory body. On February 5, 2010, E&Y filed objections to the subpoena and refused to produce
26 the documents sought.

27      47.    Counsel for Lead Plaintiff worked diligently to obtain the documents sought from
28 E&Y. From March to June 2010, counsel for Lead Plaintiff participated in five telephonic meet and

confers with counsel from E&Y and exchanged six letters. Counsel for Lead Plaintiff and counsel for E&Y were able to reach a resolution, and E&Y began collecting and reviewing hundreds of thousands of pages of documents, including audit work papers and desk files for the fiscal years covered by the Class Period. Lead Plaintiff paid the vendor costs associated with copying and producing these documents. However, before E&Y produced responsive documents, the parties reached the settlement.

**F.     Defendants' Discovery Requests Propounded to Lead Plaintiff**

48.     On April 14, 2010 Defendants propounded their first set of document requests and first set of special interrogatories on the Operating Engineers. After consultation with the Operating Engineers, Lead Counsel served responses and objections to the interrogatories and document requests on May 14, 2010. In the subsequent weeks, Lead Counsel engaged in two meet and confer sessions with counsel for Defendants regarding Lead Plaintiff's responses and objections. On May 28 and June 9, 2010, the Operating Engineers produced approximately 100 pages of responsive documents, including trading records in PMI stock and the Operating Engineers' investment policies.

49.     On May 21, 2010, the Defendants noticed the deposition of the Operating Engineers. Counsel for Lead Plaintiff traveled to Seattle, Washington on June 9, 2010 to prepare Malcolm Auble, Chairman of the Board of Trustees of Operating Engineers, for his deposition. Counsel for Defendants took a six hour deposition of Mr. Auble on June 11, 2010, in Menlo Park, California.

**G.     Discovery Requests Propounded to Experts**

50.     During May 2010, counsel for Lead Plaintiff and counsel for Defendants engaged in discussion and exchanged proposals regarding modifications to the rules on expert discovery from those set forth in Federal Rule of Civil Procedure 26. The parties entered into a stipulation modifying the rules for expert discovery as set forth in the Federal Rules of Civil Procedure on May 20, 2010.

51.     On May 21, 2010, the Defendants issued a subpoena seeking documents and testimony from Bjorn I. Steinholt who submitted an expert declaration in connection with Lead Plaintiff's motion for class certification. Dkt. No. 79. Counsel for Lead Plaintiff worked with Mr.

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI          - 15 -

1   Steinholt to produce responsive documents on May 28, 2010. Counsel for Defendants took Mr.

2   Steinholt's deposition on June 14, 2010, in San Diego, California.

### H.   Protective Order

3

4       52.     The parties spent substantial time negotiating the terms of a proposed protective order

5   that would govern the treatment of confidential evidence produced in this case. From January to

6   April 2010, the parties exchanged drafts and comments on a proposed order. The parties reached an

7   agreement and filed a proposed Stipulated Protective Order on April 7, 2010. Dkt. No. 75. On April

8   9, 2010, the Court signed the Protective Order. Dkt. No. 76.

## IV.   INVESTIGATORS, CONSULTANTS, AND EXPERTS

9

### A.   Investigators

10

11      53.     In the era after the passage of the PSLRA, the use of investigators to gather detailed,

12  fact-specific information from percipient witnesses is sometimes necessary in order to draft the

13  highly particularized complaints mandated by the pleading standards of the PSLRA. Lead Plaintiff's

14  counsel retained experienced private investigators from L.R. Hodges & Associates, Ltd. to perform

15  investigative and consulting services relating to the Litigation. The tasks performed by the

16  investigators, at the direction of counsel included, *inter alia*, identifying, locating, and interviewing

17  former PMI employees, and other potentially knowledgeable witnesses. During 2008 and 2009, the

18  investigators contacted and/or interviewed dozens of potential witnesses as well as discussed their

19  findings and research with counsel. The FAC referenced six former employee witnesses who were

20  located and interviewed by the investigators and provided essential and corroborative information to

21  Lead Counsel in order to plead a securities case that met the stringent pleading standard of the

22  PSLRA. This investigation also significantly aided Lead Counsel in identifying potential deponents,

23  evaluating the strengths and weaknesses of Lead Plaintiff's case, and ultimately, settling the

24  Litigation with the Defendants. In sum, the efforts of the private investigators were integral in

25  achieving this settlement on behalf of the Class.

### B.   Consultants

26

27      54.     The nature and complexity of the Litigation required Lead Plaintiff's counsel to seek

28  out consultants with expertise in the mortgage insurance industry. Lead Plaintiff's counsel retained

the services of APF Advisory Services. During July to November 2008, consultants from APF Advisory Services provided critical information and assisted Lead Counsel with analysis of publically available information regarding home mortgage insurance, PMI and FGIC's risk exposure, structured finance, residential mortgage backed securities and other issues in this Litigation. The services of APF Advisory Services were essential in drafting a complaint with sufficient particularity to meet the PSLRA's heightened pleading standard.

### C. Market Efficiency Expert

55. Bjorn I. Steinholt is a Certified Financial Analyst (CFA) and Principal at Financial Markets Analysis, LLC ("FMA"), an economic consulting and valuation firm with offices in San Diego, California and Princeton, New Jersey. Mr. Steinholt has served for many years as a consultant and testifying expert in the areas of market efficiency, materiality, causation, and damages in many securities class actions. He was retained to provide expertise regarding issues related to market efficiency, materiality, loss causation, and damages in this matter.

56. On May 6, 2010, Mr. Steinholt submitted a declaration in connection with Lead Plaintiff's motion for class certification. Dkt. No. 79. Mr. Steinholt based his opinions on his professional experience as well as, *inter alia*, a review of: (i) the FAC; (ii) PMI's public filings with the SEC; (iii) the Company's press releases and conference call transcripts; (iv) securities analyst reports regarding PMI and its industry issued during the relevant time period; (v) contemporaneous media reports regarding PMI and its industry issued during the relevant time period; (vi) price and volume data for PMI common stock and options, as well as for the mortgage insurance industry and marked indices; (vii) PMI common stock ownership by reporting institutions during the Class Period; (viii) short interest in PMI common stock during the Class Period; and (ix) articles, court decisions, and other relevant public information.

57. Mr. Steinholt opined on the efficiency of the market for PMI stock by analyzing the five *Cammer* factors: (a) whether the security traded at a large weekly volume; (b) whether analysts followed and reported on the security; (c) whether the security had market makers and whether there was the potential for arbitrage activity; (d) whether the company was eligible to file SEC Form S-3; and (e) whether there are empirical facts showing a cause-and-effect relationship between

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

- 17 -

1  unexpected corporate events or financial information releases, and an immediate response in the

2  security's price. Dkt. No. 79, at ¶¶10-13.[13] Mr. Steinholt produced an event analysis for the Class

3  Period and analyzed whether the stock price moved significantly in response to new material

4  information. *Id.* at ¶¶21-22, Ex. D.

5       58.    As a result of his analysis, Mr. Steinholt specifically opined that the market in which

6  PMI common stock and options traded was impersonal, open, well developed, and efficient. Mr.

7  Steinholt's declaration, with exhibits, totaled more than 280 pages. Mr. Steinholt's services in these

8  proceedings were necessary and contributed materially to the benefits achieved by the Class.

9      **D.**    **Class Certification Proceedings**

10       59.    Pursuant to the schedule set forth in the Court's Pretrial Preparation Order of

11  February 23, 2010, Lead Plaintiff filed its motion for class certification, along with supporting

12  documents, on May 6, 2010, seeking an order certifying the Litigation as a class action pursuant to

13  Rule 23(a) and (b)(3), appointing Lead Plaintiff, the Operating Engineers, as the Class

14  Representative and Robbins Geller as Class Counsel. Dkt. No. 71, 77-80. On June 17, 2010,

15  Defendants filed a statement of non-opposition to Lead Plaintiff's motion. Dkt. No. 81. In light of

16  the parties' settlement, the Court did not rule on Lead Plaintiff's class certification motion.

17  **V.**    **THE STRENGTHS AND WEAKNESSES OF THE CASE**

18       60.    Based on publicly available documents, discovery obtained from Defendants, their

19  own investigation and their consultation with experts, Lead Counsel believe that they have adduced

20  and would continue to adduce substantial evidence to support Lead Plaintiff's claims. They also

21  realize, however, that they face considerable risks and defenses as the case proceeded. Some of the

22  most serious risks are discussed in the following paragraphs. Lead Plaintiff and its counsel carefully

23  considered these risks during the months leading up to the settlement and during its settlement

24  discussions with the Defendants.

25

26  _____

27  [13]    The *Cammer* factors refer to those factors laid out in *Cammer v. Bloom*, 711 F. Supp. 1264
(D.N.J. 1989).

28

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI    

1   61.   As an initial matter, prevailing on its claims would undoubtedly have required Lead

2   Plaintiff to survive a motion for summary judgment. Summary judgment posed a number of real and

3   substantial risks for the Class. Lead Plaintiff would have to demonstrate to the Court that a genuine

4   issue of material fact exists with regard to each element of its securities claims. Summary judgment

5   allows both lead plaintiffs and defendants to present their strongest evidence before the court. Here,

6   there was a substantial risk that the Court would find evidence proffered by Lead Plaintiff in support

7   of loss causation and/or scienter inadequate to create a genuine issue of material fact. Of course,

8   even if Lead Plaintiff received a favorable ruling on summary judgment, Defendants would likely

9   seek reconsideration of such a ruling, or, if the ruling was dispositive, would appeal.

10   62.   If Lead Plaintiff were to proceed to trial, there would be a substantial risk that the

11   evidence in support of its allegations related to PMI's accounting and loss reserves would not

12   convince a jury to render a verdict in the Class's favor. Lead Plaintiff believes that the evidence

13   supports its allegations and would present highly trained expert witnesses who would testify

14   accordingly. However, there is no guarantee that a jury comprised of lay people – who would likely

15   possess little accounting or financial expertise – would be persuaded by this testimony. In that

16   event, the Class would recover nothing.

17   63.   In addition, there was a substantial risk that Lead Plaintiff might not be able to prove

18   loss causation at trial. A private plaintiff who claims securities fraud must prove that the defendants'

19   fraud caused an economic loss. Loss causation can be proved with evidence of a stock price decline

20   when the facts revealing the Company's true financial condition are disclosed. To establish loss

21   causation, "'the plaintiff must demonstrate a causal connection between the deceptive acts that form

22   the basis for the claim of securities fraud and the injury suffered'" by plaintiffs. *In re Gilead Scis.*

23   *Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), *cert. denied*, __ U.S. __, 129. S. Ct. 1993 (2009)

24   (citation omitted).

25   64.   Lead Plaintiff believes that, at trial and through expert testimony, it would be able to

26   demonstrate loss causation as to each of Defendants' challenged statements throughout the Class

27   Period. However, Lead Plaintiff recognizes that the Defendants would likely present expert

28   testimony demonstrating the absence of a causal link between the various stock price declines and

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI          - 19 -

those disclosures. As a result, the Defendants would likely argue that Lead Plaintiff could not prove the loss causation and the damage elements of the case.

65. Moreover, there was a substantial risk that Lead Plaintiff would not be able to prove scienter at trial, *i.e.*, that the Defendants acted with knowledge or with deliberate recklessness in violation of federal securities laws. State of mind in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence such as an admission. Thus, it was quite possible that Lead Plaintiff would depose all Defendants and those with knowledge about the case and yet adduce insufficient evidence to satisfy its burden of proof on this issue at trial. Notwithstanding these difficulties of proof, Lead Plaintiff believes that among other things, Defendants' Class Period admissions, the internal reports described by the confidential witnesses and the Individual Defendants' sales of stock and compensation packages are strong indicators of scienter.

66. Furthermore, in order to meet its burden at trial, Lead Plaintiff would require the testimony of multiple experts on mortgage lending and mortgage insurance, complex financial instruments, loss causation, and damages. Even with experts who are among the most respected in these fields, there could be no guarantee that Lead Plaintiff would prevail on liability and damages, as the Defendants would likewise hire equally competent experts to counter Lead Plaintiff's experts' conclusions. Indeed, the trial of this case is likely to hinge as much on the testimony of experts as on fact witnesses, which always presents a substantial risk of a party prevailing not because of the merits but because of a jury's assessment of one party's expert or experts. These issues would require substantial and complex expert testimony, and there was a risk that a jury would credit the Defendants' experts rather than Lead Plaintiff's experts.

67. Even if Lead Plaintiff prevailed on liability on any or all of its claims and was awarded all of its damages, there was the significant risk that the Defendants would appeal the verdict and award. The appeals process would likely span several years, during which time the Class would receive no distribution on any damage award. Of course, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no distribution despite having prevailed on the claims at trial.

68.    In summary, there were multiple procedural hurdles as well as significant merits-based risks involved in proceeding with this matter, each of which was carefully considered by Lead Plaintiff, in consultation with Lead Counsel, in making the determination to settle with the Defendants on the agreed terms.

## VI.    SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

69.    The parties agreed to a mediation to be held on June 10, 2010, before the Honorable Layn R. Phillips (Ret.) in San Francisco, California. Lead Counsel spent substantial time preparing a comprehensive mediation statement that included reviewing relevant discovery. The June 10, 2010 mediation lasted approximately seven hours.    During the mediation, Judge Phillips spent considerable time conferring with counsel for Lead Plaintiff and counsel for Defendants, both separately and in joint sessions. The parties were adamant about their respective positions and were unable to reach a resolution of the Litigation. Lead Plaintiff firmly believed that, even in light of the risks outlined in the preceding section, the strength of its case rendered inadequate the amounts offered at the time by the Defendants to settle.

70.    Following the June 2010 mediation, the parties resumed their discovery efforts, while continuing to explore resolution of the case. The parties agreed to attend a second mediation in New York City on July 13, 2010.    The parties filed a stipulation to move out the date of the scheduled case management conference to permit further time to mediate. Dkt. No. 83. Though scheduled for a half-day, this mediation session lasted roughly eight hours, and the parties were able to reach a mutually acceptable resolution of this Litigation.    At the conclusion of the mediation, the parties executed a Memorandum of Understanding. The parties informed the Court of these developments by stipulation on July 19, 2010. Dkt. No. 84.

71.    Lead Plaintiff and the Defendants submitted the Stipulation of Settlement to the Court on August 31, 2010, as well as a motion for preliminary approval of settlement. Dkt. Nos. 89-91. The Court heard the preliminary approval motion on September 3, 2010, and on September 7, 2010, the Court issued an order preliminarily approving the settlement, providing for notice to the Class and setting a final approval hearing for December 16, 2010. Dkt. No. 93.

72.     The insurers for the Defendants will pay $31.25 million for the benefit of the Class, consisting of all persons who purchased or otherwise acquired the common stock of PMI during the period from November 2, 2006 to March 3, 2008.  Excluded from the Class are the Defendants, members of the immediate family of the Defendants, the directors, officers, subsidiaries and affiliates of PMI, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors-in-interest or assigns of any such excluded party.  Also excluded from the Class are those persons who timely and validly request exclusion from the Class.

73.     Michael J. Dowd and I led the settlement negotiations for Lead Plaintiff.  We have years of experience in the prosecution and resolution of complex class actions.  George A. Riley and Meredith N. Landy led the defense team.  Defense counsel's credentials in defending class actions are similarly unquestionable.

74.     Lead Counsel are actively engaged in complex civil litigation, particularly the litigation of securities class actions.  Lead Counsel's reputation as attorneys who will zealously prosecute a meritorious case through the trial and appellate levels put Lead Plaintiff in a strong position in settlement negotiations with the Defendants and their insurance carriers.

75.     The Stipulation resulted from vigorous arm's-length negotiations.  In the estimation of Lead Plaintiff and Lead Counsel, the compromise embodied in the Stipulation with the Defendants represents a successful resolution of a complex and risky class action.

76.     Upon approval of the Stipulation by the Court and entry of a judgment that becomes a final judgment, and upon satisfaction of the other conditions to the settlement, the Settlement Fund will pay for certain administrative expenses, including the cost of providing notice to the Class; the cost of publishing newspaper notice; payment of taxes assessed against the income earned by the Settlement Fund; costs associated with the processing of claims submitted; and payment of Lead Counsel's fees and expenses.  The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation (described below) to Class Members who submit valid, timely Proof of Claim forms.

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI                    - 22 -

## VII. THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

77. While Lead Plaintiff believes it could have prevailed on the merits of the case, the Defendants were just as adamant that Lead Plaintiff would fail. There was a very real risk, as discussed in detail above, that Lead Plaintiff would not prevail at the summary judgment stage or at trial. Had Lead Plaintiff successfully reached trial, Lead Plaintiff faced the risk that the jury would not be convinced by the evidence presented in support of Lead Plaintiff's allegations of falsity, that Lead Plaintiff would not convince a jury that the Defendants acted with the requisite scienter or that Lead Plaintiff could not prove loss causation. There was also the very real risk that, even if Lead Plaintiff prevailed at trial, the Defendants would appeal, which would take years to resolve and could result in reversal.

78. Having considered the foregoing, and evaluating the Defendants' likely defenses at trial, it is the informed judgment of Lead Plaintiff and Lead Counsel, based upon all proceedings to date and their extensive experience in litigating shareholder class actions, that the proposed settlement of this matter before this Court is fair, reasonable and adequate, and in the best interests of the Class.

## VIII. THE PLAN OF ALLOCATION

79. Pursuant to the Order Preliminarily Approving Settlement and Providing for Notice and as set forth in the Notice of Pendency and Proposed Settlement of Class Action, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a proper Proof of Claim and Release form.

80. If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Proof of Claim and Release forms. To the extent there are sufficient funds in the Net Settlement Fund, each Class Member who submits a valid, timely Proof of Claim and Release form ("Authorized Claimant") will receive an amount equal to the Authorized Claimant's claim. If, however, as is more likely, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claims of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage that each

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI - 23 -

1  Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants. Payment

2  in this manner shall be deemed conclusive against all Authorized Claimants.

3       81.    A Claim will be calculated as follows:

4          (a)    For shares of PMI common stock that were purchased or acquired from

5  November 2, 2006 through July 30, 2007, and

6               (i)    sold prior to July 31, 2007, the claim per share is $0;

7               (ii)    sold from July 31, 2007 through October 17, 2007, the claim is $2.44

8  per share;

9               (iii)    sold from October 18, 2007 through October 29, 2007, the claim is

10  $5.40 per share;

11               (iv)    sold from October 30, 2007 through March 3, 2008, the claim is $7.03

12  per share;

13               (v)    retained at the end of March 3, 2008, the claim is $7.24 per share.

14          (b)    For shares of PMI common stock that were purchased or acquired from July

15  31, 2007 through October 17, 2007, and

16               (i)    sold prior to October 18, 2007, the claim per share is $0;

17               (ii)    sold from October 18, 2007 through October 29, 2007, the claim is

18  $2.96 per share;

19               (iii)    sold from October 30, 2007 through March 3, 2008, the claim is $4.59

20  per share;

21               (iv)    retained at the end of March 3, 2008, the claim is $4.80 per share.

22          (c)    For shares of PMI common stock that were purchased or acquired from

23  October 18, 2007 through October 29, 2007, and

24               (i)    sold prior to October 30, 2007, the claim per share is $0;

25               (ii)    sold from October 30, 2007 through March 3, 2008, the claim is $1.63

26  per share;

27               (iii)    retained at the end of March 3, 2008, the claim is $1.84 per share.

28

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

1    (d)    For shares of PMI common stock that were purchased or acquired from

2 October 30, 2007 through March 3, 2008, and

3                (i)    sold prior to March 3, 2008, the claim per share is $0;

4                (ii)    retained at the end of March 3, 2008, the claim is $0.21 per share.

5    82.    The date of purchase or sale is the "contract" or "trade" date as distinguished from the

6 "settlement" date.

7    83.    For Class Members who held shares at the beginning of the Class Period or made

8 multiple purchases or sales during the Class Period, the first-in, first-out ("FIFO") method will be

9 applied to such holdings, purchases, and sales for purposes of calculating a claim. Under the FIFO

10 method, sales of shares during the Class Period will be matching, in chronological order, first against

11 shares held at the beginning of the Class Period. The remaining sales of shares during the Class

12 Period will then be matched, in chronological order, against shares purchased during the Class

13 Period.

14    84.    A Class Member will be eligible to receive a distribution from the Net Settlement

15 Fund only if a Class Member had a net loss, after all profits from transactions in PMI common stock

16 during the Class Period are subtracted from all losses. However, the proceeds from sales of stock

17 which have been matched against stock held at the beginning of the Class Period will not be used in

18 the calculation of such net loss. No distributions will be made to Class Members who would

19 otherwise receive less than $10.00.

20    85.    The Court will reserve jurisdiction to allow, disallow, or adjust the claim of any Class

21 Member on equitable grounds.

22    86.    This proposed Plan of Allocation is based on widely accepted economic principles,

23 was formulated in consultation with Lead Plaintiff's materiality and damages expert, and is intended

24 to be a fair way to divide the Net Settlement Fund for distribution among Class Members. The Plan

25 of Allocation is also based on Lead Plaintiff's damage theory of the case and eliminates, to the

26 extent possible, the effects on PMI's stock price of market forces unrelated to the alleged

27 misrepresentations and omissions. In addition, it simplifies claims administration with attendant

28 reduced cost to the Class. Finally, the proposed Plan of Allocation is designed to fairly and

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT,
PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI        - 25 -

rationally allocate the proceeds of the Net Settlement Fund among Class Members in accordance with the relative damages suffered by purchasers during different time periods.

## IX. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS REASONABLE

### A. The Requested Fee of 24.5% of the Settlement Fund is Fair and Reasonable, is Consistent with Percentages Routinely Awarded by Courts, is Amply Justified by the Specific Facts and Circumstances in This Case and is Supported by the Lead Plaintiff

#### 1. Nature and Extent of Litigation

87.     The prosecution of this action required Lead Counsel and their paraprofessionals to perform 3,535.50 hours of work resulting in a lodestar of $1,609,175.00 and incur $247,924.15 in expenses.

88.     This case was vigorously litigated and settled only after Lead Counsel had, *inter alia*: (i) successfully opposed Defendants' motions to dismiss the FAC; (ii) aggressively sought discovery from Defendants and third parties; (iii) reviewed and analyzed over 44,000 pages of documents produced by Defendants; (iv) consulted with experts in materiality, market efficiency, loss causation and damages as well as industry experts; (v) prepared for and attended two mediation sessions; and (vi) assessed the risks of prevailing on the asserted claims at trial. These efforts and others on the part of Lead Counsel are described in detail throughout this declaration.

89.     For our extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.

90.     Lead Counsel request a fee of 24.5% of the Settlement Fund. As set forth in the accompanying memorandum in support of Lead Plaintiff's application for an award of attorneys' fees and expenses, numerous courts have applied the percentage-of-recovery method in awarding fees in "common fund" cases. The percentage sought is merited in this case in light of the effort required and the results obtained.

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI                    - 26 -

### 2. The Support of the Lead Plaintiff

91.     Lead Plaintiff actively monitored the Litigation and consulted with Lead Counsel during the course of the Litigation and the settlement negotiations. Malcolm J. Auble, as Chairman of the Board of Trustees of the Operating Engineers, spent considerable time and effort fulfilling his duties and responsibilities in this case, including reviewing briefs, answering discovery requests, sitting for a deposition and consulting with counsel concerning the merits of this Litigation. Mr. Auble and the Operating Engineers support Lead Counsel's requested fee. *See* the accompanying Declaration of Malcolm J. Auble as Representative of Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust in Support of Plaintiff's Motion for (1) Final Approval of Settlement; (2) Approval of the Plan of Allocation of Settlement Proceeds; and (3) Award of Attorneys' Fees and Expenses and Plaintiff's Expenses.

### 3. The Settlement Achieved

92.     The $31.25 million cash settlement was achieved as a result of extensive and creative prosecutorial and investigative efforts, and contentious and complicated motions practice and settlement negotiations, as detailed herein. As a result of this settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### 4. The Risk of Contingent Class Action Litigation

93.     This declaration and the motion in support of the proposed settlement and the fee application describe the substantial risks of this Litigation. Those same difficulties also constituted risks that counsel might never be paid for their efforts.

94.     There are numerous cases where class counsel in contingent fee cases such as this, after expenditures of thousands of hours and significant expenses, have received no compensation whatsoever. Class counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the plaintiffs' bar. The fact that defendants and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial even in high-risk cases gives rise to meaningful settlements in actions such as this. The losses suffered by class counsel in other actions where insubstantial settlement offers are rejected, and class counsel

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI
- 27 -

1 ultimately receives little or no fee, should not be ignored. Lead Counsel know from personal

2 experience that despite the most vigorous and competent efforts, success in contingent litigation,

3 such as this, is never assured.

4        95.     Because the fee to be awarded in this matter is entirely contingent, the only certainty

5 from the outset was that there would be no fee without a successful result, and that such a result

6 would be realized only after a lengthy and difficult effort.

7        96.     As discussed in greater detail above, this case was fraught with significant risk factors

8 concerning liability. Lead Plaintiff's success was by no means assured. Defendants disputed

9 whether Lead Plaintiff could even establish liability and would no doubt contend, as the case

10 proceeded to expert discovery, that even if liability existed, the amount of damages was substantially

11 lower than Lead Plaintiff alleged. Were this settlement not achieved, and even if Lead Plaintiff

12 prevailed at trial, Lead Plaintiff faced potentially years of costly and risky appellate litigation against

13 Defendants, with ultimate success far from certain. It is also possible that a jury could have found

14 no liability or no damages. Lead Counsel are entitled to 24.5% of the Settlement Fund because of

15 the risk factors involved in this case.

16           **5.**     **The Diligent Prosecution of This Case**

17        97.     A 24.5% fee is also warranted in light of the extensive efforts on the part of Lead

18 Counsel, as outlined above, that were required to produce this settlement. Lead Counsel and their in-

19 house professionals spent substantial time on the case, *inter alia*, conducting discovery, reviewing

20 and analyzing documents, consulting with experts, analyzing complex accounting issues, drafting

21 three complaints and comprehensive memoranda of law concerning the motions to dismiss and

22 motion for class certification, making court appearances, and engaging in extensive settlement

23 discussions.

24           **6.**     **The Complexity of This Action's Factual and Legal Questions**

25        98.     Courts have recognized that the novelty and difficulty of the issues in a case are

26 significant factors to be considered in making a fee award. As demonstrated by the discussion above

27 of the contested issues in the Litigation, this case involved difficult issues of fact and law regarding

28

the falsity of Defendants' statements, Defendants' states of mind, GAAP compliance and loss causation.

### 7. The Contingent Nature of the Case and the Financial Burden Carried by Lead Counsel

99. A determination of a fair fee must include consideration of the contingent nature of the fee, the financial burden carried by Lead Counsel and the difficulties that were overcome in obtaining the settlement.

100. Lead Counsel fully assumed the risk of an unsuccessful result. Thus, counsel should be fairly compensated for their efforts. Lead Counsel have received no compensation for their services during the course of the Litigation and have incurred very significant expenses in litigating for the benefit of the Class. Any fee or expense award to Lead Counsel has always been completely contingent on the result achieved.

101. Lead Counsel's efforts were performed on a wholly-contingent basis, in the face of significant risk and determined opposition. Under these circumstances, it necessarily follows that we are entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained. Under all of the circumstances present here, a 24.5% fee plus $247,924.15 in expenses is fair and reasonable.

## X. CONCLUSION

102. For all of the foregoing reasons, Lead Counsel respectfully request the Court to approve the settlement, the Plan of Allocation of settlement proceeds, and the fee and expense application and award Lead Counsel 24.5% of the Settlement Fund plus $247,924.15 in expenses, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid and award Lead Plaintiff $1,416.00 in expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of October, 2010, at San Diego, California.

_____
DANIEL S. DROSMAN

579437_1

DECL OF DROSMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF FEES AND EXPENSES - 3:08-cv-01405-SI

- 29 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at: http://securities.stanford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 8, 2010.

s/ Keith F. Park
KEITH F. PARK

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:KeithP@rgrdlaw.com

579437_1

# Mailing Information for a Case 3:08-cv-01405-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel S. Drosman**
  DanD@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Lawrence Timothy Fisher**
  ltfisher@bramsonplutzik.com,dschroeder@bramsonplutzik.com

- **Catherine J. Kowalewski**
  katek@rgrdlaw.com

- **Meredith N. Landy**
  mlandy@omm.com,vtran@omm.com,sfolchi@omm.com,mpaul@omm.com,jcoakley@omm.com

- **Jeffrey W. Lawrence**
  jeffreyl@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Keith F. Park**
  keithp@rgrdlaw.com,karnold@rgrdlaw.com,jstark@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,khuang@rgrdlaw.com,gfreemon@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union**
  sward@barrack.com

- **George A. Riley**
  griley@omm.com,lperez@omm.com,cchiu@omm.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Samuel M. Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Alan R. Plutzik
Barroway Topaz Kessler Meltzer & Check LLP
2125 Oak Grove Road
Suite 120
Walnut Creek, CA 94598

Dhaivat H. Shah
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025
```